**MDL 1416**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**MAY 1 1 2001**

FILED
CLERK'S OFFICE



## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| In re | ) | |
| | ) | |
| CLEAN AIR ACT LITIGATION | ) | MDL Docket No. _____ |
| AGAINST SOUTHERN COMPANY | ) | |
| COAL-FIRED ELECTRIC UTILITIES | ) | |
| | ) | |

### UNITED STATES' MOTION FOR AN ORDER TRANSFERRING RELATED ACTIONS FOR CONSOLIDATED PRETRIAL PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407

The United States of America respectfully moves the Panel for an order, pursuant to 28

U.S.C. § 1407, transferring the cases referenced below, as well as any additional "tag-along"

actions that the United States may bring, to a single United States judicial district for coordinated

or consolidated pretrial treatment.

In support of this motion, the United States states as follows:

1. The United States has filed multiple actions against electric utility companies that are

engaged in the generation and sale of electricity through the operation of coal-fired electric

generating units (boilers). In each of these actions, the plaintiff, the United States, is acting at

the request of and on behalf of the United States Environmental Protection Agency ("EPA").

2. Among those actions are two pending actions against different operating subsidiaries



OFFICIAL FILE COPY

IMAGED MAY 15 '01

of the Southern Company, now pending in two different United States district courts -- the Northern District of Georgia and the Northern District of Alabama -- as set forth in the "Schedule of Pending Actions" attached to the accompanying brief in support of this motion. These pending actions are hereinafter referred to as "the Southern Cases."

3. The United States initially filed a complaint, or sought leave to file an amended complaint, against each of the defendants in the Southern Cases, and additional subsidiaries of the Southern Company -- all of which operate as part of an integrated, interconnected system to generate and distribute electric power in the southeastern states of Georgia, Alabama, Mississippi and Florida -- in one action in one court (in the Northern District of Georgia).

4. The United States' initial complaint filed in the Northern District of Georgia on November 3, 1999 was against Southern Company subsidiaries Alabama Power Company ("Alabama Power"), Georgia Power Company ('Georgia Power"), and Southern Company Services Inc. ("SCS").

5. The United States moved on March 31, 2000 for leave to amend its complaint in the Northern District of Georgia, seeking to add further counts against the original defendants, and to add similar claims against three additional Southern Company subsidiaries -- Gulf Power Company ("Gulf Power"), Mississippi Power Company ("Mississippi Power"), and Savannah Electric and Power Company ("Savannah Power").

6. On August 1, 2000, the Northern District of Georgia court granted the motion to dismiss filed by Alabama Power (for lack of personal jurisdiction) and by SCS (for failure to

state a claim).

7. On March 27, 2001, the court partially granted the United States' motion for leave to amend the complaint (instructing the United States to file a new amended complaint in which it could amend its claims against Georgia Power and bring claims against Savannah Power), denied the motion as to Gulf Power and Mississippi Power (for lack of personal jurisdiction), and granted, with restrictions, motions for leave to intervene as plaintiffs filed on behalf of four citizens' groups (Physicians for Social Responsibility, Campaign for a Prosperous Georgia, U.S. Public Interest Research Group, and Alabama Environmental Council).

8. The United States plans to file its amended complaint, amending its claims against Georgia Power and bringing claims against Savannah Power, on or before May 11, 2001, in the Northern District of Georgia.

9. In light of the Northern District of Georgia's dismissal of Alabama Power from the action in that court for lack of personal jurisdiction, the United States re-filed its claims against Alabama Power in a new action, now pending in Northern District of Alabama.

10. Neither of the Southern Cases has yet progressed into active discovery, nor is a Scheduling Order yet in place for either of the cases.

11. In each of the Southern Cases, there is a pending motion (filed by Georgia Power in the Northern District of Georgia and by Alabama Power in the Northern District of Alabama) to stay discovery to await a ruling by the United States Court of Appeals for the Eleventh Circuit on consolidated petitions for review in *Alabama Power Company, et al. v. United States*

*Environmental Protection Agency, et al.* (lead docket No. 00-12310-E), a case involving the appeal of administrative actions taken by EPA with respect to the Tennessee Valley Authority's coal-fired electric generating units.

12. In light of the Northern District of Georgia's denial of the United States' motion for leave to amend to sue Mississippi Power and Gulf Power in the Northern District of Georgia, the United States is presently considering filing its claims against Southern Company subsidiaries Mississippi Power and Gulf Power in new actions in different judicial districts in which these companies operate.

13. The United States is considering filing additional Clean Air Act actions ("tag-along" actions) against additional electric utilities involving modifications to coal-fired units on the same bases asserted in the pending Southern Cases including, but not necessarily limited to, the contemplated actions against Southern Company subsidiaries Mississippi Power and Gulf Power.

14. As is detailed in our accompanying brief, the Southern Cases and the contemplated "tag-along" actions involve common issues of fact and law concerning whether each defendant has made similar "modifications" to coal-fired electric generating units at facilities it owns and/or operates without complying with the permit and pollution control requirements of the Clean Air Act, 42 U.S.C. §§ 7401 to 7671q ("the Clean Air Act"), and, if so, whether each of these Southern Company subsidiaries or other potential defendants can establish that it lacked "fair notice" of the legal requirements sought to be applied in these cases.

15. As is further detailed in our accompanying brief, consolidation of pretrial

-4-

proceedings in the Southern Cases would promote the just, efficient and speedy conduct of these cases by avoiding duplicative discovery associated with the common defenses asserted by defendants; avoiding inconsistent rulings on the appropriateness of the stay of discovery sought in the two Southern Cases; and avoiding inconsistent rulings on the appropriate scope of discovery, on the validity of defenses or other common issues that will affect the scope of discovery, and on the validity and scope of privileges likely to be asserted by defendants.

16. Inasmuch as the same or overlapping discovery issues are likely to arise in any "tag-along" actions the United States files, the United States expects to propose that such additional cases also be transferred and consolidated with the Southern Cases, to the extent that timing permits, in accordance with Panel Rules 1.1, 7.4, and 7.5.

WHEREFORE, the United States respectfully requests that this Panel transfer the Southern Cases, along with any "tag-along" actions, to a single United States District Judge for the conduct of all pretrial proceedings.

Respectfully submitted,

JOHN C. CRUDEN
Acting Assistant Attorney General
Environment and Natural Resources Division

CATHERINE R. McCABE*
JON A. MUELLER
ROBERT A. KAPLAN
DAVID ROSSKAM
United States Department of Justice
Environmental Enforcement Section
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C.  20044-7611
(202) 514-1447

Attorneys for the United States of America

* - Attorney in Active Charge of the Cases

-6-

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAY 1 1 2001

FILED
CLERK'S OFFICE

BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| In re ) | |
| ) | |
| CLEAN AIR ACT LITIGATION ) | MDL Docket No. _____ |
| AGAINST SOUTHERN COMPANY ) | |
| COAL-FIRED ELECTRIC UTILITIES ) | |
| ) | |

BRIEF IN SUPPORT OF UNITED STATES' MOTION
FOR AN ORDER TRANSFERRING RELATED ACTIONS
FOR CONSOLIDATED PRETRIAL PROCEEDINGS
PURSUANT TO 28 U.S.C. § 1407

The United States of America respectfully submits this brief in support of the

accompanying motion to the Panel for an order, pursuant to 28 U.S.C. § 1407, transferring the

cases set forth in the attached "Schedule of Pending Actions," as well as any additional "tag-

along" actions that the United States may bring, to a single United States judicial district for

coordinated or consolidated pretrial treatment.

Background of the Litigation

The United States has filed multiple actions against electric utility companies that are

engaged in the generation and sale of electricity through the operation of coal-fired electric

generating units (boilers). In each of these actions, the plaintiff, the United States, acting at the

request of and on behalf of the United States Environmental Protection Agency ("EPA"), has

alleged that defendants have made similar "modifications" to coal-fired electric generating units

at their facilities without complying with the permit and pollution control requirements of the

Clean Air Act, 42 U.S.C. §§ 7401 to 7671q ("the Clean Air Act"), which requirements the United

States alleges were triggered by the making of said modifications.

Among those actions are ones the United States has sought to bring against various

subsidiaries of the Southern Company. These Southern Company subsidiaries -- Alabama

Power Company ("Alabama Power"), Georgia Power Company ("Georgia Power"), Savannah

Electric and Power Company ("Savannah Power"), Mississippi Power Company ("Mississippi

Power") and Gulf Power Company ("Gulf Power") (collectively, the "Southern Company

Operating Affiliates") – all operate coal-fired units at their respective facilities as part of an

integrated, interconnected system to generate and distribute electric power in the southeastern

states of Georgia, Alabama, Mississippi and Florida.

The electric generating resources of the Southern Company Operating Affiliates are

combined into an interconnected electric system known as the Southern System or Southern

Power Pool. This integrated Southern System is coordinated through the Southern Company's

engineering arm, another Southern Company subsidiary known as Southern Company Services,

Inc. ("SCS"). SCS provides engineering expertise to the Southern Company Operating

Affiliates to operate the plants safely and to develop long-term plans to meet consumer demand.

Contractual agreements bind the Southern Company subsidiaries together, define the manner in

which the individual plants are to be operated, and provide a mechanism for the coordination of

any major changes in the integrated power supply system. SCS coordinates operation of the

-2-

entire interconnected system through its central power supply coordination office.  It allocates to each of the Southern Company Operating Affiliates available sources of energy to provide the most economical sources of power consistent with good operations.  The United States has alleged that the "modifications" at issue at the various Southern Company Operating Affiliates' plants were made as part of an overall "life extension" program coordinated by SCS with the Southern Company Operating Affiliates.  In addition, SCS has entered into an Intercompany Interchange Contract under which SCS, as agent for the Southern Company Operating Affiliates, coordinates plant operations for the pooling of surplus energy available for interchange to or from non-affiliated companies.  SCS, acting on behalf of the Southern Company Operating Affiliates, also negotiates and manages contracts between the Southern Company Operating Affiliates and third parties.  The Southern Company Operating Affiliates engage in joint marketing and power sales.

The United States sought to bring its claims against all these Southern Company subsidiaries in one action in one court -- the Northern District of Georgia .  *See* United States Motion for Leave to File Amended Complaint, with attached proposed amended complaint (*Exhibit A hereto*).  However, as a result of two rulings by that court (*Exhibits B and C hereto*), only the United States' claims against Georgia Power and against Savannah Power are being pursued in that court.[1/]  The United States' claims against Alabama Power that were initially brought in the Northern District of Georgia, but dismissed for lack of personal jurisdiction

---

[1/]    The United States plans to file by May 11, 2001 its amended complaint in the Northern District of Georgia, which would add Savannah Power as a defendant in accordance with the court's March 27, 2001 order (*Exhibit C*).  The United States will provide a courtesy copy of that amended complaint to this Panel promptly after it is filed.

(*Exhibit B*), were re-filed in the Northern District of Alabama on January 12, 2001. With respect to the claims the United States sought to bring against Mississippi Power and against Gulf Power through the filing of a proposed amended complaint in the Northern District of Georgia (Exhibit A), but was denied leave to do so for lack of personal jurisdiction (*Exhibit C*), the United States is presently considering filing in new actions in different judicial districts in which these companies conduct business. The United States' claims against SCS brought in the Northern District of Georgia were dismissed for failure to state a claim upon which relief could be granted (on the ground that SCS could not be deemed an "operator" of the subject facilities within the meaning of the Clean Air Act (*Exhibit B*).

Thus, at present, the United States is pursuing its Clean Air Act claims against Southern Company Operating Affiliates in two different United States District Courts, as set forth in the attached "Schedule of Pending Actions." These cases, hereinafter referred to as "the Southern Cases," are currently pending in the Northern District of Georgia and in the Northern District of Alabama. Four citizens groups -- Physicians for Social Responsibility, Campaign for a Prosperous Georgia, U.S. Public Interest Research Group, and Alabama Environmental Council -- have been granted leave to intervene as plaintiffs, with restrictions, in the Northern District of Georgia action (*Exhibit C*). In addition, the United States is considering filing additional, "tag-along" actions against additional electric utilities involving modifications to coal-fired units on the same bases asserted in the pending Southern Cases including, but not necessarily limited to, the aforementioned contemplated actions against Southern Company subsidiaries Mississippi Power and Gulf Power.

The Southern Cases have not yet progressed into active discovery, and a Scheduling

-4-

Order is not yet in place for either of the cases.[2]   In both of the Southern Cases, defendants have

filed a motion to stay discovery pending a ruling by the Eleventh Circuit in *Alabama Power

Company, et al. v. United States Environmental Protection Agency, et al.*, a case involving

petitions for review of administrative actions taken by the United States Environmental

Protection Agency ("EPA") with respect to coal-fired electric generating units operated by the

Tennessee Valley Authority ("the *TVA* case").[3]   In *United States v. Georgia Power, et al.* (N.D.

Ga.),  the stay motion filed by defendant Georgia Power is fully briefed and awaiting decision by

Judge Carnes.   In *United States v. Alabama Power* (N.D. Ala.), Judge Blackburn has established

a briefing schedule on the stay motion filed by defendant Alabama Power under which briefing

will be completed by May 31, 2001, and oral argument will be held on June 7, 2001.   In each of

the Southern Cases, the United States has filed a response opposing the requested stay pending a

ruling by the Eleventh Circuit, but suggesting instead that a moderate stay would be appropriate

pending a decision of this Panel on the instant motion.

---

[2]      In the Northern District of Georgia action, the United States and Georgia Power
exchanged but have not responded to discovery requests.  Discovery was previously stayed in
that case pending the court's ruling on the outstanding motions to dismiss, for intervention, and
for leave to file an amended complaint against additional parties, which motions have now all
been resolved  (*Exhibits B and C*).  Both the United States and Georgia Power have proposed
scheduling orders, but one has not yet been adopted by the court.

[3]      The *TVA* case has been fully briefed to the Eleventh Circuit although oral argument has
not yet been scheduled.  Both of the Southern Cases are pending in judicial districts within the
Eleventh Circuit.  Any "tag-along" actions the United States may file against Mississippi Power
and Gulf Power would also be in judicial districts within the Eleventh Circuit .

<u>Factual and Legal Contentions At Issue in the Litigation</u>

The complaints filed in the Southern Cases (as well as the complaint unsuccessfully sought to be filed against Mississippi Power and Gulf Power in the Northern District of Georgia) allege or sought to allege that each defendant has made similar "modifications" to coal-fired electric generating units at facilities it owns and/or operates. These alleged modifications, the complaints allege or sought to allege, have subjected those defendants and those units to the permit and pollution control requirements of the Clean Air Act, 42 U.S.C. §§ 7401 to 7671q ("the Clean Air Act"), including requirements arising out of the Prevention of Significant Deterioration, 42 U.S.C. §§ 7470-7492 ("PSD"), and/or New Source Performance Standards, 42 U.S.C. § 7411(b) ("NSPS"), provisions of the Clean Air Act. The complaints further allege or sought to allege that each defendant has failed to apply for the permits or to install the pollution control technology required by these provisions, in violation of the Clean Air Act, and that each defendant violated a requirement of the relevant State Implementation Plan ("SIP") to obtain a permit for construction, modification, or operation -- a requirement mandated by the SIP provisions of the Clean Air Act, 42 U.S.C. § 7410. The complaints all allege or sought to alleged that the foregoing violations warrant the imposition of civil penalties, and of injunctive relief requiring compliance with the Clean Air Act with respect to each of the subject coal-fired units.

The complaints also allege or sought to allege that, as a consequence of these violations, the defendants' power plants have emitted hundreds of thousands of tons of air pollutants that have significantly contributed to air pollution, and continue to do so, in downwind regions and states, thus causing widespread adverse health and environmental effects. As noted above, the United States is considering filing additional actions against other electric utilities involving

modifications to coal-fired units on the same bases asserted in the pending Southern Cases including, but not necessarily limited to, the aforementioned contemplated actions against Southern Company subsidiaries Mississippi Power and Gulf Power that the United States unsuccessfully sought to bring in the Northern District of Georgia..

The Answers filed by the defendants in the Southern Cases assert the same or similar defenses, including (1) that the defendants' modifications of their electric generating units fall within a regulatory exception to the definition of "modification" for "routine maintenance," thus exempting the defendants from the Clean Air Act requirements set forth in the complaints; (2) that EPA has changed its interpretation of the governing regulations and has failed to give "fair notice" to the electric utility industry (including defendants) of the interpretation of the regulations reflected in the complaints; and (3) that the actions are barred by statue of limitations, laches, estoppel, waiver, acquiescence.

<u>Common Factual Issues and Other Reasons for Consolidation</u>

The similarity of the United States' allegations in the complaints filed in the Southern Cases, and the defendants' assertion of these common defenses, has raised several central common issues of fact, including:

- Whether the alleged plant modifications were part of a coordinated Southern Company "life extension" project, and whether the Southern Company Operating Affiliates decided jointly that they were not going to apply for PSD permits for life extension projects;

- Whether it is "routine maintenance" under common industry practice to perform the types of unit modifications described in the complaints;

- Whether, as the United States has alleged, the unit modifications at issue have resulted in increased emissions of NOx, among others, in excess of 40 tons per year;

- Whether and to what extent the allegedly unlawful emissions from defendants' power plants have caused or contributed to harm to public health and the environment, including adverse regional health effects in the southeastern United States;

- Whether the United States has issued interpretations of the relevant regulations that are at variance with the interpretation relied on in the complaints;

- Whether and for how long the defendants have been aware of the United States' interpretation of the relevant regulations that is relied on in the complaints; and

- Whether, in making the alleged modifications to their coal-fired units without complying with the allegedly applicable permit and pollution control requirements of the Clean Air Act, defendants in fact relied upon EPA's conduct and representations.

As noted above, in both of the Southern Cases, defendants have filed a motion to stay discovery pending a ruling by the Eleventh Circuit in the *TVA* case. Neither motion has yet been ruled upon. In both of the Southern Cases, the United States is suggesting that a moderate stay would be appropriate pending a decision of this Panel on the instant motion for consolidation and transfer.

Transfer of the Southern Cases, and any "tag-along" actions the United States may file involving other coal-fired electric generating units, to a single judicial district for pretrial proceedings will promote the just, efficient and speedy conduct of these cases by:

- avoiding duplicative discovery associated with the common defenses asserted by defendants;

- avoiding inconsistent rulings on the appropriateness of a stay pending a ruling by the Eleventh Circuit in the *TVA* case;

- avoiding inconsistent rulings on the appropriate scope of discovery, on the validity of defenses or other common issues that will affect the scope of discovery, and on the validity and scope of privileges likely to be asserted by defendants (*e.g.*, confidential business information) and the United States (*e.g.*, deliberative process privilege).

Pretrial proceedings in several similar cases filed in the Southern District of Illinois, the Southern District of Indiana, and the Southern District of Ohio, against other electric utility companies operating coal-fired units ("the Northern Cases") have demonstrated that the absence of coordination will bring about the undesirable duplication and inconsistency that the United States here seeks to avoid.[5]   In the Northern Cases, there has been complete overlap in the

_____

[5]     The Northern Cases, which are not the subject of the instant motion, are: *United States v. Illinois Power Co., et al.*, (S.D. Ill., Civil Action No. 99-833-MJR); *United States v. Southern Indiana Gas & Electric Co.* (S.D. Ind., Civil Action No. IP99-1692 C-M/S) ; *United States and State of New York, et al. v. American Electric Power Service Corp., et al.* (S.D. Ohio, Civil Action No. C2-99-1182), consolidated with *Ohio Citizen Action, et al. v. American Electric Power Service Corp., et al.* (S.D. Ohio, Civil Action No. C2-99-1250); *United States v. Cinergy Corp., et al.* (S.D. Ind., Civil Action No. IP99-1693 C-M/S); *United States and State of New York, et al. v. Ohio Edison Co., et al.* (S.D. Ohio, Civil Action No. C2-99-1181).  A relatively

discovery that defendants in all the cases are seeking from the United States. All defendants in

the Northern Cases have served similar, if not identical, document requests on the United States,

and the United States has made the same production (approximately 276,000 pages to date in

hard copy or electronic (CD) form) available to all parties. The United States repeatedly sought,

without success, to obtain common agreement from the defendants in the Northern Cases on the

appropriate scope and other aspects of this production. Defendants in the Northern Cases have

filed and continue to file duplicative motions to compel over the same document production,

despite the four court orders issued to date. As defendants in some of the Northern Cases are

now beginning to take depositions of United States employees, duplicative requests for

depositions of the same witnesses on the same subjects have been served. Such duplication is

causing a waste of the courts' and the parties' time and resources, inconsistency and potential

conflicts among the courts' resolution of disputes among the parties, and serious inconvenience

to witnesses who are subjected to duplicative depositions. The duplicative efforts and

conflicting resolutions in the different Northern Cases, in turn, will slow down the United States'

ability to complete the required discovery and will delay the timely completion of discovery in

all the cases. These difficulties are detailed in the motions the United States recently filed in

those cases seeking orders for coordination of common discovery against the United States

(*Exhibit D* hereto is an example from one case).

   These are precisely the effects the United States seeks to avoid with respect to the

---

recent action, *United States v. Duke Energy Corp.* (M.D.N.C., Civil Action No. 1:00 CV 1262)
involves similar issues but is neither one of the Northern Cases nor one of the Southern Cases,
as defined in the instant motion.

Southern Cases, which have not yet moved into active discovery. By consolidating the Southern Cases and any "tag-along" actions for pretrial proceedings, the Panel can prevent in these actions the duplication, inconsistency, and inconvenience occurring in the Northern Cases.

Because the Northern Cases are at a significantly different stage than the Southern Cases and any as yet unfiled "tag-along" actions, it would not be appropriate to include the Northern Cases in the instant motion to this Panel. Instead, as noted, the United States is seeking from the relevant district courts in the Northern Cases orders for consolidation and coordination of common discovery against the United States in order to prevent further duplication, inconsistency, burden on the courts and parties, and delay in resolution (*Exhibit D*). In the instant motion to this Panel, the United States is seeking to consolidate and transfer to a single United States District Judge only those cases against coal-fired utilities in the Southern Cases that are at an early enough stage, and that involve such commonality of issues of fact, as to make consolidation and transfer appropriate under 28 U.S.C. § 1407.

Inasmuch as the same or overlapping discovery issues are likely to arise in any "tag-along" actions the United States files, the United States expects to propose that such additional cases also be transferred and consolidated with the Southern Cases, to the extent that timing permits, in accordance with J.P.M.L. Rules 1.1, 7.4, and 7.5.

We recognize that there are, at present, but two pending actions. However, the United States has seen in the similar Northern Cases that (although there are more than two such actions) substantial duplication, burden, and inconsistency can occur from the discovery requests and disputes of the parties and rulings of the courts in as few as two actions of this type. Moreover, as we have indicated above, the United States is considering filing at least two similar, additional

-11-

actions, for which the grant of the instant motion will ensure a ready forum. *See In re: Air Crash Disaster of Stapleton Int'l Airport*, 447 F. Supp. 1071, 1072 (J.P.M.L. 1978) (transfer granted over objection that only two actions were actually pending and voluntary cooperation among parties was available alternative, where transfer would ensure duplication of discovery and inconsistent pretrial rulings would be avoided and provide ready forum for additional actions the United States suggested might be filed).

We further recognize that the Southern Cases, and any potential "tag-alongs," will entail factual differences as well as common facts, and important mixed questions of fact and law. However, Panel precedent nonetheless supports the requested transfer and consolidation under these circumstances. In *In re Federal Election Campaign Act Litigation*, 511 F. Supp. 821 (J.P.M.L. 1979), the Panel consolidated cases in which Plaintiff, the Federal Election Commission, had charged multiple defendants with the same substantive violation of federal election law, based on the same theory interpreting the relevant statutory provision. In *In re Westinghouse Elec. Corp. Uranium Contracts Litigation*, 405 F. Supp. 316, 318-19 (J.P.M.L. 1975), a number of electric utilities' contractual claims against a uranium supplier were consolidated where the defendant was asserting the same contractual defense in each suit, despite some individual differences in the relationship of each plaintiff utility to the defendant. In *In re Capital Underwriters, Inc. Secs. Litigation*, 464 F. Supp. 955, 959 (J.P.M.L. 1979), the Panel determined that transfer was appropriate to avoid duplicative discovery of many identical parties, witnesses and documents, despite the existence of individual differences in the cases as to facts surrounding the different plaintiffs' purchases of the securities at issue, where all cases shared similar issues concerning the alleged defrauders' method of operations. *Accord, Mutual Fund*

-12-

*Sales Antitrust Litigation*, 361 F. Supp. 638, 640 (J.P.M.L. 1973) (common preliminary question whether alleged acts are exempt from antitrust laws). *See also, In re Panty Hose Seaming Patent Litigation*, 402 F. Supp. 1401, 1402 (J.P.M.L. 1975) (consolidation and transfer of suits by single patent holder against multiple alleged infringers, all of whom claimed invalidity of the patent); *In re Smith Patent Litigation*, 407 F. Supp. 1403, 1404 (J.P.M.L. 1976) (transfer appropriate in patent infringement cases, even assuming some uniqueness to discovery in support of each defendant's laches defense, because all shared common question of fact with respect to patent validity); *accord, In re Phonometrics, Inc.*, 1997 WL 83673 (J.P.M.L. Feb. 19, 1997).

### Conclusion

For the foregoing reasons, the United States respectfully requests that this Panel transfer the Southern Cases, along with any "tag-along" actions, to a single United States District Judge for the conduct of all pretrial proceedings.

Respectfully submitted,

JOHN C. CRUDEN
Acting Assistant Attorney General
Environment and Natural Resources Division

CATHERINE R. McCABE*
JON A. MUELLER
ROBERT A. KAPLAN
DAVID ROSSKAM
United States Department of Justice
Environmental Enforcement Section
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C.  20044-7611
(202) 514-1447

Attorneys for the United States of America

* - Attorney in Active Charge of the Cases

-14-

BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

In re )
)
CLEAN AIR ACT LITIGATION )  MDL Docket No. _____
AGAINST SOUTHERN COMPANY )
COAL-FIRED ELECTRIC UTILITIES )
)

**Schedule of Pending Actions**

1.  *United States of America v. Georgia Power Company*,  No. 1:99-CV-2859-JEC (N.D. Ga., Atlanta Division) (Judge Julie E. Carnes), was originally filed in this same docket as *United States of America v. Alabama Power Company, Georgia Power Company, and Southern Company Services, Inc.*

Defendants Alabama Power Company and Southern Company Services, Inc. were both subsequently dismissed from this action (*see Exhibit B* accompanying this brief).

Physicians for Social Responsibility, Campaign for a Prosperous Georgia, U.S. Public Interest Research Group, and Alabama Environmental Council -- have been granted leave to intervene as plaintiffs, with restrictions, in this action (*Exhibit C*).

The United States plans to file an amended complaint by May 11, 2001 that will, pursuant to this court's March 27, 2001 order partially granting the United States' motion for leave to amend its complaint (*Exhibit C*), add Savannah Electric and Power Company as a defendant in this action.

2.  *United States of America v. Alabama Power Company*,  No. CV-01-B-0152-S (N.D. Ala., Southern Division) (Judge Sharon Lovelace Blackburn).

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAY 1 1 2001

BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

FILED
CLERK'S OFFICE

```
                                      )
In re                                 )
                                      )
CLEAN AIR ACT LITIGATION              )        MDL Docket No. _____
AGAINST SOUTHERN COMPANY              )
COAL-FIRED ELECTRIC UTILITIES         )
                                      )
```

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Pursuant to Panel Rule 16.1(b), the United States of America respectfully submits this

statement of reasons why it believes that oral argument should be heard in relation to the

accompanying "United States' Motion For an Order Transferring Related Actions For

Consolidated Pretrial Proceedings Pursuant to 28 U.S.C. § 1407."

The United States believes that oral argument may helpful (1) in answering any questions

the Panel may have in relation to the relatively complex interrelationship of proceedings that are

here involved, *i.e.*, pending filed cases that are the subject of this motion ("the Southern Cases"),

similar pending filed cases that are not the subject of this motion, a pending appellate matter that

may bear on the Southern Cases, an amendment to the claims in one of the Southern Cases that

the United States anticipates will be filed presently, and stay motions that have been filed in both

of the Southern Cases and which may be under advisement, or decided, by the time of oral

argument to this Panel; and (2) in addressing the issue of the forum to which the requested

transfer may be appropriate.

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**MAY 1 1 2001**

BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION    FILED
CLERK'S OFFICE

```
_____
In re                          )
                               )
CLEAN AIR ACT LITIGATION       )    MDL Docket No. _____
AGAINST SOUTHERN COMPANY       )
COAL-FIRED ELECTRIC UTILITIES  )
_____)
```

**Proof of Service**

1.   Pursuant to Panel Rule 5.2(a), the undersigned  hereby certifies that I have, this _/0th_ day of May, 2001, caused a copy of the accompanying "United States' Motion For an Order Transferring Related Actions For Consolidated Pretrial Proceedings Pursuant to 28 U.S.C. § 1407" and attached "Statement Why Oral Argument Should Be Heard," and the Brief and Exhibits in support of said Motion, to be sent by United States mail, postage prepaid, to the following:

Steven G. McKinney, Esq.
Michael D. Freeman, Esq.
Lyle D. Larson, Esq.
R. Bruce Barze, Jr., Esq.
Balch & Bingham LLP
1710 Sixth Avenue North, P.O. Box 306
Birmingham, Alabama  35201-0306
(*Attorneys for Alabama Power Company*)

Daniel S. Reinhardt, Esq.
Margaret C. Campbell, Esq.
Marshall B. Dukes, Esq.
Troutman Sanders LLP
5200 NationsBank Plaza,
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2216
(*Attorneys for Georgia Power Company*)

Mr. Karl Moor
Vice President and Associate General Counsel
Southern Company
1130 Connecticut Avenue, N.W., Suite 830
Washington, D.C.  20036
(*Attorney for Savannah Electric and Power Company*)

Jeffrey M. Gleason, Esq.
Southern Environmental Law Center
201 Main Street- Suite 14
Charlottesville, VA 22902

S. Wesley Woolf, Esq.
Southern Environmental Law Center
127 Peachtree Street, Suite 605
Atlanta, GA 30303-1800

(*Attorneys for Physicians for Social Responsibility, Campaign for a Prosperous Georgia, U.S. Public Interest Research Group, and Alabama Environmental Council*)

2.   Pursuant to Panel Rule 5.2(b), the undersigned  further certifies that I have, this _/0th_ day of May, 2001, caused copies of the accompanying "United States' Motion For an Order

Transferring Related Actions For Consolidated Pretrial Proceedings Pursuant to 28 U.S.C.
§ 1407" and attached "Statement Why Oral Argument Should Be Heard," and the Brief and
Exhibits in support of said Motion, to be sent for filing by Federal Express to the clerk of each
district court, listed below, in which an action is pending that will be affected by this motion:

Clerk of the Court
United States District Court for
 the Northern District of Georgia
Intake Section
Suite 2211
United States Courthouse
75 Spring Street, S.W.
Atlanta, GA 30303
(*With respect to United States v. Georgia Power Company and Savannah Electric and Power
Company, No. 1:99-CV-2859 (N.D. Ga.)*)

Clerk of the Court
United States District Court for
 the Northern District of Alabama
Hugo Black United States Courthouse
1729 5th Avenue North
Birmingham, AL 35203
(*With respect to United States v. Alabama Power Company, No. CV-01-B-0152-S (N.D. Ala.)*)


David Rosskam
One of Attorneys for Movant
The United States of America

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAY 1 1 2001

FILED
CLERK'S OFFICE

BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| In re | ) |
| | ) |
| CLEAN AIR ACT LITIGATION | )   MDL Docket No. _____ |
| AGAINST SOUTHERN COMPANY | ) |
| COAL-FIRED ELECTRIC UTILITIES | ) |
| | ) |

EXHIBITS TO BRIEF IN SUPPORT OF
UNITED STATES' MOTION FOR AN ORDER TRANSFERRING
RELATED ACTIONS FOR CONSOLIDATED PRETRIAL
PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407

## Exhibits

A - United States' "Motion for Leave to File An Amended Complaint," "Memorandum in Support of the United States' Motion for Leave to Amended its Complaint," and proposed "Amended Complaint," filed March 1, 2000 in No. 1:99-CV-2859-JEC (N.D. Ga.).

B - August 1, 2000 Order in No. 1:99-CV-2859-JEC (N.D. Ga.)

C - March 27, 2001 Order in No. 1:99-CV-2859-JEC (N.D. Ga.)

D - "Plaintiff United States' Motion for Coordination of Discovery Among Related Cases," and "Plaintiff United States' Memorandum in Support of its Motion for Coordination of Discovery Among Related Cases," filed May 1, 2001 in *United States v. Illinois Power Company, et al.*, No. 99-CV-833-MJR (S.D. Ill.)

A

US OFFICE PRODUCTS

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR - 1 2000

LUTHER D. THOMAS, Clerk

By: _____ Deputy Clerk

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

ALABAMA POWER COMPANY,
GEORGIA POWER COMPANY,
SOUTHERN COMPANY SERVICES, INC.,
    subsidiaries of the
    Southern Company,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.
1:99-CV-2859-JEC

MOTION OF THE UNITED
STATES FOR LEAVE TO
FILE AN AMENDED COMPLAINT

<u>MOTION</u>

Comes now the United States of America, plaintiff, by counsel, and pursuant to Rule 15 of the Federal Rules of Civil Procedure, requests this Honorable Court for leave to amend its complaint to add claims against the original defendants, Alabama Power Company, Georgia Power Company and Southern Company Services, Inc. (collectively the "Original Defendants"), and three new parties; Gulf Power Company, Mississippi Power Company and Savannah Power and Electric Company (collectively the "Proposed Defendants").

On November 3, 1999, the United States filed suit against the Original Defendants seeking injunctive relief and the recovery of civil penalties under the Clean Air Act ("CAA" or the "Act"), 42 U.S.C. §§ 7401, <u>et seq.</u>, and related regulations. Georgia Power Company filed an answer on or about December 28, 1999. Alabama Power Company and Southern Company Services, Inc.,

EXHIBIT A

have both filed motions to dismiss. Responses and replies have been filed; however, the Court has not ruled upon those motions.

The initial complaint was filed as part of an on-going initiative undertaken by the United States Environmental Protection Agency ("EPA") investigating compliance with the CAA by the electric utility industry. At the time the original complaint was filed, EPA had not completed its investigation into the five additional facilities identified in the proposed amended complaint. Further, a Notice of Violation ("NOV") had not been issued to the Original or Proposed Defendants at the time the initial complaint was filed. An NOV was issued to all of the defendants on November 3, 1999. Pursuant to the Act, a judicial action concerning the violations asserted in the NOV could not be brought until 30 days thereafter. 42 U.S.C. § 7413(a).

For these reasons and those stated in the accompanying Memorandum in Support of this motion, the United States respectfully requests that it be granted leave to file its amended complaint which is attached to the Memorandum in Support as Exhibit A.

Respectfully submitted,

LOIS J. SCHIFFER
Assistant Attorney General
Environment and Natural
 Resources Division
U.S. Department of Justice

By: _Jon A. Mueller (by pmc)_
JON A. MUELLER
Senior Attorney
Environmental Enforcement

-2-

Section
Environment and Natural
 Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
(202) 514-0056


RICHARD H. DEANE, JR.
United States Attorney
for the Northern District of
Georgia

By:   *Del A Caldwell*
      DANIEL A. CALDWELL
      Assistant United States Attorney
      Georgia Bar No. 102510
      1800 United States Courthouse
      75 Spring Street, S.W.
      Atlanta, Georgia  30335
      (404) 581-6224

- 3 -

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>ALABAMA POWER COMPANY,<br>GEORGIA POWER COMPANY,<br>SOUTHERN COMPANY SERVICES, INC.,<br>　　subsidiaries of the<br>　　Southern Company,<br><br>　　　　Defendants. | Civil Action No.<br>1:99-CV-2859-JEC<br><br>MEMORANDUM IN SUPPORT<br>OF THE UNITED STATES'<br>MOTION FOR LEAVE TO<br>AMEND ITS COMPLAINT |

## I.   INTRODUCTION

Comes now the United States of America, plaintiff, by counsel, and submits the following memorandum in support of its Motion For Leave to Amend its Complaint pursuant to Rule 15 of the Federal Rules of Civil Procedure to add claims against defendants Alabama Power Company ("Alabama Power"), Georgia Power Company ("Georgia Power"), and Southern Company Services Inc. ("SCS") (collectively the "Original Defendants"), and to add Gulf Power Company ("Gulf Power"), Mississippi Power Company ("Mississippi Power"), and Savannah Power and Electric Company ("Savannah Power")(collectively the "Proposed Defendants") as defendants. [1]

On November 3, 1999, the United States filed suit

---

[1] The Proposed Defendants, like the Original Defendants, are all subsidiaries of the Southern Company.

against Alabama Power, Georgia Power, and SCS seeking penalties and injunctive relief under the Clean Air Act ("CAA" or the "Act"), 42 U.S.C. §§ 7401, et seq., and related regulations. Georgia Power filed an answer on or about December 28, 1999. Alabama Power and SCS have both filed motions to dismiss. Responses and replies have been filed; however, the Court has not ruled upon those motions.

In its initial complaint, the United States alleged that Alabama Power, Georgia Power and SCS, modified, and thereafter operated, the electric generating units at their Barry, Gorgas, Miller, Bowen, and Scherer, coal-fired electricity generating power plants in Mobile, Walker, and Jefferson Counties, Alabama, and Bartow and Monroe Counties, Georgia, without first obtaining appropriate permits authorizing this construction and without installing the best available control technology to control emissions of nitrogen oxides, sulfur dioxide, and particulate matter, as the CAA requires.  The United States further alleged that the Original Defendants began construction of units at the Miller and Scherer facilities without complying with the New Source Performance Standards ("NSPS"), 42 U.S.C. § 7411.

The proposed amended complaint alleges that, in addition to the violations at the aforementioned plants, Alabama Power and SCS also modified the Gaston and Greene County plants in Shelby County and Greene County, Alabama, respectively, and conducted modifications at Plant Barry in addition to those alleged in the

original complaint.  Exhibit A, hereto. The proposed amended
complaint also adds allegations that all of the current and
Proposed Defendants violated the Act and the applicable CAA State
Implementation Plans ("SIPs") in place at the time of the
modifications. Further, the proposed amended complaint asserts
that Gulf Power, Mississippi Power, and Savannah Power, in
conjunction with SCS, modified Plant Crist in Escambia County,
Florida, Plant Watson in Harrison County, Mississippi, and Plant
Kraft in Chatham County, Georgia, respectively, in violation of
the CAA and the applicable SIPs.

The proposed claims against the Original Defendants and the
Proposed Defendants are similar in nature to those alleged in the
original complaint and in many respects arise out of the same set
of operative facts and law as the claims against the Original
Defendants. Accordingly, plaintiff respectfully requests that
the Court permit amendment of the United States' complaint to add
additional claims against the Original Defendants and to add new
claims against three new Proposed Defendants.

II.    THE CLEAN AIR ACT

Both the original complaint and the amended complaint are

_____

The proposed amended complaint does not allege NSPS
violations at Plant Miller.

The CAA requires that before claims asserting violations of a
SIP may be brought by the United States, 30 days must have
elapsed from the issuance of a Notice of Violation by EPA to the
proposed defendant. 42 U.S.C. § 7413(a). EPA issued a Notice of
violation to the Original and Proposed Defendants on November 3,
1999. Hence, a judicial action could not have been filed on the
SIP claims until after December 4, 1999.

- 3 -

premised upon the CAA and its implementing regulations. The following is a brief discussion of the CAA as alleged in the original and proposed amended complaint. Allegations concerning the promulgation of and requirements of the applicable SIPs were not included in the original complaint. Relevant portions of the applicable SIPs are provided in the amended complaint at paragraphs 74 - 105.

### National Ambient Air Quality Standards

Section 109 of the Act, 42 U.S.C. § 7409, requires the Administrator of EPA to promulgate regulations establishing primary and secondary national ambient air quality standards ("NAAQS" or "ambient air quality standards") for those air pollutants ("criteria pollutants") for which air quality criteria have been issued pursuant to Section 108, 42 U.S.C. § 7408. The primary NAAQS are to be adequate to protect the public health, and the secondary NAAQS are to be adequate to protect the public welfare, from any known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air.

Each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data. 42 U.S.C. § 7407(d). An area that meets the NAAQS for a particular pollutant is an "attainment" area. An area that does not meet the NAAQS is a "nonattainment" area. An area that cannot be classified due to insufficient data is designated as

-4-

"unclassifiable."

## The Prevention of Significant Deterioration Requirements

Part C of the Act, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration ("PSD") of air quality in those areas designated as either "attainment" or "unclassifiable" for purposes of meeting the NAAQS standards.  These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process.  These provisions are referred to  as the "PSD program."

Section 165(a) of the Act, 42 U.S.C. § 7475(a), among other things, prohibits the construction and operation of a "major emitting facility" in an area designated as attainment unless a permit has been issued that comports with the requirements of Section 165, including the requirement that the facility install and operate the best available control technology ("BACT") for each pollutant subject to regulation under the Act that is emitted from the facility.  Section 169(1) of the Act, 42 U.S.C. § 7479(1), designates fossil-fuel fired steam electric plants of more than two hundred and fifty million British thermal units ("BTUs") per hour heat input and that emit or have the potential to emit one hundred tons per year or more of any pollutant to be

"major emitting facilities."  Each of the units identified in the original and amended complaints are "major emitting facilities".

"Construction" is defined as including "modification" (as defined in Section 111(a) of the Act).  42 U.S.C. § 7479(2)(C).  "Modification" is defined to be "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."  42 U.S.C. § 7411(a).

Sections 110(a) and 161 of the Act, 42 U.S.C. §§ 7410(a) and 7471, require states to adopt SIPs that contain emission limitations and such other measures to prevent significant deterioration of air quality in attainment areas.  A state may comply with Sections 110(a) and 161 of the Act by having its own PSD regulations, which must be at least as stringent as those set forth at 40 C.F.R. § 51.166, approved as part of its SIP by EPA.  If a state does not have a PSD program that has been approved by EPA and incorporated into its SIP, the federal PSD regulations set forth at 40 C.F.R. § 52.21 may be incorporated by reference into the SIP.  40 C.F.R. § 52.21(a).

Under Section 110(a)(2)(C) of the Act, 42 U.S.C. § 7410(a)(2)(C), each SIP must include a program to regulate the modification and construction of any stationary source of air pollution, regardless of whether the source is defined as "major," in both attainment and nonattainment areas of the state as necessary to assure that NAAQS are achieved.

- 6 -

Upon EPA approval, SIP requirements are federally
enforceable. 42 U.S.C. § 7413; 40 C.F.R. § 52.23.

Construction of any major stationary source or major
modification in an area designated as attainment or
unclassifiable requires a PSD permit prior to that construction.
40 C.F.R. § 52.21(i). Under EPA's PSD regulations, a "major
stationary source" is defined to include a fossil-fuel fired
steam electric plant of more than 250 million BTUs per hour heat
input which emits or has the potential to emit one hundred tons
per year or more of any regulated air pollutant. 40 C.F.R. §
52.21(b)(1)(i)(a). "Major modification" is defined at 40 C.F.R.
§ 52.21(b)(2)(i) as any physical change in or change in the
method of operation of a major stationary source that would
result in a significant net emission increase of any pollutant
subject to regulation under the Act. "Significant" is defined at
40 C.F.R. § 52.21(b)(23)(i) in reference to a net emissions
increase of the following pollutants, at a rate of emissions that
would equal or exceed any of the following: for $SO_2$, 40 tons per
year; for NOx, 40 tons per year; and for PM, 25 tons per year.
"Net emissions increase" means "the amount by which the sum of
the following exceeds zero: (a) Any increase in actual emissions
[as defined by 40 C.F.R. § 52.21(b)(21)] from a particular
physical change or change in method of operation at a stationary
source; and (b) Any other increases and decreases in actual
emissions [as defined by 40 C.F.R. § 52.21(b)(21)] at the source
that are contemporaneous with the particular change and are

-7-

otherwise creditable."  40 C.F.R. § 52.21(b)(3)(i).

A source with a major modification in an attainment area must install and operate best available control technology ("BACT") for each pollutant subject to regulation under the Act for which the modification would result in a significant net emissions increase.  40 C.F.R. § 52.21(j)

The PSD program requires a person who wishes to modify a major source in an attainment area to demonstrate, before construction commences, that construction of the facility will not cause or contribute to air pollution in violation of any ambient air quality standard or any specified incremental amount. 40 C.F.R. § 52.21(k).  Any application for a PSD permit must be accompanied by an analysis of ambient air quality in the area. 40 C.F.R. § 52.21(m).  The owner or operator of a facility which is proposed to be modified must submit all information necessary to make any analysis or make any determination required under 40 C.F.R. § 52.21.  40 C.F.R. § 52.21(n).  Further, the owner or operator must provide an analysis of the impairment to visibility, soils, and vegetation resulting from the source or modification.  40 C.F.R. § 52.21(o).

The complaint alleges that the Original Defendants made major modifications to their power plants which led to significant net emissions increases as defined by federal statute and regulation.  The proposed complaint alleges that the Original and Proposed Defendants violated federal law and the applicable SIPs which in many respects mimic the federal PSD regulations.

-8-

## New Source Performance Standards

The Act requires the Administrator of EPA to publish a list of categories of stationary sources that emit or may emit any air pollutant.  42 U.S.C. § 7411(b)(1)(A).  The list must include any categories of sources which are determined to cause or significantly contribute to air pollution which may endanger public health or welfare.  The Administrator is also required to promulgate regulations establishing federal standards of performance for new sources of air pollutants within each of these categories.  42 U.S.C. § 7411(b)(1)(B).  "New sources" are defined as stationary sources, the construction or modification of which is commenced after the publication of the regulations or proposed regulations prescribing a standard of performance applicable to such source.  42 U.S.C. § 7411(a)(2).  These standards are known as New Source Performance Standards ("NSPS").  The Act prohibits an owner or operator of a new source from operating that source in violation of a NSPS after the effective date of the applicable NSPS to such source.  42 U.S.C. § 7411(e).

Pursuant to the requirements of the Act, EPA promulgated 40 C.F.R. Part 60, Subpart A, §§ 60.1 - 60.19, which contains general provisions regarding NSPS.  Section 60.1 states that the provisions of 40 C.F.R. Part 60 apply to the owner or operator of any stationary source which contains an affected facility, the construction or modification of which is commenced after the publication in Part 60 of any standard (or, if earlier, the date of publication of any proposed standard) applicable to that

-9-

facility.  40 C.F.R. § 60.2.  An "affected facility" is any apparatus to which a standard is applicable.  40 C.F.R. § 60.2.

EPA also promulgated 40 C.F.R. §§ 60.40a-49a (Subpart Da), in which EPA has identified electric utility steam generating units as one category of stationary sources that cause, or contribute significantly to, air pollution that may reasonably be anticipated to endanger public health or welfare. These requirements are applicable to electric utility steam generating units for which construction or modification is commenced after September 18, 1978.  40 C.F.R. Part 60, Subpart Da, §§ 60.40a-49a.

Pursuant to 40 C.F.R. § 60.7(a), any owner or operator of an affected facility subject to NSPS must furnish written notification to EPA of, among other things, the date of construction of an affected facility no later than 30 days after such date. Further, the owner or operator of an affected facility that is an electric utility steam generating unit must conduct a performance test in accordance with 40 C.F.R. § 60.48a within 60 days after achieving the maximum production rate at which the affected facility will be operated, but not later than 180 days after initial startup of such facility, and furnish EPA a written report of the results of such performance test.  40 C.F.R. § 60.8

An owner and operator of an affected facility under subpart Da is required to install, calibrate, maintain and operate a continuous monitoring system, and record the output of the system for measuring $SO_2$ and NOx emissions.  40 C.F.R. § 60.47a(b) and

(c)   Further, the owner or operator of an electric utility steam generating unit subject to Subpart Da must submit quarterly reports to EPA containing certain emissions information.  40 C.F.R. §§ 60.49a(b) and (i).  The owner or operator of an electric utility steam generating unit subject to Subpart Da, may not discharge into the atmosphere from the affected facility any gases which contain $SO_2$ or $NO_x$, respectively, in excess of the applicable limitations.  40 C.F.R. §§ 60.43a(a); 60.44a(a).

Section 111(e) of the Act, 42 U.S.C. § 7411(e), prohibits the operation of any new source in violation of an NSPS applicable to such source.  Thus, a violation of an NSPS is a violation of Section 111(e) of the Act.

The initial complaint and the proposed amended complaint both allege violations of the NSPS.

Enforcement Provisions

Section 113(a)(3) of the Act, 42 U.S.C. § 7413(a)(3), provides that "[e]xcept for a requirement or prohibition enforceable under the preceding provisions of this subsection, whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated, or is in violation of, any other requirement or prohibition of this subchapter . . . the Administrator may . . . bring a civil action in accordance with subsection (b) of this section . . . ."  The Administrator is authorized to initiate a judicial enforcement action for a permanent or temporary injunction, and/or for a civil penalty of up to $25,000 per day

- 11 -

of violation for violations occurring on or before January 30, 1997 and $27,500 per day for each such violation occurring after January 30, 1997, against any person whenever such person has violated, or is in violation of, any requirement or prohibition of an applicable implementation plan or permit. 42 U.S.C. § 7413(b)(1) and (2); 40 C.F.R. § 52.23; and 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

Section 167 of the Act, 42 U.S.C. § 7477, authorizes the Administrator to initiate an action for injunctive relief, as necessary to prevent the construction, modification or operation of a major emitting facility which does not conform to the PSD requirements.

As in the original complaint, EPA has asked the Attorney General to initiate an action for penalties and injunctive relief against the Original and the Proposed Defendants for violations of the Act and the applicable SIPs.

III. <u>STATEMENT OF THE CLAIMS</u>

The initial complaint was brought against the Original Defendants pursuant to Sections 113(b)(2) and 167 of the Clean Air Act ("the Act"), 42 U.S.C. § 7413(b)(2) and 7477, for injunctive relief and the assessment of civil penalties for violations of the Prevention of Significant Deterioration ("PSD") provisions and the New Source Performance Standards ("NSPS") of the Act, 42 U.S.C. §§ 7470-92 and 7411, respectively. The complaint further alleges that the Original Defendants modified, and thereafter operated, their electric generating units at

Barry, Bowen, Gorgas, Miller, and Scherer, coal-fired electricity generating power plants in Jefferson, Mobile, and Walker Counties, Alabama, and Bartow and Monroe Counties, Georgia, without first obtaining appropriate permits authorizing this construction and without installing the best available control technology to control emissions of nitrogen oxides, sulfur dioxide, and particulate matter, as the CAA requires.

The proposed amended complaint repeats the claims asserted in the initial complaint and adds claims against the Original Defendants under the SIP applicable to each plant identified in the original complaint. For example, the amended complaint reasserts that Alabama Power modified its Plant Barry by installing a new design spiral fin economizer in Unit 5 in 1993, and adds allegations that additional modifications were made to Unit 1 in 1994 and to Unit 2 in 1997. All of these modifications are alleged to have violated the CAA and the Alabama SIP PSD regulations. Further, it is alleged that these modifications violated the Alabama SIP's general permitting requirements.

Moreover, the amended complaint asserts that Gulf Power, Mississippi Power, Savannah Power, and SCS undertook modifications at plants they own[9] and operate. These modifications are alleged to have violated the CAA and the applicable SIP PSD regulations and general permitting

_____

[9] As in the original complaint, SCS is not alleged to own any of the plants at issue, but is alleged to have operated those facilities within the meaning of the CAA, its regulations, and the applicable SIPs.

- 13 -

requirements.

The original complaint alleged that Alabama Power and SCS violated the NSPS provisions of the Act at Plant Miller Units 3 and 4 and that Georgia Power and SCS violated the NSPS as Plant Scherer Units 3 and F. The proposed amended complaint does not assert NSPS violations at Plant Miller, but realleges NSPS violations at Plant Scherer Units 3 and 4.

The legal underpinnings upon which the two complaints are based are essentially the same. The initial complaint was based upon the CAA and federal PSD regulations promulgated by EPA, 40 C.F.R. Part 52. The amended complaint is also predicated upon the CAA, and adds citations to the applicable regulations set forth in the SIPs of Alabama, Georgia, Florida, and Mississippi. The SIPs, in many respects, mimic the federal regulations. For example, the Mississippi SIP regulations at issue in the amended complaint incorporate by reference the federal PSD regulations. APC-S-5(2). See also Georgia Rules and Regulations for Air Quality Control 391-1-1.02(7); 391-3-1-.02(7), incorporating by reference 40 C.F.R. Part 52.21(c) - (e) and (h) - (r). The SIPs which do not incorporate the federal regulations by reference, in general, repeat verbatim the federal regulations. E.g., compare Alabama Rule 16.4.8, Review of Major Stationary Sources and Major Modifications - Source Applicability and Exemptions, with 40 C.F.R. § 52.21(i), Review of Major Stationary Sources and Major Modifications - Source Applicability and Exemptions.

Accordingly, while additional regulatory citations have been

-14-

added to the proposed amended complaint, the effect of those
additional citations on the ability of the Original Defendants to
proceed is inconsequential.  Thus, there is no prejudice to the
Original Defendants if the proposed amendment is granted.

Similarly, the factual basis of the claims alleged in the
original complaint and the proposed complaint are identical in
many respects.  While the specific facts about the work done at
each plant which the United States alleges triggered PSD
applicability varies from plant to plant, the facts concerning
the relationship of the defendants to each other, the harm caused
by the emissions from these facilities, and the numerous defenses
raised by Georgia Power in its answer which are likely to be
asserted by the other Southern Company defendants, among others,
are the same for each defendant.

IV.  ARGUMENT

A.  Leave to Amend Pleadings Shall be Freely Given.

Rule 15(a) of the Federal Rules of Civil Procedure provides
that after 20 days has elapsed from the filing of a responsive
pleading, "a party may amend his pleading only by leave of court
or by written consent of the adverse party; and leave shall be
freely given when justice so requires." Id.[2]  The decision to
grant or deny leave to amend lies within the discretion of the

_____

[2] Motions to amend are almost always granted because a party
should have the right to test his claim or defense on the merits
without being shackled by some procedural technicality.  Federal
Deposit Ins. Corp. v. Blackburn, 109 F.R.D. 66, 77 (E.D. Tenn.
1985).

- 15 -

District Court. <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962);
<u>Grayson v. Kmart Corp.</u>, 79 F.3d 1086,1110 (11th Cir. 1996); <u>Rosen</u>
<u>v. TRW, Inc.</u>, 979 F.2d 191, 194(11th Cir. 1992); <u>Rudolph v.</u>
<u>Arthur Anderson & Co.</u>, 800 F.2d 1040, 1041-42 (11th Cir. 1986).

However, absent

> any apparent or declared reason - such as undue delay,
> bad faith or dilatory motive on the part of the movant,
> repeated failure to cure deficiencies by amendments
> previously allowed, undue prejudice to the opposing
> party by virtue of allowance of the amendment, futility
> of amendment, etc.--the leave sought should, as the
> rules require, be "freely given."

<u>Foman</u>, at 182.

This motion is being brought within three months of the
filing of the original complaint, no discovery has been taken,
only one defendant has filed an answer, and, although the two
other defendants have filed motions to dismiss, none of those
motions have been ruled upon. Thus, there has been no undue
delay, bad faith, or dilatory motive on the part of the United
States and there is no prejudice to the current or Proposed
Defendants. Further, previous amendments have not been sought.
Accordingly, leave to amend should be "freely given."

Denial of this motion would prejudice plaintiff. Were the
Court to deny plaintiff's motion, the United States would be
forced to file a separate action in this Court against the
Original Defendants and the three proposed additional defendants
alleging these claims based on similar facts and law as those
asserted in the original complaint. This would lead to
duplicative discovery, motions practice and trials requiring the

expenditure of additional money and time to the prejudice of the United States and the defendants.

Permitting the United States to amend its complaint will conserve judicial resources. If the United States is denied leave to amend and must file a separate cause of action against the current and proposed defendants on similar claims, two trials will have to be held. One trial will have to consider the claims of the United States against Alabama Power, Georgia Power and SCS for certain modifications at the Barry, Bowen, Gorgas, Miller and Scherer plants on federal PSD claims. Another trial will consider the claims of the United States against Alabama Power, Georgia Power, Gulf Power, Mississippi Power, Savannah Power, and SCS at the Barry, Bowen, Crist, Gaston, Greene County, Gorgas, Kraft, Miller, Scherer and Watson plants on federal and SIP PSD claims. Hence, two courts will have to render decisions based upon essentially the same facts and law. Such a circumstance would create the possibility of inconsistent results. Plaintiff submits that one court should reach a decision with respect to all interested parties.

Allowing plaintiff to amend the complaint will not be a futile act. As stated above, the CAA provides for liability against the Original and Proposed Defendants.

<u>CONCLUSION</u>

For the reasons described above, plaintiff respectfully requests that this Court grant plaintiff leave to amend its complaint to add claims against the Original Defendants and to

- 17 -

add Gulf Power, Mississippi Power, and Savannah Power as defendants in this action.

Respectfully submitted,

LOIS J. SCHIFFER
Assistant Attorney General
Environment and Natural
 Resources Division
U.S. Department of Justice

By: _____
JON A. MUELLER (by one)
Senior Attorney
Environmental Enforcement
 Section
Environment and Natural
 Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
(202) 514-0056

RICHARD H. DEANE, JR.
United States Attorney
for the Northern District of
Georgia

By: _____
DANIEL A. CALDWELL
Assistant United States Attorney
Georgia Bar No. 102510
1800 United States Courthouse
75 Spring Street, S.W.
Atlanta, Georgia  30335
(404) 581-6224

- 18 -

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. |
| | ) 1:99-CV-2859-JEC |
| ALABAMA POWER COMPANY, | ) |
| GEORGIA POWER COMPANY, GULF POWER | ) |
| COMPANY, MISSISSIPPI POWER COMPANY, | ) |
| SAVANNAH ELECTRIC AND POWER | ) |
| COMPANY, AND SOUTHERN COMPANY | ) |
| SERVICES, INC., | ) |
| subsidiaries of the | ) |
| Southern Company, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## AMENDED COMPLAINT

The United States of America, by authority of the Attorney
General of the United States and through the undersigned
attorneys, acting at the request of the Administrator of the
United States Environmental Protection Agency ("EPA"), alleges:

### NATURE OF THE ACTION

1. This is a civil action brought against the Defendants
pursuant to Sections 113 and 167 of the Clean Air Act ("the
Act"), 42 U.S.C. § 7413 and 7477, for injunctive relief and the
assessment of civil penalties for violations of the Prevention of
Significant Deterioration ("PSD") provisions, 42 U.S.C. §§ 7470-
92, and the New Source Performance Standards ("NSPS") of the Act,
42 U.S.C. § 7411, and for violations of the State Implementation

PLAINTIFF'S
EXHIBIT
A

Plans ("SIPs") approved under the Act for the states of Alabama, Florida, Georgia, and Mississippi. Defendants modified, and thereafter operated, the following coal-fired electric generating power plants: Barry in Mobile County, Gaston in Shelby County, Gorgas in Walker County, Greene County in Greene County, and Miller in Jefferson County, Alabama; Bowen in Bartow County, Kraft in Chatham County, and Scherer in Monroe County, Georgia; Crist in Escambia County, Florida; and Watson in Harrison County, Mississippi, without first obtaining appropriate permits authorizing the construction and without installing the appropriate pollution control technology to control emissions of nitrogen oxides ("NOx"), sulfur dioxide ("$SO_2$"), and particulate matter ("PM"), as the Act requires.

2. As a result of Defendants operation of the power plants following these unlawful modifications and the absence of appropriate controls, massive amounts of $SO_2$, NOx, and PM have been, and still are being, released into the atmosphere aggravating air pollution locally and far downwind from these plants.

3. Defendants violations, alone and in combination with similar violations at other coal-fired electric power plants, have been significant contributors to some of the most severe environmental problems facing the nation today. An order of this Court directing these Defendants, forthwith, to install and operate the pollution control technology to control these

2

pollutants, in conjunction with orders being sought in similar cases involving other coal-fired electrical power plants in the midwest and southern United States filed by the United States concurrent with the filing of the original complaint, will produce an immediate and dramatic improvement in the quality of air breathed by millions of Americans downwind of the these plants. Such an order, in conjunction with others sought in other jurisdictions, will reduce illness, improve visibility, and protect national parks, wilderness areas, forests, lakes, and streams from further degradation due to the fallout from acid precipitation, and allow the environment to restore itself following years, and in some cases decades, of illegal emissions.

4. Sulfur dioxide, NOx, and PM when emitted into the air can have adverse environmental and health impacts. Electric utility plants collectively account for about 70 percent of annual SO emissions and 30 percent of NOx emissions in the United States. Sulfur dioxide interacts in the atmosphere to form sulfate aerosols, which may be transported long distances through the air. Most sulfate aerosols are particles that can be inhaled. In the eastern United States, sulfate aerosols make up about 25 percent of the inhalable particles and according to recent studies, higher levels of sulfate aerosols are associated with increased sickness and mortality from lung disorders, such as asthma and bronchitis. Lowering sulfate emissions from electric utility plants may significantly reduce the incidence

3

and the severity of asthma and bronchitis and associated hospital admissions and emergency room visits.

5.  Nitrogen oxides have numerous adverse effects on health and welfare.  Nitrogen oxides react with other pollutants and sunlight to form ground-level ozone, which scientists have long recognized as being harmful to human health and causing environmental damage.  Ozone causes decreases in lung function (especially among children who are active outdoors) and respiratory problems leading to increased hospital admissions and emergency room visits.  Ozone may inflame and possibly cause permanent damage to people's lungs.  In addition, ozone cause damages vegetation.  Nitrogen dioxide ("$NO_2$"), one type of NOx, is a dangerous pollutant that can cause people to have difficulty breathing by constricting lower respiratory passages; it may weaken a person's immune system, causing increased susceptibility to pulmonary and other forms of infections.  While children and asthmatics are the primary sensitive populations, individuals suffering from bronchitis, emphysema, and other chronic pulmonary diseases have a heightened sensitivity to $NO_2$ exposure.

6.  Sulfur dioxide and NOx interact in the atmosphere with water and oxygen to form nitric and sulfuric acids, commonly known as acid rain.  Acid rain, which also comes in the form of snow or sleet, "acidifies" lakes and streams rendering them uninhabitable by aquatic life, and it damages trees at high elevations.  Acid precipitation accelerates the decay of building

4

materials and paints, including irreplaceable buildings, statues, and sculptures that are part of our nation's cultural heritage. Sulfur dioxide and ... gases and their particulate matter derivatives, sulfates and nitrates, contribute to visibility degradation and impact public health.  In this civil action, and in other civil actions filed concurrent with the original complaint, the United States intends to reduce dramatically, the amount of SO and NOx that certain electric utility plants have been illegally releasing into the atmosphere.  If the injunctive relief requested by the United States in this action is imposed, and in others filed concurrent with the original complaint, many acidified lakes and streams will improve so that they may once again support fish and other forms of aquatic life.  Visibility will improve, allowing for increased enjoyment of scenic vistas throughout the eastern half of our country including several national parks and wilderness areas.  Stress to our forests from Maine to Florida will be reduced.  Deterioration of our historic buildings and monuments will be slowed.  In addition, reductions in SO and NOx will reduce sulfates, nitrates, and ground level ozone, leading to improvements in public health.

7.  Particulate matter is the term for solid or liquid particles found in the air.  Smaller particulate matter of a diameter of 10 micrometers or less is referred to as PM-10. Power plants are a major source of PM.  Breathing PM at concentrations in excess of existing ambient air standards may

increase the chances of premature death, damage to lung tissue, cancer, or respiratory disease. The elderly, children, and people with chronic lung disease, influenza, or asthma, tend to be especially sensitive to the effects of PM. Particulate matter can also make the effects of acid precipitation worse, reducing visibility and damaging man-made materials. Reductions in PM illegally released into the atmosphere by the defendants and others will significantly reduce the serious health and environmental effects caused by PM in our atmosphere.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action and the defendants pursuant to Sections 113(b) and 167 of the Act, 42 U.S.C. §§ 7413(b) and 7477, and pursuant to 28 U.S.C. §§ 1331, 1345, and 1355.

9. Venue is proper in this District pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because the Defendants reside in this District, two Defendants have their principal places of business in this district, violations occurred and are occurring in this District, and two facilities are located in this District.

## NOTICES

10. On November 3, 1999, EPA issued Notices of Violation to Defendants for Defendants' violations of the Act and the Alabama, Florida, Georgia, and Mississippi SIPs. Pursuant to 42 U.S.C. §§ 7413(a)(1) and (b)(1), EPA provided a copies of the Notices of

Violation to the States of Alabama, Florida, Georgia, and Mississippi.

11.   The 30-day period established in 42 U.S.C. § 7413, between issuance of the Notices of Violation and commencement of a civil action, has elapsed.

12.   The United States is providing notice of the commencement of this action to the States of Alabama, Florida, Georgia, and Mississippi as required by Section 113(b) of the Act, 42 U.S.C. § 7413(b).

## THE DEFENDANTS

13.   Defendants Alabama Power Company ("Alabama Power"), Georgia Power Company ("Georgia Power"), Gulf Power Company ("Gulf Power"), Mississippi Power Company ("Mississippi Power"), Savannah Electric and Power Company ("Savannah Power"), and Southern Company Services, Inc. ("SCS"), are wholly owned subsidiaries of The Southern Company ("Southern"), a Delaware corporation with headquarters in Atlanta, Georgia, and doing business in the states of Alabama, Florida, Georgia, and Mississippi (the "Four States"). Defendants Alabama Power, Georgia Power, Gulf Power, Mississippi Power, and Savannah Power are operating affiliates of Southern (collectively referred to as the "Operating Affiliates"). Southern does business in the Four States on behalf of the Operating Affiliates.

14.   Defendant Georgia Power and Savannah Power are Georgia corporations doing business in the Four States, among others.

7

Defendant Georgia Power undertakes such business by, among other things, operating electric generating facilities within the states of Alabama and Georgia.  Further, Defendants Georgia Power and Savannah Power conduct such business by providing electric capacity and energy to a shared system maintained and operated by Defendant SCS which is distributed within the Four States.  Accordingly, Defendants Georgia Power and Savannah Power maintain substantial and continuous contacts with the Four States.

15.   Defendants Alabama Power and SCS are Alabama corporations.  Defendant Alabama Power does business in the Four States by, among other things, operating electric generating facilities in Alabama and by providing electric capacity and energy to a shared Southern system which is distributed within the Four States.  Defendant SCS does business in the Four States by, among other things, controlling the distribution of electric capacity and energy contributed by the Operating Affiliates to systems within the Four States.  Accordingly, Defendants Alabama Power and SCS maintain substantial and continuous contacts with the Four States.

16.   Defendant Gulf Power is a Maine corporation with its principal place of business in Pensacola, Florida.  Defendant Gulf Power is admitted to do business in the states of Alabama, Florida, Georgia, and Mississippi.  Defendant Gulf Power owns and operates electric generating facilities within the states of Florida, Mississippi, and Georgia, and provides electric capacity

8

and energy to a shared Southern system operated by SCS which is distributed within the Four States.

17.   Defendant Mississippi Power is a Mississippi corporation with its principal place of business in Gulfport, Mississippi.  Defendant Mississippi Power undertakes such business by, among other things, owning and operating electric generating facilities within the states of Mississippi and Alabama and by providing electric capacity and energy to a shared Southern system operated by SCS which is distributed within the Four States.

18.   Defendants Alabama Power and Georgia Power each own 50% of the outstanding common stock of Southern Energy Generation Company ("SEGCO"), a Southern corporation doing business in Alabama and Georgia.

19.   SEGCO owns electric generating units at Plant Gaston on the Coosa River near Wilsonville, Alabama, which supplies power to Defendants Alabama Power and Georgia Power.  Defendants Alabama Power and Georgia Power are each entitled to one-half of SEGCO's capacity and energy.  Defendant Alabama Power acts as SEGCO's agent in the operation of SEGCO's units and furnishes coal to SEGCO as fuel for its units.  SEGCO also owns three 230,000 volt transmission lines extending from Plant Gaston into Georgia through a connection with Defendant Georgia Power's transmission line system.

20.   The transmission facilities of each of the Operating

9

Affiliates and SEGCO are connected to the respective company's own generating plants and other sources of power and are interconnected with the transmission facilities of the other Operating Affiliates and SEGCO by means of heavy-duty high voltage lines.

21.  Operating contracts with the Operating Affiliates covering arrangements in effect with principal neighboring utility systems provide for capacity exchanges, capacity purchases and sales, transfers of economy energy and other similar transactions.  Additionally, the Operating Affiliates, have entered into voluntary reliability agreements with electric power companies located in other southern states including Florida, North Carolina, Tennessee, South Carolina, and Virginia, each of which provides for the establishment and periodic review of principles and procedures for planning and operation of generation and transmission facilities, maintenance schedules, load retention programs, emergency operations, and other matters affecting the reliability of bulk power supply.  Southern's Operating Affiliates have joined with other utilities in the Southeast (including those referred to above) to form the Southeastern Electric Reliability Council ("SERC") to augment further the reliability and adequacy of bulk power supply. Through the SERC, the Operating Affiliates are represented on the National Electric Reliability Council.

22.  An intra-system interchange contract among the

10

Operating Affiliates and SEGCO provides for coordinating operations of the power producing facilities and the capacities available to such companies from non-affiliated sources and for the pooling of surplus energy available for interchange. Coordinated operation of the entire interconnected system is conducted through a central power supply coordination office maintained by Defendant SCS. The available sources of energy are allocated to the Operating Affiliates to provide the most economical sources of power consistent with good operation. The resulting benefits and savings are apportioned among the Operating Affiliates.

23. Defendant SCS has contracted with Southern, each Operating Affiliate, various other subsidiaries, and SEGCO to furnish, at cost and upon request, the following services: general executive and advisory services, power pool operations, general engineering, design engineering, purchasing, accounting, finance and treasury, taxes, insurance and pensions, corporate, rates, budgeting, public relations, employee relations, systems and procedures and other services with respect to business and operations.

24. Defendant SCS, acting on behalf of the Operating Affiliates, also has a contract with the Southeastern Power Administration ("SEPA") (a federal power marketing agency) providing for the use of those companies' facilities at government expense to deliver to certain cooperatives and

11

municipalities, entitled by federal statute to preference in the purchase of power from SEPA, quantities of power equivalent to the amounts of power allocated to them by SEPA from certain United States Government hydroelectric projects.  Those cooperatives and municipalities are located within the Four States.

25.  The Operating Affiliates and SEGCO are subject to regulation by the Federal Energy Regulatory Commission as companies engaged in the transmission or sale at wholesale of electric energy in interstate commerce.

26.  At all times relevant to this Complaint, Defendant Alabama Power owned and operated Plant Barry, a coal fired electric generation plant in Mobile County, Alabama.  Plant Barry generates electricity from five steam generating boilers which are designated as Plant Barry Units 1 through 5.

27.  At all times relevant to this Complaint, Defendants Alabama Power and Georgia Power owned Plant E.C. Gaston (" Plant Gaston"), a coal fired electric generation plant in Shelby County, Alabama.  Defendant Alabama Power operated Plant Gaston which generates electricity from five steam generating boilers which are designated as Plant Gaston Units 1 through 5.

28.  At all times relevant to this Complaint, Defendant Alabama Power owned and operated Plant Gorgas, a coal fired electric generation plant in Walker County, Alabama.  Plant Gorgas generates electricity from five steam generating boilers

which are designated as Plant Gorgas Units 6 through 10.

29.  At all times relevant to this Complaint, Defendant Alabama Power owned and operated Plant Greene County, an electric generation plant in Greene County, Alabama.  Plant Greene County generates electricity from ten steam generating boilers, two of which are coal fired units designated as Plant Greene County Units 1 and 2.

30.  At all times relevant to this Complaint, Defendant Alabama Power owned and operated Plant James H. Miller, Jr. ("Plant Miller"), a coal fired electric generation plant in Jefferson County, Alabama.  Plant Miller generates electricity from four steam generating boilers which are designated as Plant Miller Units 1 through 4.

31.  At all times relevant to this Complaint, Defendant Georgia Power owned and operated Plant Bowen, a coal fired electric generation plant in Bartow County, Georgia.  Plant Bowen generates electricity from four steam generating boilers which are designated as Plant Bowen Units 1 through 4.

32.  At all times relevant to this Complaint, Defendant Georgia Power owned and operated Plant Scherer, a coal fired electric generation plant in Monroe County, Georgia.  Plant Scherer generates electricity from four steam generating boilers which are designated as Plant Scherer Units 1 through 4.

33.  At all times relevant to this Complaint, Defendant Gulf Power owned and operated Plant Crist, a coal fired electric

13

generation plant in Escambia County, Florida. Plant Crist generates electricity from four steam generating boilers which are designated as Plant Crist Units 4 through 7.

34.  At all times relevant to this Complaint, Defendant Mississippi Power owned and operated Plant Jack Watson (" Plant Watson"), a coal fired electric generation plant in Harrison County, Mississippi. Plant Watson generates electricity from two steam generating boilers which are designated as Plant Watson Units 1 through 2.

35.  At all times relevant to this Complaint, Defendant Savannah Power owned and operated Plant Kraft, a coal fired electric generation plant in Chatham County, Georgia. Plant Kraft generates electricity from four steam generating boilers which are designated as Plant Kraft Units 1 through 4.

36.  At all times relevant to this Complaint, Defendant SCS, in conjunction with the Operating Affiliates, has "operated" Plants Barry, Bowen, Crist, Gaston, Gorgas, Greene County, Kraft, Miller, Scherer, and Watson as that term is defined in the Act, its implementing regulations, and the relevant State Implementation Plans.

37.  The Defendants are "persons" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e).

### STATUTORY AND REGULATORY BACKGROUND

38.  The Clean Air Act is designed to protect and enhance the quality of the nation's air so as to promote the public

14

health and welfare and the productive capacity of its population.
Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1).

### The National Ambient Air Quality Standards

39.   Section 108(a) of the Act, 42 U.S.C. § 7408(a), requires the Administrator of EPA to identify and prepare air quality criteria for each air pollutant, emissions of which may endanger public health or welfare and the presence of which results from numerous or diverse mobile or stationary sources. For each such pollutant, Section 109 of the Act, 42 U.S.C. § 7409, requires EPA to promulgate national ambient air quality standards ("NAAQS") requisite to protect the public health and welfare.   Pursuant to Sections 108 and 109, EPA has identified and promulgated NAAQS for NOx, SO₂, PM (now measured in the ambient air as PM-10), and ozone as such pollutants.   40 C.F.R. §§ 50.4 - 50.11.

40.   Under Section 107(d) of the Act, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data.   An area that meets the NAAQS for a particular pollutant is an "attainment" area.   An area that does not meet the NAAQS is a "nonattainment" area.   An area that cannot be classified due to insufficient data is "unclassifiable."

41.   At times relevant to this complaint Plants Barry,

15

Bowen, Crist, Gorgas, Greene County, Kraft, Scherer, and Watson were located in areas that had been classified as attainment or unclassifiable for one or more of the following pollutants: NO, SO, PM-10, and PM.

42. At times relevant to this complaint, Gaston and Miller were located in areas that had been classified attainment or unclassifiable for NO, SO, PM-10, and PM and as nonattainment for Ozone.

### The Prevention of Significant Deterioration Requirements

43. Part C of the Act, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration ("PSD") of air quality in those areas designated as either attainment or unclassifiable for purposes of meeting the NAAQS standards. These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process. These provisions are referred to herein as the "PSD program."

44. Section 165(a) of the Act, 42 U.S.C. § 7475(a), among other things, prohibits the construction and operation of a "major emitting facility" in an area designated as attainment unless a permit has been issued that comports with the

16

requirements of Section 165, including the requirement that the
facility install and operate the best available control
technology for each pollutant subject to regulation under the Act
that is emitted from the facility.  Section 169(1) of the Act, 42
U.S.C. § 7479(1), designates fossil-fuel fired steam electric
plants of more than two hundred and fifty million British thermal
units ("BTUs") per hour heat input and that emit or have the
potential to emit one hundred tons per year or more of any
pollutant to be "major emitting facilities."  Section 169(2)(C)
of the Act, 42 U.S.C. § 7479(2)(C), defines "construction" as
including "modification" (as defined in Section 111(a) of the
Act).  "Modification" is defined in Section 111(a) of the Act, 42
U.S.C. § 7411(a), to be "any physical change in, or change in the
method of operation of, a stationary source which increases the
amount of any air pollutant emitted by such source or which
results in the emission of any air pollutant not previously
emitted."

   45.  Sections 110(a) and 161 of the Act, 42 U.S.C. §§
7410(a) and 7471, require states to adopt state implementation
plans ("SIPs") that contain emission limitations and such other
measures to prevent significant deterioration of air quality in
attainment areas.

   46.  A state may comply with Sections 110(a) and 161 of the
Act by having its own PSD regulations, which must be at least as
stringent as those set forth at 40 C.F.R. § 51.166, approved as

17

part of its SIP by EPA.

47. If a state does not have a PSD program that has been approved by EPA and incorporated into its SIP, the federal PSD regulations set forth at 40 C.F.R. § 52.21 may be incorporated by reference into the SIP. 40 C.F.R. § 52.21(a).

48. As set forth at 40 C.F.R. § 52.21(i), construction of any major stationary source or major modification in an area designated as attainment or unclassifiable requires a PSD permit prior to that construction.

49. Under EPA's PSD regulations, a "major stationary source" is defined to include a fossil-fuel fired steam electric plant of more than 250 million BTUs per hour heat input which emits or has the potential to emit one hundred tons per year or more of any regulated air pollutant. 40 C.F.R. § 52.21(b)(1)(i)(a).

50. "Major modification" is defined at 40 C.F.R. § 52.21(b)(2)(i) as any physical change in or change in the method of operation of a major stationary source that would result in a significant net emission increase of any pollutant subject to regulation under the Act.

51. "Significant" is defined at 40 C.F.R. § 52.21(b)(23)(i) in reference to a net emissions increase of the following pollutants, at a rate of emissions that would equal or exceed any of the following: for $SO_2$, 40 tons per year; for NOx, 40 tons per year; and for PM, 25 tons per year. "Net emissions increase"

18

means "the amount by which the sum of the following exceeds zero: (a) Any increase in actual emissions [as defined by 40 C.F.R. § 52.21(b)(21)] from a particular physical change or change in method of operation at a stationary source; and (b) Any other increases and decreases in actual emissions [as defined by 40 C.F.R. § 52.21(b)(21)] at the source that are contemporaneous with the particular change and are otherwise creditable." 40 C.F.R. § 52.21(b)(3)(i).

52.  As set forth at 40 C.F.R. § 52.21(j), a source with a major modification in an attainment area must install and operate best available control technology ("BACT") for each pollutant subject to regulation under the Act for which the modification would result in a significant net emissions increase.

53.  As set forth at 40 C.F.R. § 52.21(k), the PSD program requires a person who wishes to modify a major source in an attainment area to demonstrate, before construction commences, that construction of the facility will not cause or contribute to air pollution in violation of any ambient air quality standard or any specified incremental amount.

54.  As set forth in 40 C.F.R. § 52.21(m), any application for a PSD permit must be accompanied by an analysis of ambient air quality in the area.

55.  As set forth in 40 C.F.R. § 52.21(n), the owner or operator of a proposed modification must submit all information necessary to make any analysis or make any determination required

19

under 40 C.F.R. § 52.21.

56.   As set forth in 40 C.F.R. § 52.21(o), the owner or operator shall provide an analysis of the impairment to visibility, soils, and vegetation resulting from the source or modification.

## General Permitting Requirements

57.   Under Section 110(a)(2)(C) of the Act, 42 U.S.C. § 7410(a)(2)(C), each SIP must include a program to regulate the modification and construction of any stationary source of air pollution, regardless of whether the source is defined as "major," in both attainment and nonattainment areas of the state as necessary to assure that NAAQS are achieved.

## New Source Performance Standards

58.   Section 111(b)(1)(A) of the Act, 42 U.S.C. § 7411(b)(1)(A), requires the Administrator of U.S. EPA to publish a list of categories of stationary sources that emit or may emit any air pollutant.  The list must include any categories of sources which are determined to cause or significantly contribute to air pollution which may endanger public health or welfare.

59.   Section 111(b)(1)(B) of the Act, 42 U.S.C. § 7411(b)(1)(B), requires the Administrator of U.S. EPA to promulgate regulations establishing federal standards of performance for new sources of air pollutants within each of the categories identified pursuant to Section 111(b)(1)(A).  "New

20

sources" are defined as stationary sources, the construction or modification of which is commenced after the publication of the regulations or proposed regulations prescribing a standard of performance applicable to such source.  42 U.S.C. § 7411(a)(2). These standards are known as New Source Performance Standards ("NSPS").

60.   Pursuant to Sections 111 and 114 of the Act, 42 U.S.C. §§ 7411, 7414, U.S. EPA promulgated 40 C.F.R. Part 60, Subpart A, §§ 60.1 - 60.19, which contains general provisions regarding NSPS.

61.   Section 60.1 states that the provisions of 40 C.F.R. Part 60 apply to the owner or operator of any stationary source which contains an affected facility, the construction or modification of which is commenced after the publication in Part 60 of any standard (or, if earlier, the date of publication of any proposed standard) applicable to that facility.  40 C.F.R. § 60.1.

62.   Section 60.2 defines "affected facility" as any apparatus to which a standard is applicable.  40 C.F.R. § 60.2.

63.   Pursuant to Section 111(b)(1)(A) of the Act, 42 U.S.C. § 7411(b)(1)(A), EPA has identified electric utility steam generating units as one category of stationary sources that cause, or contribute significantly to, air pollution that may reasonably be anticipated to endanger public health or welfare.

64.   Pursuant to Section 111(b)(1)(B) of the Act, 42 U.S.C.

21

§ 7411(b)(1)(B), EPA has promulgated NSPS for electric utility steam generating units. NSPS requirements for electric utility steam generating units for which construction or modification is commenced after September 18, 1978, are codified at 40 C.F.R. Part 60, Subpart Da, §§ 60.40a-49a.

65. The "affected facilities" to which Subpart Da applies are each "electric utility steam generating unit" that is capable of combusting more than 73 megawatts (250 million Btu/hour) heat input of fossil fuel (either alone or in combination with any other fuel) and for which construction or modification is commenced after September 18, 1978. 40 C.F.R. § 60.40a.

66. Under Subpart Da, "steam generating unit" means any furnace, boiler, or other device, other than nuclear steam generators, used for combusting fuel for the purpose of producing steam, including fossil-fuel-fired steam generators associated with combined cycle gas turbines. 40 C.F.R. § 60.41a.

67. Under Subpart Da, an "electric utility steam generating unit", means any steam electric generating unit that is constructed for the purpose of supplying more than one-third of its potential electric output capacity and more than 25 megawatts ("MW") electrical output to any utility power distribution system for sale. 40 C.F.R. § 60.41a.

68. Section 111(e) of the Act, 42 U.S.C. § 7411(e), prohibits the operation of any new source in violation of an NSPS applicable to such source after the effective date of that NSPS.

22

Thus, a violation of an NSPS is a violation of Section 111(e) of the Act.

69.   Pursuant to 40 C.F.R. § 60.7(a), any owner or operator of an affected facility subject to NSPS must furnish written notification to EPA of, among other things, the date of construction or modification of an affected facility no later than 30 days after such date.

70.   Pursuant to 40 C.F.R. § 60.8, the owner or operator of an affected facility that is an electric utility steam generating unit must conduct a performance test in accordance with 40 C.F.R. § 60.48a within 60 days after achieving the maximum production rate at which the affected facility will be operated, but not later than 180 days after initial startup of such facility, and furnish EPA a written report of the results of such performance test.

71.   An owner and operator of an affected facility under subpart Da is required to install, calibrate, maintain and operate a continuous monitoring system, and record the output of the system for measuring SO and NOx emissions. 40 C.F.R. § 60.47a(b) and (c).

72.   Pursuant to 40 C.F.R. §§ 60.49a(b) and (i), the owner or operator of an electric utility steam generating unit subject to Subpart Da must submit quarterly reports to EPA containing certain emissions information.

73.   Pursuant to 40 C.F.R §§ 60.43a(a) and 60.44a(a), the

23

owner or operator of an electric utility steam generating unit subject to Subpart Da, may not discharge into the atmosphere from the affected facility any gases which contain $SO_2$ or $NO_x$ in excess of the applicable limitations.

## STATE REGULATORY PROVISIONS

A. ALABAMA

### PSD Permitting

74.   The Alabama PSD program is part of the Alabama SIP and was originally approved by EPA on November 10, 1981, 46 Fed. Reg. 55517, as Alabama Air Pollution Control Commission Rules and Regulations, Chapter 16.4 (hereafter "Rule 16.4"). Effective June 22, 1989, 55 Fed. Reg. 38994, Alabama's PSD program was recodified at the Alabama Department of Environmental Management ("ADEM") Code Chapter 335-3-14 (hereafter "Rule 335-3-14").

75.   At all relevant times, the Alabama SIP has prohibited the construction, major modification, or operation of a major stationary source in any area in Alabama which has been designated "attainment" or "unclassifiable" unless a PSD permit has been obtained and the other requirements of the Alabama SIP have been satisfied.  Rules 16.1 and 16.4; Rules 335-3-14-.01 (General Provisions) and 335-3-14-.04(8) (Air Permits Authorizing Construction in Clean Air Areas).

76.   At all relevant times, the Alabama SIP defined "major stationary source" to include any fossil-fuel fired steam electric plant of 250 million British thermal units (BTUs) per

24

hour heat input which emits or has the potential to emit, 100 tons per year or more of any regulated air pollutant, or any physical change that would occur at a stationary source not otherwise qualifying as a major stationary source, if the change would constitute a major stationary source by itself.  Rule 16.4.2(a)(1); Rule 335-3-14-.04(2)(a)(1).

77.  At all relevant times, the Alabama SIP defined "major modification" to mean any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act.  Rule 16.4.2.(b)(1); Rule 335-3-14-.04(2)(b)(1).

78.  At all relevant times, the Alabama SIP required that sources with modifications subject to PSD review apply the best available control technology ("BACT") for each pollutant subject to regulation for which the modification would result in a significant net emissions increase.  Rule 16.4.9; Rule 335-3-14-.04(9).

79.  At all relevant times, the Alabama SIP required that sources with modifications subject to PSD regulations comply with other requirements of the Alabama SIP, including but not limited to:

a.  a person who wishes to modify a major source subject to PSD review must demonstrate, before construction commences, that construction of the facility will not cause or

25

contribute to air pollution in violation of any ambient air quality standard or any specified incremental amount. Rule 16.4.10; Rule 335-3-14-.04(10);

b. any application for a PSD permit must be accompanied by an analysis of ambient air quality in the area. Rule 16.4.12; Rule 335-3-14-.04(12);

c. the owner or operator of a proposed modification must submit all information necessary to make any analysis or make any necessary determination. Rule 16.4.13; Rule 335-3-14-.04(13); and

d. the owner or operator shall provide an analysis of the impairment to visibility, soils and vegetation resulting from the source or modification. Rule 16.4.14; Rule 335-3-14-.04(14).

<u>General Permitting Requirements</u>

80. Alabama's general air permitting requirements are currently promulgated at ADEM Rule 335-3-14-.01. This rule was originally promulgated as Rule 1.12 and approved by EPA as part of the Alabama SIP on May 31, 1972. 37 Fed. Reg.10842. Through subsequent revisions, the rule was recodified to Alabama Air Pollution Control Commission Chapter 16, Rule 16.1 and the Alabama SIP revision approved November 26, 1979. 44 Fed. Reg. 67375. Through subsequent revisions, Rule 16.1 was recodified, effective June 22, 1989, 55 Fed. Reg. 38994, at Rule 335-3-14-.01.

81. Rule 335-3-14-.01 (formerly Rule 16.1) provides that

26

any person building, erecting, altering or replacing any article, machine, equipment or other contrivance which may cause the issuance of air contaminants shall apply for an Air Permit at least 10 days prior to construction. This rule further provides that an Air Permit shall be obtained before any such article, machine, equipment or other contrivance may be operated or used.

82.   Rule 335-3-14-.02 (formerly Chapter 16.2) requires that every application for an Air Permit shall contain all the information necessary to enable the Director to make the determination required by Rule 335-3-14-.03.

B.   FLORIDA

### PSD Permitting

83.   Florida's PSD program was originally approved by EPA as part of the Florida SIP on November 22, 1983 (48 Fed. Reg. 52716). Effective December 19, 1994, the PSD provisions of the Florida SIP were located at Florida Administrative Code ("FAC") § 17-212. 59 Fed. Reg. 52916.  The PSD provisions of the Florida SIP are currently located at FAC § 62-212. 64 Fed. Reg. 32346.

84.   The PSD provisions of the Florida SIP apply to any area in Florida which has attained the state ambient air quality standards.  FAC § 17-212.400; FAC § 62-212.400.

85.   The PSD provisions of the Florida SIP prohibit the construction, modification, or operation of a facility subject to the PSD provisions of the Florida SIP unless a PSD permit has been obtained.  FAC §§ 17-212.300 and 17-212.400(5)(a)(2); FAC §§

27

62-212.300 and 62-212.400(5)(a)(2).

86.   The PSD provisions of the Florida SIP prohibit the construction of a facility or modification subject thereto unless certain requirements of the PSD portion of the Florida SIP have been satisfied.   FAC 17-212.400(5)(a)(1); FAC 62-212.400(5)(a)(1).   These requirements include, but are not limited to:

a.   Compliance with emission limitations.   FAC §17-212.400(5)(b); FAC § 62-212.400(5)(b);

b.   Application of Best Available Control Technology. FAC § 17-212.400(5)(c); FAC § 62-212.400(5)(c);

c.   Performance of an Ambient Impact Analysis.   FAC § 17-212.400(5)(d); FAC § 62-212.400(5)(d);

d.   Performance of Additional Impact Analysis.   FAC § 17-212.400(5)(e); FAC § 62-212.400(5)(e); and

e.   Performance of Preconstruction Air Quality Monitoring and Analysis.   FAC § 17- 212.400(5)(f); FAC § 62-212.400(5)(f).

87.   The PSD provisions of the Florida SIP apply to proposed modifications to major facilities if the facility to be modified would be subject to review if it were itself a proposed new facility and the modification would result in a significant net emissions increase of any pollutant regulated under the Act.   FAC § 17.212-400(2)(d)(4); FAC § 62-212.400(2)(d)(4).

88.   At all relevant times, the Florida SIP defined the term

28

"major facility" to include any facility which emits, or has the potential to emit, 100 tons per year or more of any air pollutant subject to regulation under the Act.  FAC § 17-212-400(2)(d)(2)(b); 62-212.400(5); 17-210.200(171)(c).

89.   At all relevant times, the Florida SIP defined the term "modification" to mean any physical change in, or change in the method of operation of, or addition to a stationary source or facility which increases the actual emissions of any air pollutant regulated under the Chapter, from any source or facility, excluding routine maintenance, repair or replacement of component parts of the source, and excluding an increase in the hours of operation or production rate.  FAC § 17-210.200(39); FAC § 17-212.200(46); FAC § 62-210.200(183).

90.   At all relevant times, the Florida SIP provides that a "net emissions increase" results from a modification when, for a pollutant regulated under the Act, the sum of all contemporaneous creditable increases and decreases in the actual emissions, as defined by FAC § 17-210.200 1; FAC § 62-210.200(12), of the facility is greater than zero.  FAC § 17-212.400(2)(e)(1); FAC § 62-212.400(2)(e)(1).

91.   At all relevant times, the Florida SIP defines "significant net emissions increase" as a net emissions increase equal to or greater than the applicable significant emission rates listed in Table 212.400-2.  FAC § 17-212.400(2)(e)(2); FAC § 62-212.400(2)(e)(2).  Table 212.400-2 identifies the following

29

significant emission rates: 40 tpy of NOx emissions; 40 tpy of SO emissions; and 25 tpy of particulate matter.

### General Permitting Requirements

92.  With respect to Florida's general air permitting requirements, FAC § 17-212.300 was approved as part of the Florida SIP by EPA on October 20, 1994 (59 Fed. Reg. 52916). This regulation is currently located in the Florida SIP at FAC 62-212.300.  64 Fed. Reg. 32346 (June 16, 1999).

93.  The requirements of FAC § 17-212.300 (FAC § 62-212.300) apply to the proposed construction or modification of all emissions units and facilities for which an air construction permit is required pursuant to FAC § 17-210.300(1) (FAC § 62-210.300(1)).

94.  FAC § 17-210.300(1) (FAC § 62-210.300(1)) provides that owners and operators of emissions units which emit or can reasonably be expected to emit any air pollutant shall obtain an appropriate permit from the Department prior to beginning construction, modification, or initial or continued operation of the emissions unit.

95.  Pursuant to FAC § 17-212.300(1)(a) (FAC § 62-212.300(1)(a)), no emissions unit or facility subject to the general permitting requirements shall be constructed or modified without obtaining an air construction permit.

//

C.  GEORGIA

PSD Permitting

96.  Georgia's PSD program is set forth at Section 7 of
Georgia Department of Natural Resources Air Quality Control Rule
391-3-1-.02(7), "Prevention of Significant Deterioration of Air
Quality" (PSD) (hereafter "DNR 391-3-1-.02(7)").  DNR 391-3-1-
.02(7) was approved as part of the Georgia SIP on February 16,
1979.  44 Fed. Reg. 54047.  On February 10, 1982, EPA approved as
a revision to the Georgia SIP an amendment to DNR 391-3-1-.02(7).
47 Fed. Reg. 6017.  Through this revision, the Georgia SIP
incorporated by reference certain EPA Part 52 regulations
promulgated through August 7, 1980.  The regulations set forth at
40 C.F.R. §§ 52.21(b) and 52.21(i) through (r), among others,
have been incorporated by reference into the Georgia SIP.  DNR
391-3-1-.02(7).

97.  Through modifications to the Georgia SIP subsequently
approved by EPA on December 14, 1992, (57 Fed. Reg. 58989) and
February 2, 1996, (61 Fed. Reg. 3817), the Georgia SIP now
incorporates EPA Part 52 (Approval and Promulgation of
Implementation Plans) regulations promulgated through June 3,
1993.

98.  At all relevant times, the Georgia SIP has prohibited
the construction, major modification, or operation of a major
emitting facility in any area in Georgia which has attained the
NAAQS unless a permit has been issued for such facility (PSD

31

permit) and the other requirements of DNR 391-3-1-.02(7) have been satisfied.

### General Permitting Requirements

99. Georgia's general air permitting regulations are promulgated at Georgia DNR Air Quality Control Rule 391-3-1-.03 (hereinafter "DNR 391-3-1-.03"). DNR 391-3-1-.03 provides that any person constructing or modifying any equipment which may emit any air pollutant shall, prior to such construction or modification, obtain a permit authorizing such construction, modification, or operation. DNR 391-3-1-.03 was originally approved by EPA as part of the Georgia SIP on August 20, 1976 (41 Fed. Reg. 35184). Revisions to DNR 391-3-1-.03 were approved as part of the Georgia SIP on September 18, 1979 (44 Fed. Reg. 54047) and on March 8, 1995 (60 Fed. Reg. 12688).

100. The Georgia SIP currently defines "modification" as any change in or alteration of fuels, processes, operation or equipment which affects the amount of any air pollutant emitted. DNR 393-3-1.01(PP).

D. MISSISSIPPI

### PSD Permitting

101. Mississippi's PSD program is set forth at Mississippi Department of Environmental Quality Regulation APC-S-5 ("Rule APC-S-5"). The requirements of the Federal PSD regulations at 40 C.F.R. § 52.21 have been incorporated by reference into the federally enforceable SIP for Mississippi. Rule APC-S-5(2). The

provisions of 40 C.F.R. § 52.21, as incorporated in the
Mississippi regulations, prohibit the construction, major
modification, or operation of a major stationary source in any
area which has attained the NAAQS unless a PSD permit has been
issued which meets the requirements of 40 C.F.R. §§ 52.21(j)-(r).
Rule APC-S-5.

102.   The PSD provisions of the Mississippi SIP were
approved by EPA on October 15, 1990.  55 Fed. Reg. 41691.  EPA
approved revisions to the PSD provisions of the Mississippi SIP
on August 4, 1992.  57 Fed. Reg. 34252.  Through these revisions,
which were effective October 5, 1992, the Mississippi SIP
incorporated EPA's Part 52 PSD regulations through October 25,
1991.  The current version of the PSD provisions of the
Mississippi SIP, approved by EPA, incorporate EPA's Part 52 PSD
regulations through August 22, 1996.  62 Fed. Reg. 37724.

### General Permitting Requirements

103.   Effective May 31, 1972, EPA approved Mississippi's
general permitting regulations as part of the Mississippi SIP.
37 Fed. Reg. 10875.  These regulations are found at Mississippi
Commission on Natural Resources Permit Regulations for the
Construction and/or Operation of Air Emission Equipment APC-S-2
(hereafter, "Rule APC-S-2").  EPA approved revisions to Rule APC-
S-2 effective February 7, 1979.  44 Fed. Reg. 7713.  EPA approved
additional revisions to Rule APC-S-2 on September 15, 1994, (59
Fed. Reg. 47258) and on May 2, 1995 (60 Fed. Reg. 21442).

33

104. As of February 7, 1979, Section 1.1.2 of Rule APC-S-2 provided that it is "unlawful for any person to build, erect, alter, replace, use or operate any equipment which will cause the issuance of air contaminants unless he holds a permit."

105. Revisions to Rule APC-S-2 approved by EPA on September 15, 1994, provide that any new, reconstructed or modified facility must have a permit to construct before beginning construction, reconstruction or modification and a state permit to operate before beginning operations. Rule APC-S-2 Section I.B.1.

## ENFORCEMENT PROVISIONS

106. Section 113(a)(1) of the Act, 42 U.S.C. § 7413(a)(1), provides that:

> Whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated or is in violation of any requirement or prohibition of an applicable implementation plan or permit, the Administrator shall notify the person and the State in which the plan applies of such finding. At any time after the expiration of 30 days following the date on which such notice of a violation is issued, the Administrator may

. . . *       *       *

> (C) bring a civil action in accordance with subsection (b) of this section.

107. Section 113(a)(3) of the Act, 42 U.S.C. § 7413(a)(3), provides that "[e]xcept for a requirement or prohibition enforceable under the preceding provisions of this subsection, whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has

34

violated, or is in violation of, any other requirement or prohibition of this subchapter . . . the Administrator may . . . bring a civil action in accordance with subsection (b) of this section . . . ."

108.  Section 113(b)(1) of the Act, 42 U.S.C. § 7413(b)(1), and 40 C.F.R. § 52.23, authorize the Administrator to initiate a judicial enforcement action for a permanent or temporary injunction, and/or for a civil penalty of up to $25,000 per day of violation for violations occurring on or before January 30, 1997 and $27,500 per day for each such violation occurring after January 30, 1997, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, against any person whenever such person has violated, or is in violation of, any requirement or prohibition of an applicable implementation plan or permit.

109.  Section 113(b)(2) of the Act, 42 U.S.C. § 7413(b)(2), authorizes the Administrator to initiate a judicial enforcement action for a permanent or temporary injunction, and/or for a civil penalty of up to $25,000 per day of violation for violations occurring on or before January 30, 1997 and $27,500 per day for each such violation occurring after January 30, 1997, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, against any person whenever such person has violated, or is in violation of, requirements of the Act other than those specified

35

in Section 113(b)(1), 42 U.S.C. § 7413(b)(1), including violations of Section 165(a), 42 U.S.C. § 7475(a) and Section 111, 42 U.S.C. § 7411.

110.  Section 167 of the Act, 42 U.S.C. § 7477, authorizes the Administrator to initiate an action for injunctive relief, as necessary to prevent the construction, modification or operation of a major emitting facility which does not conform to the PSD requirements.

111.  At all times pertinent to this civil action, Plants Barry, Bowen, Crist, Gaston, Gorgas, Greene County, Kraft, Miller, Scherer, and Watson were each a "major emitting facility" and a "major stationary source" within the meaning of the Act and the respective state SIPs for NOx, SO₂, PM-10, and PM.

112.  Any owner or operator who constructs or operates a source or modification subject to 40 C.F.R. Part 52 regulations who commences construction after the effective date of those regulations without applying for and receiving approval thereunder, shall be subject to appropriate enforcement action. 40 C.F.R. § 52.21(r).

113.  Pursuant to Section 113 of the Act, 42 U.S.C. § 7413, and 40 C.F.R. § 52.23, upon EPA approval, SIP requirements are federally enforceable under Section 113.  40 C.F.R. § 52.23.

## FIRST CLAIM FOR RELIEF
(PSD Violations at Plant Barry)

114.  Paragraphs 1 through 113 are realleged and incorporated herein by reference.

115.  At various times, Defendants Alabama Power and SCS commenced construction of major modifications, as defined in the Act and the Alabama SIP, at Plant Barry.  These modifications included, but are not limited to:  (1) installation of a new design spiral fin economizer in Unit 5 in 1993; (2) installation of new primary superheater top and intermediate bundle in Unit 1 in 1994; and, (3) installation of a new reheater section in Unit 2 in 1997.  Defendants Alabama Power and SCS constructed additional major modifications to Plant Barry other than those described in this paragraph.

116.  Defendants Alabama Power and SCS did not obtain a PSD permit as required by Rule 16.4 of the Alabama SIP (currently Rule 335-3-14-.04) prior to constructing or operating the major modifications at Plant Barry identified in paragraph 115. Defendants Alabama Power and SCS have not installed and operated BACT for control of NOx, SO, and PM, as applicable, as required by Rule 16.4 of the Alabama SIP (currently Rule 335-3-14-.04) at Plant Barry.  In addition, Defendants Alabama Power and SCS did not comply with Alabama SIP Rules 16.1, 16.4.09, .10, .12, .13, or .14 prior to construction or operation of any of the major modifications of Plant Barry identified in paragraph 115.  (Rules 335-3-14-.01 and 335-3-14-.04(9, 10, 12, 13, 14).

117.  Defendants Alabama Power and SCS have violated and continue to violate Section 165(a) of the Act, 42 U.S.C. § 7475(a), and Rule 16.4 of the Alabama SIP at Plant Barry.  Unless

restrained by an order of this Court, these and similar violations of the Act will continue.

118. As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendants Alabama Power and SCS to injunctive relief and civil penalties of up to $25,000 per day for each violation prior to January 30, 1997, and $27,500 per day for each such violation after January 30, 1997, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

### SECOND CLAIM FOR RELIEF
(Alabama SIP General Permit Violations at Plant Barry)

119. Paragraphs 1 through 113 are realleged and incorporated herein by reference.

120. Defendants Alabama Power and SCS failed to obtain a permit to construct or operate the modifications at Plant Barry identified in paragraph 115 as required by Rule 335-3-14-.01.

121. Defendants Alabama Power and SCS have violated and continue to violate the Act and the Alabama SIP at Plant Barry. Unless restrained by an order of this Court, these and similar violations of the Act and the Alabama SIP will continue.

122. As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b) and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendants Alabama Power and SCS to injunctive relief and civil penalties of up to $25,000 per day for each violation prior to January 30, 1997, and $27,500 per

day for each such violation after January 30, 1997, pursuant to
the Federal Civil Penalties Inflation Adjustment Act of 1990, 28
U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

### THIRD CLAIM FOR RELIEF
(PSD Violations at Plant Gaston)

123.   Paragraphs 1 through 113 are realleged and
incorporated herein by reference.

124.   At various times, Defendants Alabama Power, Georgia
Power, and SCS commenced construction of major modifications, as
defined in the Act and the Alabama SIP, at Plant Gaston.   These
major modifications included, but are not limited to: replacement
of the front reheater for Unit 5 in 1991.   Defendants Alabama
Power, Georgia Power, and SCS constructed additional major
modifications to Plant Gaston other than those described in this
paragraph.

125.   Defendants Alabama Power, Georgia Power, and SCS did
not obtain a PSD permit as required by Rule 16.4 of the Alabama
SIP (currently Rule 335-3-14-.04) prior to constructing or
operating the major modifications at Plant Gaston identified in
paragraph 124.   Defendants Alabama Power, Georgia Power, and SCS
have not installed and operated BACT for control of NOx, SO, and
PM, as applicable, as required by Rule 16.4 of the Alabama SIP
(currently Rule 335-3-14-.04) at Plant Gaston.   In addition,
Defendants Alabama Power, Georgia Power, and SCS did not comply
with Alabama SIP Rules 16.1, 16.4.09, .10, .12, .13, or .14 prior
to construction or operation of any of the major modifications of

39

Plant Gaston identified in paragraph 124.  (Rules 335-3-14-.01 and 335-3-14-.04(9, 10, 12, 13, 14).

126.  Defendants Alabama Power, Georgia Power, and SCS have violated and continue to violate Section 165(a) of the Act, 42 U.S.C. § 7475(a), and Rule 16.4 of the Alabama SIP at Plant Gaston.  Unless restrained by an order of this Court, these and similar violations of the Act will continue.

127.  As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendants Alabama Power, Georgia Power, and SCS to injunctive relief and civil penalties of up to $25,000 per day for each violation prior to January 30, 1997, and $27,500 per day for each such violation after January 30, 1997, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

### FOURTH CLAIM FOR RELIEF
(Alabama SIP General Permit Violations at Plant Gaston)

128.  Paragraphs 1 through 113 are realleged and incorporated herein by reference.

129.  Defendants Alabama Power, Georgia Power, and SCS failed to obtain a permit to construct or operate the modifications at Plant Gaston identified in paragraph 124 as required by Rule 335-3-14-.01.

130.  Defendants Alabama Power, Georgia Power, and SCS have violated and continue to violate the Act and the Alabama SIP at

40

Plant Gaston.  Unless restrained by an order of this Court, these and similar violations of the Act and the Alabama SIP will continue.

131.  As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendants Alabama Power, Georgia Power, and SCS to injunctive relief and civil penalties of up to $25,000 per day for each violation prior to January 30, 1997, and $27,500 per day for each such violation after January 30, 1997, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

FIFTH CLAIM FOR RELIEF
(PSD Violations at Plant Gorgas)

132.  Paragraphs 1 through 113 are realleged and incorporated herein by reference.

133.  At various times, Defendants Alabama Power and SCS commenced construction of major modifications, as defined in the Act and the Alabama SIP, at Plant Gorgas.  These major "modifications" included, but are not limited to: (1) a balance draft conversion of Unit 10 in 1985; (2) installation of a new design spiral fin economizer in Unit 10 in 1994; and, (3) installation of redesigned air heaters in Unit 10 in 1994.  Defendants Alabama Power and SCS constructed additional major modifications to Plant Gorgas other than those described in this paragraph.

41

134.  Defendants Alabama Power and SCS did not obtain a PSD
permit as required by Rule 16.4 of the Alabama SIP (currently
Rule 335-3-14-.04) prior to constructing or operating the major
modifications at Plant Gorgas identified in paragraph 133.
Defendants Alabama Power and SCS have not installed and operated
BACT for control of NOx, SO_2, and PM, as applicable, as required
by Rule 16.4 of the Alabama SIP (currently Rule 335-3-14-.04) at
Plant Gorgas.  In addition, Defendants Alabama Power and SCS did
not comply with Alabama SIP Rules 16.1, 16.4.09, .10, .12, .13,
or .14 prior to construction or operation of any of the major
modifications of Plant Gorgas identified in paragraph 133.
(Rules 335-3-14-.01 and 335-3-14-.04(9, 10, 12, 13, 14).

135.  Defendants Alabama Power and SCS have violated and
continue to violate Section 165(a) of the Act, 42 U.S.C. §
7475(a), and Rule 16.4 of the Alabama SIP at Plant Gorgas.
Unless restrained by an order of this Court, these and similar
violations of the Act will continue.

136.  As provided in Section 113(b) of the Act, 42 U.S.C. §
7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the
violations set forth above subject Defendants Alabama Power and
SCS to injunctive relief and civil penalties of up to $25,000 per
day for each violation prior to January 30, 1997, and $27,500 per
day for each such violation after January 30, 1997, pursuant to
the Federal Civil Penalties Inflation Adjustment Act of 1990, 28
U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

### SIXTH CLAIM FOR RELIEF
(Alabama SIP General Permit Violations at Plant Gorgas)

137.  Paragraphs 1 through 113 are realleged and incorporated herein by reference.

138.  Defendants Alabama Power and SCS failed to obtain a permit to construct or operate the modifications at Plant Gorgas identified in paragraph 133 as required by Rule 335-3-14-.01.

139.  Defendants Alabama Power and SCS have violated and continue to violate the Act and the Alabama SIP at Plant Gorgas. Unless restrained by an order of this Court, these and similar violations of the Act and the Alabama SIP will continue.

140.  As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendants Alabama Power and SCS to injunctive relief and civil penalties of up to $25,000 per day for each violation prior to January 30, 1997, and $27,500 per day for each such violation after January 30, 1997, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

### SEVENTH CLAIM FOR RELIEF
(PSD Violations at Plant Greene County)

141.  Paragraphs 1 through 113 are realleged and incorporated herein by reference.

142.  At various times, Defendants Alabama Power and SCS commenced construction of major modifications, as defined in the Act and the Alabama SIP, at Plant Greene County.  These "major

43

modifications" included, but are not limited to: replacement of the primary reheater for Unit 2 in 1989. Defendants Alabama Power and SCS constructed additional major modifications to Plant Greene County other than those described in this paragraph.

143. Defendants Alabama Power and SCS did not obtain a PSD permit as required by Rule 16.4 of the Alabama SIP (currently Rule 335-3-14-.04) prior to constructing or operating the major modifications at Plant Greene County identified in paragraph 142. Defendants Alabama Power and SCS have not installed and operated BACT for control of NOx, SO, and PM, as applicable, as required by Rule 16.4 of the Alabama SIP (currently Rule 335-3-14-.04) at Plant Greene County. In addition, Defendants Alabama Power and SCS did not comply with Alabama SIP Rules 16.1, 16.4.09, .10, .12, .13, or .14 prior to construction or operation of any of the major modifications of Plant Greene County identified in paragraph 142. Rules 335-3-14-.01 and 335-3-14-.04(9, 10, 12, 13, 14).

144. Defendants Alabama Power and SCS have violated and continue to violate Section 165.a. of the Act, 42 U.S.C. § 7475(a), and Rule 16.4 of the Alabama SIP at Plant Greene County. Unless restrained by an order of this Court, these and similar violations of the Act will continue.

145. As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendants Alabama Power and

44

SCS to injunctive relief and civil penalties of up to $25,000 per day for each violation prior to January 30, 1997, and $27,500 per day for each such violation after January 30, 1997, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

## EIGHTH CLAIM FOR RELIEF
(Alabama SIP General Permit Violations at Plant Greene County)

146.   Paragraphs 1 through 113 are realleged and incorporated herein by reference.

147.   Defendants Alabama Power and SCS failed to obtain a permit to construct or operate the modifications at Plant Greene County identified in paragraph 142 as required by Rule 335-3-14-.01.

148.   Defendants Alabama Power and SCS have violated and continue to violate the Act and the Alabama SIP at Plant Greene County.   Unless restrained by an order of this Court, these and similar violations of the Act and the Alabama SIP will continue.

149.   As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendants Alabama Power and SCS to injunctive relief and civil penalties of up to $25,000 per day for each violation prior to January 30, 1997, and $27,500 per day for each such violation after January 30, 1997, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

## NINTH CLAIM FOR RELIEF

(PSD Violations: Construction at Plant Miller Unit 3

150.  Paragraphs 1 through 113 are realleged and incorporated herein by reference.

151.  Defendants Alabama Power and SCS commenced construction of major modifications, as defined in the Act and the Alabama SIP, at Plant Miller.  These "major modifications" included, but are not limited to: construction of Miller Unit 3 on or after June 1, 1975.  Defendants Alabama Power and SCS did not, as required by the CAA and the Alabama SIP, undertake a continuous program of construction at Unit 3, or failed to complete construction of Unit 3 within a reasonable time, subjecting Unit 3 to the PSD provisions of the CAA and the Alabama SIP as a new major modification upon resumption of construction activities after June 1, 1975.  Defendants Alabama Power and SCS constructed additional major modifications to Plant Miller other than those described in this paragraph.

152.  Defendants Alabama Power and SCS did not obtain a PSD permit as required by Section 165 of the Act, 42 U.S.C. § 7475, , or, following November 17, 1981, Rule 16.4 of the Alabama SIP (currently Rule 335-3-14-.04 , prior to constructing or operating the major modifications at Plant Miller identified in paragraph 151.  Defendants Alabama Power and SCS have not installed and operated BACT for control of NOx, SO , and PM, as applicable, as required by Section 165 of the Act, 42 U.S.C. § 7475 or Rule 16.4 of the Alabama SIP (currently Rule 335-3-14-.04) at Plant Miller.

46

In addition, Defendants Alabama Power and SCS did not comply with Alabama SIP Rules 16.1, 16.4.09, .10, .12, .13, or .14 prior to construction or operation of any of the major modifications of Plant Miller identified in paragraph 151. (Rules 335-3-14-.01 and 335-3-14-.04(9, 10, 12, 13, 14).

153.  Defendants Alabama Power and SCS have violated and continue to violate Section 165(a) of the Act, 42 U.S.C. § 7475(a), and Rule 16.4 of the Alabama SIP at Plant Miller. Unless restrained by an order of this Court, these and similar violations of the Act will continue.

154.  As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendants Alabama Power and SCS to injunctive relief and civil penalties of up to $25,000 per day for each violation prior to January 30, 1997, and $27,500 per day for each such violation after January 30, 1997, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

TENTH CLAIM FOR RELIEF
(PSD Violations: Construction at Plant Miller Unit 4)

155.  Paragraphs 1 through 113 are realleged and incorporated herein by reference.

156.  Defendants Alabama Power and SCS commenced construction of major modifications, as defined in the Act and the Alabama SIP, at Plant Miller.  These "major modifications" included, but are not limited to: construction of Miller Unit 4

47

on or after June 1, 1975.  Defendants Alabama Power and SCS did not, as required by the CAA and the Alabama SIP, undertake a continuous program of construction at Unit 4, or failed to complete construction of Unit 4 within a reasonable time, subjecting Unit 4 to the PSD provisions of the CAA and the Alabama SIP as a new major modification upon resumption of construction activities after June 1, 1975.  Defendants Alabama Power and SCS constructed additional major modifications to Plant Miller other than those described in this paragraph.

157.  Defendants Alabama Power and SCS did not obtain a PSD permit as required by Section 165 of the Act, 42 U.S.C. § 7475, or, following November 10, 1981, Rule 16.4 of the Alabama SIP (currently Rule 335-3-14-.04), prior to constructing or operating the major modifications at Plant Miller identified in paragraph 156.  Defendants Alabama Power and SCS have not installed and operated BACT for control of NOx, SO, and PM, as applicable, as required by Section 165 of the Act, 42 U.S.C. § 7475 or Rule 16.4 of the Alabama SIP (currently Rule 335-3-14-.04) at Plant Miller. In addition, Defendants Alabama Power and SCS did not comply with Alabama SIP Rules 16.1, 16.4.09, .10, .12, .13, or .14 prior to construction or operation of any of the major modifications of Plant Miller identified in paragraph 156.  (Rules 335-3-14-.01 and 335-3-14-.04(9, 10, 12, 13, 14).

158.  Defendants Alabama Power and SCS have violated and continue to violate Section 16 .a) of the Act, 42 U.S.C. §

48

7475(a), and Rule 16.4 of the Alabama SIP at Plant Miller. Unless restrained by an order of this Court, these and similar violations of the Act will continue.

159.  As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendants Alabama Power and SCS to injunctive relief and civil penalties of up to $25,000 per day for each violation prior to January 30, 1997, and $27,500 per day for each such violation after January 30, 1997, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

<u>ELEVENTH CLAIM FOR RELIEF</u>
(PSD Violations: Modifications at Plant Bowen)

160.  Paragraphs 1 through 113 are realleged and incorporated herein by reference.

161.  At various times, Defendants Georgia Power and SCS commenced construction of major modifications, as defined in the Act and the Georgia SIP, at Plant Bowen.  These modifications included, but are not limited to: installation of a new economizer in Unit 2 in 1990.  Defendants Georgia Power and SCS constructed additional major modifications to the Bowen plant other than those described in this paragraph.

162.  Defendants Georgia Power and SCS did not obtain a PSD permit as required by the Georgia SIP, DNR 391-3-1-.02(7), prior to constructing or operating the major modifications at Plant Bowen identified in paragraph 161.  Defendants Georgia Power and

SCS have not installed and operated BACT for control of NOx, SO and PM, as applicable, as required by the Georgia SIP, DNR 391-3-1-.02(7), at the Bowen Plant.  In addition, Defendants Georgia Power and SCS have failed and continue to fail to comply at Plant Bowen with the requirements of the Georgia SIP, DNR 391-3-1-.02(7)(b)(6, 7, 9, 10).

163.  Defendants Georgia Power and SCS have violated and continue to violate Section 165(a) of the Act, 42 U.S.C. § 7475(a), and the Georgia SIP, DNR 391-3-1-.02(7), at Plant Bowen. Unless restrained by an order of this Court, these and similar violations of the Act will continue.

164.  As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendants Georgia Power and SCS to injunctive relief and civil penalties of up to $25,000 per day for each violation prior to January 30, 1997, and $27,500 per day for each such violation after January 30, 1997, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

TWELFTH CLAIM FOR RELIEF
(Georgia SIP General Permit Violations at Plant Bowen)

165.  Paragraphs 1 through 113 are realleged and incorporated herein by reference.

166.  Each of the modifications at Plant Bowen identified in paragraph 161 is a modification as defined by DNR 393-3-1.01(pp).

167.  Defendants Georgia Power and SCS failed to obtain a

50

permit pursuant to DNR 391-3-1-.03 prior to construction or operation of the modifications of the Bowen Plant identified in paragraph 161.

168.  Defendants Georgia Power and SCS have violated and continue to violate the Act and the Georgia SIP, DNR 391-3-1-.03, at Plant Bowen.  Unless restrained by an order of this Court, these and similar violations of the Act and the Georgia SIP will continue.

169.  As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendants Georgia Power and SCS to injunctive relief and civil penalties of up to $25,000 per day for each violation prior to January 30, 1997, and $27,500 per day for each such violation after January 30, 1997, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

THIRTEENTH CLAIM FOR RELIEF
(PSD Violations: Construction at Plant Scherer Unit 3)

170.  Paragraphs 1 through 113 are realleged and incorporated herein by reference.

171.  Defendants Georgia Power and SCS commenced construction of major modifications, as defined in the Act and the Georgia SIP, at Plant Scherer.  These "major modifications" included, but are not limited to: construction of Scherer Unit 3 on or after June 1, 1975.  Defendants Georgia Power and SCS constructed additional major modifications to Plant Scherer other

51

than those described in this paragraph.

172.  Defendants Georgia Power and SCS did not obtain a PSD permit as required by Section 165 of the Act, 42 U.S.C. § 7475, or, following February 16, 1979, DNR 391-3-1-.02(7) of the Georgia SIP, prior to constructing or operating the major modifications at Plant Scherer identified in paragraph 171. Defendants Georgia Power and SCS have not installed and operated BACT for control of NOx, SO., and PM, as applicable, as required by Section 165 of the Act, 42 U.S.C. § 7475 or DNR 391-3-1-.02(7) of the Georgia SIP at Plant Scherer.

173.  Defendants Georgia Power and SCS have violated and continue to violate Section 165(a) of the Act, 42 U.S.C. § 7475(a), and DNR 391-3-1-.02(7) of the Georgia SIP at Plant Scherer.  Unless restrained by an order of this Court, these and similar violations of the Act will continue.

174.  As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendants Georgia Power and SCS to injunctive relief and civil penalties of up to $25,000 per day for each violation prior to January 30, 1997, and $27,500 per day for each such violation after January 30, 1997, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

### FOURTEENTH CLAIM FOR RELIEF
(NSPS Violations: Construction at Plant Scherer Unit 3)

175.  Paragraphs 1 through 112 are realleged and

incorporated herein by reference.

176.  Defendant Georgia Power is the "owner" and Georgia Power and SCS are the "operators" of Plant Scherer Unit 3 within the meaning of Section 111(a)(5) of the Act, 42 U.S.C. § 7411(a)(5), and 40 C.F.R. § 60.2, of an electric utility steam generating unit within the meaning of 40 C.F.R. §§ 60.40a and 60.41a, designated Scherer Unit 3.

177.  Defendants Georgia Power and SCS commenced construction of Scherer Unit 3 after September 18, 1978.  Hence, Scherer Unit 3 was and is subject to NSPS Subpart Da requirements.

178.  Defendants Georgia Power and SCS have failed to comply with Subpart Da requirements at Plant Scherer Unit 3 by, including but not limited to, failing to conduct a performance test in accordance with 40 C.F.R. § 60.48a within 60 days after achieving the maximum production rate at the facility or furnishing EPA a written report of the results of such performance test.

179.  Each day that Defendants Georgia Power and SCS fail to comply with NSPS requirements at Plant Scherer Unit 3 is a violation of Section 111(e) of the Act, 42 U.S.C. § 7411(e).

180.  Defendants Georgia Power and SCS have been in violation of  the Act and the Georgia SIP at Plant Scherer.  Unless restrained by an order of this Court, these and similar violations of the Act and the Georgia SIP will continue.

181.  As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendants Georgia Power and SCS to injunctive relief and civil penalties of up to $25,000 per day for each violation prior to January 30, 1997, and $27,500 per day for each such violation after January 30, 1997, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

### FIFTEENTH CLAIM FOR RELIEF
(PSD Violations: Construction at Plant Scherer Unit 4)

182.  Paragraphs 1 through 113 are realleged and incorporated herein by reference.

183.  Defendants Georgia Power and SCS commenced construction of major modifications, as defined in the Act and the Georgia SIP, at Plant Scherer.  These "major modifications" included, but are not limited to: construction of Scherer Unit 4 on or after June 1, 1975.  Defendants Georgia Power and SCS did not, as required by the CAA and the Georgia SIP, undertake a continuous program of construction at Unit 4, or failed to complete construction of Unit 4 within a reasonable time, subjecting Unit 4 to the PSD provisions of the CAA and the Georgia SIP as a new major modification upon resumption of construction activities after June 1, 1975.  Defendants Georgia Power and SCS constructed additional major modifications to Plant Scherer other than those described in this paragraph.

184.  Defendants Georgia Power and SCS did not obtain a PSD

permit as required by Section 165 of the Act, 42 U.S.C. § 7475, or, following February 18, 1979, DNR 391-3-1-.02(7) of the Georgia SIP, prior to constructing or operating the major modifications at Plant Scherer identified in paragraph 183. Defendants Georgia Power and SCS have not installed and operated BACT for control of NOx, SO, and PM, as applicable, as required by Section 165 of the Act, 42 U.S.C. § 7475 or DNR 391-3-1-.02(7) of the Georgia SIP at Plant Scherer.

185.  Defendants Georgia Power and SCS have violated and continue to violate Section 165(a) of the Act, 42 U.S.C. § 7475(a), and DNR 391-3-1-.02(7) of the Georgia SIP at Plant Scherer.  Unless restrained by an order of this Court, these and similar violations of the Act will continue.

186.  As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendants Georgia Power and SCS to injunctive relief and civil penalties of up to $25,000 per day for each violation prior to January 30, 1997, and $27,500 per day for each such violation after January 30, 1997, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

### SIXTEENTH CLAIM FOR RELIEF
(NSPS Violations: Construction at Plant Scherer Unit 4)

187.  Paragraphs 1 through 113 are realleged and incorporated herein by reference.

188.  Defendant Georgia Power is the "owner" and Defendants

Georgia Power and SCS are the "operators," within the meaning of Section 111(a)(5) of the Act, 42 U.S.C. § 7411.a 5 , and 40 C.F.R. § 60.2, of an electric utility steam generating unit within the meaning of 40 C.F.R. §§ 60.40a and 60.41a, designated Plant Scherer Unit 4.

189.  Defendants Georgia Power and SCS commenced construction of Plant Scherer Unit 4 after September 18, 1978. Hence, Plant Scherer Unit 4 was and is subject to NSPS Subpart Da requirements.

190.  Defendants Georgia Power and SCS have failed to comply with Subpart Da requirements at Plant Scherer Unit 4 by, including but not limited to, failing to conduct a performance test in accordance with 40 C.F.R. § 60.48a within 60 days after achieving the maximum production rate at the facility or furnishing EPA a written report of the results of such performance test.

191.  Each day that Defendants Georgia Power and SCS fail to comply with NSPS requirements at Plant Scherer Unit 4 is a violation of Section 111 e of the Act, 42 U.S.C. § 7411(e).

192.  Defendants Georgia Power and SCS have been in violation of the Act and the Georgia SIP at Plant Scherer. Unless restrained by an order of this Court, these and similar violations of the Act and the Georgia SIP will continue.

193.  As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the

violations set forth above subject Defendants Georgia Power and
SCS to injunctive relief and civil penalties of up to $25,000 per
day for each violation prior to January 30, 1997, and $27,500 per
day for each such violation after January 30, 1997, pursuant to
the Federal Civil Penalties Inflation Adjustment Act of 1990, 28
U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

## SEVENTEENTH CLAIM FOR RELIEF
### (PSD Violations: Modifications at Plant Crist)

194.   Paragraphs 1 through 113 are realleged and
incorporated herein by reference.

195.   At various times, Defendants Gulf Power and SCS
commenced construction of major modifications, as defined in the
Act and the Florida SIP, at Plant Crist.  These major
modifications included, but are not limited to: installation of a
new economizer in Unit 7 in 1996.  Defendants Gulf Power and SCS
constructed additional major modifications to Plant Crist other
than those described in this paragraph.

196.   Defendants Gulf Power and SCS did not obtain a PSD
permit as required by FAC § 17-212.400(5) (FAC § 62-212.400(5)),
prior to construction or operation of any of the modifications of
Plant Crist identified in paragraph 195.  Defendants Gulf Power
and SCS have not installed and operated BACT for control of NOx,
SO and PM, as applicable, as required by FAC § 17-212.400(5)(c)
(FAC § 62-212.400(5)(c)), at Plant Crist.  In addition,
defendants Gulf Power and SCS did not comply with all provisions
of the Florida SIP, including FAC § 17-212.400(5)(b-f) (FAC § 62-

212.400(5)(b-f)) prior to constructing and operating the modifications at Plant Crist identified in paragraph 195.

197. Defendants Gulf Power and SCS have violated and continue to violate Section 165(a) of the Act, 42 U.S.C. § 7475(a), and the Florida SIP at Plant Crist. Unless restrained by an order of this Court, these and similar violations of the Act and the Florida SIP will continue.

198. As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendants Gulf Power and SCS to injunctive relief and civil penalties of up to $25,000 per day for each violation prior to January 30, 1997, and $27,500 per day for each such violation after January 30, 1997, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

EIGHTEENTH CLAIM FOR RELIEF
Florida SIP General Permit Violations at Plant Crist

199. Paragraphs 1 through 113 are realleged and incorporated herein by reference.

200. As defined in the Florida SIP, Plant Crist is an "emissions unit." FAC § 17-210.300 (FAC § 62-210.300).

201. Defendants Gulf Power and SCS failed to obtain a permit pursuant to FAC § 17-212.300(1)(a) (FAC § 62-212.300(1)(a)) prior to construction or operation of any of the modifications of Plant Crist identified in paragraph 195.

202. Defendants Gulf Power and SCS have been in violation

58

of the Act and the Florida SIP at Plant Crist.  Unless restrained
by an order of this Court, these and similar violations of the
Act and the Florida SIP will continue.

203.  As provided in Section 113(b) of the Act, 42 U.S.C. §
7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the
violations set forth above subject Defendants Gulf Power and SCS
to injunctive relief and civil penalties of up to $25,000 per day
for each violation prior to January 30, 1997, and $27,500 per day
for each such violation after January 30, 1997, pursuant to the
Federal Civil Penalties Inflation Adjustment Act of 1990, 28
U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

## NINETEENTH CLAIM FOR RELIEF
(PSD Violations: Modifications at Plant Watson)

204.  Paragraphs 1 through 113 are realleged and
incorporated herein by reference.

205.  At various times, Defendants Mississippi Power and SCS
commenced construction of major modifications, as defined in the
Act, at Plant Watson.  These major modifications included, but
are not limited to: installation of a new economizer in Unit 5 in
1992.  Defendants Mississippi Power and SCS constructed
additional major modifications to Plant Watson other than those
described in this paragraph.

206.  Defendants Mississippi Power and SCS did not obtain a
PSD permit as required by 40 C.F.R. §§ 52.21(i)(1) and
52.21(r)(1) prior to constructing or operating the major
modifications at Plant Watson identified in paragraph 205.

Defendants Mississippi Power and SCS have not installed and operated BACT for control of NOx, SO, and PM, as applicable, as required by the Mississippi SIP, Rule APC-S-5, 40 C.F.R. § 52.21(j), at Plant Watson. Defendants Mississippi Power and SCS have also failed and continue to fail to comply at Plant Watson with the requirements of 40 C.F.R. §§ 52.21(k), (m), (n), and (o), as incorporated into the Mississippi SIP, Rule APC-S-5.

207. Defendants Mississippi Power and SCS have violated and continue to violate Section 165(a) of the Act, 42 U.S.C. § 7475(a), and the Mississippi SIP, Rule APC-S-5, 40 C.F.R. § 52.21 at Plant Watson. Unless restrained by an order of this Court, these and similar violations of the Act.

208. As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendants Mississippi Power and SCS to injunctive relief and civil penalties of up to $25,000 per day for each violation prior to January 30, 1997, and $27,500 per day for each such violation after January 30, 1997, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

TWENTIETH CLAIM FOR RELIEF
(Mississippi SIP General Permit Violations at Plant Watson)

209. Paragraphs 1 through 113 are realleged and incorporated herein by reference.

210. By performing the modifications at Plant Watson identified in paragraph 205, Defendants Mississippi Power and SCS

60

"built," "altered," and "operated" Plant Watson as those terms are defined in the Mississippi SIP.  Rule 1.1.C (APC-S-2.1.B).

211.  Defendants Mississippi Power and SCS did not obtain a permit under Rule APC-S-2 of the Mississippi SIP prior to building, altering, or operating the modifications of Plant Watson identified in paragraph 205.

212.  Defendants Mississippi Power and SCS have therefore violated the Act and Rule APC-S-2 of the Mississippi SIP at Plant Watson.  Unless restrained by an order of this Court, these and similar violations of the Act and the Mississippi SIP will continue.

213.  As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendants Mississippi Power and SCS to injunctive relief and civil penalties of up to $25,000 per day for each violation prior to January 30, 1997, and $27,500 per day for each such violation after January 30, 1997, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

TWENTY-FIRST CLAIM FOR RELIEF
(PSD Violations: Modifications at Plant Kraft)

214.  Paragraphs 1 through 113 are realleged and incorporated herein by reference.

215.  At various times, Defendants Savannah Power and SCS commenced construction of major modifications, as defined in the Act and the Georgia SIP, at Plant Kraft.  These major

61

modifications included, but are not limited to: balanced draft conversion of Unit 3 in 1985. Defendants Savannah Power and SCS constructed additional major modifications to the Kraft plant other than those described in this paragraph.

216. Defendants Savannah Power and SCS did not obtain a PSD permit as required by the Georgia SIP, DNR 391-3-1-.02(7), prior to constructing or operating the major modifications at Plant Kraft identified in paragraph 215. Defendants Savannah Power and SCS have not installed and operated BACT for control of NOx, SO and PM, as applicable, as required by the Georgia SIP, DNR 391-3-1-.02(7), at Plant Kraft. In addition, Defendants Savannah Power and SCS have failed and continue to fail to comply at Plant Kraft with the requirements of the Georgia SIP, DNR 391-3-1-.02(7)(b)(6, 7, 9, 10).

217. Defendants Savannah Power and SCS have violated and continue to violate Section 165(a) of the Act, 42 U.S.C. § 7475(a), and the Georgia SIP, DNR 391-3-1-.02(7), at Plant Kraft. Unless restrained by an order of this Court, these and similar violations of the Act will continue.

218. As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendants Savannah Power and SCS to injunctive relief and civil penalties of up to $25,000 per day for each violation prior to January 30, 1997, and $27,500 per day for each such violation after January 30, 1997, pursuant to

62

the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

### TWENTY-SECOND CLAIM FOR RELIEF
(Georgia SIP General Permit Violations at Plant Kraft)

219.  Paragraphs 1 through 113 are realleged and incorporated herein by reference.

220.  Each of the modifications at Plant Kraft identified in paragraph 215 is a modification as defined by DNR 393-3-1.01(pp).

221.  Defendants Savannah Power and SCS failed to obtain a permit pursuant to DNR 391-3-1-.03 prior to construction or operation of any of the major modifications of Plant Kraft identified in paragraph 215.

222.  Defendants Savannah Power and SCS have violated and continue to violate the Act and the Georgia SIP, DNR 391-3-1-.03, at Plant Kraft.  Unless restrained by an order of this Court, these and similar violations of the Act and the Georgia SIP will continue.

223.  As provided in Section 113 b of the Act, 42 U.S.C. § 7413 b, and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendants Savannah Power and SCS to injunctive relief and civil penalties of up to $25,000 per day for each violation prior to January 30, 1997, and $27,500 per day for each such violation after January 30, 1997, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

PRAYER FOR RELIEF

WHEREFORE, based upon all the allegations contained in paragraphs 1 through 223 above, the United States of America requests that this Court:

1. Permanently enjoin the Defendants Alabama Power and SCS from operating Plants Barry, Gorgas, Greene County, and Miller, including the construction of future modifications, except in accordance with the Clean Air Act and any applicable regulatory requirements;

2. Permanently enjoin the Defendants Alabama Power, Georgia Power, and SCS from operating Plant Gaston, including the construction of future modifications, except in accordance with the Clean Air Act and any applicable regulatory requirements;

3. Permanently enjoin the Defendants Georgia Power and SCS from operating Plants Bowen and Scherer, including the construction of future modifications, except in accordance with the Clean Air Act and any applicable regulatory requirements;

4. Permanently enjoin the Defendants Gulf Power and SCS from operating Plant Crist, including the construction of future modifications, except in accordance with the Clean Air Act and any applicable regulatory requirements;

5. Permanently enjoin the Defendants Mississippi Power and SCS from operating Plant Watson, including the construction of future modifications, except in accordance with the Clean Air Act and any applicable regulatory requirements;

64

6.  Permanently enjoin the Defendants Savannah Power and SCS from operating Plant Kraft, including the construction of future modifications, except in accordance with the Clean Air Act and any applicable regulatory requirements;

7.  Order each Defendant to remedy its violations by, among other things, requiring it to install, as appropriate, the best available control technology or the lowest achievable emission rate technology, on the plants that it owns or operates for each pollutant subject to regulation under the Clean Air Act;

8.  Order Defendants Alabama Power and SCS to apply for permits for Plants Barry, Gorgas, Greene County and Miller that are in conformity with the requirements of the PSD provisions of the Act and the Alabama SIP, and the general permit provisions of the Alabama SIP;

9.  Order Defendants Alabama Power, Georgia Power, and SCS to apply for a permit for Plant Gaston that is in conformity with the requirements of the PSD provisions of the Act and the Alabama SIP, and the general permit provisions of the Alabama SIP;

10.  Order Defendants Georgia Power and SCS to apply for permits for Plant Bowen and Plant Scherer that are in conformity with the requirements of the PSD provisions of the Act and the Georgia SIP, and the general permit provisions of the Georgia SIP;

11.  Order Defendants Gulf Power and SCS to apply for a permit for Plant Crist that is in conformity with the

B

US OFFICE PRODUCTS

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,

v.

ALABAMA POWER CO., GEORGIA
POWER CO., and SOUTHERN
COMPANY SERVICES, INC.,

              Defendants.

CIVIL ACTION NO.
1:99-CV-02859-JEC

## ORDER

    This case is presently before the Court on defendant Southern Company Services' Motion to Dismiss [5], defendant Alabama Power Co.'s Motion to Dismiss [7], defendant Alabama Power Co.'s Alternative Motion to Transfer Venue [8], Consumers' Utility Counsel Division of the Governor's Office of Consumer Affairs Motion for Leave to File Brief as Amicus Curiae [15], Alabama Power Co.'s Objection to Exhibits and Motion to Exclude [33], plaintiff's Motion for Leave to File Amended Complaint [35], Physicians for Social Responsibility, Campaign for a Prosperous Georgia, U.S. Public Interest Research Group, and Alabama Environmental Council's Motion to Intervene as Plaintiffs [38], plaintiff's Unopposed Motion for Leave to Exceed Page Limit [46], plaintiff's Motion for Leave to File its Reply Memorandum in

AO 72A
(Rev.8/82)

Support of its Motion for Leave to Amend its Complaint Under Seal [46], and Consumers' Utility Counsel's Motion for Leave to File a Reply Brief Amicus Curiae [48]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendant Southern Company Services' Motion to Dismiss [5] should be **GRANTED**, Alabama Power Co.'s Objection to Exhibits and Motion to Exclude [33] should be **GRANTED IN PART AND DENIED IN PART**, defendant Alabama Power Co.'s Motion to Dismiss [7] should be **GRANTED**, defendant Alabama Power Co.'s Alternative Motion to Transfer Venue [8] should be **DENIED AS MOOT**, Consumers' Utility Counsel's Motion for Leave to File a Reply Brief Amicus Curiae [48] should be **GRANTED**, Consumers' Utility Counsel's Motion for Leave to File Brief as Amicus Curiae [15] should be **DENIED**, plaintiff's Motion for Leave to File its Reply Memorandum in Support of its Motion for Leave to Amend its Complaint Under Seal [46] should be **GRANTED**, and plaintiff's Unopposed Motion for Leave to Exceed Page Limit [46] should be **GRANTED**. Plaintiff's Motion for Leave to File Amended Complaint [35] and Physicians for Social Responsibility, Campaign for a Prosperous Georgia, U.S. Public Interest Research Group, and Alabama Environmental Council's Motion to Intervene as Plaintiffs [38] remain under consideration by the Court.

2

## BACKGROUND

### I.   The Parties

#### A.   *Plaintiff/Proposed Intervening Plaintiffs*

##### 1.   The United States

The plaintiff in this case is the United States, acting at the request of the Administrator of the United States Environmental Protection Agency (hereinafter "EPA"). (Compl. [1].) Under the Clean Air Act, the Administrator of the EPA may bring a civil action against the owner or operator "of an affected source, a major emitting facility, or a major stationary source . . . for a permanent or temporary injunction, or to assess and recover a civil penalty of not more than $25,000 per day for each violation, or both [in certain] instances." 42 U.S.C. § 7413(b).

##### 2.   The Proposed Intervenors

The following groups have filed a motion to intervene as plaintiffs: Physicians for Social Responsibility, Campaign for a Prosperous Georgia, United States Public Interest Group, and Alabama Environmental Council. (Mot. of Physicians for Social Responsibility, Campaign for a Prosperous Georgia, United States Public Interest Group, and Alabama Environmental Council to Intervene as Pls [38].) These organizations state that they have "thousands of members in Alabama and Georgia that are exposed to the pollutants and their byproducts that Defendants are alleged to be emitting into the air in violation of the clean Air Act." (*Id.*

3

at 8.)  They state that they have an unconditional statutory right to intervene because they have a direct, substantial, and legally protectible interest in the subject matter of the action.  In the alternative, the applicants move for permissive intervention pursuant to Federal Rule of Civil Procedure 24(b).  (*Id.* at 6-15.)

### B.   Defendants

#### 1.   Georgia Power

Georgia Power Company (hereinafter "Georgia Power") is a Georgia corporation.[1]  (Compl. [1] at ¶ 11.)  Georgia Power is a wholly-owned subsidiary of the Southern Company[2].  Georgia Power operates electric generating facilities in Georgia[3] and provides electrical capacity and energy to a shared system maintained by defendant Southern Company Services (hereinafter "SCS"), which is

---

[1]   Plaintiff contends that Georgia Power conducts business in both Georgia and Alabama.  Georgia Power, however, denies that it "does business" in Alabama.  (Answer of Georgia Power Co. [3] at ¶ 10.)

[2] The Southern Company is not a party to this lawsuit. It is the parent company of all of the defendants, however. The Southern Company is a Delaware corporation with its headquarters in Georgia.  (Resp. of the U.S. to Alabama Power's Mot. to Dismiss for Lack of Jurisdiction and Improper Venue [21] at 5.)  It is "a registered public utility holding company, organized and existing under the Public Utility Holding Company Act of 1935.  (SCS's Mot. to Dismiss [5] at 4 n.4.)  The Southern Company owns all of the outstanding common stock of five public utility operating companies: Alabama Power, Georgia Power, Gulf Power, Mississippi Power, and Savannah Power.  (*Id.*)

[3] Plaintiff states that Georgia Power also operates such facilities in Alabama, a fact that Georgia Power denies. (Answer of Georgia Power [3] at ¶ 11.)

4

then distributed within Georgia and Alabama.  (*Id.*)  Among the power plants owned by Georgia Power are two named in the complaint: Plant Bowen in Bartow County, Georgia, and Plant Scherer in Monroe County, Georgia.  (*Id.* at ¶¶ 22-23.)

Georgia Power is a member of the Southeastern Electric Reliability Council (hereinafter "SERC"), and through SERC Georgia Power is represented on the National Electric Reliability Council. (Answer of Georgia Power [4] at ¶ 15.)  Defendant Georgia Power is also a 50% owner of Southern Energy Generation Co. (hereinafter "SEGCO"), a corporation doing business in Georgia and Alabama. (Compl. at ¶ 10.)  SEGCO owns electric generating units at Plant Gaston on the Coosa River near Wilsonville, Alabama.  (*Id.* at ¶ 13.)  Georgia Power is entitled to 50% of SEGCO's capacity and energy.  (*Id.*)  SEGCO owns three 230,000 volt transmission lines that extend from Plant Gaston to the Georgia state line where they connect to Georgia Power's transmission line system.  (*Id.*)

### 2.    Alabama Power

Alabama Power Company (hereinafter "Alabama Power") is an Alabama corporation headquartered in Birmingham, Alabama. (Alabama Power Co.'s Mem. of Law in Supp. of its Mot. to Dismiss for Lack of Personal Jurisdiction and Improper Venue [7] at 2.) Alabama Power is regulated as a "public utility" by the Alabama Public Service Commission.  (*Id.*)  Alabama Power owns and operates twenty-four power plants, all of which are located in the state of

5

Alabama.   Three of these plants are the subject of this suit: Plant Miller in Jefferson County, Plant Gorgas in Walker County, and Plant Barry in Mobile County.   (*Id.* at 3.)[4]   Alabama Power provides electric power to 1.3 million retail customers, all of whom are located in Alabama.   (*Id.*)   Just as Georgia Power, Alabama Power is a member of SERC  Alabama Power is also a 50% owner of SEGCO and is entitled to 50% of SEGCO's capacity and energy.

### 3.   Southern Company Services, Inc.

Like the other two defendants, SCS is a wholly-owned subsidiary of the Southern Company.   SCS states that it is "a service company that provides engineering and consulting services to both Alabama Power and Georgia Power," as well as the Southern Company's other operating companies.[5]   (SCS's Mem. in Supp. of Mot. to Dismiss Compl. [5] at 1 n.1, 3.)   The services that SCS provides to the Southern Company's operating companies include interchange and generation coordination services, general engineering and technical support, [and] finance and treasury

---

[4] In its amended complaint, plaintiff seeks to add claims in reference to two other Alabama Power plants: Plant Gaston in Shelby County and Plant Greene County in Greene County. (Mem. in Supp. of the U.S.'s Mot. for Leave to Amend its Compl. [35] at 2.)

[5] Throughout this Order, the terms "operating affiliate" and "operating company" are used interchangeably to refer to any one of the following five companies: Alabama Power, Georgia Power, Mississippi Power, Gulf Power, or Savannah Power.

AO 72A
(Rev.8/82)

support." (*Id.* at 6.) "Any and all support services provided by SCS to Alabama Power and Georgia Power are rendered upon request and billed at cost in accord with the Public Utility Holding Company Act and its implementing regulations. *See* 17 C.F.R. §§ 250.80 to 250.91." (*Id.* at 5-6.)

Not only does SCS provide technical support to the Southern Company's operating companies, it also coordinates the distribution of electricity produced by the operating companies. (U.S.'s Opp'n to SCS's Mot. to Dismiss the Compl. [24] at 3; SCS's Reply Mem. in Supp. of Mot. to Dismiss Compl. [30] at 4.)[6] The operating affiliates "operate as an integrated power supply system of a large web of interconnected electric generating facilities in Georgia, Alabama, Mississippi and Florida." (U.S.'s Opp'n to SCS's Mot. to Dismiss the Compl. [24] at 3.) SCS and the operating companies operate under an agreement entitled the Intercompany Interchange Contract (hereinafter "IIC"). (SCS's Mem. in Supp. of Mot. to Dismiss Compl. [5] at 5.)

Under the IIC, the coordination of "the entire interconnected system is conducted through a central power supply coordination office maintained by SCS." (U.S.'s Opp'n to SCS's Mot. to Dismiss

------

[6] SCS does not dispute the factual description of the services that plaintiff contends it provides to the operating affiliates or the plaintiff's description of the system as an interconnected power supply system. SCS does dispute, however, that such activities deem it an owner or operator of the affiliates power plants.

7

the Compl. [24] at 4.)  The available sources of energy are then allocated to the affiliates in a manner that "promotes the most economically efficient production of power by the operating companies and serves to balance the generation ad load among those companies." (SCS's Reply Mem. in Supp. of Mot. to Dismiss Compl. [30] at 5.)  A simplified layman's description of this process would be that under the IIC, the affiliates buy and sell each other electric power based on who can produce it the most economically at that time, and SCS coordinates these transactions.

SCS also acts on behalf of the operating affiliates in its contract with the Southeastern Power Administration (hereinafter "SEPA"). (U.S.'s Opp'n to SCS's Mot. to Dismiss the Compl. [24] at 4.)  SEPA is a federal power marketing agency headquartered in Elberton, Georgia. (Resp. of the U.S. to Alabama Power's Mot. to Dismiss for Lack of Jurisdiction and Improper Venue [21] at 8.)  Under its contract with SCS, SEPA is allowed to use the affiliates facilities "to deliver to certain cooperatives and municipalities quantities of power allocated to them by SEPA from certain United States Government hydroelectric projects." (*Id.*)  SEPA markets this electrical power to customers in West Virginia, Virginia, North Carolina, South Carolina, southern Illinois, Florida, Mississippi, Alabama, and Georgia.  (*Id.*)

8

### 4.   Proposed Defendants

In plaintiff's proposed amended complaint, it seeks to add three new defendants: Savannah Power and Electric Company, Gulf Power Company, and Mississippi Power Company.  Just as Georgia Power and Alabama Power, these three companies are wholly-owned subsidiaries of the Southern Company.  (Mem. in Supp. of the U.S.'s Mot. for Leave to Amend its Compl. [35] at 1 n.1.)  Gulf Power is a Maine corporation with its principal place of business in Pensacola, Florida.  (Am. Compl. [345] at ¶ 16.)  Plaintiff states that Gulf Power is admitted to do business in Alabama, Florida, Georgia, and Mississippi and that it owns and operates electric generating facilities in Florida, Mississippi, and Georgia.  (*Id.*)  Mississippi Power is a Mississippi corporation with its principal place of business in Gulfport, Mississippi. (*Id.* at ¶ 17.)  Plaintiff states that Mississippi Power owns and operates electric generating facilities in Mississippi and Alabama.  Savannah Power is a Georgia corporation.  All of the proposed defendants participate in the shared system coordinated by SCS.

### C.   *Proposed Amicus Curiae*

The Consumers' Utility Counsel Division of the Governor's Office of Consumer Affairs (hereinafter "CUC") has moved the Court for leave to file a brief as an amicus curiae.  (Mot. for Leave to File Brief as Amicus Curiae [15].)   The CUC "represents

9

residential and small business consumers in proceedings involving regulated utilities before state and federal courts, the Georgia Public Service Commission, and state and federal administrative agencies concerning the areas of electricity, natural gas, and telecommunications. (*Id.* at 2.)  The CUC seeks to file a brief to speak to the potential impact  of this lawsuit on residential and small business consumers.  (*Id.*)

## II.   **The Clean Air Act**

This lawsuit is brought under the Clean Air Act (hereinafter "the Act"), 42 U.S.C. §§ 7401-7671q.  At this stage in the lawsuit, only a brief overview of the Act is necessary.

### A.   *Prevention of Significant Deterioration*

One of the stated purpose of the Clean Air Act is "to protect and enhance the nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(a).  Under the Act, the Administrator of the EPA (hereinafter the "Administrator") is required to promulgate regulations establishing both primary and secondary national ambient air quality standards (hereinafter "NAAQS") for those air pollutants for which air quality standards have been set under 42 U.S.C. § 7408.[7]   42 U.S.C. § 7408.  Primary NAAQS are the

_____

[7] The air pollutants relevant to this case are nitrogen oxides ("No$_x$"), sulfur dioxide ("SO$_2$"), and particulate matter ("PM" and "PM-10").  "Particulate matter is the term for solid or liquid particles found in the air.  Smaller particulate matter of a diameter of 10 micrometers or less is

10

requisite standards, in the judgment of the Administrator, necessary to protect the public health. 42 U.S.C. § 7409(b)(1). Secondary NAAQS are those standards necessary to protect the "public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air." 42 U.S.C. § 7409(b)(2).

Each state is then required to classify all areas within its boundaries as either meeting or not meeting the NAAQS for a particular pollutant. 42 U.S.C. § 7407(d). Those areas meeting the NAAQS are termed "attainment" areas. 42 U.S.C. § 7407(d)(1)(A)(ii). Those areas failing to meet the NAAQS are "nonattainment" areas, and areas that cannot be classified due to insufficient data are "unclassifiable." 42 U.S.C. § 7407(d)(1)(A)(i), (iii).[8] Each state is then required to adopt and submit a state implementation plan (hereinafter "SIP"), which provides for the "implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) with such State." 42 U.S.C. § 7410(a)(1). Each state is also required to adopt a SIP regarding the secondary NAAQSs. *Id.* In order to maintain the good air quality in areas that are "attainment" areas for a certain pollutant, the Clean Air

---

referred to as PM-10." (Compl. [1] at ¶ 6.)

[8] This classification is done pollutant by pollutant, and an area may be an attainment area for some pollutants, but a nonattainment area for others.

11

Act includes provisions establishing a prevention of significant deterioration (hereinafter "PSD") program.  42 U.S.C. §§ 7470-7479.  Under the PSD, once an area has been designated as either an "attainment" area or as unclassifiable, there can be limited increases in the concentration of a pollutant, but the concentration of a pollutant may never exceed the NAAQSs.

Under the PSD program, no "major emitting facilities" may be constructed after August 7, 1977, unless a permit has been issued in accordance with 42 U.S.C. § 7475.  Under § 7475, a permit will not be issued unless (1) the proposed permit has been subject to review and a public hearing has been held, (2) the owner or operator of the facility has demonstrated that emissions from the construction or operation of the proposed facility will not cause or contribute to air pollution in excess of certain standards, (3) "the proposed facility is subject to the best available control technology for each pollutant subject to regulation under [the Act] emitted from, or which results from, such facility, (4) certain precautions regarding public lands are met, (5) an analysis of any area quality impacts projected for the area as a result of the growth associated with the new facility has been conducted, (6) the owner/operator of the proposed facility has agreed to any monitoring necessary to determine the effect that emissions may have on air quality, and (7) the Administrator has approved the determination of best available technology if the

12

facility is to be built in a "class III area." 42 U.S.C. § 7475(a).

The term "major emitting facilities" is defined in 42 U.S.C. § 7479(1). Relevant to this case, the definition includes "fossil-fuel fired steam electric plants of more than two hundred and fifty million British thermal units [(hereinafter "BTUs")] per hour heat input" that emit or have the potential to emit one hundred tons per year or more of any air pollutant. 42 U.S.C. § 7479(1). "Construction" is defined to include the modification of any source or facility. 42 U.S.C. § 7479(2)(C). "Modification" is defined as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." 42 U.S.C. § 7411(a)(4). "Best available technology" is defined as:

> an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation. . . emitted from or which results from any major emitting facility, which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility through application of production processes and available methods, systems, and techniques, including fuel cleaning, clean fuels, or treatment or innovative fuel combustion techniques for control of each such pollutant. In no event shall application of "best available control technology" result in emissions of any pollutants which will exceed the emissions allowed by any applicable standard established pursuant to section 7411 or 7412 of this title. Emissions from any source utilizing clean fuels,

13

or any other means, to comply with this paragraph shall not be allowed to increase above levels that would have been required under this paragraph as it existed prior to enactment of the Clean Air Act Amendments of 1990.

42 U.S.C. § 7479(3).

B.   *New Source Performance Standards*

Also relevant to this case are the provisions of the Act that are referred to as the New Source Performance Standards (hereinafter "NSPS"). The NSPS apply to the construction or modification of certain facilities termed "new sources" that commences after the publication of the regulations or proposed regulations prescribing a standard of performance applicable to the source. 42 U.S.C. § 7411(a)(2).[9] Under these provisions, the EPA sets the NSPS to "reflect[] the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administration determines has been adequately demonstrated." 42 U.S.C. § 7411(a)(1). The NSPS provisions then prohibit an owner/operator of a new source from operating the source in violation of the NSPS applicable to that source. The NSPS provisions apply to new sources regardless of whether the source is in an attainment or nonattainment area.

---

[9] The regulations relating to the NSPS program are found at 40 C.F.R. Part 60, Subpart A, §§ 60.1-60.19.

14

C.   *Civil Enforcement Provisions*

Section 113(a)(3) of the Act, 42 U.S.C. § 7413(a)(3), provides the means by which the EPA may enforce the requirements of the Act when it identifies a violation. Under this provision, the EPA is authorized to

> (A) issue an administrative penalty order in accordance with subsection (d) of this section,

> (B) issue an order requiring such person to comply with such requirement or prohibition,

> (C) bring a civil action in accordance with subsection (b) of this section or section 7605 of this title, or

> (D) request the Attorney General to commence a criminal action in accordance with subsection (c) of this section.

42 U.S.C. § 7413(a)(3). If the EPA chooses to bring a civil action for an alleged violation of the PSD or NSPS programs, it is authorized to seek a temporary or permanent injunction and/or a civil penalty of up to $25,000 per day if the violation occurred on or before January 30, 1997, and $27,500 per day if the violation occurred after such time. 42 U.S.C. § 7413(b); 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701. Section 167 of the Act, 42 U.S.C. § 7477, also provides that the EPA shall seek injunctive relief as necessary to prevent the construction or modification of a major emitting facility that does not conform to the PSD requirements.

15

### III. Plaintiff's Allegations

Plaintiff contends that defendants are in violation of the Act due to their construction, modification, and/or operation of five power plants in Alabama and Georgia.[10]   First, plaintiff alleges that defendants Alabama Power and SCS commenced the construction of modifications at Plant Barry, including, but not limited to, the installation of a "new design spiral fin economizer in Unit 5 in 1993." (Compl. [1] at ¶ 55.)   Plaintiff further alleges these defendants made these modifications and continued to operate the plant without (1) obtaining a PSD permit and (2) applying the best available technology for $NO_x$, $SO_2$, and PM, as required. (*Id.* at ¶ 56.)   Similarly, plaintiff alleges that these same defendants made modifications at Plant Gorgas and continued to operate the facility without (1) obtaining a PSD permit and (2) applying the best available technology for $NO_x$, $SO_2$, and PM, as required. (*Id.* at ¶ 17.)   Plaintiff states that at

---

[10]   Plaintiff's proposed amended complaint brings additional counts against the original defendants and similar counts against three new defendants. First, plaintiff alleges that defendants Georgia Power and SCS began construction of Plants Scherer in violation of the NSPS. (The amended complaint does not bring a NSPS claim in regard to Plant Miller.) The amended complaint also states that Alabama Power and SCS modified Plants Gaston and Greene County, and conducted further modifications at Plant Barry in violation of the PSD provisions of the Act. Plaintiff also adds PSD claims against the new defendants similar to those against the original defendants. Finally, the amended complaint alleges that all of the defendants violated the applicable SIPs in place at the time of the modifications. (Mot. of United States for Leave to File and Amended Compl. [35] at 2-3.)

16

Plant Gorgas, defendants' modifications included (1) a balance draft conversion in 1985, and (2) the installation of a new design spiral fin economizer in 1994, and (3) a major upgrade of air heaters in 1994.

Plaintiff's third through sixth claims for relief relate to construction undertaken on Units 3 and 4 at Plant Miller by Alabama Power and SCS.   Plaintiff contends that defendants undertook this construction without (1) obtaining a PSD permit and (2) applying the best available technology for $NO_x$, $SO_2$, and PM, as required.   (*Id.* at ¶¶ 66, 71.)   Plaintiff also states that these defendants are the owners/operators of Plant Miller and have violated the NSPS provisions of the Act by "failing to conduct a performance test in accordance with 40 C.F.R. § 60.48a within 60 days after achieving the maximum production rate at the facility or furnishing EPA a written report of the results of such performance test."   (*Id.* at ¶¶ 77, 83.)

Plaintiff's seventh count is against defendants Georgia Power and SCS.   Plaintiff contends that these defendants made modifications at Plant Bowen, including, but not limited to, the installation of a new economizer in Unit 2 in 1992.   (*Id.* at ¶ 87.)   Such modifications, according to plaintiff, violated the Act because they were made without (1) obtaining a PSD permit and (2) applying the best available technology for $NO_x$, $SO_2$, and PM, as required.   (*Id.* at ¶ 88.)

17

The eighth through eleventh claims are based on construction allegedly done at Units 3 and 4 of Plant Scherer by defendants Georgia Power and SCS.   Plaintiff contends that defendants commenced construction of Scherer Units 3 and 4 after August 7, 1977, and are in violation of the Act because they did so without (1) obtaining a PSD permit and (2) applying the best available technology for $NO_x$, $SO_2$, and PM, as required.   (*Id.* at ¶¶ 93, 98.) Plaintiff also states that this construction was in violation of the NSPS requirements because defendants "fail[ed] to conduct a performance test in accordance with 40 C.F.R. § 60.48a within 60 days after achieving the maximum production rate at the facility or furnishing EPA a written report of the results of such performance test." (*Id.* at ¶¶ 104, 110.)

Plaintiff's prayer for relief requests that the Court:

(1) permanently enjoin defendants Alabama Power and SCS from operating Plants Barry, Gorgas, and Miller, except in accordance with the Act and other applicable regulations;

(2) permanently enjoin defendants Georgia Power and SCS from operating Plants Bowen and Scherer, except in accordance with the Act and other applicable regulations;

(3) order each defendant to remedy past violations of the Act by installing the best available control technology

(4) order defendants Alabama Power and SCS to apply for PSD program permits for Plants Barry, Gorgas, and Miller;

(5) order defendants Georgia Power and SCS to apply for PSD program permits for Plants Bowen and Scherer;

18

(6) order each defendant to comply with the NSPS provisions of the Act;

(7) order each defendant to conduct audits of all of its operations to determine whether any other modifications have occurred that are subject to the requirements of PSD and NSPS;

(8) order each defendant to take other appropriate actions to remedy the harm caused by violation of the Act;

(9) assess a civil penalty against defendants in the maximum amount allowed under the Act;

(10) award plaintiff costs; and

(11) grant such other relief as the Court deems just and proper.

(*See* Compl. [1] at 26-27.)

## IV.   Procedural History

Although just in its early stages, this ligation has already become fairly complicated due to the number of claims and parties involved.   On November 3, 1999, plaintiff filed a complaint asserting claims against defendants Alabama Power, Georgia Power, and SCS under sections 113(b)(2) and 167 of the Act, 42 U.S.C. § 7413(b)(2) and 7477, the PSD provisions of the Act, 42 U.S.C. §§ 7470-92, and the NSPS of the Act, 42 U.S.C. § 7411.   (Compl. [1].) Defendant Georgia Power filed an answer on December 28, 1999. (Answ. [4].)   The next day, SCS filed a Rule 12(b)(6) motion to dismiss, asserting that plaintiff's complaint failed to state a claim against SCS upon which relief could be granted.   (Mot. to Dismiss [5].)   That same day, defendant Alabama Power filed two

19

motions--the first motion a to dismiss based on lack of personal jurisdiction and improper venue, and the second an alternative motion to transfer venue to the Northern District of Alabama. (Mot. to Dismiss [7], Mot. to Transfer Venue [8].)  On January 15, CUC filed a motion for leave to file an amicus brief on the behalf of electrical utility consumers potentially affected by the suit. (Mot. for Leave to File Brief as Amicus Curiae [15].)  On March 31, plaintiff filed a motion for leave to file an amended complaint, the purpose of which is to add further counts against the original defendants and add similar claims against new defendants Gulf Power, Mississippi Power, and Savannah Power. (Mot. for Leave to File Am. Compl. [35].)  Two weeks later, several public interest groups filed a motion to intervene as plaintiffs.  (Physicians for Social Responsibility, Campaign for a Prosperous Georgia, U.S. Public Interest Research Group, and Alabama Environmental Council's Motion to Intervene as Plaintiffs [38].)

## DISCUSSION

I.   **Southern Company Services' Motion to Dismiss**

A.   *Motion to Dismiss Standard*

Under Federal Rule 12(b)(6) a court may dismiss a claim for failure to state a claim upon which relief may be granted.  When deciding whether to dismiss a claim under Rule 12(b)(6), a court must construe the complaint in the light most favorable to the

20

plaintiff and accept the plaintiff's allegations of material fact as true. *Beck v. Deloitte & Touche*, 144 F.3d 732, 735 (11th Cir. 1998). A court may grant a motion to dismiss if it finds that plaintiff cannot prove any set of facts consistent with the complaint which would entitle him or her to relief. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). Defendants bear "the 'very high burden' of showing that the plaintiff cannot conceivably prove any set of facts that would entitle [it] to relief." *Beck*, 144 F.3d at 736.

B.   *SCS as an Owner/Operator*

SCS has moved to dismiss plaintiff's complaint against it on the ground that it is neither an owner or operator of the facilities at issue in this lawsuit and therefore cannot be liable under the PSD or NSPS provisions of the Act. (SCS's Mot. to Dismiss Compl. [5].) With regard to this controversy there are several points as to which the parties agree. First, under the Act and accompanying regulations, the NSPS and PSD standards apply only to the "owners" and "operators" of the power plants.[11]

---

[11] Section 7411(e), which addresses the NSPS requirements, states:

> After the effective date of standards of performance promulgated under this section, it shall be unlawful for <u>any owner or operator of any new source</u> to operate such source in violation of any standard of performance applicable to such source.

42 U.S.C. § 7411(e) (emphasis added).

21

Second, Alabama Power and Georgia Power are both owners and operators of their respective power plants. Third, because the enforcement provisions of the Act speak in terms of "any person that is an owner or operator of an affected source," there can be more than one owner or operator liable for violation of the Act relating to a single source.[12]   Fourth, the term "owner or operator" is defined by the Act, 42 U.S.C. § 7411(a)(5), to mean "any person who owns, leases, controls, or supervises a stationary source,"[13] and SCS neither owns nor leases any of the power plants.

---

The provisions of the Code of Federal Regulations that address the PSD program similarly state:

> <u>Any owner or operator who constructs or operates a source or modification</u> not in accordance with the application submitted pursuant to this section or with the terms of any approval to construct, or any owner or operator of a source or modification subject to this section who commences construction after the effective date of these regulations without applying for and receiving approval hereunder, shall be subject to appropriate enforcement action.

40 C.F.R. § 52.21(r)(1) (emphasis added).

[12] SCS initially argued that there could be only one single responsible party as an owner or operator, (SCS's Mot. to Dismiss [5] at 10-11), but in its reply brief conceded that in certain circumstances, there could be more than one operator of a power plant. (SCS's Reply Mem. in Supp. of Mot. to Dismiss [30] at 3.)

[13] This definition applies to the NSPS provisions of the Act. The regulations applicable to the NSPS provisions define "owner or operator" in a similar manner as "any person who owns, leases, operates, controls, or supervises an affected

22

The sole issue, therefore, is whether SCS's activities bring it within the definition of an "operator" of the plants in question because it either controlled or supervised the power plants where the alleged violations occurred.  Plaintiff states that "[i]n its capacity as the engineering arm of the Southern Company and Agent for the Operating Affiliates under the IIC, SCS plays a critical role in the operation of the plants in question."  (U.S.'s Opp'n to SCS's Mot. to Dismiss the Compl. [24] at 11.)  Plaintiff also contends that it "has made, on the face of its Complaint, allegations sufficient to support its claims against SCS as an 'operator' of the Southern Company facilities at issue."  (*Id.*)

In the complaint, plaintiff states that defendant SCS maintains and operates a shared system through which the operating affiliates provide electric capacity and energy and SCS distributes such capacity and energy within Georgia, Alabama, Florida, and Mississippi.  (Compl. [1] at ¶¶ 11-12].  Plaintiff contends that SCS coordinates the operation of the entire interconnected system through a central power supply coordination office that it maintains (*Id.* at ¶ 16) and controls the

---

facility or a stationary source of which an affected facility is a part."  40 C.F.R. § 60.2.  The Act does not provide a separate definition for an "owner or operator" under the PSD provisions, but the applicable regulations define a PSD owner/operator to be the same as an owner/operator under the NSPS regulations.  40 C.F.R. §  124.41.

23

distribution of electric capacity and energy contributed by the operating affiliates. (*Id.* at ¶ 12.) The complaint also alleges that SCS has contracted with the operating affiliates, various other subsidiaries, and SEGCO "to furnish, at cost and upon request, the following services: general executive and advisory services, power pool operations, general engineering, design engineering, purchasing, accounting, finance and treasury, taxes, insurance and pensions, corporate, rates, budgeting, public relations, employee relations, systems and procedures and other services with respect to business and operations." (*Id.* at ¶ 17.) Plaintiff asserts that "[c]ontrol over these general operational functions for the entire network gives SCS a supervisory role at the plants and control over critical operating decisions." (U.S.'s Opp'n to SCS's Mot. to Dismiss the Compl. [24] at 15.) SCS does not appear to take issue with the factual allegations in the complaint; however, SCS asserts that its relationship with the operating affiliates does not result in it supervising or having control over the affiliates power plants.

The relationship between SCS and the operating affiliates is delineated in the IIC, which SCS attached to its motion to dismiss.[14] In addition to the IIC, SCS attached a second exhibit

-----

[14] The roles of the operating affiliates and SCS are also statutorily limited by the Public Utility Holding Act (hereinafter "PUHA"), 15 U.S.C. §§ 79-79z-6. Under the PUHA, an "electric utility company," such as any of the operating affiliates, is defined as "any company which owns or operates

24

to its motion to dismiss.   Exhibit B contains copies of permits issued to Alabama Power by the State of Alabama Air Pollution Control Commission.   (SCS's Mot. to Dismiss Compl. [5] at Ex. B.)   Although plaintiff did not bring a motion to strike these exhibits, plaintiff states in its response brief that the attachment of these exhibits was "inappropriate" and "[i]n resolving this motion, matters outside the pleadings should not be considered."   (U.S.'s Opp'n to SCS's Mot. to Dismiss the Compl. [24] at 15, 16 n.5.)   Plaintiff then states, however, that if the Court takes judicial notice of SCS's exhibits, the Court should also consider the two exhibits attached to its response brief: the Southern Company's 1998 SEC Form 10-K and the Southern Company's 1988 SEC Form U-1.

In general, a district court may not consider matters outside of the pleadings on a motion to dismiss for failure to state a claim.   If the court does so, the motion to dismiss is converted to a motion for summary judgment, and all parties must "be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." FED. R. CIV. P. 12(b).   There are

---

facilities used for the generation, transmission, or distribution of electric energy for sale."   15 U.S.C. § 79b(3).   On the other hand, a "service company," such as SCS is statutorily limited to providing various services, at cost, to electric utility companies, providing a reasonable savings over what that company would have to pay if it brought in an outside contractor.   15 U.S.C. § 79m(d).

AO 72A
(Rev.8/82)

limited circumstances, however, when the consideration of such matters is appropriate.

The first is when "where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim." *Brooks v. Blue Cross & Blue Shield of Fla.,* 116 F.3d 1364, 1369 (11th Cir. 1997).  In such a situation, commonly referred to as "incorporation by reference," "the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment."  *Id.*.  The IIC falls within this exception because plaintiff clearly relied upon the IIC in its complaint to establish the relationship between SCS and the other defendants.  (*See* Compl. [1] at ¶ 16.)

The second general exception to the rule that matters outside of the pleadings should not be considered on a motion to dismiss was addressed by the Eleventh Circuit in *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271 (11th Cir. 1999).  In *Bryant*, a securities fraud case, the circuit court reviewed whether the district court had properly refused to consider certain SEC filings attached to the defendant's motion to dismiss.  The circuit court concluded that in securities fraud cases, it was appropriate to consider "certain public disclosure document required by law to be filed, and actually filed, with the SEC."  *Id.* at 1277.  The court

26

emphasized, however, that its holding was limited to a district court taking judicial notice of such documents only "for the purposes of determining what statements the documents contain and not to prove the truth of the documents' contents." *Id.* at 1278. The *Bryant* court explicitly refused to offer an opinion as to the latter use of such documents.

In the present case, defendant seeks to have the Court consider certain operating permits issued by the State of Alabama to Alabama Power.   Plaintiff objects to such use, but in the alternative, asks the Court to consider two SEC filings that it attached to its response brief.   The Court concludes that none of these documents fall within the *Bryant* exception.   Of importance is that the present case is not a securities fraud case, and the Eleventh Circuit thus far has limited this exception to such cases.   This is so because in a securities fraud case one of the elements of establishing a Rule 10b-5 claim is establishing whether certain material statements or omissions were made.   This is the purpose for which the Eleventh Circuit has allowed such documents to be attached.   In the present case, the parties seek to have the documents considered not as to the issue of whether they contain certain statements, but as to the truth of such statements.   This is an extension of *Bryant* that this Court is

27

unwilling to make.  Accordingly, the Court will consider the IIC, but will not consider SCS's exhibit B or plaintiff's exhibits A or B.

The IIC is a contract between the Southern Company's five operating affiliates, referred to in the IIC as the "operating companies," and SCS, referred to as "the agent."  (SCS's Mot. to Dismiss Compl. [5] at Ex. A (hereinafter "IIC") at § 1.1.)  Because the SEC has found that the service areas of the five operating affiliates are geographically contiguous, under the Public Utility Holding Company Act of 1935, the operating affiliates are allowed to be operated as an "integrated power supply system with the common stock held under common ownership by The Southern Company as an integrated public utility system."[15]

---

[15] There are several benefits to the operating affiliates to operate as an integrated system:

> A.  The combined loads of the OPERATING COMPANIES can be supplied with less aggregate installed capacity;
>
> B.  Installations of additional capacity can be made at lower unit cost because of the larger unit sizes;
>
> C.  The new installations can be more economical and require less operating labor and maintenance costs because of the larger unit sizes;
>
> D.  The strengthened transmission system will make possible a fuller utilization of the capability of the lower cost generating units of the integrated system; and
>
> E.  Emergency conditions in any part of the integrated electric system or other electric systems in adjacent areas can be met with less probability of

28

(IIC [5] at § 1.3.)  It is pursuant to and in accordance with the IIC that this integrated system is operated.  (*Id.* at § 1.4.)

> Under the IIC, each operating company
>
> operates as a public utility in its respective service area and has a responsibility to the members of the public within its respective service area or territory to construct, operate and maintain electric generating, transmission and distribution facilities and otherwise provide electric power capacity to supply the electric requirements of its customers and to serve the public in its service area.

(*Id.* at § 1.6.)  Under the IIC, a representative from each operating company and a representative from SCS are required to form an operating committee that meets periodically to determine the methods of operating under the IIC.  (*Id.* at § 4.1.)  The representative from SCS is designated as the chairman of the committee.  (*Id.*)  The duties of the committee are to (1) "develop the concepts, terms and conditions" of the IIC, (2) to provide guidance and direction to SCS for the coordination of the integrated system, (3) to establish provisions to be included in interconnection agreements between the affiliates and nonassociated utilities, (4) to approve projects and expenditures associated with the Southern Electric System Coordination Center and Power Management System, (5) to approve applications and

---

impairment of services to the general public.

(*Id.* at § 3.5.)  The benefits and costs of the integrated system are shared by the affiliates in accordance with the IIC.  (*Id.* at § 3.6.)

29

equipment for data processing systems for power system operations, (6) to approve recommendations relative to the telecommunications network, (7) to review and recommend generation expansion plans for approval by the respective operating affiliates, and (8) to address "other similar power system matters which relate to overall coordinated operation of the Southern electric system." (*Id.* at § 4.3.)   The IIC specifically states that only the operating companies have a vote, they each have one vote, and all decisions made by the committee must be unanimous.   (*Id.*)

Under the IIC, SCS "is designated as AGENT of the OPERATING COMPANIES for administrative and coordination functions." (*Id.* at § 4.3.)   The IIC denominates SCS's duties as agent of the operating affiliates as follows: (1) to perform such services and represent the affiliates "in all things to be done by their agent in the execution of and operation under their existing contracts," including those contracts with other utility companies to purchase, exchange, or sell energy or capacity and (2) to make and collect payments under such contracts, for which SCS will be reimbursed for payments made or distribute the proceeds for payments received.   (*Id.* at § 4.4.)

While SCS acts as the affiliates' agent in these transactions, it is clearly the responsibility of the operating affiliates to maintain their respective facilities.   Section 5.1 of the IIC states,

30

> The OPERATING COMPANIES agree to maintain their respective generating plants and transmission facilities in good operating condition and to operate such generating plants and transmission facilities of the other OPERATING COMPANIES as an integrated electric system in accordance with determinations made from time to time by the Operating Committee in order that an adequate power supply shall be available to meet the load requirements of the customers of the respective parties hereto at the lowest cost consistent with a high degree of service reliability.

(*Id.* at § 5.1.)   In addition, although SCS, as agent of the operating affiliates, coordinates the integrated system, the mechanics and methods of doing so are set forth in a manual that is incorporated into the IIC.   (*Id.* at §§ 6.1–.2.)   Also, as mentioned above, despite the fact that the SCS representative serves as chairman of the Operating Committee, the SCS representative has no vote.

SCS maintains that its role as agent of the operating affiliates under the IIC simply does not reach the level of controlling or supervising the affiliates' power plants.   The Court must agree.  Plaintiff has alleged no facts indicating that SCS is involved in the actual day-to-day running of any of the plants.   Instead, plaintiff states that by coordinating the distribution of power and capacity to the operating affiliates and providing technical and financial support services, SCS controls or supervises the facilities.   The statutory definition of an operator, however, does not include one who merely coordinates the activities of a facility's owner, and plaintiff has failed to show

31

how the act of coordinating the power supply results in SCS "controlling" or "supervising" the power plants.[16]

When interpreting the language of a statute, a court must first attempt to do so in accordance with its plain meaning. *See Perrin v. United States*, 444 U.S. 37, 42 (1979). It is only if the wording is ambiguous or would lead to an absurd result that one looks beyond the plain meaning. *See United States ex re. Williams v. NEC Corp.*, 931 F.2d 1493, 1498 (11th Cir. 1991). The plain language of the applicable statute and regulations state:

> After the effective date of standards of performance promulgated under this section, it shall be unlawful <u>for any owner or operator of any new source to operate such source</u> in violation of any standard of performance applicable to such source.

42 U.S.C. § 7411(e) (NSPS program) (emphasis added).

> <u>Any owner or operator who constructs or operates a source or modification</u> not in accordance with the application submitted pursuant to this section or with the terms of any approval to construct, or <u>any owner or operator of a source or modification subject to this section who commences construction</u> after the effective date of these regulations without applying for and receiving approval hereunder, shall be subject to appropriate enforcement action.

40 C.F.R. § 52.21(r)(1) (PSD program) (emphasis added).

_____

[16] SCS likens its role to that of a police officer directing traffic. While the traffic cop indicates where the cars should drive, and coordinates the flow of traffic, he does not operate or control the individual automobiles. (SCS's Reply Mem. in Supp. of Mot. to Dismiss Compl. [30] at 5.)

32

As stated above, the term "owner or operator" is defined by the Act, 42 U.S.C. § 7411(a)(5), to mean "any person who owns, leases, controls, or supervises a stationary source."[17]   A stationary source is defined as "any building, structure, facility, or installation which emits or may emit any air pollutant."  42 U.S.C. § 7411(a)(3).  The language is clear that this statute is intended to apply to those persons who actually own, lease, control, or supervise the <u>facility</u> in question, not just a person who provides services to the owner of the facility. While there readily could be situations where the owner and the operator are not the same, or there is an additional operator to the owner, this is not the case.  SCS is not in the shoes of a company contracted to provide day-to-day management at the plants in question.  Rather, SCS is under a contract to provide services to the operating affiliates as a whole.  The clear language of the statute does not encompass such a relationship.  SCS neither owns,

---

[17] As stated in footnote 13, this definition applies to the NSPS provisions of the Act, and while the Act does not provide a separate definition for an "owner or operator" under the PSD provisions, the applicable regulations define a PSD owner/operator to be the same as an owner/operator under the NSPS regulations.  40 C.F.R. §  124.41.

33

leases, operates, or supervises the facilities in question.[18]
Accordingly, SCS's motion to dismiss is **GRANTED**.[19]

## II.   Alabama Power's Motions to Dismiss/Transfer Venue

Defendant Alabama Power has moved to have all claims against
it dismissed for lack or personal jurisdiction and improper venue.
(Alabama Power Co.'s Mem. of Law in Supp. of its Mot. to Dismiss
for Lack of Personal Jurisdiction and Improper Venue [7].)  In the
alternative, Alabama Power has brought a motion to transfer venue
to the district court for the Northern District of Alabama.
(Alabama Power Co.'s Alternative Mot. to Transfer Venue [8].)

Personal jurisdiction is the power of the court to summon a
defendant before it to adjudicate a claim.  Plaintiff has the
burden of establishing this Court's jurisdiction over defendants.
*Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988).  As this
Court is deciding the motion without a discretionary preliminary
hearing, plaintiff need only present a prima facie case of
jurisdiction over the defendants to survive the motion to dismiss.

---

[18] The government argues that it needs discovery to
support this claim.  The Court concludes, however, that
plaintiff has failed to state a claim and there is no set of
facts that would support plaintiff's assertion that SCS is an
owner or operator.  In addition, the Court notes that a year
of administrative discovery has already occurred in this case.

[19] Plaintiff argues that without SCS it will be unable to
obtain "meaningful injunctive relief."  The Court finds this
argument suspect.  Regardless, where the plaintiff has failed
to state a claim against a defendant, the Court must dismiss
the claims.

34

*Cable/Home Comm. Corp. v. Network Prods., Inc.*, 902 F.2d 829 (11th Cir. 1990); *Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988). Before substantial discovery, "a motion to dismiss for lack of personal jurisdiction should be denied if the plaintiff has alleged sufficient facts to support a reasonable inference that the defendant can be subjected to the jurisdiction of the Court." *General Elec. Credit Corp. v. Scott's Furniture Warehouse Showroom, Inc.*, 699 F. Supp. 907, 910 (N.D. Ga. 1988) (Moye, J.). When a motion to dismiss is decided on the basis of written submissions alone, "disputes of fact found in the affidavits are resolved in favor of the exercise of jurisdiction." *ETS Payphone, Inc. v. TK Indus.*, 236 Ga. App. 713, 713-14, 513 S.E.2d 257, 258 (1999); *see also Sturm v. Marriott Marquis Corp.*, 26 F. Supp. 2d 1358, 1373 (N.D. Ga. 1998) (Thrash J.) (where conflicting evidence is presented the court should err in favor of jurisdiction). Thus, "allegations in the complaint which are not controverted by the defendant's evidence must be accepted as true." *Electronic Transaction Network v. Katz*, 734 F. Supp. 492, 495 (N.D. Ga. 1989) (Forrester, J.) (citing *Delong Equip. Co.*, 840 F.2d at 843).

Before a federal court may exercise personal jurisdiction over a defendant it must determine whether the defendant is amenable to service as directed by the applicable statutory authority and then determine whether that service comports with

35

due process. *Willingway Hosp. v. Blue Cross & Blue Shield*, 870 F. Supp. 1102, 1104 (S.D. Ga. 1994) (citing *Sun Bank, N. A. v. E.F. Hutton & Co.*, 926 F.2d 1030, 1033 (11th Cir. 1991)) (diversity case); *Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1413 (9th Cir. 1989) (federal question case)).   This two-step analysis was established by the Supreme Court in *Omni Capital International, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987).   In the present case, Alabama Power does not challenge its amenability to service of process.    The issue, therefore, is whether such service comports with due process.

The Eleventh Circuit has recently reiterated the requirements of due process:

> The Due Process Clause permits a court to summon a nonresident to defend himself in the forum so long as that person has some "minimum contacts" with that state and, the exercise of personal jurisdiction over the defendant would not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945); *Williams Elec. Co. v. Honeywell*, Inc., 854 F.2d 389, 392 (11th Cir. 1988).   The nonresident defendant's contacts with the forum must be such that he has "fair warning" that a particular activity may subject him to the jurisdiction of a foreign sovereign. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S. Ct. 2174, 85 L. Ed.2d 528 (1985).

*Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1355-56 (11th Cir. 2000).

In determining whether a defendant has sufficient contacts with the forum state, a court must consider whether the contacts

36

are related to the cause of action.   "If a person has only 'minimal contacts' with the forum, the court may summon him to defend himself in that forum only so long as the cause of action is related to his specific contacts with that forum."   *Ruiz de Molina*, 207 F.3d at 1357 n.4 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 nn.8, 9 (1984)).   This is commonly referred to specific jurisdiction.

For specific jurisdiction to exist in the present case, plaintiff would have to establish that (1) its cause of action arises out of or relates to the Alabama Power's contacts with Georgia, (2) Alabama Power "purposefully availed itself of conducting activities within [Georgia] and invoked the benefits of [Georgia's] laws," and (3) Alabama Power's "contacts must demonstrate that [it] should reasonably anticipate being haled into court in [Georgia.]"   *Railcar, Ltd. v. Southern Ill. Railcar Co.*, 42 F. Supp. 2d 1369, 1372 (N.D. Ga. 1999) (Camp, J.) (citing *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 258 (11th Cir. 1996)).   The Eleventh Circuit has stated that "[a] person has fair warning if he "purposefully directs" his activities at the forum, and claims of injury result from these activities."   *Ruiz de Molina*, 207 F.3d at 1356 (citation omitted).   In such a case, "[t]he exercise of jurisdiction over him does not 'offend traditional notions of fair play and substantial justice' because his conduct and connection with the forum are such that he should

37

reasonably anticipated being haled into court there." *Id.* (citation omitted).

The second type of jurisdiction--where a nonresident is summoned "to answer claims unrelated to his contacts with the forum"--is referred to as general jurisdiction. *Ruiz de Molina*, 207 F.3d at 1357 n.4. *See also Helicopteros*, 466 U.S. at 414 n.9 ("When a State exercises personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum, the State has been said to be exercising 'general jurisdiction' over the defendant.")   A court may exercise jurisdiction over the defendant in such a situation "so long as those contacts are *substantial, persistent, continuous and systematic*." *Id.* (emphasis added). It is much more difficult for a plaintiff to establish the requisite requirements for general jurisdiction.   Therefore, before proceeding with the due process analysis the Court must determine whether Alabama Power's contacts with the state of Georgia are related to the cause of action brought against it.

Plaintiff contends that there are facts to support an assertion of either specific or general jurisdiction over Alabama

38

Power.[20]    As    to    specific    jurisdiction,    plaintiff    asserts

---

[20] In support of its argument, plaintiff has attached several exhibits to its response brief.  Alabama Power has objected to the exhibits on the grounds that they are unauthenticated and "replete with hearsay and other incompetent evidence." (Alabama Power's Mem. of Law in Supp. of its Objection to Exs. and Mot. to Strike [33] at 1.) Exhibits A and F, the Southern Company's and SCS's 1998 10-K forms, and Exhibit J, the Southern Company's Form U-1, are documents required to be filed with the SEC.  Exhibit B is a copy of a document entitled "1998 Overview, Southern Company," which was obtained from the Southern Company's web site. Exhibit C is a blow-up of two pages of Exhibit B.  Exhibit D is an excerpt from the IIC.  Exhibit E is an excerpt from a book on electric power transmission.  Exhibit G is a copy of the EPA's Notice of Violation.  Exhibit H is a copy of Alabama Power's annual report.  Exhibit I is a copy of a document produced by SCS to the EPA.  Exhibit K is a map produced titled "Impact of AL Emissions."  Exhibit L is the affidavit of meteorologist Norman Possiel.  Exhibit M is a chart describing emissions for four states including Alabama.

Alabama Power seeks to exclude all of these exhibits. Alabama Power states that it does not claim that the facts contained in these documents are inaccurate, but that they have not been authenticated. (Alabama Power's Reply in Supp. of its Mot. to Exclude Exs. [44] at 2.)  Alabama Power concedes that it would not have objected to the government attaching copies of the SEC filings if it had gone to the SEC and obtained certified copies rather than downloading "EDGAR" copies from the SEC website. (*Id.* at 6.)  The SEC has used the "EDGAR" system for several years now, and although the copies obtained by plaintiff are not actually certified copies of the filings, the Court is confident that the web version is identical to that on file with the SEC.  Exhibits A, F, and J are therefore admissible.

The Court cannot say with the same certainty what is contained on the Southern Company and SCS's website.  These documents are not "public records" as are the SEC filings, and the Court has no way of judging their authenticity.  Exhibits B, C and H are therefore excluded.

Alabama Power objects that Exhibits E, K, and L are not relevant to the motion to dismiss.  The Court agrees and excludes them.  SCS has filed a certified copy of the ICC, and the Court will refer thereto rather than the uncertified copy attached as Exhibit D to the government's brief.  Exhibit G is admitted, but Exhibits H and I must be excluded because they

39

that Alabama Power has engaged in the following activities related to the claims against it:

> (1) Alabama Power has contracted with Georgia Power, a Georgia corporation, in the ownership and operation of SEGCO's Plant Gaston.
>
> (2) Alabama Power's shareholder service operations are run from SCS's offices in Atlanta, Georgia.
>
> (3) Alabama Power and its employees have specifically sought the application of Georgia law and its courts in resolving disputes regarding certain employee benefit plans and incentive plans.
>
> (4) When Alabama Power modified its plants as alleged in the Complaint, it increased its emissions of $No_x$. Those increased emissions affect air quality in Georgia. Thus, one of the operative facts of the United States' claims against Alabama Power concern emissions which relate to the environment and citizens of Georgia.
>
> (5) Alabama Power contracted with Georgia Power to share employees responsible for managing electric plants in Georgia.
>
> (6) Alabama Power maintains a high voltage transmission line, or lines, which run into the state of Georgia and furnish electricity to Southern customers in Georgia.

(Resp. of the U.S. to Alabama Power's Mot. to Dismiss [21] at 14.)

As stated above, the Eleventh Circuit uses a three-pronged analysis in determining if specific jurisdiction exists, the first prong of which is whether the plaintiff's cause of action arises out of or relates to the defendant's contacts with the forum state. Of the factual allegations supporting jurisdiction put forth above by plaintiff, only number four has any conceivable

---

have not been authenticated. The Court notes that none of these documents is essential to its conclusion that personal jurisdiction is lacking.

40

relationship to the claims brought in this case.[21]  Plaintiff's argument is that while Alabama Power's power plants are physically located in Alabama, the changes made by Alabama Power to such plants have a detrimental effect on the quality of Georgia air. (*Id.* at 16 ("However, the modifications, as such, cause no harm. It's the uncontrolled emissions resulting from those modifications that cause the harm which the CAA was enacted to prevent.  42 U.S.C. § 7401.").)

Plaintiff compares the present case to another case involving a situation where Alabama Power's actions in Alabama caused injury in Georgia--*Clemones v. Alabama Power*, 250 F. Supp. 433 (N.D. Ga. 1966).[22]  The facts of *Clemones* are clearly distinguishable, however.  In *Clemones*, Alabama Power had built a dam on the Coosa

---

[21] The claims against Alabama Power very specifically deal with construction or modifications made at certain enumerated power plants and have nothing to do with SEGCO, Alabama Power's shareholders, or the activities of Alabama Power outside of actions taken at the relevant plants.  The Court does note that in plaintiff's amended complaint, plaintiff seeks to add a count relating to Plant Gaston.  Plaintiff's motion for leave to file an amended complaint is still under consideration by the Court.  At this time, the Court addresses only the claims brought in the original complaint, none of which relate to Plant Gaston.

[22] While plaintiff refers to *Clemones* as "a controlling opinion from this district," Alabama Power is correct in stating that "[t]he doctrine of *stare decisis* does not compel one district court judge to follow the opinion of another." (Alabama Power Co.'s Reply to the Govt.'s Resp. to the Mot. to Dismiss [32] at 6 n.9 (quoting *State Farm Mut. Auto Ins. v. Bates*, 542 F. Supp. 807, 816 (N.D. Ga. 1982)).)

41

River which resulted in flooding on land belonging to plaintiff in Georgia. Although all of Alabama Power's relevant equipment was located on the Alabama side of the river and Alabama Power sold all of the power generated by the dam to customers in Alabama, the court concluded that specific jurisdiction existed so that Alabama Power was amenable to suit in Georgia.

There is a key distinction between *Clemones* and the present case, however, in that the cause of action in the former was trespass. In the present suit, plaintiff claims that Alabama Power's actions have caused injury in Georgia.[23] However, plaintiff has not sued for pollution caused in Georgia, although the Act contains a provision specifically addressing "Interstate Pollution Abatement." *See* 42 U.S.C. § 7426. Plaintiff brought its claims under the PSD and NSPS provisions, both of which specifically deal with the construction or modification of facilities. The facilities allegedly constructed/modified by Alabama Power in violation of the Act are located in Alabama. The fact that the modifications could have an effect in Georgia is insufficient to show that the cause of action "arises out of or

---

[23] In support of this contention, plaintiff submits the affidavit of meteorologist Norman Possiel and maps he created showing the impact of Alabama emissions on Georgia air quality. (Resp. of the U.S. to Alabama Power's Mot. to Dismiss for Lack of Personal Jurisdiction and Improper Venue [21] at Exs. K-M.) The Court has excluded these exhibits on the ground that they are irrelevant to the motion to dismiss.

42

relates to" any action taken by Alabama Power in the state of Georgia.

The Court can find no other factual assertions that would support the existence of specific jurisdiction in this case. The facilities were located in Alabama. The permits to own and operate the facilities were issued by the state of Alabama. The power generated at the facilities was predominately sold to Alabama customers. Therefore, if jurisdiction exists, it is only general jurisdiction. Accordingly, plaintiff must put forth evidence that Alabama Power had "substantial, persistent, continuous and systematic" contacts with Georgia.

In support of its assertion of general jurisdiction, plaintiff states that the following additional facts support a finding of general jurisdiction:

> Alabama Power is involved in the interstate transmission of electricity through the southeast. Defendant is part of an integrated group of electric utility companies owned by Southern and managed by SCS. Through marketing of its wholesale power as part of the Southern System, Alabama Power received over a billion dollars in revenues between 1996-1998. When Southern undertakes resource planning for its southeastern service area, which includes the state of Georgia, it considers Alabama power units.

(Resp. of the U.S. to Alabama Power's Mot. to Dismiss [21] at 14.) On the other hand, Alabama Power puts forth the following facts to support its claim that the government's claims against it should be dismissed for lack of jurisdiction:

43

(1) Alabama Power was organized and exists under the laws of the state of Alabama. Its principal place of business is in Birmingham, Alabama. It generates, transmits and distributes power to the citizens of Alabama;

(2) Alabama Power owns and operates twenty-four power plants consisting of seventy-seven separate power generation units, all of which are located in Alabama;

(3) The Alabama Public Service Commission has issued a Certificate of Convenience and Necessity for each of these units, thereby authorizing their construction and operation;

(4) Plants Miller, Gorgas and Barry, the Alabama plants targeted by the Government are located in Alabama;

(5) Alabama Power provides electric service to some 1.3 million retail customers, all of whom are located in Alabama;

(6) Alabama is not licensed or qualified to do business and does not do business in Georgia;

(7) Alabama's long-standing corporate policy has been to abstain from any action which could be construed as doing business anywhere other than Alabama;

(8) Alabama Power does not have or maintain any offices in Georgia;

(9) Alabama Power's service area does not extend into Georgia;

(10) Alabama Power has no employees engaged in the generation, transmission or distribution of electric power within Georgia;

(11) Alabama Power does not sell electricity to the public in Georgia and, in fact, is prohibited by law from doing so;

(12) Alabama Power owns no generation, transmission, and distribution facilities in Georgia; [and]

(13) While Alabama Power does make sales and exchanges in of bulk power to wholesale customers located in Georgia, delivery and transfer of this energy occurs at the Alabama state line.

(Alabama Power Co.'s Mem. of Law in Supp. of its Mot. to Dismiss

AO 72A
(Rev.8/82)

for Lack of Personal Jurisdiction and Improper Venue [7] at 3-4.)[24]

Establishing general jurisdiction is a heavy burden. "In order to assert general jurisdiction, the defendant's activity in the forum must be continuous and substantial." *Sears Roebuck & Co. v. Sears plc,* 744 F. Supp. 1297, 1304 (D. Del. 1990) (citing *International Shoe,* 326 U.S. 310). It appears that the only case in which a court has found general jurisdiction to exist is

_____

[24] Alabama Power attached to its motion to dismiss the affidavit of William E. Zales, vice president, attesting to the facts set forth above. Plaintiff argues that under *Posner v. Essex Ins., Co., Ltd.,* 178 F.3d 1209 (11th Cir. 1999), these assertions "prove nothing, do not address the facts, and require no further response by the United States." (Resp. of the U.S. to Alabama Power's Mot. to Dismiss for Lack of Personal Jurisdiction and Improper Venue [21] at 3 n.3.)

*Posner,* however, stands only for the proposition that "statements, although presented in the form of factual declarations, [that] are in substance legal conclusions . . . do not trigger a duty for Plaintiffs to respond with evidence in support of their own supporting jurisdiction." *Posner,* 178 F.3d at 1215. The only "factual allegation" made above that falls within the ambit of *Posner* is the statement that Alabama Power does not do business in Georgia. This is clearly a legal conclusion, and the Court does not accept Mr. Zales' statement as to this matter as conclusive.

In the same vein, the Court does not accept as conclusive plaintiff's unsupported legal conclusion that Alabama Power "does business" in Georgia. Conclusory allegations are insufficient to support a finding of personal jurisdiction. *See EBM Group Corp., Ltd. v. Gulfstream Aerospace Corp.,* 145 F.R.D. 8, 10 (D.D.C. 1992) ("[T]he assertion that GAC has been 'doing business' in the District of Columbia . . . is no more than a conclusory allegation which does not suffice to establish personal jurisdiction."). The decision for the Court on this motion to dismiss, is whether plaintiff has alleged sufficient <u>facts</u> to support a reasonable inference that the defendant can be subjected to the jurisdiction of the Court.

*Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437 (1952).[25]  *See Sears Roebuck,* 744 F. Supp. at 1304 ("Indeed, there appears to be only one case . . . in which the United States Supreme Court has upheld the exercise of personal jurisdiction over a defendant where the claim is not related to the defendant's forum related activities.")  In *Perkins,* the president of the defendant corporation conducted the following activities in Ohio: maintained an office, kept files, carried on business correspondences, employed two secretaries, drew and distributed salary checks, used and maintained two checking accounts at Ohio banks, held board meetings, and generally carried out corporate duties.  *Perkins,* 342 U.S. at 447-48.  Although the cause of action on which Benguet was sued was unrelated to its activities in Ohio,[26] the Court upheld the exercise of personal jurisdiction, stating that Benguet's activities were so systematic and continuous that the exercise of jurisdiction did not violate due process.  *Id.* at 448.

Alabama Power's direct contacts with Georgia simply to do not

---

[25] The facts of *Perkins* were unusual.  Benguet was a mining company located in the Philippine Islands.  During World War II, however, operations there were halted because the Japanese occupied the Philippines.  During that time, the president of Benguet, a native of Ohio, returned to Ohio to run the business.  Although clearly no mining went on in Ohio, all other corporate functions were conducted from the office maintained there.

[26] The lawsuit involved the payment of a dividend and the issuance of stock certificates.  *Id.* at 415.

46

rise to the level of "continuous and systematic." The real question is whether Alabama Power's participation in the Southern Company's integrated system, as delineated in the ICC, results in Alabama Power "doing business" in the state of Georgia. Plaintiff strongly asserts that as a member of the ICC, Alabama Power ends up selling its power to Georgia retailers and purchasing power from Georgia Power on a continuous and substantial basis. Plaintiff argues that the Southern Company affiliates are all interdependent on each other and could not provide the services that they do without the ICC.[27]

While the ICC may allow the operating affiliates to provide superior services and allow the Southern Company to grow more aggressively than it would be able to without the integrated system, Alabama Power's contractual relationship with the other participants of the Southern Company integrated system, including Georgia Power and SCS, does not translate into carrying on activities in such other states. Under the ICC, Alabama Power may sell power to Georgia Power and Savannah Power, but the electricity is sold at the state line and Alabama Power's connection to the power is terminated at that point. As plaintiff admits, while Georgia Power customers at times may end up receiving power generated in Alabama, they are not purchasing such

---

[27] The Court does not disagree that the Southern Company affiliates greatly benefit, as does the Southern Company, from the integrated system under which they operate.

47

power from Alabama Power.   They are purchasing it from Georgia Power.   (Resp. of the U.S. to Alabama Power's Mot. to Dismiss for Lack of Personal Jurisdiction and Improper Venue [21] at 20.)

Plaintiff also argues that Alabama Power has contracted with Georgia Power in the ownership and operation of SEGCO's Plant Gaston.   Again, a contractual relationship between corporations of two states does not necessarily result in the first party conducting business in the second party's state.   Plaintiff also raised the issue of a choice of law provision in some of Alabama Power's employee benefit plans, which calls for the application of Georgia law and its courts in resolving disputes.   While a factor, the designation of Georgia law does not lead to the conclusion that Alabama Power had a continuous and systematic course of activity in Georgia.   Plaintiff also points out that Alabama Power and Georgia Power contracted to share employees.   A contract to share employees, however, is different from the case in *Perkins*, where Benguet employees were conducting their duties on behalf of Benguet in Ohio.   In the present case, there is no indication that the shared employees worked in Georgia for Alabama Power.   It appears that they conducted work for Georgia Power in Georgia and Alabama Power in Alabama.

In disputing plaintiff's assertion of general jurisdiction, Alabama Power relies on *Applewhite v. Metro Aviation, Inc.*, 875

48

F.2d 491 (5th Cir. 1989). While certainly not binding precedent,[28] *Applewhite* is relevant to this inquiry because the Fifth Circuit therein examined Alabama Power's activities outside of Alabama arising out of its participation in the IIC. In *Applewhite*, the court considered the following assertions made by plaintiff in support of general jurisdiction: Alabama Power conducted business in Mississippi through its agent, SCS; Alabama Power sold power to nonassociated utilities in Mississippi; Alabama Power participated in the ICC, the operating committee of which made decisions affecting Mississippi; Alabama Power occasionally engaged in the joint development of power facilities and had "loaned" employees to Mississippi Power for this purpose; and, through the ICC, Alabama Power and Mississippi Power bought and sold power from each other. The court concluded, however, that participation in the ICC was properly viewed as "an exchange of power" between the two states and not Alabama Power conducting business in Mississippi. In addition, the court concluded that when Alabama Power assisted Mississippi Power with construction or loaned employees, it did so for Mississippi Power's benefit and

---

[28] Only those Fifth Circuit cases decided before October 1, 1981 have been adopted as binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*). In addition, the cases are factually distinguishable. Although Alabama Power is the defendant in both *Applewhite* and the present case, the former case is eleven years old, and, as pointed out by plaintiff, the operations of Alabama Power have likely changed somewhat since that time.

49

not in the conduct of its own business. The court also noted, as is true in the present case, that Alabama Power had submitted an affidavit of an officer stating that Alabama Power intentionally structures its activities to avoid taking any action that could be construed as conducting business in any state other than Alabama.

Although Alabama Power clearly has numerous contacts with the state of Georgia, this Court cannot say that, in their totality, they are continuous and systematic, or that they are of the nature indicating that Alabama Power had purposefully availed itself of the laws of Georgia. *See Helicopteros*, 466 U.S. at 411-12 (holding no personal jurisdiction existed over Columbian corporation in Texas even though corporation had sent CEO to Houston to negotiate contract, purchased $4 million worth of helicopters and parts from a Texas company, and sent employees to Texas for training); *Hirsch v. Blue Cross, Blue Shield of Kansas City*, 800 F.2d 1474, 1478 (9th Cir. 1986) (holding that in 9th circuit, following factors should be considered in for determining whether general jurisdiction exists: "whether the defendant makes sales, solicit or engages in business, serves the state's markets, designates an agent for service of process, holds a license, has employees, or is incorporated there); *Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055 (11th Cir. 1986) (sales contract between Georgia corporation and Missouri corporation did not subject Georgia corporation to general jurisdiction in

50

Missouri); *Sea Lift, Inc. v. Refinadora Costaricense*, 792 F.2d 989, 992 (11th Cir. 1986) (holding no general jurisdiction existed where company was not engaged in "general business activity" in the forum state).   Plaintiff has failed to demonstrate that the exercise of either specific or general jurisdiction is appropriate in this case as to the claims against Alabama Power.   Accordingly, Alabama Power's motion to dismiss on this ground is **GRANTED**.[29]

### III. Consumers' Utility Counsel's Motion to File Brief as Amicus Curiae/Motion for Leave to File a Reply Brief Amicus Curiae

The CUC has filed a motion for leave to file a brief in this case.   In its motion, the CUC states that it "represents residential and small business consumers in proceedings involving regulated utilities before state and federal courts, the Georgia Public Service Commission, and state and federal administrative agencies."   (Mot. for Leave to File Br. as Amicus Curiae [15] at ¶ 1.)   Further, the CUC states that "in its representation of Georgia consumers in matters involving electricity, natural gas and telecommunications, [it] plays an active role in advocating for the best interests of [its] legislatively mandated

---

[29] Because the lack of personal jurisdiction is a sufficient basis for dismissing the claims against Alabama Power the Court does not address its second grounds for dismissal, improper venue.   In addition, because the Court is granting this motion, Alabama Power's alternative motion to transfer venue is **DENIED AS MOOT**.

constituents, the residential and small business consumers in the state of Georgia." (*Id.* at ¶ 2.)[30]

The CUC seeks to participate as an amicus curiae "to have the interests and concerns of consumers protected in this case." (Br. of Amicus Curiae, the CUC Division of the Georgia Governor's Office of Consumer Affairs [15] at 4.) The CUC states that it does not seek to argue the merits of the case, but "has concerns over the impact on [Georgia] consumers of the remedies being sought in this case." (*Id.* at 5.) Specifically, the CUC is concerned that if penalties are assessed against the defendants, the costs incurred not be passed along to the consumers.[31] (*Id.*) CUC requests both that the Court "ensure in any order the necessary protection of innocent consumers from any penalties assessed, from additional costs incurred to remedy harm resulting from imprudent actions of the Defendants, and from any degradation of service" and that the Court "consider, alone or in consultation with others, development of a plan for implementing any remedies which will minimize any negative effect upon consumers." (*Id.*)

---

[30] The Consumers' Utility Counsel Division of the Governor's Office of Consumer Affairs was legislatively created in the 1980s in order to assist the Public Service Commission and ensure that "the citizens of Georgia . . . receive adequate utility service at the lowest reasonable cost to the consumer while maintaining the ability of public utilities to furnish their product and services." O.C.G.A. § 46-10-1 to -3 (1999).

[31] CUC admits that it was unable to find any federal court precedent for such an action.

52

Rather than passing the costs of this litigation and associated possible penalties on to consumers, CUC asks the Court to ensure that such expenses are absorbed by the defendants.

Georgia Power has opposed CUC's motion to file an amicus brief. (Br. of Georgia Power Co. in Opp'n to the CUC Motion for Leave to File Br. as Amicus Curiae [19].) Georgia Power's objection has four bases: (1) CUC is improperly attempting to expand the issues before the Court, (2) CUC's brief fails to address or elucidate the issues before the Court, (3) the "nonjusticiability strand of the 'filed rate doctrine' prevents the Court from granting the relief CUC requests, and (4) CUC's failure to exhaust administrative remedies renders its claim premature and unripe for adjudication. The Court addresses each of these concerns in turn.

As to the first two issues, Georgia Power states that CUC has admitted that it is not seeking to argue the merits of the case and that it only seeks to protect Georgia consumers if penalties are assessed against Georgia Power. (*Id.* at 3-8.) Georgia Power contends that the source of payment of any potential penalties has not been made an issue in the case, and that CUC's argument is therefore irrelevant to the issues at hand. CUC counters that it is not raising a new issue and that the source of any potential penalties is part and parcel of this dispute because civil penalties are included in the plaintiff's prayer for relief.

53

(Mot. for Leave to File a Reply Br. Amicus Curiae [48].)[32]   The Court has wide discretion in determining whether an amicus brief would be relevant and helpful.[33]   Although the parties have not raised the issue of how any potential penalties would be paid, the Court agrees with CUC that this issue is sufficiently related to the cause of action.

However, Georgia Power's next argument--that the "nonjusticiability strand of the 'filed rate doctrine' prevents the Court from granting the relief CUC requests"--prevents this Court from considering the issues raised by CUC in its amicus brief.   "The 'filed rate doctrine,' in its most basic form, 'forbids a regulated entity to charge rates for its services other

---

[32] CUC failed to file a reply brief in a timely manner. Almost two months late, CUC filed a motion for leave to do so. (Mot. for Leave to File a Reply Br. Amicus Curiae [48].) Although Georgia Power has opposed CUC's motion for leave to file its reply, it is within the Court's discretion to grant leave.   Georgia Power will suffer no prejudice if the Court considers the reply brief.   In fact, Georgia Power contends that the reply brief fails to refute its arguments. Accordingly, the Court **GRANTS** CUC's Motion for Leave to File a Reply Brief Amicus Curiae [48].

[33] Both parties agree there is "no governing standard, rule, or statute prescribing the procedure for obtaining leave to participate as an amicus curiae in the federal district courts." (Br. of Georgia Power Co. in Opp'n to the CUC Motion for Leave to File Br. as Amicus Curiae [19] at 3.)   *See also United States v. Michigan*, 940 F.2d 143, 165 (6th Cir. 1991) ("Classical participation as an amicus to brief and argue as a friend of the court was, and continues to be, a privilege within the sound discretion of the courts upon a finding that the proffered information of amicus is timely, useful, or otherwise necessary to the administration of justice.")

AO 72A
(Rev.8/82)

than those properly filed with the appropriate regulatory authority." *See Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 (1981). The doctrine has two purposes: (1) to preserve the authority of regulating agencies to determine the reasonableness of rates and (2) to insure that regulated entities charge only those rates which have been approved of by the applicable regulating agency. *Id*. at 577-79. The doctrine also bars courts from awarding a party a 'retroactive rate increase based on speculation about what the [regulating agency] might have done had it been faced with the facts." *Id*. at 578-79.

The nonjusticiability strand of the doctrine is that principle that holds that courts must not usurp regulatory agencies' exclusive authority to set reasonable rates for utility services. *See Marcus v. AT&T Corp.*, 138 F.3d 46, 58 (11th Cir. 1998). The reasoning behind the nonjusticiability strand is that regulatory agencies are more competent to perform this function. *Id*. In Georgia, it is the Georgia Public Service Commission that regulate utilities and the rates which they charge the consumer. O.C.G.A. § 46-2-24. The Court is confident that the Georgia Public Service Commission is far more qualified than itself to regulate electric power rates in Georgia. Although the CUC is not directly asking the Court to set utility rates, it is asking the Court to become entwined in the process. (*See* Br. of Georgia Power Co. in Opp'n to the CUC Motion for Leave to File Br. as

55

Amicus Curiae [19] at 12 ("To grant the requested relief, the Court would necessarily be required to engage in the legislative function of balancing the interests of Georgia utility rate-payers against the interests of Georgia Power. Implicit in any order preventing Georgia Power from including costs and expenses resulting from this lawsuit into its retail electric rate-base is the Court's conclusion that a rate set on such terms would be excessive or unreasonable.").) The Supreme Court has recognized that the setting of utility rates is a legislative act, not a judicial one. *See Arkansas Elec. Co-op. v. Public Serv. Comm'n,* 461 U.S. 375 (1983); *Prentis v. Atlantic Cost Line Co.,* 211 U.S. 210, 226 (1908) ("[t]he establishment of a rate is the making of a rule for the future, and therefore is an act legislative, not judicial in kind"). For these reasons, the Court concludes that CUC's amicus brief will not be helpful to the Court because the Court is unwilling to become involved in the utility rate-setting process. Accordingly, CUC's Motion for Leave to File Brief as Amicus Curiae [15] is **DENIED.**[34]

---

[34] If this lawsuit does ultimately result in an award of damages against Georgia Power, CUC will have the opportunity to address this argument with the Georgia Public Service Commission. In setting utility rates, the commission has the authority to (1) conduct discovery, (2) hold public hearings, and (3) evaluate all evidence submitted. *See* O.C.G.A. §§ 46-2-57, -25, -44, -45. The commission's decisions are subject to judicial review in the state judicial system. *See* O.C.G.A. §§ 50-13-19 and 46-2-91(7).

CUC argues that its brief is timely, and that "if these matters are left to the dictates of political processes, the

CONCLUSION

For the foregoing reasons, the Court finds that defendant Southern Company Services' Motion to Dismiss [5] is **GRANTED**, Alabama Power Co.'s Objection to Exhibits and Motion to Exclude [33] is **GRANTED IN PART AND DENIED IN PART**, defendant Alabama Power Co.'s Motion to Dismiss [7] is **GRANTED**, defendant Alabama Power Co.'s Alternative Motion to Transfer Venue [8] is **DENIED AS MOOT**, Consumers' Utility Counsel's Motion for Leave to File a Reply Brief Amicus Curiae [48] is **GRANTED**, Consumers' Utility Counsel's Motion for Leave to File Brief as Amicus Curiae [15] is **DENIED**, plaintiff's Motion for Leave to File its Reply Memorandum in Support of its Motion for Leave to Amend its Complaint Under Seal [46] is **GRANTED**, and plaintiff's Unopposed Motion for Leave to Exceed Page Limit [46] is **GRANTED**.  Plaintiff's Motion for Leave to File Amended Complaint [35] and Physicians for Social Responsibility, Campaign for a Prosperous Georgia, U.S. Public Interest Research Group, and Alabama Environmental Council's

---

opportunities for misunderstanding, miscalculation, and obfuscation are greatly increased." (Reply Br. of Amicus Curiae [48] at 5.)  Georgia Power notes that the imposition of any penalties is purely speculative at this point.  In addition, Georgia Power argues that because there is a state remedy provided, which CUC has not availed itself of, CUC has failed to exhaust its state remedies and the controversy is premature and not yet ripe for adjudication.  The Court has decided CUC's motion on other grounds, so need not address this issue.  The Court notes, however, that Georgia Power's argument appears to have merit.

Motion to Intervene as Plaintiffs [38] remain under consideration by the Court.

SO ORDERED, this ___/___ day of August, 2000.

JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

58

US OFFICE PRODUCTS

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

ALABAMA POWER CO., GEORGIA
POWER CO., and SOUTHERN
COMPANY SERVICES, INC.,

        Defendants.

CIVIL ACTION NO.

1:99-CV-02859-JEC

## ORDER

This case is presently before the Court on plaintiff's Motion for Leave to File Amended Complaint [35] and Physicians for Social Responsibility, Campaign for a Prosperous Georgia, U.S. Public Interest Research Group, and Alabama Environmental Council's Motion to Intervene as Plaintiffs [38].   The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that plaintiff's Motion for Leave to File Amended Complaint [35] should be **GRANTED IN PART AND DENIED IN PART**, and Physicians for Social Responsibility, Campaign for a Prosperous Georgia, U.S. Public Interest Research Group, and Alabama Environmental Council's Motion to Intervene as Plaintiffs [38] should be **GRANTED WITH CONDITIONS**.

EXHIBIT C

AO 72A
(Rev.8/82)

## BACKGROUND

The facts and an explanation of the underlying law in this case are set out in the Court's Order [57] dated August 1, 2000, and are only briefly repeated herein. On November 3, 1999, plaintiff filed a complaint asserting claims against defendants Alabama Power, Georgia Power, and Southern Company Services (hereinafter "SCS") under sections 113(b)(2) and 167 of the Clean Air Act (hereinafter "the Act"), 42 U.S.C. §§ 7413(b)(2) and 7477; the Prevention of Significant Deterioration (hereinafter "PSD") provisions of the Act, 42 U.S.C. §§ 7470-92; and the New Source Performance Standards (hereinafter "NSPS") provisions of the Act, 42 U.S.C. § 7411. (Compl. [1].) Defendant Georgia Power filed an answer on December 28, 1999. (Answer [4].) The next day, SCS filed a Rule 12(b)(6) motion to dismiss, asserting that plaintiff's complaint failed to state a claim against SCS upon which relief could be granted. (Mot. to Dismiss [5].) That same day, defendant Alabama Power filed two motions—the first a motion to dismiss based on lack of personal jurisdiction and improper venue, and the second an alternative motion to transfer venue to the Northern District of Alabama. (Mot. to Dismiss [7]; Mot. to Transfer Venue [8].) On January 15, the Consumers' Utility Counsel Division of the Governor's Office of Consumer Affairs (hereinafter "CUC") filed a motion for leave to file an amicus brief on behalf of electrical utility consumers potentially

2

affected by the suit. (Mot. for Leave to File Brief as Amicus Curiae [15].) On March 31, plaintiff filed a motion for leave to file an amended complaint, the purpose of which is to add further counts against the original defendants and add similar claims against three new defendants--Gulf Power, Mississippi Power, and Savannah Power and Electric. (Mot. for Leave to File Am. Compl. [35].) Two weeks later, several public interest groups filed a motion to intervene as plaintiffs. (Physicians for Social Responsibility, Campaign for a Prosperous Georgia, U.S. Public Interest Research Group, and Alabama Environmental Council's Mot. to Intervene as Plaintiffs (hereinafter "Mot. to Intervene as Pls.") [38].)

On August 1, 2000, this Court issued an Order in which it granted defendants Alabama Power's and SCS's motions to dismiss. (Order [57].) In addition, the Order denied CUC's motion to file an amicus brief. (Id.) The Court deferred ruling on plaintiff's motion for leave to file an amended complaint and the public interest groups' motion to intervene as plaintiffs at that time. The Court addresses those motions today.

The following groups have filed a motion to intervene as plaintiffs: Physicians for Social Responsibility, Campaign for a Prosperous Georgia, United States Public Interest Group, and Alabama Environmental Council. (Mot. to Intervene as Pls. [38].) These organizations state that they have "thousands of members in

3

Alabama and Georgia that are exposed to the pollutants and their byproducts that Defendants are alleged to be emitting into the air in violation of the Clean Air Act." (*Id.* at 8.)  They state that they have an unconditional statutory right to intervene because they have a direct, substantial, and legally protectible interest in the subject matter of the action.  In the alternative, the applicants move for permissive intervention pursuant to Federal Rule of Civil Procedure 24(b).  (*Id.* at 6-15.)

In plaintiff's proposed amended complaint, it seeks to add three new defendants: Savannah Power and Electric Company, Gulf Power Company, and Mississippi Power Company.  Just as Georgia Power and Alabama Power, these three companies are wholly-owned subsidiaries of the Southern Company.  (Mem. in Supp. of the U.S.'s Mot. for Leave to Amend its Compl. [35] at 1 n.1.)  Gulf Power is a Maine corporation with its principal place of business in Pensacola, Florida.  (Am. Compl. [35] at ¶ 16.)  Plaintiff states that Gulf Power is admitted to do business in Alabama, Florida, Georgia, and Mississippi and that it owns and operates electric generating facilities in Florida, Mississippi, and Georgia.  (*Id.*)  Mississippi Power is a Mississippi corporation with its principal place of business in Gulfport, Mississippi.  (*Id.* at ¶ 17.)  Plaintiff states that Mississippi Power owns and operates electric generating facilities in Mississippi and Alabama.  Savannah Power is a Georgia corporation.  All of the

4

proposed defendants participate in the shared system coordinated by SCS.

Plaintiff's proposed amended complaint brings additional counts against the original defendants and similar counts against three new defendants. First, plaintiff alleges that defendants Georgia Power and SCS began construction of Plant Scherer in violation of the NSPS. (The amended complaint does not bring a NSPS claim in regard to Plant Miller.) The amended complaint also states that Alabama Power and SCS modified Plants Gaston and Greene County, and conducted further modifications at Plant Barry in violation of the PSD provisions of the Act. Plaintiff further adds PSD claims against the new defendants similar to those against the original defendants. Finally, the amended complaint alleges that all of the defendants violated the applicable Clean Air Act State Implementation Plans (hereinafter "SIPS")[1] in place at the time of the modifications. (Mem. in Supp. of the Mot. of U.S. for Leave to File an Am. Compl. [35] at 2-3.)

---

[1] Under the Act, each state is required to adopt a SIP that contains emission limitations and other measures to prevent significant deterioration in attainment areas. 42 U.S.C. § 7410. A state may either have its own PSD regulations, which must be at least as strict as those under 40 C.F.R. § 51.66, approved by the EPA and incorporated into its SIP, or it may incorporate the federal regulations by reference. Each SIP must, among other measures, include a program to regulate the modification and construction of any stationary source of air pollution. 42 U.S.C. § 7410(a)(2)(C).

5

## DISCUSSION

### I.    Motion to Amend

As discussed above, plaintiff has moved to amend its complaint to bring several additional claims.  First, plaintiff seeks to add two new claims relating to power plants already at issue: (1) defendants Georgia Power and SCS began construction of Plants Scherer, in violation of the NSPS, and (2) defendants Alabama Power and SCS began construction of Plant Miller, in violation of the NSPS.  The amended complaint also states that Alabama Power and SCS modified Plants Gaston and Greene County, and conducted further modifications at Plant Barry in violation of the Act.  Plaintiff also adds claims against three new defendants--Savannah Power and Electric Company, Gulf Power Company, and Mississippi Power Company.  Finally, the amended complaint alleges that all of the defendants violated the Act and the applicable SIPS in place at the time of the modifications.  (Mem. in Supp. of the Mot. of U.S. for Leave to File an Am. Compl. [35] at 2-3.)  All of the original defendants have filed briefs in opposition to amendment.  (SCS's Opp'n to Pl.'s Mot. to Amend Compl. [40]; Def. Georgia Power Co.'s Br. in Opp'n to Pl.'s Mot. to Amend Compl. [41]; Alabama Power Co.'s Opp'n to the Gov't's Mot. to Amend Compl. [42].)

At this stage in the litigation, Rule 15(a) of the Federal Rules of Civil Procedure allows a party to amend its pleading 'only by leave of court or by written consent of the adverse

6

party; and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). As defendants' responses to plaintiff's motion for leave to amend clearly indicate, defendants' consent is not forthcoming. Whether leave to amend should be granted, therefore, is a decision within the sound discretion of the district court. *See Moore v. Baker*, 989 F.2d 1129, 1131 (11th Cir. 1993); *see also Zenith Radio Corp. v. Hazeltine Research Inc.*, 401 U.S. 321, 330 (1971). The decision is not automatic, however. *Layfield v. Bill Heard Chevrolet Co.*, 607 F.2d 1097, 1099 (5th Cir. 1979).

The Supreme Court has defined several factors that a district court may consider when reviewing a motion for leave to amend under Rule 15(a), including undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the non-moving party, or futility of the amendment. *Rosen v. TRW, Inc.*, 979 F.2d 191, 194 (11th Cir. 1992) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Additionally, courts may consider the amount of time and opportunities the movant had to seek leave to amend, whether the proposed amendment is such that could have been added shortly after the complaint was filed, whether allowance of the proposed amendment would complicate trial preparation by requiring additional discovery, and whether the movant has attempted to justify any delay. *See O'Brien v. Union Oil Co. of Cal.*, 699 F. Supp. 1562, 1571 (N.D. Ga. 1988) (Forrester, J.)

7

AO 72A
(Rev.8/82)

(citing *National Serv. Indus., Inc. v. Vafla Corp.*, 694 F.2d 246
(11th Cir. 1982); *Addington v. Farmers' Elevator Mut. Ins. Co.*,
650 F.2d 663 (5th Cir. 1981); *Staggs v. Chrysler Corp.*, 678 F.
Supp. 270 (N.D. Ga. 1988); *Ferrell v. Busbee*, 91 F.R.D. 225 (N.D.
Ga. 1981)).  In the present case, there is no evidence of undue
delay, bad faith, or dilatory motive.  Rather, defendant Georgia
Power[2] argues that it would be prejudiced and that amendment would
be futile as to the claims against Alabama Power, SCS, Gulf Power,
and Mississippi Power, as they would likely be dismissed later on
jurisdictional grounds.

A.   *New Claims Against Alabama Power and SCS*

The Court's August 1 Order granted both SCS's and Alabama
Power's motions to dismiss.  In that Order, the Court concluded
that SCS is not an owner or operator of any of the operating
affiliates' power plants, and accordingly, dismissed all claims
asserted against SCS.. The new claims asserted against SCS in the
amended complaint rely on the same theories of owner/operator as
those in the original complaint.  With relation to Georgia or
Alabama Power plants, it is clear that any claims asserting
liability against SCS fail as a matter of law.  As SCS played a
similar role in its interaction with all of the operating
affiliates under the ICC, it is also clear that the claims

_____

[2] Although original defendants Alabama Power and SCS
opposed the motion to amend as well, they have since been
dismissed from the case.

8

involving the new defendants fail as well.  It would therefore be futile to allow plaintiff to amend its complaint to add further claims against SCS.

As to Alabama Power, the Court granted its motion to dismiss on the ground that personal jurisdiction was lacking.  Any claims asserted against Alabama Power fail as a matter of law, and plaintiff's attempt to amend its complaint to add further claims against Alabama Power would be futile.  Accordingly, to the extent that the amended complaint seeks to add new claims against these two defendants, amendment would be futile and the motion to amend to add these claims is DENIED.

B.    New Claims Against Georgia Power

Plaintiff's amended complaint also seeks to add an additional claim against defendants Georgia Power, alleging that Georgia Power violated the Georgia SIP.  (Am. Compl. [35] at ¶¶ 165-69.)  Although Georgia Power filed a response opposing plaintiff's motion to amend, it did not address this issue, and the Court concludes that Georgia Power does not object to this aspect of the amendment.  (Def. Georgia Power Co.'s Br. in Opp'n to Pl.'s Mot. to Amend Compl. [41].)  The Court sees no reason why amendment to add this claim should not be allowed, as it would not prejudice Georgia Power.  Accordingly, plaintiff's motion to amend is GRANTED as to the Georgia SIP claim against Georgia Power.

9

C.   Claims Against New Plaintiffs

Plaintiff's amended complaint also includes claims against three new defendants, Gulf Power, Mississippi Power, and Savannah Power and Electric.  These three defendants operate, among other plants, Plant Crist, Plant Jack Watson, and Plant Kraft, respectively.  (Am. Compl. [35] at ¶¶ 33-35.)  Plaintiff alleges violation of the PSD provisions and applicable SIPs occurred at each of these plants.  (Id. at ¶¶ 194-223.)  The Court addresses the claims against Savannah Power and Electric first and then those against the other two new defendants.

1.   Savannah Power and Electric

Plaintiff alleges that Savannah Power and Electric is a Georgia corporation doing business in Alabama, Florida, Georgia, and Mississippi.  (Am. Compl. [35] at 7.)  The claims against Savannah Power and Electric involve Plant Kraft, a coal fired electric generation plant owned and operated by Savannah Power and Electric in Chatham County, Georgia.  As defendants have not objected to the joinder of Savannah Power and Electric, the Court GRANTS plaintiff's motion to amend as to the claims against this party.

2.   Gulf Power and Mississippi Power

In the amended complaint, plaintiff alleges that Gulf Power is a Maine corporation with its principal place of business in Pensacola, Florida.  (Am. Compl. [35] at ¶ 16.)  In addition,

10

plaintiff states that Gulf Power is admitted to do business in the states of Alabama, Florida, Georgia, and Mississippi. (*Id.*) Plaintiff states that Gulf Power owns and operates electric generating facilities within the states of Florida, Mississippi, and Georgia and provides electric capacity and energy to the shared system operated by SCS. (*Id.*)

Plaintiff's claims are based on activities occurring at Plant Crist, a coal fired electric generation plant owned and operated by Gulf Power in Escambia County, Florida. (*Id.* at ¶ 33.) In its Seventeenth Claim for Relief, plaintiff alleges that Plant Crist generates electricity from four steam generating boilers which are designated as Plant Crist Units 4 through 7. Plaintiff's amended complaint alleges that Gulf Power violated the PSD provisions of the Act by commencing construction of major modifications, as defined by the Act and the Florida SIP, at Plant Crist. (*Id.* at ¶ 195.) Plaintiff alleges that these modifications included the installation of a new economizer in Unit 7 in 1996, as well as other "major modifications." (*Id.*)

Plaintiff asserts that Gulf Power "did not obtain a PSD permit as required by FAC § 17-212.400(5) (FAC § 62-212.400(5))[3] prior to construction or operation of any of the modifications"

_____

[3] The Florida Administrative Code was renumbered, and plaintiff has therefore provided citation to the code in effect at the time of the alleged violations, followed by the current numbering.

11

undertaken at Plant Crist.  (*Id.* at ¶ 196.)  Specifically, plaintiff states that Gulf Power did not install or operate "Best Available Control Technology" (hereinafter "BACT") for control of NO$_x$, SO$_2$, and PM, as applicable, as required by FAC § 17-212.400(5) (FAC § 62-212.400(5)), at Plant Crist.  Plaintiff further alleges that Gulf Power "did not comply with all provisions of the Florida SIP, including FAC § 17-212.400(5)(b-f) (FAC § 62-212.400(5)(b-f)) prior to constructing and operating the modifications at Plant Crist."  (*Id.*)  Plaintiff argues that unless restrained by the Court, Gulf Power will continue to violate Section 165(a) of the Act, 42 U.S.C. § 7475(a), and the Florida SIP.  (*Id.* at ¶ 197.) Plaintiff seeks injunctive relief and civil penalties in regard to the alleged violations at Plant Crist.  (*Id.* at ¶ 198.)

In plaintiff's Eighteenth Claim for Relief, plaintiff claims that Gulf Power has further violated the Florida SIP because Plant Crist is an "emissions unit," as defined by FAC § 17-210.300 (FAC § 62-212.300).  (*Id.* at ¶ 200.)  Plaintiff alleges that as an emission unit, Gulf Power was required to obtain a permit pursuant to FAC § 17-210.300(1)(a) (FAC § 62-210.300(1)(a)) prior to construction or operation of any of the modifications undertaken at Plant Crist.  (*Id.* at 201.)  Again, plaintiff argues that unless enjoined by the Court, Gulf Power will continue to violate the Act and the Florida SIP.  (*Id.* at 202.)  Plaintiff seeks an

AO 72A
(Rev.8/82)

injunction and civil damages as to this claim as well. (*Id.* at 203.)

The allegations against Mississippi Power, which are quite similar, are contained in plaintiff's Nineteenth and Twentieth Claims for relief. (Am. Compl. [35] at ¶¶ 204-13.) Plaintiff claims that Mississippi Power made major modifications at Plant Watson, including the installation of a economizer in Unit 5 in 1992, and that it did so without first obtaining a permit as required by 40 C.F.R. §§ 52.21(a)(1) and 52.21(r)(1). (*Id.* at ¶¶ 205-06.) Plaintiff further alleges that Mississippi Power has not installed and operated BACT for control of $NO_x$, $SO_2$, and PM, as applicable, in violation of the Mississippi SIP, Rule APC-S-5, 40 C.F.R. § 52.21(j). (*Id.* at ¶ 206). Lastly, plaintiff alleges that Mississippi Power has also failed to comply at Plant Watson with the requirements of 40 C.F.R. § 52.21(k), (m), (n), and (o), as incorporated into the Mississippi SIP, Rule APC-S-5. (*Id.*)

Defendant Georgia Power opposes plaintiff's motion to amend as far as it allows claims against Gulf Power and Mississippi Power. (Def. Georgia Power Co.'s Br. in Opp'n to Pl.'s Mot. to Amend Compl. [41].) Georgia Power points out that, like Alabama Power, which was dismissed after Georgia Power filed its response brief, "both Mississippi Power and Gulf Power are corporations incorporated and headquartered outside the state of Georgia." (*Id.* at 2.) In addition, "like Alabama Power, the allegations

13

against Gulf Power and Mississippi Power concern alleged modifications at coal-fired electric plants located outside Georgia, in Florida and Mississippi, respectively." (*Id.*) Georgia Power further claims that none of the allegations against these two parties involve any activities occurring within Georgia. (*Id.* at 2-3.)

Georgia Power contends that joinder of these two parties is improper and would significantly prejudice Georgia Power by confusing the issues. (*Id.* at 3.) It further argues that the motion to amend should be denied because it would be futile, as this Court lacks jurisdiction over either Gulf Power or Mississippi Power for the claims alleged. (*Id.* at 3-4.) The Court addresses each of these issues in turn.

a. Improper Joinder

Permissive joinder is governed by Rule 20(a) of the Federal Rules of Civil Procedure, which states:

> All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action. All persons (and any vessel, cargo or other property subject to admiralty process in rem) may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action. A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded. Judgment may be given for one or

14

AO 72A
(Rev.8/82)

more of the plaintiffs according to their respective rights to relief, and against one or more defendants according to their respective liabilities.

Fed. R. Civ. P. 20(a). "A party seeking joinder of claimants under Rule 20 must establish two prerequisites: 1) a right to relief arising out of the same transaction or occurrence, or series of transactions or occurrences, and 2) some question of law or fact common to all persons seeking to be joined." *Alexander v. Fulton County, Georgia*, 207 F.3d 1303 (11th Cir. 2000). In *Alexander*, a panel of the Eleventh Circuit discussed the purpose and scope of Rule 20(a):

> Plainly, the central purpose of Rule 20 is to promote trial convenience and expedite the resolution of disputes, thereby eliminating unnecessary lawsuits. *See Mosley v. General Motors Corp.*, 497 F.2d 1330, 1332 (8th Cir. 1974). The Federal Rules, however, also recognize countervailing considerations to judicial economy. Rule 42(b), for example, provides for separate trials where the efficiency of a consolidated trial is outweighed by its potential prejudice to the litigants. *See* Fed. R. Civ. P. 42(b); *Grayson*, 79 F.3d at 1097. The Supreme Court has instructed the lower courts to employ a liberal approach to permissive joinder of claims and parties in the interest of judicial economy: "Under the Rules, the impulse is towards entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers v. Gibbs*, 383 U.S. 715, 724, 86 S. Ct. 1130, 1137, 16 L. Ed.2d 218 (1966).

*Alexander*, 207 F.3d at 1323.

The *Alexander* court also discussed how lower courts should analyze Rule 20's requirements of the same transaction or occurrence, or series of transactions or occurrences, and common

15

questions of law or fact common to all persons seeking to be joined.  As to the "same transaction requirement," the court explained:

> In determining what constitutes a transaction or occurrence for the purposes of Rule 20(a), courts have looked for meaning to Fed. R. Civ. P. 13(a) governing compulsory counterclaims. *See Mosley*, 497 F.2d at 1333. For the purposes of Rule 13(a), "'[t]ransaction' is a word of flexible meaning.  It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Moore v. New York Cotton Exchange*, 270 U.S. 593, 610, 46 S. Ct. 367, 371, 70 L. Ed. 750 (1926) (interpreting the compulsory counterclaim provision of former Equity Rule 30).  Accordingly, "all 'logically related' events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence." *Mosley*, 497 F.2d at 1333.

*Alexander*, 207 F.3d at 1323.  Addressing the common questions of law or fact prong, the court explained that "[t]he second prong of Rule 20 does not require that all questions of law and fact raised by the dispute be common, but only that some question of law or fact be common to all parties."  *Alexander*, 207 F.3d at 1324 (citing *Mosley*, 497 F.2d at 1334.)  Georgia Power contends that plaintiff's attempt at joinder fails to meet either requirement.

As to the first prong, Georgia Power points out that the claims against Georgia Power involve the installation of an economizer at Plant Bowen in Bartow County, Georgia, in 1992, and construction at Plant Scherer in Bartow and Monroe County, Georgia, in 1977 and 1978.  (Def. Georgia Power Co.'s Br. in Opp'n to Pl.'s Mot. to Amend Compl. [41] at 6.)  The proposed claims

16

against Gulf Power involve repairs to equipment at Plant Crist in
Escambia County, Florida, in 1996, and the proposed allegations
against Mississippi Power concern repairs to equipment at Plant
Watson in Harrison County, Mississippi, in 1992.  (*Id.*)  Georgia
Power argues that "[t]he subject repairs in the proposed amendment
involve distinct decision making, distinct power production units
and equipment, not to mention distinct post-repair results—all of
which occurred outside of Georgia."  (*Id.* at 7.)  Further, Georgia
Power points out that the Government admitted that "'the specific
facts about the work done at each plant . . . varies (sic) from
plant to plant.'"  (*Id.* (citing Mem. in Supp. of the Mot. of the
U.S. for Leave to File an Am. Compl. [35] at 15).)

Plaintiff counters this argument by stating that although the
modifications and construction at the power plants occurred at
different times in different locations, and were conducted by
different corporations, they constitute a series of common
transactions or occurrences because the five Southern Company
affiliates "act together as an integrated unit," and "the
operations and management of the original and proposed defendants
are inextricably bound."  (U.S.'s Reply Mem. in Supp. of its Mot.
for Leave to Amend its Compl. [46] at 7.)  Plaintiff contends that
because the affiliates pool their resources, "[d]ecisions
regarding increases and decreases in any one affiliate's
generating capacity thus must be made on a coordinated basis as

17

they affect the reliability of the other affiliates' systems and their attendant needs regarding new generating capacity." (*Id.* at 8.)  In sum, plaintiff argues that all of thu claims arise from a common, coordinated series of decisions to extend the lives of the coal-fired electric generating facilities across the Southern Company electric system.  (*Id.* at 6.)

As to the second prong, Georgia Power claims that the allegations do not present common questions of law or fact.  (Def. Georgia Power Co.'s Br. in Opp'n to Pl.'s Mot. to Amend Compl. [41] at 9.).  Defendant states that while the underlying claims all involve "the meaning and practical application of the terms 'major modification' and 'routine maintenance, repair and replacement,'" these are determinations that the Government has admitted must be made on a case-by-case basis.  (*Id.*)  In addition, Georgia Power argues that SIPS are, by definition, state laws and regulations.  Plaintiff, however, claims that the facts are not unique, as each of the defendants replaced the same piece of equipment--an economizer--at the plants in question.  (U.S.'s Reply Mem. in Supp. of its Mot. for Leave to Amend its Compl. [46] at 12.)  Further, plaintiff maintains that SIPS are federal laws, as least for the purposes of this case, and that the SIPS of Georgia, Mississippi, Alabama, and Florida are substantively the same.  (*Id.* at 16-19.)

18

In support of its argument against joinder, Georgia Power cites *Grayson v. K-Mart Corp.*, 849 F. Supp. 785 (N.D. Ga. 1994) (Carnes, J.), in which the undersigned severed the claims of several plaintiffs alleging employment discrimination.[4]   In *Grayson*, eleven plaintiffs brought age discrimination suits against their employer, K-Mart, and K-Mart brought a motion to sever the claims and have separate trials.  The plaintiffs worked in different K-Mart stores throughout Alabama, Florida, Georgia, and North Carolina.  *Id.* at 786.  Plaintiffs argued that K-Mart had a company-wide policy to demote managers over forty years of age and that joinder of their claims and a single trial were appropriate because of a common series of transactions and common questions of law and fact.  K-Mart, however, countered that the employees' demotions were distinct, unrelated employment decisions.   While all of the employment decisions had to be approved by a regional officer, the undersigned concluded that the evidence established that the initial decision to demote an employee began at the local level and that the plaintiffs' cases did not constitute one logical transaction or occurrence for purposes of Rule 20(a).  *Id.* at 789.   The undersigned also concluded that, although all of the plaintiffs' claims arose under

---

[4] Defendant also cites *Smith v. North American Rockwell Corp.*, 50 F.R.D. 515, 524 (N.D. Okla. 1970), which likewise involved discrimination claims by several different plaintiffs.

19

AO 72A
(Rev.8/82)

the ADEA, no common question of law or fact existed between the plaintiffs' cases, within the meaning of Rule 20. *Id.* at 789. ("As detailed previously, each demotion decision affecting the plaintiffs in these cases was a discrete act by the defendant. 'As indicated, the factual and legal questions between the plaintiffs and the defendant are based upon the wholly separate acts of the defendant with respect to each plaintiff. There is consequently a complete lack of common questions of fact or law, the second element required by Rule 20(a), and the action[s] must be severed on this ground as well.' *Id.*") (citation omitted).

Plaintiff argues that *Grayson* is distinguishable for two reasons. (U.S.'s Reply Mem. in Supp. of its Mot. for Leave to Am. its Compl. [46] at 10.) First, plaintiff points out that allowing joinder in *Grayson*, "based solely on allegations of company-wide bias would [have] eliminate[d] virtually all limits on joinder." (*Id.*) *See Grayson*, 849 F. Supp. at 789 ("Taking plaintiffs' reasoning to its logical end, every employment decision made by managers subject to central policies and review would constitute one transaction or occurrence, and any group of aggrieved employees would be entitled to join its claims under Rule 20(a).") Second, plaintiff points out that the Court noted that if it had allowed joinder in *Grayson*, it would have had to conduct essentially eleven "mini-trials." *See id.* at 791. Plaintiff contends that these concerns are not present in the case at bar.

20

Plaintiff is correct that *Grayson* is factually distinguishable. However, the underlying principles and concerns are the same. While the operating affiliates may act in a coordinated manner, the determination of whether construction or modification of equipment at a particular plant was in violation of the Act or relevant SIP is a fact-specific determination that must be made on a case-by-case basis. As this Court stated in *Grayson*, "It is, of course, true that plaintiffs have alleged against defendant[s] claims based on the same general theories of law, but this is not sufficient." *Grayson*, 848 F. Supp. at 789. The Court agrees with Georgia Power that "whether Georgia Power violated the Act by making certain repairs at a Georgia power plant in 1992 is not common with the question of whether another company, Gulf Power, violated the Act by repairing a power plant in Florida in 1996." (Def. Georgia Power Co.'s Br. in Opp'n to Pl.'s Mot. to Am. Compl. [41] at 12.)

Georgia Power also argues that granting plaintiff's motion to amend would result in undue prejudice to it, as there would be a risk of "unnecessary confusion and complication of already complicated facts and issues." (*Id.* at 19.) It claims that the "additional expense and potential for confusion is substantial" and that "[b]y comparison, any potential prejudice to the Government would be slight." (*Id.* at 20.) Plaintiff, on the other hand, argues that any prejudice to defendants will not be

21

"undue" because the similarity of the claims is so great.  In addition, plaintiff contends that it will be substantially prejudiced if it must try the claims against each defendant in separate cases.  (U.S.'s Reply Mem. in Supp. of its Mot. for Leave to Amend its Compl. [46] at 13.)  The Government contends this is so because many of the same individuals will need to be deposed, and the testimony of many of the witnesses--including utility boiler experts, engineers and environmental compliance staff from SCS, industry witnesses, and EPA engineers--will have to be duplicated if there are separate trials.  *Id.*  It also argues that it could be subject to inconsistent verdicts if forced to try the cases in four separate states.  (*Id.* at 22-23.)

### b.    Futility

Georgia Power's second argument in opposition to the motion to amend is that amendment should be denied due to futility because this Court lacks jurisdiction over the proposed defendants and venue would be improper.  (Def. Georgia Power Co.'s Br. in Opp'n to Pl.'s Mot. to Amend Compl. [41] at 13.)  Although the Court had not ruled on defendants Alabama Power and SCS's motions to dismiss at the time Georgia Power filed its brief in opposition to the motion to amend, Georgia Power argued that it was likely that the Court would grant the motions to dismiss, and if it did, it should also deny the motion for leave to amend as to defendants Gulf and Mississippi Power because the Court lacked jurisdiction

over them as well.  The Court has since ruled on the motions to dismiss and concluded that Alabama Power and SCS should be dismissed from the case as they lacked sufficient contacts for the Court to exercise jurisdiction over them.  The question before the Court now is whether Gulf Power and Mississippi Power are similarly situated.

Georgia Power contends that "[a] review of the pleadings shows that the Government will not be able to sustain its burden of establishing that jurisdiction over Gulf Power and Mississippi Power is proper . . . and that the proposed amended complaint is futile because of this jurisdictional defect." (Def. Georgia Power Co.'s Br. in Opp'n to Pl.'s Mot. to Am. Compl. [41] at 13.) In support of this argument, Georgia Power relies on Alabama Power's motion to dismiss and the cases cited therein. (*Id.*)  It points out that, similar to Alabama Power, both Gulf Power and Mississippi Power are incorporated in other states, have their principal places of business in other states, have their customer bases in other states, and conducted the relevant repairs at plants located in other states.  Georgia Power contends that plaintiff's "allegations fail to establish that the prospective defendants had sufficient contacts with this forum." (*Id.* at 15.)

Plaintiff argues that it is premature for the Court to consider these jurisdictional questions.  (U.S.'s Reply Mem. in Supp. of its Mot. for Leave to Amend its Compl. [46] at 23.)

23

Plaintiff maintains that "[q]uestions of personal jurisdiction over a corporation cannot be decided without an analysis of that corporation's contacts with the forum state." (*Id.* at 24.) The Government, however, contends that the same documents submitted in opposition to Alabama Power's motion to dismiss support a finding of jurisdiction over Gulf and Mississippi Power.[5] (*Id.*) Just as it did with the earlier motions to dismiss, the Government requests an opportunity to conduct discovery before the Court rules on whether there are sufficient contacts to exercise jurisdiction over these defendants.

Georgia Power also argues that venue in the Northern District of Georgia is inappropriate as to Gulf and Mississippi Power. (*Id.*) The venue provision of the Clean Air Act reads:

> Any action under this subsection may be brought in the district court of the United States for the district in which the violation is alleged to have occurred, or is occurring, or in which the defendant resides, or where the defendant's principal place of business is located, and such court shall have jurisdiction to restrain such violation, to require compliance, to assess such civil penalty, to collect any fees owed the United States under this chapter (other than subchapter II of this chapter) and any noncompliance assessment and nonpayment penalty owed under section 7420 of this title, and to award any other appropriate relief.

42 U.S.C. § 7413(b). Georgia Power states that plaintiff has failed to demonstrate that any of the venue provisions have been

---

[5] Again, at the time the parties filed the pleadings regarding the motion to amend, the Court had not yet issued its Order on Alabama Power's and SCS's motions to dismiss.

24

met, as these two proposed defendants are foreign corporations, have their principal places of business out of state, and the repairs at issues were made at out-of-state plants. (Def. Georgia Power Co.'s Br. in Opp'n to Pl.'s Mot. to Am. Compl. [41] at 16.) Georgia Power anticipates that plaintiff's only possible argument that venue would be proper in the Northern District of Georgia as to Gulf or Mississippi Power would be an argument based on emissions. (*Id.*) It points out, however, that there is an emissions provision to the Act, 42 U.S.C. § 7426, but plaintiff chose not to bring the claims under this provision. (*Id.* at 17.) Plaintiff failed to respond to this argument in its reply brief.

The Court concludes that leave to amend the complaint to add claims against Gulf Power and Mississippi Power would be inappropriate.[6] The Court is unconvinced that joinder under Rule 20(c) would be proper. Further, the Court concludes that the proposed amendment would be futile as venue would be inappropriate.[7] Finally, the Court concludes that and personal

_____

[6] As noted above, the motion to amend is granted as to additional claims against Georgia Power and claims against new defendant Savannah Power and Light.

[7] As set out by defendants, the venue provision of the Clean Air Act would not provide for venue in this district as to Gulf Power or Mississippi Power for claims unrelated to emissions. *See Halliburton & Assocs., Inc. v. Henderson, Few & Co.,* 774 F.2d 441, 444 (11th Cir. 1985) ("If a complaint as amended is still subject to dismissal, leave to amend need not be given.")

jurisdiction is lacking.[8]    In doing so, the Court adopts the discussion contained in its August 1, 2000 Order at pages 34-51. (*See* Order [57] at 34-51.)

As to personal jurisdiction, the Court finds that both specific[9] and general[10] jurisdiction over Gulf Power or Mississippi

---

[8] Personal jurisdiction is the power of the court to summon a defendant before it to adjudicate a claim. Before a federal court may exercise personal jurisdiction over a defendant it must determine whether the defendant is amenable to service as directed by the applicable statutory authority and then determine whether that service comports with due process. *Willingway Hosp. v. Blue Cross & Blue Shield*, 870 F. Supp. 1102, 1104 (S.D. Ga. 1994) (citing *Sun Bank, N. A. v. E.F. Hutton & Co.*, 926 F.2d 1030, 1033 (11th Cir. 1991)) (diversity case); *Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1413 (9th Cir. 1989) (federal question case)). This two-step analysis was established by the Supreme Court in *Omni Capital International, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987). In the present case, defendants do not challenge the amenability of Gulf Power and Mississippi Power to service of process. Rather, these defendants claim that such service would not comport with due process.

[9] The Eleventh Circuit has recently reiterated the requirements of due process:

> The Due Process Clause permits a court to summon a nonresident to defend himself in the forum so long as that person has some "minimum contacts" with that state and, the exercise of personal jurisdiction over the defendant would not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945); *Williams Elec. Co. v. Honeywell*, Inc., 854 F.2d 389, 392 (11th Cir. 1988). The nonresident defendant's contacts with the forum must be such that he has "fair warning" that a particular activity may subject him to the jurisdiction of a foreign sovereign. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S. Ct. 2174, 85 L. Ed.2d 528

26

Power is lacking.  *See Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 nn.8, 9 (1984) (specific jurisdiction); *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952) (general jurisdiction).  For specific jurisdiction to exist in the present case, plaintiff would have to establish that (1) the claims against defendants Gulf Power and Mississippi arise out of or relate to such defendants' contacts with Georgia, (2) Gulf Power and Mississippi Power "purposefully availed itself of conducting activities within [Georgia] and invoked the benefits of

---

(1985).

*Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1355-56 (11th Cir. 2000).

    In determining whether a defendant has sufficient contacts with the forum state, a court must consider whether the contacts are related to the cause of action.  "If a person has only 'minimal contacts' with the forum, the court may summon him to defend himself in that forum only so long as the cause of action is related to his specific contacts with that forum."  *Ruiz de Molina*, 207 F.3d at 1357 n.4 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 nn.8, 9 (1984)).  This is commonly referred to specific jurisdiction.

    [10] The second type of jurisdiction--where a nonresident is summoned "to answer claims unrelated to his contacts with the forum"--is referred to as general jurisdiction.  *Ruiz de Molina*, 207 F.3d at 1357 n.4.  *See also Helicopteros*, 466 U.S. at 414 n.9 ("When a State exercises personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum, the State has been said to be exercising 'general jurisdiction' over the defendant.")  A court may exercise jurisdiction over the defendant in such a situation "so long as those contacts are *substantial, persistent, continuous and systematic.*"  *Id.* (emphasis added).  It is much more difficult for a plaintiff to establish the requisite requirements for general jurisdiction.

AO 72A
(Rev.8/82)

[Georgia's] laws," and (3) Gulf Power's and Mississippi Power's contacts must demonstrate that [they] should reasonably anticipate being haled into court in [Georgia.]" *Railcar, Ltd. v. Southern Ill. Railcar Co.*, 42 F. Supp. 2d 1369, 1372 (N.D. Ga. 1999) (Camp, J.) (citing *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 258 (11th Cir. 1996)).

Gulf Power is a Maine corporation with its principal place of business in Pensacola, Florida. (Am. Compl. [35] at ¶ 16.) Plaintiff states that Gulf Power is admitted to do business in Alabama, Florida, Georgia, and Mississippi and that it own and operates electric generating facilities in Florida, Georgia, and Mississippi; however, the Gulf Power plant at issue is located in Escambia County, Florida. (Id. at ¶¶ 16, 33.) Mississippi Power is a Mississippi corporation with its principal place of business in Gulfport, Mississippi. (Id. at ¶ 17.) Mississippi Power owns power plants in Mississippi and Alabama, but the plant at issue in this case is located in Mississippi. (Id. at ¶¶ 19-20.) As plaintiff's claims against Gulf Power and Mississippi address only actions taken at power plants located in Florida and Mississippi, it cannot be said that the claims arise out of or relate to their contacts with Georgia. Therefore, if jurisdiction exists, it is only general jurisdiction.

Establishing general jurisdiction is a heavy burden. "In order to assert general jurisdiction, the defendant's activity in

28

the forum must be continuous and substantial." *Sears Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1304 (D. Del. 1990) (citing *International Shoe*, 326 U.S. 310).[11]  Indeed, it appears that the only case in which a court has found general jurisdiction to exist is *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952).[12] Gulf Power's and Mississippi Power's direct contacts with Georgia simply to do not rise to the level of "continuous and systematic" set forth in *Perkins*.  In addition, as discussed in the Court's August 1, 2000 Order, the affiliates' participation in the Southern Company's integrated system, as delineated in the ICC, does not result in them "doing business" in the state of Georgia. Although Gulf Power and Mississippi Power may have contacts with the state of Georgia, this Court cannot say that, in their totality, they are continuous and systematic, or that they are of the nature indicating that these potential defendants had purposefully availed themselves of the laws of Georgia.  *See Helicopteros*, 466 U.S. at 411-12; *Hirsch v. Blue Cross, Blue*

---

[11] For a more thorough history and discussion of the doctrine of general jurisdiction, see the Court's August 1, 2000 Order at pages 43-51.

[12] The facts of *Perkins* were unusual.  Benguet was a mining company located in the Philippine Islands.  During World War II, however, operations there were halted because the Japanese occupied the Philippines.  During that time, the president of Benguet, a native of Ohio, returned to Ohio to run the business.  Although clearly no mining went on in Ohio, all other corporate functions were conducted from the office maintained there.

29

*Shield of Kansas City*, 800 F.2d 1474, 1478 (9th Cir. 1986); *Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055 (11th Cir. 1986); *Sea Lift, Inc. v. Refinadora Costaricense*, 792 F.2d 989, 992 (11th Cir. 1986) (holding no general jurisdiction existed where company was not engaged in "general business activity" in the forum state). Plaintiff has failed to demonstrate that the exercise of either specific or general jurisdiction is appropriate in this case as to the claims against Gulf Power and Mississippi Power.

Lastly, the Court addresses plaintiff's argument that while Gulf Power's and Mississippi Power's power plants are physically located in Florida and Mississippi, respectively, the changes made by these defendants to such plants have a detrimental effect on the quality of Georgia air. Although plaintiff may argue that these defendants' facilities caused pollution in Georgia, as discussed in the Court's August 1, 200 Order, plaintiff's claims address the modification and construction of facilities, not interstate pollution. (*See* Order [57] at 42.) Accordingly, this allegation is insufficient to convey jurisdiction.

Accordingly, plaintiff's motion for leave to amend its complaint is **GRANTED IN PART AND DENIED IN PART**. Plaintiff is instructed to file a new amended complaint in which it may amend it claims against Georgia Power as noted above and bring new claims against Savannah Power and Electric. Plaintiff, however,

30

may not bring any claims against Alabama Power, SCS, Gulf Power, or Mississippi Power in this district.

II.  **Physicians for Social Responsibility, Campaign for a Prosperous Georgia, U.S. Public Interest Research Group, and Alabama Environmental Council's Motion to Intervene as Plaintiffs**

These public interest groups (hereinafter "Applicants") have moved to intervene as plaintiffs in this lawsuit.  (Mot. to Intervene as Pls. [38].)  Applicants argue that they have a statutory right to intervene under Federal Rule of Civil Procedure 24(a), but if the Court concludes that they do not, they move in the alternative for permissive intervention pursuant to Federal Rule of Civil Procedure 24(b).  The Government has stated that it has no opposition to the intervention.  (U.S.'s Stm't of No Opp'n to Mot. to Intervene [45].)  Both Georgia Power and Alabama Power,[13] however, objected to the motion.  (Georgia Power Co.'s Mem. in Supp. of Opp'n to Mot. for Intervention [49]; Alabama Power Co.'s Mem. in Opp'n to Mot. for Intervention [50].)

A.  *Intervention as of Right*

Federal Rule of Civil Procedure 24 reads, in relevant part:

(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the

---

[13] As noted above, Alabama Power is no longer a party to this action.

31

action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed. R. Civ. P. 24(a).   The Applicants claim that their application was timely and, as they meet both the requirements of subsection (1) and (2), they are entitled to intervene as of right.   They state that the litigation is in an early stage and the parties therefore would not be prejudiced by intervention at this point.   (Mot. to Intervene as Pls. [38] at 3-4.)   As there has been no significant legal action in the case yet, the Court agrees that the motion to intervene is timely.

The next question is whether the Applicants meet the requirements of Rule 24(a)(1) or (2).   Applicants claim that they meet both.   First, they claim that the Clean Air Act gives them an unconditional right to intervene under its "citizen suit provision," 42 U.S.C. § 7604.   (Id. at 4.)   Section 7604(a) reads, in part:

> Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf--
>
> (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation,
>
> (2) against the Administrator where there is alleged a

32

failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator, or

(3) against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I of this chapter (relating to significant deterioration of air quality) or part D of subchapter I of this chapter (relating to nonattainment) or who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit.

42 U.S.C. § 7604(a) (emphasis added). Subsection (b) provides a limitation, however:

No action may be commenced--

(1) under subsection (a)(1) of this section--

(A) prior to 60 days after the plaintiff has given notice of the violation (i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or

(B) <u>if the Administrator or State has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any person may intervene as a matter of right.</u>

(2) under subsection (a)(2) of this section prior to 60 days after the plaintiff has given notice of such action to the Administrator,
except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of section 7412(i)(3)(A) or (f)(4) of this title or an order issued by the Administrator pursuant to section 7413(a) of this title. Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation.

33

42 U.S.C. § 7604(b) (emphasis added). Accordingly, the Applicants claim that while they are restricted from bringing a separate suit, under § 7604(b)(1)(B), they have the right to intervene as plaintiffs in the Government's suit because the Government's claims involve "emissions limitations." (Mot. to Intervene as Pls. [38] at 4-5.)

"Emission limitation or standard" is defined generally by the Act as:

> a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice or operational standard promulgated under this chapter.

42 U.S.C. § 7602(k). Under the citizen suit provision, however, the definition is expanded to include, in relevant part:

> (1) a schedule or timetable of compliance, emission limitation, standard of performance or emission standard, . . . or
> (3) any condition or requirement of a permit under part C of subchapter I of this chapter (relating to significant deterioration of air quality) or part D of subchapter I of this chapter (relating to nonattainment), section 7419 of this title (relating to primary nonferrous smelter orders), any condition or requirement under an applicable implementation plan relating to transportation control measures, air quality maintenance plans, vehicle inspection and maintenance programs or vapor recovery requirements, section 7545(e) and (f) of this title (relating to fuels and fuel additives), section 7491 of this title (relating to visibility protection), any condition or requirement under subchapter VI of this chapter (relating to ozone protection), or any requirement under section 7411 or 7412 of this title (without regard to whether such

34

requirement is expressed as an emission standard or otherwise).

42 U.S.C. § 7604(f)(1) & (3).

The Applicants contend that both the alleged violations of the PSD provisions and of the NSPS provisions fall within the ambit of the citizen suit's provision's expanded definition of an emission limitation or standard. (Mot. to Intervene [38] at 5-6.) Georgia Power appears to concede that the Applicants may have a statutory right to intervene under 42 U.S.C. § 7604(a)(1) as to the NSPS allegations, but they state that the alleged PSD violations do not involve emissions standards. (Georgia Power Co.'s Mem. in Supp. of Opp'n to Mot. for Intervention [38] at 5-6.) Applicants counter that Georgia Power's interpretation of the definition of emissions limitation or standard is overly restrictive. (Reply Mem. in Supp. of Mot. for Intervention [53] at 2-6.) The issue in dispute between the parties appears to be whether the term Best Available Control Technology/BACT, as used in the PSD provisions, should be construed as an emission limitation or standard.

Applicants contend it should, arguing that it is explicitly defined as such:

> The term "best available control technology" means an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility, which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs,

35

AO 72A
(Rev.8/82)

determines is achievable for such facility through application of production processes and available methods, systems, and techniques, including fuel cleaning, clean fuels, or treatment or innovative fuel combustion techniques for control of each such pollutant. In no event shall application of "best available control technology" result in emissions of any pollutants which will exceed the emissions allowed by any applicable standard established pursuant to section 7411 or 7412 of this title. Emissions from any source utilizing clean fuels, or any other means, to comply with this paragraph shall not be allowed to increase above levels that would have been required under this paragraph as it existed prior to enactment of the Clean Air Act Amendments of 1990.

42 U.S.C. § 7479(3). Georgia Power, on the other hand, argues that a BACT is not an emission limitation because BACT determinations are made on a case-by-case basis.

Georgia Power further argues that PSD violations cannot be brought under § 7604(a)(1) because PSD claims are explicitly covered by § 7604(a)(3).[14] Applicants claim that just because the Act allows for PSD claims under (a)(3) does not mean that such claims cannot also be pursued under (a)(1). Applicants state that the purpose of (a)(3) is to allow such claims without the notice required under (a)(1) or (2).

The Applicants' second argument for intervention as of right is that they meet the requirements of Rule 24(a)(2) because (1) they have an interest relating to the property or transaction, (2) they are so situated that the disposition of the action may as a

_____

[14] Applicants cannot intervene as to claims under § 7604(a)(3) because § 7604(b)(1)(B) provides no right to do so.

36

practical matter impair or impede their ability to protect that interest, and (3) the Government does not adequately represent their interest. The Applicants contend that under *Trbovich v. United Mine Workers of America*, 404 U.S. 528 (1972), Rule 24(a)(2)'s requirements of inadequate representation "is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Id.* at 538 n.10. Georgia Power contends that although this may be the general rule, in cases where the government is already a party, the burden of establishing that a party's interest are not adequately represented is higher. This is the rule espoused by the Second Circuit in *United States v. Hooker Chemicals and Plastics Corp.*, 749 F.2d 968, 985 (2d Cir. 1984). ("Under the parens patriae concept, however, a state that is a party to a suit involving a matter of sovereign interest is presumed to represent the interests of all its citizens. Thus, to intervene in a suit in district court in which a state is already a party, a citizen or subdivision of that state must overcome this presumption of adequate representation. A minimal showing that the representation may be inadequate is not sufficient. The applicant for intervention must demonstrate that its interest is in fact different from that of the state and that that interest will not be represented by the state.") The Applicants counter that *Hooker* is not the law of this Circuit and that it is

37

distinguishable because the intervenor therein did not have an independent right to sue and the government had objected to the intervention.  (Reply Mem. in Supp. of Mot. for Intervention [53] at 7-8.)

Applicants urge the Court to find that they have a statutory right to intervene because their interests and that of the government are likely to diverge

> regarding issues such as money expended to defend the existing system and vulnerability to political forces in deciding litigation strategy, *Meek v. Metro. Dade County,* 985 F.2d 1471, 1478 (11th Cir. 1993), and a potential greater willingness to compromise due to these and other factors.  *Clark v. Putnam County,* 168 F.3d 458, 462 (11th Cir. 1999).

(Mot. to Intervene [38] at 13.)  Further, Applicants maintain that the Government represents a much broader interest, as it also represents the interests of industry.  (*Id.*)

Georgia Power argues, however, that under the doctrine of *parens patriae,*[15] there is a presumption that the Government

---

[15] Parens patriae is defined by Black's Law Dictionary as follows:

> "Parens patriae," literally "parent of the country," refers traditionally to role of state-as sovereign and guardian of persons under legal disability, such as juveniles or the insane . . . and in child custody determinations, when acting on behalf of the state to protect the interests of the child.  It is the principle that the state must care for those who cannot take care of themselves, such as minors who lack proper care and custody from their parents.  It is a concept of standing utilized to protect those quasi-sovereign interests such as health, comfort and welfare of the people,

38

adequately represents the interests of this citizens, and the
Applicants have not overcome this presumption.  Georgia Power also
argues that the cases cited by Applicants, *Meek* and *Clark*, are
distinguishable because they both arose under the Voting Rights
Act and, in both cases, the Eleventh Circuit concluded that the
county commissioners, who represented all voters--black and white-
-could not adequately represent a group of voters with a racially
identifiable agenda.   Georgia Power also argues that the
Applicants have failed to carry their burden in rebutting the
presumption of adequate representation.  This should involve an
inquiry into such factors as whether there is collusion between
the   representative   and   an   opposing   party,   whether   the
representative has an interest adverse to that of the proposed
intervenor, and whether the representative has failed to fulfill
its duties.  *See, e.g., United States v. United States Steel
Corp.*, 548 F.2d 1232, 1236 (5th Cir. 1977).  Georgia Power again
encourages the Court to hold that there is a more demanding
showing required by an intervenor when the plaintiff is the
government acting in the role of parens patriae.  Georgia Power
contends   that   the   Applicants'   vague   allegations   of   the
Government's vulnerability to "political forces" or a "potential

---

interstate water rights, general economy of the
state, etc.

39

difference" in litigation strategy are insufficient to make the required showing.

   B.   *Permissive Intervention*

   In the alternative, the Applicants ask the Court to grant their motion for permissive intervention pursuant to Federal Rule of Civil Procedure 24(b)(2).   Rule 24(b) reads, in relevant part:

> (b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. . . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Fed. R. Civ. P. 24(b).   It is within the sound discretion of the district court whether to allow intervention under Rule 24(b)(2). *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989) ("A party seeking to intervene under Rule 24(b)(2) must show that: (1) his application to intervene is timely; and (2) his claim or defense and the main action have a question of law or fact in common.   The district court has the discretion to deny intervention even if both of those requirements are met, and its decision is reviewed for an abuse of discretion.   *Sellers v. United States*, 709 F.2d 1469, 1471 (11th Cir. 1983).

   As to permissive intervention, Georgia Power argues it should be denied because the nature of the claims are duplicative and will only lead to undue delay, burden, and expense in relation to

40 .

AO 72A
(Rev.8/82)

the minimal benefit it may bring.  Georgia Power suggests that if the Court were to allow intervention, either as of right or permissive, the Court should limit the Applicants' participation. (Georgia Power Co.'s Mem. in Supp. of its Opp'n to Mot. for Intervention [49] at 16.)  Georgia Power states that with conditions, it would not oppose intervention.  Georgia Power contends that restrictions are appropriate whether intervention is as of right or permissive.  Indeed, the Supreme Court has specifically addressed the imposition of restrictions in a permissive intervention case, *see Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370 (1987), and the Eleventh Circuit has indicated that restrictions in a permissive intervention case could be appropriate as well.  *See United States v. South Fla. Water Management Dist.*, 922 F.2d 704, 710 & n.9 (11th Cir. 1991) ("On remand, the District Court may choose to condition their intervention in this case on such terms as will be consistent with the fair, prompt conduct of this litigation. . . .  'An intervention of right . . . may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of proceedings.'  Fed. R. Civ. P. 24(a) advisory committee's notes to 1966 amendments.'").

Georgia Power has suggested the following restrictions:

- Applicants may have access to discovery initiated by the original parties but should not be allowed to initiate or conduct discovery independent from the Government;

41

- Applicants may be allowed to attend depositions but only one party (either the Government or Applicants) may participate by asking questions;

- Applicants should be restricted from filing any duplicative pleadings or motions in the case;

- Applicants should be required to confer with the Government before filing any pleadings or motions in the case to confirm they are not duplicative; and

- Applicants' statutory intervention on the NSPS claims should be strictly limited to the Government's allegations regarding NSPS violations because those are the only allegations involving an "emission standard or limitation" as that term is defined under the citizen suit provision of the Act.

(Georgia Power Co.'s Mem. in Supp. of Opp'n to Mot. for Intervention [49] at 18-19.)  The Applicants are opposed to such restrictions because they say that they do not know at this time if they will need to conduct their own discovery.  They state that their promise that they will always consult with the Government before conducting discovery or filing pleadings should be sufficient to allay Georgia Power's concerns that it may otherwise be unduly burdened by their participation in the case.

The Court is unconvinced that Applicants have a statutory right to intervene under Fed. R. Civ. P. 24(a)(1) on any claims other than those related to the alleged NSPS violations.  As to intervention by right under Fed. R. Civ. P. 24(a)(2), the Applicants have made only unsupported allegations that the Government will not adequately represent their interests, and it

42

is doubtful that the Court would allow intervention as of right under subsection (a)(2) either.  The Court need not reach that question, however, because it concludes that some participation by Applicants, whether as of right or permissive, is appropriate. The Court agrees with Georgia Power, however, that it is appropriate to place restrictions on the Applicants' involvement to ensure that neither Georgia Power nor the Court are overburdened by the addition of more litigants, where it appears that the majority of the Applicants' concerns are duplicative of those of the Government.  Accordingly, Applicants may intervene as to all of the claims that survive in plaintiff's amended complaint; however, the following restrictions apply to Applicants' participation:

- Applicants may have access to discovery initiated by the original parties but should not be allowed to initiate or conduct discovery independent from the Government;

- Applicants may be allowed to attend depositions but only one party (either the Government or Applicants) may participate by asking questions;

- Applicants shall be restricted from filing any duplicative pleadings or motions in the case; and

- Applicants shall be required to confer with the Government and each other before filing any pleadings or motions in the case to confirm they are not duplicative.  Only one consolidated pleading may be filed by Applicants on any matter

43

for   which   such   a   pleading   would   not   be
duplicative.[16]

## CONCLUSION

For the foregoing reasons, the Court finds that plaintiff's
Motion for Leave to File Amended Complaint [35] is **GRANTED IN PART**
**AND DENIED IN PART** and Physicians for Social Responsibility,
Campaign for a Prosperous Georgia, U.S. Public Interest Research
Group, and Alabama Environmental Council's Motion to Intervene as
Plaintiffs [38] is **GRANTED WITH RESTRICTIONS.**   Plaintiff is
instructed to refile its amended complaint, limiting its claims to
those brought against Georgia Power and Savannah Power and
Electric.

SO ORDERED, this ___ day of March, 2001.


_____
JULIE E. CARNES
UNITED STATES DISTRICT JUDGE


_____

[16] In a case that will likely involve voluminous pleadings
and documents, it is a tremendous burden on the Court to be
required to read duplicative pleadings.   The Court fully
expects that plaintiff, who is well staffed and conversant on
these issues, will file briefs and pleadings that are more
than adequate.   The Court envisions Applicant's role, for the
most part, as one of monitoring the litigation.   To the extent
that applicants' participation creates an undue burden on the
Court or parties, the Court reserves the right to review its
decision to allow permissive intervention.

44

D

US OFFICE PRODUCTS

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 99-833-MJR |
| | ) | |
| ILLINOIS POWER COMPANY and | ) | |
| DYNEGY MIDWEST GENERATION, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF UNITED STATES'
## MOTION FOR COORDINATION
## OF DISCOVERY AMONG RELATED CASES

Plaintiff United States of America ("United States") hereby moves this Court, pursuant to

Rules 16(c)(12), 26(b)(2) and Rule 83(b) of the Federal Rules of Civil Procedure and Section 31.14

of the *Manual for Complex Litigation*, Third (1995), to issue an Order directing the parties to

coordinate any further discovery against the United States and selecting one magistrate judge to

resolve any pending or further disputes among the parties concerning discovery against the United

States in the following related cases currently pending in the Southern Districts of Illinois, Indiana

and Ohio:

United States v. Illinois Power Co., et al., (S.D. Ill., Civil Action No. 99-833-MJR,
Judge Reagan, Magistrate Judge Proud);

United States v. Southern Indiana Gas & Electric Co. (S.D. Ind., Civil Action No.
IP99-1692 C-M/S, Judge McKinney, Magistrate Judge Shields) (referred to hereinafter as
("SIGECO");

United States and State of New York, et al. v. American Electric Power Service Corp.,

EXHIBIT D

*et al.* (S.D. Ohio, Civil Action No. C2-99-1182), consolidated with *Ohio Citizen Action, et al. v. American Electric Power Service Corp., et al.* (S.D. Ohio, Civil Action No. C2-99-1250) (Judge Sargus, Magistrate Judge Kemp) (referred to hereinafter as ("*AEP*"); and

*United States and State of New York, et al. v. Ohio Edison Co., et al.* (S.D. Ohio, Civil Action No. C2-99-1181, Judge Sargus, Magistrate Judge Kemp).

These are all civil actions to enforce federal environmental laws brought by the United States, alleging similar violations of the Clean Air Act at a total of 13 coal-fired electric generating power plants owned and operated by defendants in the States of Illinois, Indiana, Ohio and West Virginia. The cases have become "related" in that all defendants are seeking unprecedented, nationwide and common discovery from the United States as to defenses raised by all defendants alleging lack of fair notice of EPA's interpretation of the relevant regulations and similar common defenses. Common disputes as to the appropriate scope and other aspects of defendants' discovery against the United States have arisen in all the cases and, despite four court orders issued to date (one by Magistrate Judge Proud in *Illinois Power* and three by Magistrate Judge Shields in *SIGECO*) additional disputes continue to arise.

To promote efficiency for the courts and the parties in resolving these disputes and to avoid unnecessary duplication and inconvenience to United States witnesses who are now being called for depositions, the United States now requests that the courts (1) select a single magistrate judge to resolve all pending and further disputes over the scope and other aspects of discovery against the United States, and (2) require defendants to coordinate their depositions of U.S. officials, employees or agents whom multiple defendants wish to depose with respect to their common defenses or other common subjects.

As explained in the attached Memorandum in Support of the United States' Motion to

2

Coordinate Discovery in Related Cases, there is complete overlap in the discovery that defendants in all the cases are seeking from the United States. All defendants have served similar, if not identical, document requests on the United States, and the United States has made the same production (approximately 230,000 pages to date) available to all parties. The United States repeatedly sought, without success, to obtain common agreement from the parties in all cases on the appropriate scope and other aspects of this production. Defendants have filed and continue to file duplicative motions to compel over the same document production, despite the four court orders issued to date. As defendants are now beginning to take depositions of United States employees in some of the cases, it has become apparent that there will be duplicative requests for depositions of the same witnesses on the same subjects and likely duplicative motions for resolution of disputes that arise in depositions.

This duplication of effort is threatening to cause a waste of the courts' and the parties' time and resources, and is very likely to lead to inconsistency and potential conflicts among the courts' resolution of disputes among the parties, cause serious inconvenience to witnesses who are subjected to duplicative depositions, and delay the timely completion of discovery in all the cases.

The Courts, the parties, the witnesses and the public all would benefit greatly from consolidation and coordination of common discovery against the United States in these cases. The United States specifically requests that the courts:

(1) select a single magistrate judge to resolve all pending and future disputes over common discovery against the United States;[1/]

_____

[1/] The United States respectfully suggests that Magistrate Judge Shields (S.D.Ind.) may be the best positioned to step immediately into this role. Magistrate Shields already has issued three

3

(2) require defendants in all the related cases to provide the courts and plaintiffs with an estimated total number and a list of all officials, employees or agents of the United States from whom they currently expect to seek deposition testimony, and to update this list periodically;

(3) require defendants to specify in Notices of Depositions to United States officials, employees and witnesses when they plan to question the witness as to fair notice or other issues common to the related cases;

(4) require defendants in the related cases to consult and coordinate in the taking of any depositions of any United States officials, employees, or agents so as to minimize duplication and avoid inconvenience to the witnesses, to select one lead counsel for taking each deposition, to agree with plaintiffs on an appropriate time limit for such deposition, to refrain from duplicative questioning in such deposition, and to refrain from noticing or taking depositions of a United States official, employee or agent whose deposition previously has been taken in another related case; and

(5) permit defendants to cross-file and use the depositions United States officials, employees and agents on subjects common to the related cases, in accordance with the Federal Rules of Evidence, in any case.

The United States believes that these coordination procedures will avoid unnecessary burdens and expenses for the Courts and the parties, minimize inconvenience to witnesses, and expedite resolution of disputes and completion of discovery in these cases. The requested procedures are frequently used to coordinate discovery in related cases and are well within the courts' power to manage litigation, as set forth in the United States' Memorandum in Support of this Motion to

---

orders in *United States v. SIGECO* addressing disputes over discovery against the United States.

Coordinate Discovery in Related Cases submitted herewith.

Respectfully submitted,

Catherine R. McCabe
Deputy Chief
Environmental Enforcement Section

Dated: __4/30/01__

PAMELA R. LEE
NICOLE VEILLEUX
ARNOLD S. ROSENTHAL
Environmental Enforcement Section
Environment and Natural Resources
 Division
Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
(202) 305-2775

United States Attorney for the
 Southern District of Illinois

WILLIAM COONAN
Assistant United States Attorney
United States Attorney's Office
Southern District of Illinois
9 Executive Drive
Fairview Heights, Illinois 62208

OF COUNSEL
JOSE' DE LEON
Associate Regional Counsel
Office of Regional Counsel (C-14J)
U.S. EPA, Region 5
77 W. Jackson Boulevard
Chicago, Illinois 60604-3590

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

|                                          |     |                                |
| ---------------------------------------- | --- | ------------------------------ |
| UNITED STATES OF AMERICA,                | )   |                                |
|                                          | )   |                                |
| Plaintiff,                               | )   |                                |
|                                          | )   |                                |
| v.                                       | )   | Civil Action No. 99-833-MJR    |
|                                          | )   |                                |
| ILLINOIS POWER COMPANY and               | )   |                                |
| DYNEGY MIDWEST GENERATION,               | )   |                                |
| INC.,                                    | )   |                                |
|                                          | )   |                                |
| Defendants.                              | )   |                                |

## PLAINTIFF UNITED STATES' MEMORANDUM IN SUPPORT OF ITS MOTION FOR COORDINATION OF DISCOVERY AMONG RELATED CASES

Plaintiff United States of America ("United States") submits this Memorandum in Support of its Motion for Coordination of Discovery among Related Cases, pursuant to Rules 16(c)(12), 26(b)(2) and Rule 83(b) of the Federal Rules of Civil Procedure and Section 31.14 of the *Manual for Complex Litigation* (Third) (1995). This Motion is filed simultaneously in the United States District Courts for the Southern Districts of Illinois, Indiana, and Ohio ("the Courts"), in which five related actions by the United States for Clean Air Act violations at coal-fired power plants are pending. The defendant utility companies in all these cases are seeking the same broad, nationwide discovery from the United States as to common defenses that they have asserted in these actions. Despite efforts by two of the Courts to resolve the parties' disputes over the scope of this discovery, the disputes continue and new motions continue to be filed. In order to avoid unnecessary duplication of effort, promote the efficient and timely completion of discovery in all cases,

minimize the burdens on the Courts and the parties, and avoid unnecessary inconvenience to witnesses, the United States seeks (1) the selection of a single magistrate judge to resolve all pending and future disputes among the parties concerning defendants' discovery against the United States on common issues, and (2) orders requiring coordination of depositions of United States officials or employees whom multiple defendants wish to depose on common subjects.

## STATEMENT OF THE CASE

This action is one of eight cases pending in the United States District Courts that have been filed by the United States, on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), alleging violations of the Clean Air Act at 34 coal-fired power plants located in the mid-western and south-eastern parts of the United States. The United States seeks to require these plants to install pollution controls and otherwise to comply with the Clean Air Act. The eight cases are:

*United States v. Illinois Power Co., et al.*, (S.D. Ill., Civil Action No. 99-833-MJR, Judge Reagan, Magistrate Judge Proud);

*United States v. Southern Indiana Gas & Electric Co. ("SIGECO")* (S.D. Ind., Civil Action No. IP99-1692 C-M/S, Judge McKinney, Magistrate Judge Shields);

*United States and State of New York, et al. v. American Electric Power Service Corp., et al. ("AEP")* (S.D. Ohio, Civil Action No. C2-99-1182), consolidated with *Ohio Citizen Action, et al. v. American Electric Power Service Corp., et al.* (S.D. Ohio, Civil Action No. C2-99-1250) (Judge Sargus, Magistrate Judge Kemp);

*United States and State of New York, et al. v. Ohio Edison Co., et al.* (S.D. Ohio, Civil Action No. C2-99-1181, Judge Sargus, Magistrate Judge Kemp);

*United States v. Cinergy Corp., et al.* (S.D. Ind., Civil Action No. IP99-1693 C-M/S, Judge McKinney, Magistrate Judge Shields);

*United States v. Georgia Power Co.* (N.D. Ga., Civil Action No. 1:99-CV-2859, Judge Carnes);

*United States v. Duke Energy Corp.* (M.D.N.C., Civil Action No. 1:00 CV 1262, Judge Bullock, Magistrate Judge Eliason);

*United States v. Alabama Power Co.* (N.D. Ala., Civil Action No. CV-01-B-0152-S, Judge Blackburn).[1]

In all these actions (referred to hereinafter as "the Pending Cases"), the United States, as well as several States and citizen groups who are co-plaintiffs in three of the cases (*United States and State of New York et al. v. AEP et al*, *United States and State of New York et al. v. Ohio Edison et al.* and *United States v. Georgia Power*), allege that the defendant electric-power generating companies have failed to obtain permits and install pollution controls that were required by the Clean Air Act when these plants underwent major modifications. As a result, plaintiffs allege, the power plants operated by these companies have emitted and continue to emit excessive amounts of the pollutants sulfur dioxide, nitrogen oxides and particulates into the air, resulting in serious adverse consequences to human health and the environment over a wide, multi-state area downwind of the plants. The United States, as well as the States and citizen groups, seek to require these plants to install pollution controls and otherwise to comply with the Clean Air Act.

Defendants have raised the same or similar defenses in all the cases, notably the common defense of alleged "lack of fair notice" (of EPA's interpretation of applicable Clean Air Act regulations) and similar defenses of estoppel and laches.[2] To support these defenses, the defendants

---

[1] *United States v. Alabama Power Co.* (N.D. Ga.) is a re-filing of the United States' case against Alabama Power Co., which was dismissed from *United States v. Georgia Power* in 2000 based on lack of personal jurisdiction.

[2] Defendants also asserted a common statute of limitations defense. AEP's Motion to Dismiss *United States and State of New York et al. v. AEP et al.* on this ground was denied by the S.D. Ohio on March 30, 2001.

have sought a virtually identical and extremely broad production of documents from the United States, of all documents in any way referring to the Clean Air Act provisions and regulations that are applicable to these cases.

## PROCEDURAL STATUS

<u>Case Schedules</u>.  The first four cases listed above were filed on November 3, 1999 and are in active discovery (these cases are hereinafter referred to as the "Active Cases").  No schedules have been set and no discovery has been taken yet in the other Pending Cases.[3/]  At the request of the parties, discovery and trial were bifurcated in all the Active Cases into liability and remedy phases — except in *United States v. Illinois Power*, in which discovery is not bifurcated.  The liability trial in *United States v. Illinois Power* is scheduled to begin December 4, 2001; discovery will close on August 1, 2001.  In *United States and State of New York, et al. v. AEP et al.* (S.D.Ohio), the largest of the Active Cases (involving a total of 11 power plants), Plaintiffs' request for a February 2002 "mini-trial" on liability for 1-2 plants is pending.  The liability trials in *United States v. Ohio Edison* (S.D.Ohio) and *United States v. SIGECO* (S.D. Ind.) are scheduled for fall 2002.  For further details

---

[3/] Discovery in *United States v. Cinergy Corp.* commenced in 2000 but has been in abeyance since the parties reached a settlement agreement-in-principle in December 2000.  There has been no discovery yet in the other Pending Cases.  Discovery was stayed in *United States v. Georgia Power* (N.D.Ga.) pending the Court's resolution of early motions by defendants to dismiss, by the United States to amend the complaint, and by citizen groups seeking intervention.  Following the Court's rulings on these motions, Georgia Power filed a Motion to Stay Discovery further until a ruling is issued in *Tennessee Valley Authority v. United States Environmental Protection Agency* (consolidated under lead Docket No. 00-12310-E, 11th Circuit 2000) ("*TVA v. EPA*").  *TVA v. EPA* is a challenge to EPA's administrative order to a federal agency finding the same type of Clean Air Act violations at TVA's coal-fired power plants that are alleged in the above-listed judicial actions.  Alabama Power (like Georgia Power, a subsidiary of the Southern Co.) filed a parallel motion to stay discovery in *United States v. Alabama Power* (N.D. Ala.).  These motions for a stay are currently in briefing.  No scheduling order has been issued yet in *Georgia Power*, *Alabama Power*, or *Duke Energy* (M.D.N.C., filed in December 2000).

on the status of the Active Cases, and telephone numbers for the assigned judges and magistrates, see Exhibit A hereto.

United States Document Production and Disputes. Extensive document production has taken place in the Active Cases. As noted above, all defendants sought extraordinarily broad, nationwide production from EPA and other federal agencies, particularly respecting their "fair notice" defense. The United States objected to these requests as overbroad and unduly burdensome. Between September and November 2000, Illinois Power, SIGECO and the United States filed cross-motions to compel and for protective orders, seeking court resolution of the disputes concerning the scope of document production that the United States must provide. In the meantime, the United States made a good faith effort to search for and provide responsive documents, producing a total of approximately 230,000 pages between June and November 2000 from a large number of EPA offices, including several EPA Headquarters offices and the three EPA regional offices that are involved with the Pending Cases.

Existing Court Orders Addressing Discovery Disputes. On January 10 and March 6, 2001, respectively, Magistrate Judges Proud (*United States v. Illinois Power*, S.D. Ill.) and Shields (*United States v. SIGECO*, S.D. Ind.) issued orders addressing the parties' motions concerning the scope of United States document production. See Exhibit B. Magistrate Proud ruled, *inter alia*, that the United States (1) was not required to produce documents from federal agencies other than EPA or from EPA offices other than those that enforce the Clean Air Act, but (2) must search all ten regional offices of the EPA for additional responsive documents. Magistrate Proud declined to grant the United States' request for a protective order against the production of large numbers of internal EPA documents that the United States contends are irrelevant, instead deferring resolution of the issue

of relevance until specific disputes over specific documents are presented to the court.

On March 6, 2001 Magistrate Shields ruled, *inter alia*, that the United States is not required to produce or provide privilege logs for internal agency documents that are irrelevant under the 7th Circuit rule established by *United States v. Farley*, 11 F.3d 1385 (7th Cir. 1993). Magistrate Shields defined as irrelevant "those documents which were both intended for dissemination within the EPA only and which actually were disseminated only within the EPA". March 6 Order (at Exhibit B), p. 3. On March 26, Magistrate Shields issued two additional orders, clarifying the requirements of the March 6 Order and setting forth detailed requirements for the contents of the United States' privilege log (while at the same time pointing out that the log would not have to cover the many documents ruled irrelevant by the March 6 Order). See Exhibit B.

Supplemental United States Document Production. In accordance with Magistrate Proud's Order, the United States undertook a search for additional documents in all ten regional offices of the EPA. These documents are still in the process of being collected, reviewed for privilege, and copied or scanned, and are expected to be produced to defendants within the next several weeks. This unprecedented production has imposed an extreme burden on working program and enforcement offices of the EPA nationwide and has been extremely expensive.[4]   The privilege

_____

[4] In addition to several central offices of EPA's headquarters, all ten regional offices of EPA are spending thousands of hours searching for, segregating, copying and logging privileged documents that defendants seek. This substantially interferes with the normal conduct of businesses in these offices. For example, the involved Regional offices are responsible for reviewing permits, conducting inspections, preparing reports, addressing inquiries from the public, and preparing enforcement orders and actions for Clean Air Act violations in a large number of industries throughout the country. All offices work on limited budgets and are being forced to divert personnel and budgetary resources from their regular programs to the massive document production required to satisfy defendants in these cases.

6

review is one of the most significant burdens of this production, as defendants' document requests by their nature (seeking internal agency communications concerning the development and application of a regulation) encompass a high proportion of documents that are privileged as attorney-client communications, attorney work product and agency deliberative process communications.

Pending Discovery Disputes. On March 12, 2001, Illinois Power filed a Motion to Compel the United States to complete and provide additional details for the privilege log that the United States provided to the defendants for the privileged documents that were withheld from the original EPA production. In its Response to that motion, the United States requested that the Court exclude from any revised privilege log requirement the documents that were determined by Magistrate Shields' March 6 Order to be irrelevant to the cases. This motion is still pending in the S.D. Illinois. On April 23, 2001, the United States filed a Motion for Extension of Time in *United States v. SIGECO* to complete the revised privilege log required by Magistrate Judge Shields' March 26 Order (which was to be served by April 25). The United States cited its inability to reduce the volume of the log for the original production (approximately 1200 pages long), as contemplated by Magistrate Shields' March 26 Order, in light of the continuing uncertainty as to whether the narrower log revision will be acceptable in *United States v. Illinois Power*.

Adding to the confusion, on April 9, 2001 AEP served yet another Motion to Compel on the United States, seeking resolution of the same disputes over the scope of the United States' production that already have been addressed by Magistrates Proud and Shields. AEP's Motion was filed despite the United States' prior agreement to provide AEP with the same additional documents and privilege logs that are being provided to Illinois Power and SIGECO pursuant to the court orders

7

in those cases. AEP's newly-filed Motion to Compel makes it apparent that, despite the rulings issued by two courts, defendants will continue to raise the same disputes to the various courts, creating significant potential for duplication and inconsistent rulings affecting the United States' document production and consequent delay in the completion of discovery in all of the Active Cases.

Depositions of United States Witnesses.   Similar issues are beginning to arise in the defendants' depositions of United States officials and employees.   On April 4-5, 2001 Illinois Power took its first depositions of United States witnesses, deposing an employee and a former employee of EPA Headquarters' Office of Air Quality Planning and Standards (OAQPS) (see Notices of Deposition for Walter Stevenson and Jack Farmer at Exhibit C).   OAQPS is the central EPA office that is responsible for issuing regulations and standards pertaining to air quality throughout the country.   The deposition questioning of the employees was not specific to the facts of the *Illinois Power* case (of which these witnesses have no knowledge), but addressed issues of general interpretation of EPA's Clean Air Act regulations.   In addition, SIGECO has noticed depositions under Fed. R. Civ. P. 30(b)(6) of EPA employees who are knowledgeable about the maintenance of national databases that EPA maintains pertaining to the Clean Air Act (see Notices of Deposition at Exhibit C).   Again, the witnesses would be EPA Headquarters employees and the subject of the testimony would not be specific to the facts of the *SIGECO* case, but would address issues concerning nationwide collection or dissemination of information pertaining to EPA's Clean Air Act regulations.   The only apparent purpose of such depositions is to seek information that defendants hope will support their "fair notice" defense.   Thus, the information collected in these depositions, if relevant at all, would be relevant to the defenses in all the Pending Cases.

Similarly, several defendants are now seeking depositions of the same employees of EPA's

Midwest region ("Region 5"), in which all of the power plants involved in the Active Cases are located. SIGECO issued a deposition notice under Fed. R. Civ. P. 30(b)(6) for information regarding EPA's Region 5 office.  Illinois Power recently noticed the depositions of two engineers who are employed by the Region 5 office, David Schulz and Spiros Bourgikos. Ohio Edison also has notified the United States by letter that it will seek to depose Mr. Schulz and other Region 5 employees.  See Notices of Deposition and February 23, 2001 letter from Mason Evans to Jerome Maclaughlin, at Exhibit C.  It is highly likely that all three defendants will seek information from these employees not only as to their case-specific knowledge of defendants' plants and the pending litigation, but also as to their general knowledge of EPA's interpretation of applicable Clean Air Act laws and regulations, related to the "fair notice" defense that defendants have raised in all the cases.

## SUMMARY OF ARGUMENT

The coordination of document and deposition discovery against the United States in the four Active Cases is urgently needed to prevent duplication of discovery, unnecessary burdens on the Courts and the parties, inconvenience to witnesses, and delay in the completion of discovery and resolution of the cases before the Courts.  The requested coordination is well within the authority of the Courts under Rules 16(c)(12), 26(b)(2), and 83(b) of the Federal Rules of Civil Procedure, and is expressly suggested to courts and parties by the Federal Judicial Center's *Manual for Complex Litigation*.

## ARGUMENT

### I.   THE FEDERAL RULES OF CIVIL PROCEDURE AUTHORIZE THE COURT TO ORDER THE RELIEF REQUESTED

The Federal Rules of Civil Procedure give United States  District Courts express power, in

9

addition to their inherent powers, to supervise and control the conduct of litigation before them. Under Rule 83(b), a "judge may regulate practice in any manner consistent with federal law, [federal] rules . . . [and] local rules".   Rule 26(b)(2) of the Federal Rules of Civil Procedure specifically authorizes courts to limit the "frequency or extent of use of [discovery] . . . if it determines that: (i) the discovery sought is unreasonably . . . duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive. . . .").   Rule 16(c)(12) specifically authorizes and encourages district courts to adopt "special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems."

The Supreme Court also has recognized that courts have inherent powers to manage complex litigation.  *See, e.g.*, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (inherent powers are necessarily vested in courts 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases'") (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-631 (1962)); *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 172-73 (1989) ("courts traditionally have exercised considerable authority 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases'") (citation omitted).

As explained above, the eight Pending Cases are based on similar violations of the Clean Air Act at coal-fired power plants in several different states and districts.  While the governing law is the same in all cases,[5] the operative facts alleged in the Complaints (and, accordingly, the facts as

---

[5]  There are some minor variations in the applicable "State Implementation Plans" that implement the Clean Air Act in the various states in which the subject power plants are located, as reflected in the Complaints in the Pending Cases.

10

to which the United States and other plaintiffs seek discovery) are particular to the plants and to the defendant electric generating companies in each case. However, defendants' discovery requests to the United States, focusing heavily on their common "fair notice" defense, seek the same broad, nationwide discovery. It is this cross-cutting aspect of the cases that transmogrifies them from simple, straightforward regulatory enforcement cases, based on established law and undisputed facts, into "complex litigation."

II   **THE MANUAL FOR COMPLEX LITIGATION ENCOURAGES COORDINATION OF COMMON DISCOVERY AMONG <u>RELATED CASES</u>**

The *Manual for Complex Litigation*, published by the Federal Judicial Center and used by federal courts nationwide since 1969, provides an array of litigation management techniques and procedures that are useful in addressing the challenges of complex litigation. The Manual's essential purpose is to assist the courts in carrying out their responsibility to "bring about a just resolution as speedily and inexpensively as possible" in all cases. *Manual for Complex Litigation* (Third) (1995) (the "*Manual*"), § 20.1, at 10; *available at* <u>http://</u>www.fjc.gov ("Publications"). The *Manual* strongly encourages courts to use special case management techniques for complex cases, emphasizing that the benefits include earlier dispositions, less wasteful activity, shorter trials, economies of judicial time and a lessening of judicial burdens. *Id.*

The *Manual* defines a "complex" case as any case requiring judicial management, notably including "litigation involving many parties in numerous related cases - especially if pending in different jurisdictions" and "litigation involving large numbers of witnesses and documents and extensive discovery." *Manual* 10.1, at 3. The *Manual* further notes that "litigation raising difficult and novel questions of law, though challenging to the court, may require little or no management,

11

and therefore may not be complex as that term is used here." *Id.*

The Pending Cases present an unusual example of cases that are in part simple, and in part complex. The law governing the claims for relief set forth in the complaints in the Pending Cases is simple and straightforward,[6] and the underlying facts are not likely to be disputed by the parties.[7] However, defendants' common effort to obtain broad nationwide discovery from EPA to support their alleged "fair notice" defense transforms this aspect of the cases into complex litigation. As explained above, defendants' broad document requests, all overlapping and some identical, have resulted in a massive production of documents from EPA. Defendants' first requests for depositions of United States employees indicate that there is strong potential for a large number of United States witnesses to be called in depositions. This aspect of the Pending Cases presents exactly the profile of a "complex" case described in the *Manual for Complex Litigation*: "litigation involving many parties in numerous related cases - especially if pending in different jurisdictions" and "litigation involving large numbers of witnesses and documents and extensive discovery." *Id.*

Part III of the *Manual* presents examples and detailed suggestions for management of certain types of recurring complex litigation, including antitrust, mass tort, securities, takeover, employment discrimination, patent, CERCLA (Superfund), and Civil RICO cases. *Manual* § 33, at 299 *et seq.* In its introduction to the section addressing management of CERCLA cases, the *Manual* specifically

---

[6] See, *e.g.*, the Seventh Circuit Court of Appeals' widely-followed decision in *Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990).

[7] See United States' Motion for Partial Summary Judgment filed in *United States and State of New York et al. v. AEP et al.* on February 23, 2001 (filed under seal due to defendants' claim of confidentiality for certain underlying documents; Plaintiffs' Motion to Unseal was filed on April 12, 2001).

12

notes that cases under other federal environmental statutes, "such as.... the Clean Air Act.... may involve similar management issues." *Manual* § 33.7, at 367 (emphasis added).  Like CERCLA cases, the Pending Clean Air Act cases involve a large number of parties, a large number of documents and a potentially very large number of witnesses.

There are compelling reasons to implement management techniques from the *Manual for Complex Litigation* for the Active Cases. As explained above, the broad document discovery that defendants already have been permitted to obtain from the United States in these cases has slowed discovery in the Active Cases and threatens to continue to delay the completion of discovery and the trial dates that will resolve these actions.[8]  AEP's recent filing of yet another Motion to Compel against the United States involving the same document production, despite two court rulings on the same issues in *United States v. Illinois Power* and *United States v. SIGECO*, demonstrates that the defendants are not reluctant to take "several bites at the apple" in pushing for the maximum possible scope of document production from the United States.[9]  Thus,  it is apparent that all three courts in

---

[8] The United States believes that defendants' liability can be resolved on motions for partial summary judgment in all the cases, as the facts are not likely to be disputed. See Plaintiffs' Motion for Partial Summary Judgment in *United States  and State of New York et al. v. AEP et al.* filed February 23, 2001.

[9]  AEP further demonstrated its intent to slow down resolution of the Plaintiffs' case against it by responding to the Plaintiffs' February 2001 Motion for Partial Summary Judgment (which seeks a  determination of the legal test for determining whether defendants' modifications to their plants qualify for the "routine maintenance" exemption, and partial summary judgment on this issue for a sample of modifications to AEP's plants) with a motion under Fed. R. Civ. Pro. 56(f). In its 56(f) Motion AEP urges the court not to make any ruling on this issue until the close of discovery -- immediately after acknowledging in its earlier-filed Opposition to Plaintiffs' Motion for an Early Mini-Trial that the facts needed to determine liability are not disputed by the parties and assuring the court that it will be able to make liability rulings based on summary judgment papers.

13

which the Active Cases are pending will be called upon repeatedly to resolve continuing disputes over the United States' document production.  This will lead to a very significant waste of judicial resources (as well as the United States' and defendants' resources) and, almost unavoidably, to inconsistent or conflicting rulings among the courts as more decisions are issued by different courts.

Like their document requests to the United States, defendants ' first depositions also appear to be heavily focused on seeking information to support their "fair notice" defenses.[19]   Moreover, the first notices of deposition suggest that these depositions will be duplicative, *i.e.* the same witnesses are likely to be called to testify repeatedly in the different cases.  See list of United States employees whom defendants have deposed or plan to depose in the next few weeks at Exhibit C. Duplicative depositions are likely to give rise to duplicative requests to the courts for resolution of disputes that arise during depositions,[1] further burdening the courts and delaying the completion of discovery in all the Active Cases.

The *Manual for Complex Litigation* recommends several techniques for addressing the management challenges of related cases pending in different districts, including:

1) Special assignment of a single judge designated under 28 U.S.C. §292;

2) Designation of a "lead case" by agreement of the courts and counsel;

---

[19] For example, as explained above, the first two United States  deponents called by Illinois Power were EPA Headquarters employees who have no case-specific factual knowledge, but were questioned at length on their interpretation of the regulations as to which defendants claim lack of fair notice.

[1] For example, the United States has objected to producing many of the internal EPA documents that defendants seek in their document requests because they are privileged, *e.g.* as attorney-client communications, attorney work product, or agency deliberative process. See *Illinois Power* and *SIGECO* court orders at Exhibit B.  Questions to deponents concerning these documents are likely to raise the same objections.

14

3) Joint hearings or conferences (in person or by phone) and joint orders;

4) Joint appointments of special masters;

5) Avoidance of duplicative discovery by coordination of document production, cross-filing of depositions, interrogatories and document requests, and coordinated resolution of discovery disputes by a single magistrate judge or special master;

6) Stay of related cases.

*Manual for Complex Litigation* §31.14, at 256-257. *See also* William W. Schwarzer et al., *Judicial Federalism in Action: Coordination of Litigation in State and Federal Courts*, 78 Va. L. Rev. 1689 (1992), describing the use of these types of procedures for coordination of related federal and state cases, *e.g.*, in the *Florida Everglades Air Crash* (1972), *Beverly Hills Supper Club Fire* (1977), *Chicago Air Crash* (1979), *Hyatt Skywalk Cases* (1981), *Ohio Asbestos litigation* (1983), *MGM Grand Hotel Fire* (1980), *Technical Equities Fraud Case* (tried in 1988 and 1990), *L'Ambiance Plaza Collapse* (1987), *Brooklyn Navy Yard Asbestos Litigation* (1990), *Exxon-Valdez Oil Spill* (1989), and *Sioux City Air Crash* (1989) cases.

The United States respectfully suggests that the *Manual's* technique no. 5 described above (avoidance of duplicative discovery by coordination of document production, cross-filing of depositions, interrogatories and document requests, and coordinated resolution of discovery disputes by a single magistrate judge) would be the most appropriate for the future handling of discovery against the United States in the Active Cases. [12] These techniques have the greatest potential to

---

[12] Technique no. 1 (designation of a single judge pursuant to 28 U.S.C. §292) would not provide sufficient relief as the Active Cases are in two different Circuits. Techniques nos. 2 and 6 (designation of a lead case and stays of the other cases) would cause significant delays in the trial of some of the cases, a result that is unacceptable to the United States due to the significant

prevent duplicative discovery and to avoid unnecessary further delays in the completion of discovery in these actions, with a minimum of burden to the Courts.   While technique no. 3 (joint hearings or conferences in person or by phone, and joint orders by the Courts) also could be effective, it would be far more time-consuming for the Courts.[13]

The *Manual for Complex Litigation* particularly emphasizes the need for and benefits of coordinating depositions of common witnesses:

> Depositions tend to be the most costly and time-consuming activity in complex litigation[, thus m]anagement of litigation should therefore be directed at avoiding unnecessary depositions, limiting the number and length of those that are taken, and ensuring that the process of taking depositions is conducted as fairly and efficiently as possible.

*Id.* § 21.45, at 82.

> Discovery plans in related cases pending before the same judge should be coordinated to avoid conflicts and duplication.   If the cases are pending before different judges, counsel should nevertheless attempt to coordinate the depositions of common witnesses and other common discovery. Examination regarding subjects of interest only to particular cases may be deferred until the conclusion of direct and cross-examination on matters of common interest.

*Id.* §21.455, at 89.

The United States further suggests that the following specific procedures be used to effect

---

public health issues involved in these cases.

[13] The United States also does not propose general consolidation of all the Active Cases for discovery under 28 U.S.C. § 1407 through the judicial panel on multi-district litigation.  While significant efficiencies still can be achieved in these cases through coordination of common discovery against the United States, coordination of the plaintiffs' discovery of the various defendants' separate power plant operations and corporate practices does not offer a similar opportunity for achieving efficiencies in these cases.  Moreover, much of the United States' discovery already has been completed in one of the four cases, *United States v. Illinois Power*.

the coordination called for by the *Manual for Complex Litigation*:

1. Appointment of a single magistrate judge to resolve all pending motions concerning disputes over the United States' discovery (see list at Exhibit D) and any further disputes among the parties over the United States' document production or depositions of United States officials or employees regarding defendants' fair notice and other common defenses;

2. Requiring defendants to provide the Courts and Plaintiffs in the Active Cases with an estimated total number and a list of all officials, employees and agents of the United States from whom they currently expect to seek deposition testimony on their fair notice and other common defenses, and to update this list periodically to enable advance planning for coordination of depositions and resolution of any disputes concerning the depositions;

3. Requiring defendants to so specify in their notices of deposition to United States officials, employees or agents when they plan to question the witness as to issues pertaining to fair notice and other common defenses, and to send copies of such notices to defendants in all the Active Cases;[19]

4. Requiring defendants to consult and coordinate in taking the depositions of United States officials, employees and agents on common subjects to the maximum extent feasible, including by selecting a time and place that is convenient for all parties who wish to attend, selecting lead counsel when more than one defense counsel plans to attend such deposition in order to avoid duplication of questioning and unnecessary burden on the witness, and refraining from taking depositions that

---

[19] The United States recognizes that some, or some part of, the depositions of United States employees sought by defendants will pertain to case-specific issues. As suggested by the *Manual* above, those depositions could be deferred (in all cases except *Illinois Power*, which has an imminent discovery cutoff date of August 1, 2001) until the completion of the depositions on common subjects, or separate deposition sessions could be held for common and case-specific issues.

are duplicative of depositions that already have been taken in another Active Case.

The United States believes that these coordination procedures will avoid unnecessary burdens and expenses for the Courts and the parties, minimize inconvenience to witnesses, and expedite resolution of disputes and completion of discovery in these cases. The United States proposed these coordination methods to defense counsel in all cases, beginning last February. While many counsel have indicated a willingness to agree to some of the procedures for some witnesses, or to discuss these issues further, the United States has not been successful in obtaining all counsels' commitment to these procedures. See correspondence at Exhibit E. Time is of the essence in reaching this commitment, as depositions of United States employees are now underway, and there are currently several motions pending before the courts concerning disputes over document production that could affect these depositions (see list of pending discovery motions at Exhibit D). Therefore, the United States seeks the assistance of the Courts in issuing orders directing the parties to cooperate immediately in coordinating common depositions as described above, as well as selecting a single magistrate judge to handle all pending and future disputes concerning discovery against the United States.[15]

## CONCLUSION

Coordination and consolidation of document and deposition discovery against the United States in this case and the related cases described herein is in the interest of the Courts, the parties,

---

[15] The United States respectfully suggests that Magistrate Judge Shields (S.D.Ind.) may be the best positioned to step immediately into this role. Magistrate Shields already has issued several orders in *United States v. SIGECO* addressing discovery disputes, and two of the five Pending Cases in the Southern Districts of Illinois, Indiana and Ohio (*United States v. SIGECO* and *United States v. Cinergy*) are currently assigned to her.

and the public.  The United States respectfully requests that the Courts in which the related Active

Cases are pending hold a joint conference by telephone (see list of telephone numbers at Exhibit A),

with or without the participation of counsel for all parties,  and that the courts enter an Order, similar

in form to the attached Proposed Order, requiring defendants to coordinate their discovery against

the United States on common issues.

Respectfully submitted,

Catherine R. McCabe
Deputy Chief
Environmental Enforcement Section

Dated: 4/30/01

PAMELA R. LEE
NICOLE VEILLEUX
ARNOLD S. ROSENTHAL
Environmental Enforcement Section
Environment and Natural Resources
 Division
Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
(202) 305-2775

United States Attorney for the
 Southern District of Illinois

WILLIAM COONAN
Assistant United States Attorney
United States Attorney's Office
Southern District of Illinois
9 Executive Drive
Fairview Heights, Illinois 62208

OF COUNSEL
JOSE' DE LEON

19

Associate Regional Counsel
Office of Regional Counsel (C-14J)
U.S. EPA, Region 5
77 W. Jackson Boulevard
Chicago, Illinois 60604-3590

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of April 2001, I caused true and correct copies of the foregoing Plaintiff United States' Motion for Coordination of Discovery Among Related Cases, Memorandum in Support and Proposed Order to be served upon the following counsel of record in this matter by First Class U.S. Mail, postage prepaid:

Sheldon A. Zabel
Thomas P. Luning
Stephen J. Bonebrake
Mary Ann Mullin
Schiff, Hardin & Waite
6600 Sears Tower
Chicago, Illinois 60606

Harry B. Wilson
Husch & Eppenberger, LLC
100 North Broadway, Suite 1300
St. Louis, Missouri 63102-2789

Paul E. Gutermann
Daniel Joseph
Andrea T. Vavonese
Akin, Gump, Strauss, Hauer & Feld, L.L.P
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036

*Susan C. Koepsell*
Susan C. Koepsell
United States Department of Justice

# INDEX OF EXHIBITS TO UNITED STATES' MOTION FOR COORDINATION OF DISCOVERY AMONG RELATED CASES

## TAB

**A**   <u>Status of Cases</u>

Summary of court telephone numbers, current schedules and status of Active Cases regarding Clean Air Act violations at coal-fired power plants

**B**   <u>Court Orders Regarding Discovery Against United States</u>

Order filed Jan. 10, 2001 by Clifford J. Proud, U.S. Magistrate Judge in *United States v. Illinois Power Co., et al.* (S.D. Ill.);

Entry on Motions for Protective Order, filed Mar. 6, 2001 by V. Sue Shields, U.S. Magistrate Judge in *United States v. Southern Indiana Gas & Electric Co.* ("*SIGECO*") (S.D. Ind.);

Entry on Second Motion to Compel, filed Mar. 26, 2001 by V. Sue Shields, U.S. Magistrate Judge in *United States v. SIGECO* (S.D. Ind.);

Entry for March 26, 2001 by V. Sue Shields, U.S. Magistrate Judge in *United States v. SIGECO* (S.D. Ind.)

**C**   <u>Notices of Deposition for U.S. Employees</u>

List of depositions of U.S. employees scheduled or under discussion in *United States v. Illinois Power Co., et al.* (S.D. Ill.), *United States v. SIGECO* (S.D. Ind.), *United States, et al. v. AEP, et al.* (S.D. Ohio), and *United States, et al. v. Ohio Edison Co., et al.* (S.D. Ohio);

Defendant Illinois Power Company's Notice of Depositions Pursuant to FRCP Rule 30, of Walter Stevenson and Jack Farmer, dated Mar. 28, 2001 in *United States v. Illinois Power Co., et al.* (S.D. Ill.);

Defendants' Notice of Deposition Pursuant to Rule 30 of the Federal Rules of Civil Procedure, of Spiros Bourgikos, dated Apr. 16, 2001 in *United States v. Illinois Power Co., et al.* (S.D. Ill.);

Defendants' Notice of Deposition Pursuant to Rule 30 of the Federal Rules of Civil Procedure, of David Schulz, dated Apr. 17, 2001 in *United States v. Illinois Power Co., et al.* (S.D. Ill.);

**TAB**

| | |
|---|---|
| C<br>(Contd.) | Notice of 30(b)(5) and 30(b)(6) Deposition of United States of America Regarding Certain Databases, dated Jan. 9, 2001 in *United States v. SIGECO* (S.D. Ind.); |

Notice of 30(b)(6) Deposition of United States of America Regarding Region V, dated Jan. 9, 2001 in *United States v. SIGECO* (S.D. Ind.);

Letter dated Feb. 23, 2001 from Mason Evans to Jerome W. MacLaughlin seeking clarification of proposal regarding common depositions in pending cases, and proposing depositions of Bonnie Bush, David Schulz and John Kelly in *United States, et al. v. Ohio Edison Co., et al.* (S.D. Ohio)

D   List of Pending Motions

Summary of motions currently pending in Active Cases regarding Clean Air Act violations at coal-fired power plants

E   Correspondence Among Counsel Regarding U.S. Proposal for Coordination of Discovery

Letter dated Feb. 20, 2001 from Pamela R. Lee to Paul E. Gutermann and Steven Bonebrake re: proposal for common depositions of United States officials and employees in *United States v. Illinois Power Co., et al.* (S.D. Ill.) and related cases;

Letter dated Feb. 22, 2001 from Paul E. Gutermann to Pamela R. Lee re: opposition to proposal for joint depositions of Government witnesses in *United States v. Illinois Power Co., et al.* (S.D. Ill.) and related cases;

Letter dated Apr. 19, 2001 from Catherine R. McCabe to Paul E. Gutermann and Steven Bonebrake re: proposal to seek court assistance in coordinating and consolidating common discovery against the United States in *United States v. Illinois Power Co., et al.* (S.D. Ill.) and related cases;

Letter dated Feb. 16, 2001 from Steven D. Ellis to Kevin A. Gaynor and George C. Hopkins re: proposal for common depositions of United States officials and employees in *United States v. SIGECO* (S.D. Ind.) and related cases;

Letter dated Feb. 22, 2001 from Kevin A. Gaynor to Steven D. Ellis re: conditions to be met regarding joint deposition process in *United States v. SIGECO* (S.D. Ind.) and related cases;

**TAB**

E
(Contd.)

Letter dated Apr. 19, 2001 from Catherine R. McCabe to Kevin A. Gaynor re: proposal to seek court assistance in coordinating and consolidating common discovery against the United States in *United States v. SIGECO* (S.D. Ind.) and related cases;

Letter dated Apr. 20, 2001 from Kevin A. Gaynor to Catherine R. McCabe re: response to proposals concerning coordination of discovery in *United States v. SIGECO* (S.D. Ind.) and related cases;

Letter dated Feb. 28, 2001 from Jon Mueller and Leslie B. Bellas to Ralph Gildehaus re: discovery issues and proposal for joint defensive depositions of federal governmental officials in *United States, et al. v. American Electric Power Service Corp., et al.* ("*AEP* ") (S.D. Ohio) and related cases;

Letter dated Apr. 5, 2001 from Ralph Gildehaus to Jon A. Mueller re: discovery issues and joint defensive depositions of federal governmental officials in *United States, et al. v. AEP, et al.* (S.D. Ohio) and related cases;

Letter dated Apr. 19, 2001 from Catherine R. McCabe to Janet Henry and Alvin McKenna re: proposal to seek court assistance in coordinating and consolidating common discovery against the United States in *United States, et al. v. AEP, et al.* (S.D. Ohio) and related cases;

Letter dated Apr. 26, 2001 from Jon A. Mueller, Leslie B. Bellas and Marc Borodin to Alvin McKenna re: intent to file Motion to Coordinate Discovery in *United States, et al. v. AEP, et al.* (S.D. Ohio) and related cases;

Letter dated Feb. 16, 2001 from Jerome W. MacLaughlin to Mason Evans re: proposal for common depositions of United States officials and employees in *United States, et al. v. Ohio Edison Co., et al.* (S.D. Ohio) and related cases;

Letter dated Feb. 23, 2001 from Mason Evans to Jerome W. MacLaughlin seeking clarification of proposal regarding common depositions in *United States, et al. v. Ohio Edison Co., et al.* (S.D. Ohio) and related cases;

Letter dated Apr. 20, 2001 from Catherine R. McCabe to Mason Evans re: proposal to seek court assistance in coordinating and consolidating common discovery against the United States in *United States, et al. v. Ohio Edison Co., et al.* (S.D. Ohio) and related cases

Note - the voluminous exhibits included with the filed version of this document are omitted from the copy submitted as this Exhibit D to the Brief in Support of the United States' Motion for an Order Transferring Related Actions for Consolidated Pretrial Proceedings Pursuant to 28 U.S.C. § 1407.