MDL 1416

ORIGINAL

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

MAY 31 2001

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

In re   **Coal-Fired Electric Utilities**            )
        **Clean Air Litigation**                      )          **MDL No. 1416**
                                                      )
_____              )

## GEORGIA POWER COMPANY'S RESPONSE
## TO THE GOVERNMENT'S MOTION FOR TRANSFER

Pursuant to J.P.M.L. Rule 7.1(b), Georgia Power Company ("Georgia Power") responds

to the individually-numbered paragraphs of the United States' (the "Government") Motion for an

Order Transferring Related Actions for Consolidated Pretrial Proceedings Pursuant to 28 U.S.C.

§ 1407 as follows:

1.       Georgia Power admits that the Government, on behalf of the Environmental

Protection Agency, has filed multiple actions against electric utility companies engaged in the

generation and sale of electricity through the operation of coal-fired electric generating units.

Georgia Power specifically states that in November 1999, the United States Department of

Justice, on behalf of the Environmental Protection Agency ("EPA"), filed seven lawsuits against

IMAGED JUN 4 '01    OFFICIAL FILE COPY

PLEADING NO. 10

coal-fired electric utilities located primarily in the South and Midwest[1] and issued an

Administrative Compliance Order ("ACO") to Tennessee Valley Authority ("TVA").   These

actions were part of a nationwide enforcement initiative instituted in early 1998 by EPA under

the Clean Air Act ("CAA") against the coal-fired electric utility industry.  The Government has

not previously attempted to consolidate or coordinate pretrial proceedings across these cases.

Rather, the Government has permitted these cases to progress at varying rates in different courts.

The Government now seeks consolidation of only two cases – one against Georgia Power

Company and Savannah Electric & Power Company ("Savannah Electric") filed on November 3,

1999 in the Northern District of Georgia (the "Georgia Action"), and one against Alabama Power

Company ("Alabama Power") filed on January 12, 2001 in the Northern District of Alabama (the

"Alabama Action").

      2.       Georgia Power admits the allegations in Paragraph 2.

      3.       In response to Paragraph 3, Georgia Power admits that the Government initially

filed its Complaint in the Northern District of Georgia against Georgia Power, Alabama Power,

---

[1] *See United States v. American Electric Power, et al.*, 99CV1182 (S.D. Ohio); *United States v. Cinergy, et al.*, 99CV1693 (S.D. Ind.); *United States v. Illinois Power Company, et al.*, 99CV833 (S.D. Ill.); *United States v. Ohio Edison Company, et al.*, 99CV1181 (S.D. Ohio); *United States v. Southern Indiana Gas and Electric Company, et al.,* 99CV1692 (S.D. Ind.); *United States v. Tampa Electric Company*, 99-2524 Civ-T-23F (M.D. Fla.); *United States v. Georgia Power, et al.*, 1:99-CV-2859-JEC (N.D. Ga.).  EPA also issued Notices of Violation to Duke Energy Corporation ("Duke") and five other electric utilities: Dayton Power & Light, Virginia Electric Power Company, Mississippi Power Company, Savannah Electric & Power Company, and Gulf Power Company.  Finally, EPA has issued demands for information under the CAA to numerous additional electric utility companies:  Alabama Electric Cooperative, Allegheny Energy, Arizona Electric Co-Op, Arizona Public Service Company, Baltimore Gas & Electric Company, Carolina Power & Light Company, Consumers Energy, Conectiv, Detroit Edison, East Kentucky Electric Cooperative, Florida Power Corporation, Gainesville Electric, Jacksonville Electric Authority, LG&E Energy Corporation, Minnkota Electric Cooperative,  Nevada Power, NIPSCo, Owensboro Municipal Utilities,  Orlando Utilities, Public Service Electric & Gas Company, Salt River Project, Santee Cooper, Seminole Electric and South Carolina Electric & Gas Company.

and Southern Company Services, Inc. ("SCS"). Georgia Power further admits that the Government sought to amend the Complaint to add Southern Company subsidiaries Savannah Electric, Gulf Power Company ("Gulf Power"), and Mississippi Power Company ("Mississippi Power"). Georgia Power denies the remaining allegations in Paragraph 3.

4.      Georgia Power admits the allegations in Paragraph 4.

5.      In response to Paragraph 5, Georgia Power admits that the Government moved on March 31, 2000 for leave to amend its Complaint in the Georgia Action, seeking to add further counts against the original defendants and to bring actions against Gulf Power, Mississippi Power and Savannah Electric for alleged violations of the same provisions of the CAA that are involved in the Georgia Action. Georgia Power denies the remaining allegations in Paragraph 5.

6.      Georgia Power admits the allegations in Paragraph 6.

7.      In response to Paragraph 7, Georgia Power admits that on March 27, 2001, the United States District Court for the Northern District of Georgia granted in part and denied in part the Government's motion for leave to amend its complaint in the Georgia Action, and granted limited intervention to proposed intervenors. Georgia Power further states that the district court's order, being a written document, speaks for itself. (A copy of this order is attached as Exhibit C to the Government's Brief in support of its Motion to Transfer.) Georgia Power denies the remaining allegations in Paragraph 7.

8.      In response to Paragraph 8, Georgia Power admits that the Government has filed an Amended Complaint in the Georgia Action, which Georgia Power answered on May 29, 2001.

9.      In response to Paragraph 9, Georgia Power admits that the Government has re-filed its claims against Alabama Power in the Northern District of Alabama.  Georgia Power denies the remaining allegations in Paragraph 9.

10.      Georgia Power denies the allegations in Paragraph 10 and affirmatively states that, pursuant to the district court's May 16, 2000 Order (a copy of which is attached as Exhibit 1 to Georgia Power's brief in opposition to the Government's motion to transfer), the Government and Georgia Power have continued to engage in discovery in the Georgia Action.

11.      In response to Paragraph 11, Georgia Power admits that there are pending motions to stay discovery in the Georgia and Alabama Actions to await a ruling by the Eleventh Circuit on mulitple petitions for review of an Administrative Compliance Order issued by EPA to TVA regarding TVA's coal-fired electric generating units.  These petitions have been consolidated under the caption, *Tennessee Valley Authority, et al. v. United States Environmental Protection Agency, et al.*, Lead Docket No. 00-12310-E.  Georgia Power denies the remaining allegations in Paragraph 11.

12.      Georgia Power lacks sufficient knowledge and/or information to form a belief as to the truth of the allegations in Paragraph 12 because they relate to the Government's intentions, and, therefore, Georgia Power can neither admit nor deny said allegations.

13.      Georgia Power lacks sufficient knowledge and/or information to form a belief as to the truth of the allegations in Paragraph 13 as they relate to the Government's intentions, and, therefore, Georgia Power can neither admit nor deny said allegations.  Georgia Power affirmatively states, however, that although these contemplated "tag-along actions" may assert violations of the same provisions of the CAA named in the Georgia and Alabama Actions, each

alleged violation will require a unique, fact-specific analysis different from the other alleged violations.

14.     Georgia Power denies the allegations in Paragraph 14.

15.     Georgia Power denies the allegations in Paragraph 15.

16.     In response to Paragraph 16, Georgia Power denies that additional actions the Government expects to bring will involve factual issues common to the Georgia or Alabama Action.  Georgia Power lacks sufficient knowledge and/or information to form a belief as to the truth of the allegations in Paragraph 16 regarding the Government's expectations, and, therefore, can neither admit nor deny said allegations.

17.     Any allegations not specifically admitted herein are denied.


Respectfully submitted, this _30th_ day of May, 2001.


                                    TROUTMAN SANDERS LLP

                                    Daniel S. Reinhardt (by DJA with express permission)
                                    Daniel S. Reinhardt
                                    Georgia Bar No. 600350

                                    Attorneys for
                                    Georgia Power Company

Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia  30308-2216
(404) 885-3000

ORIGINAL

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

MAY 31 2001

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |
|---|---|
| In re   **Coal-Fired Electric Utilities Clean Air Litigation** ) ) ) ) | **MDL No. 1416** |

## GEORGIA POWER COMPANY'S BRIEF IN OPPOSITION TO UNITED STATES' MOTION FOR AN ORDER TRANSFERRING RELATED ACTIONS FOR CONSOLIDATED PRETRIAL PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407

DEFENDANT GEORGIA POWER COMPANY respectively submits this brief in opposition to the United States' Motion for an Order Transferring Related Actions for Consolidated Pretrial Proceedings Pursuant to 28 U.S.C. § 1407 ("MDL Motion").

## INTRODUCTION

In what appears to be an effort to avoid awaiting a ruling by the Eleventh Circuit on significant legal issues, the United States ("Government") filed the present motion with this Panel to have two factually dissimilar cases consolidated for pretrial purposes pursuant to 28 U.S.C. § 1407. Although the Government opines about what "efficiencies" can be achieved through consolidating these two cases, the totality of the

Government's conduct reveals the reasons why it filed this motion at this point in time –
the Government is attempting to avoid staying these two cases pending a binding decision
by a higher court on controlling legal issues.

For example, the Government has created new "factual" allegations of a
"conspiracy" among Southern Company entities to perform "life extension projects" and
not to apply for permits.  Despite the Government's assertions to the contrary, *see*
Government's MDL Brief at 3, these allegations have not been made previously in any of
the operative pleadings in this litigation – not in the original complaint, the proposed
amended complaint, or the actual amended complaint.  Instead, the Government makes
them now to create a "common factual issue" (albeit an irrelevant one) where one did not
exist previously.  Moreover, this "conspiracy" has nothing to do with more than half of
the claims asserted against Georgia Power which involve the initial construction of one of
its plants.  Additionally, to bolster its claims regarding the complexity of the litigation
and achievable efficiencies, the Government asserts that it is "considering" filing other
possible "tag-along actions," including two suits which it might file against two other
Southern Company affiliates.[1]

The Government has cherry-picked the cases it included in this motion to carve
out the Eleventh Circuit cases.  The Government did not move to have any of the other
six Clean Air Act cases transferred to the MDL proceeding.  Rather, the Government
moved to coordinate certain discovery activities in four of them.  Moreover, for no other
apparent reason except the fact that the case is pending in the Fourth Circuit, the

---

[1] The Government mistakenly asserts that both of these cases will be brought in the
Eleventh Circuit when in fact only one of them can.

Government chose not to include the case it filed recently against Duke Energy

Corporation, despite the fact that it was filed a mere three weeks before the case against

Alabama Power, which was included in the MDL motion.   Most telling, however, is the

fact that the Government did not raise the prospect of transferring these two cases to an

MDL proceeding until the court in the Northern District of Georgia "strongly suggested"

that the case be administratively terminated until such time as the Eleventh Circuit rules.

The Government clearly is not interested in achieving "efficiencies" across all of

these cases.  Rather, the Government is determined not to let these cases be stayed until

the Eleventh Circuit rules on binding legal issues – rulings which very likely will affect

the future of these cases.  Because, as will be shown below, neither the facts nor the law

support consolidating these cases for pretrial proceedings, this Panel should deny the

Government's motion.

## FACTUAL BACKGROUND

### A.     *EPA's Enforcement Initiative*

In November 1999, the Government filed seven lawsuits against coal-fired

electric utilities located primarily in the South and Midwest and issued an Administrative

Compliance Order ("ACO") to Tennessee Valley Authority ("TVA").   These actions

were part of a nationwide enforcement initiative instituted in early 1998 by EPA under

the Clean Air Act ("CAA").

In these enforcement proceedings, including the case against Georgia Power, the

Government alleges that a wide variety of various routine maintenance, repair, and

replacement projects undertaken by these utility companies at their plants over the last

twenty-five years violated the CAA because they constituted "modifications" which

supposedly caused emissions increases and because the utilities did not apply for permits or install pollution control equipment as part of the projects. In these enforcement actions, the Government is seeking large monetary penalties of up to $27,500 per day per violation and injunctive relief requiring the utility companies to install extremely expensive pollution control equipment. *See, e.g.*, Original and Amended Complaints at Prayer for Relief.

The Government has continued its enforcement initiative over the last two years. On December 22, 2000, the Government filed suit against Duke Energy Corporation ("Duke Energy"), *see United States v. Duke Energy Corp.*, 1:00-CV-1262 (M.D.N.C.), and, as is discussed below, it refiled its claims against Alabama Power on January 12, 2001. As in the other complaints it filed, the Government alleges in its complaint that Duke Energy violated the CAA at eight of its plants by performing certain routine maintenance, repair, and replacement projects without complying with the pollution standards in the CAA and/or without installing pollution control equipment. To date, no discovery has been served by either party in the Duke Energy case.

Recently, the Government filed a motion in four of the original cases[2] to coordinate certain discovery matters. (Copies of the Government's Motion to Coordinate Discovery and Memorandum in support thereof are attached as Exh. D to the Government's Brief in support of its Motion to Transfer ("Govt's MDL Brief") ("Exh. D to Govt's MDL Brief.")) The Government specifically asked the courts for the following relief: 1) appointing one magistrate judge for all discovery disputes in the four cases; 2)

---

[2] The other two original cases, *United States v. Tampa Electric Company*, 99-2524 Civ-T-23F (M.D. Fla.), and *United States v. Cinergy, et al.*, 99CV1693 (S.D. Ind.), have either settled or are in the process of settling.

ordering the defendants to coordinate depositions of Government witnesses on common

subjects by requiring defendants to specify in deposition notices whether they intend to

question the Government witness about common defenses, to select lead counsel for

those depositions to prevent duplicative questioning, and to refrain from taking

depositions duplicative of those already taken in any of the four cases; and 3) permitting

the defendants to cross-file and use these depositions in their respective cases.  Exh. D to

Govt's MDL Brief, Motion to Coordinate at 3-4.

> Most interestingly, the Government stated in its brief that

> [w]hile the governing law is the same in all cases [except for some minor differences in the State Implementation Plans], **the operative facts alleged in the Complaints** (and accordingly, the facts as to which the United States and other plaintiffs seek discovery) **are particular to the plants and to the defendant electric generating companies in each case**.

Exh. D to Govt's MDL Brief, Brief at 10-11 (emphases added).  Furthermore, the

Government expressly rejected "general consolidation" under 28 U.S.C. § 1407 because

> [w]hile significant efficiencies still can be achieved in these cases through coordination of common discovery against the United States, **coordination of the plaintiffs' discovery of the various defendants' separate power plant operations and corporate practices does not offer a similar opportunity for achieving efficiencies** in these cases.

Exh. D to Govt's MDL Brief, Brief at 16 n.13 (emphasis added).

## B.    *Eleventh Circuit Proceedings*

In May 2000, several petitions for review of the ACO issued to TVA in

November 1999 were filed in the Eleventh Circuit by TVA, Alabama Power along with

Duke Energy, and the Tennessee Valley Public Power Association.  *See Tennessee Valley*

*Authority, et al. v. United States Environmental Protection Agency, et al.*, consolidated

under lead docket No. 00-12310-E.  Georgia Power moved to intervene in the petitions

0729514.07

and was granted intervention in the original petition filed by TVA. Additional petitions for review were filed in November 2000 appealing an order entered by the Environmental Appeals Board which upheld all aspects of the ACO that EPA had chosen to defend. All of these petitions have been consolidated under lead docket No. 00-12310-E.

The legal issues raised by the petitions duplicate many of the legal issues which will be determinative in the Georgia Power and Alabama Power cases, including: 1) the scope of the "routine maintenance, repair and replacement" exclusion under the CAA; 2) whether EPA's current interpretations of the CAA are arbitrary, capricious, and contrary to law because they directly contradict the CAA regulations and EPA's past pronouncements; 3) whether EPA's conduct in changing its interpretation complied with rulemaking procedures and provided "fair notice" to the utilities; 4) the proper causation test for determining that a project *results in* an emissions increase; and 5) the proper legal method for calculating an emissions increase.

These issues, and more, were thoroughly briefed in the Eleventh Circuit. In fact, over 1,000 pages of briefing were submitted to that Court. Briefing was completed on March 13, 2001, and Georgia Power expects that the Eleventh Circuit will set a date for oral argument in the near future.

## C.    *The Georgia Power Case*

EPA filed its complaint against Georgia Power as part of its initial salvo of cases filed in November 1999. In its complaint, the Government alleges that Georgia Power violated the CAA at two of its plants: 1) by replacing an economizer in 1992 at Plant Bowen Unit 2; and 2) by failing to "commence construction" of Plant Scherer Units 3 and 4 by the effective dates of the NSR programs. Nowhere in its original complaint does the

-6-

Government allege that these 'modifications' were made or that CAA permits were not applied for as part of an overall 'life extension' program coordinated among the Southern Company operating companies, as the Government asserted in its MDL Motion.  Georgia Power timely answered the Government's Complaint.  The Government moved to amend its Complaint on March 1, 2000 to add three other Southern Company operating companies as defendants and to add allegations against Georgia Power arising under the Georgia State Implementation Plan ("Georgia SIP").

On May 16, 2000, after ruling on some but not all of the significant pending motions in the Georgia Power case, Judge Carnes stayed discovery until she had ruled upon the remaining pending motions.  (A copy of the May 16, 2000 Order is attached hereto as Exh. 1.)  She also instructed Georgia Power and the Government to conduct, to the extent possible, discovery that would not be rendered unnecessary or useless by any order she might enter on the remaining motions, which Georgia Power and the Government have done by exchanging written discovery requests and seeking clarification of those requests.

The Court ruled on the remaining motions on March 27, 2001, granting in part the Government's motion to amend its Complaint by permitting the addition of Savannah Electric and Power Company ("Savannah Electric") as a defendant and the addition of Georgia SIP violation allegations against Georgia Power.  On May 11, 2001, one day after filing its motion to transfer with this Panel, the Government filed its Amended Complaint.  Nowhere in this Amended Complaint does the Government allege that Georgia Power made "modifications" to its plants or decided not to apply for CAA permits "as part of an overall 'life extension' program" coordinated among Southern

Company operating affiliates, despite making those allegations in its MDL Brief filed the previous day.[3]

## D.    *The Alabama Case*

In its Original Complaint filed in the Georgia Action, the Government also had named Alabama Power Company ("Alabama Power") and Southern Company Services, Inc. ("SCS") as defendants. Both of these companies, however, were later dismissed for, respectively, lack of personal jurisdiction and failure to state a claim.[4]

As part of its enforcement initiative, the Government refiled its complaint against Alabama Power in the United States District Court for the Northern District of Alabama on January 12, 2001. *United States of America v. Alabama Power Company*, Civil Action File No. 01-B-0152-S. In this complaint, the Government reasserted the exact same allegations that it had attempted to bring against Alabama Power in the Northern District of Georgia, and nowhere in this new complaint does the Government allege that Alabama Power made "modifications" or failed to get permits "as part of an overall 'life

---

[3] In its Reply Memorandum in Support of Its Motion for Leave to Amend Its Complaint (a copy of which is attached hereto as Exh. 2), the Government stated that it "*would submit* that [] modifications were made as part of an overall "life extension" program coordinated by SCS and the operating affiliates." *See* Exh. 2, at 9. The Court in the Northern District of Georgia rejected the Government's argument, holding that "[w]hile the operating affiliates may act in a coordinated manner, the determination of whether construction or modification of equipment at a particular plant was in violation of the Act or relevant SIP is a **fact-specific determination** that must be **made on a case-by-case basis**." Order dated March 27, 2001, attached as Exh. C to the Government's MDL Brief at 21 (emphasis added). As noted above, the Government did not raise this "conspiracy" allegation in its Amended Complaint, which was filed *after* it made these statements in its Reply Brief.

[4] Nowhere in its responses to these motions to dismiss did the Government allege that any modifications "were made as part of an overall 'life extension' program coordinated by SCS with the Southern Company operating affiliates."

extension' program" among Southern Company operating companies.  On March 20, 2001, Alabama Power answered the complaint and asserted several counterclaims.

**E.**     ***The Motions to Stay***

At the same time it answered the complaint, Alabama Power moved for a stay of discovery.  On April 9, 2001, Georgia Power filed a similar motion to stay.  Both Georgia Power and Alabama Power requested their respective courts to stay discovery pending a ruling by the Eleventh Circuit on the petitions for review discussed above.  Because these petitions involve many of the same significant, novel legal issues as are present in the Georgia and Alabama cases, any rulings by the Eleventh Circuit on these issues would be binding in the Georgia and Alabama cases and thus would shape significantly the course of discovery in the two cases.  Georgia Power also suggested in its motion that, in the alternative, the court could place the case on administrative inactive status until the Eleventh Circuit rules on the petitions.  (A copy of Georgia Power's Motion to Stay and brief in support thereof are attached hereto as Exh. 3.)

The Georgia court quickly denied a request by the Government for an extension of time to respond to the stay motion.  Instead, she issued an order "strongly suggesting" that the Government agree that the case be administratively terminated until the Eleventh Circuit rules on the pending petitions for review and instructed the Government to file its response to the motion to stay immediately.  (A copy of the Order is attached hereto as Exh. 4.)  It was only then that the Government decided to pursue a MDL transfer.  (A copy of the Government's Response to Georgia Power's Motion to Stay is attached hereto as Exh. 5.)

## ARGUMENT AND CITATION OF AUTHORITY

Transferring these cases to MDL is not appropriate because: (1) the predominant factual questions are not common to the parties; (2) suitable alternatives exist to minimize duplicative discovery and avoid inconsistent rulings on pretrial matters; and (3) transfer will not promote the just and efficient conduct of the actions, especially in light of potential rulings by the Eleventh Circuit that may have a substantial effect on these proceedings. The Government's argument that transfer is appropriate focuses on minor issues of fact that are either irrelevant or will not comprise the majority of discovery in these cases. In addition, the Government fails to address the fact that there are alternatives to transfer that will achieve the goals addressed in the Government's MDL Brief without causing any hardships on the parties.

## I. THE PREDOMINANT FACTUAL ISSUES ARE NOT COMMON AMONG THE ACTIONS.

Transferring actions under Section 1407 requires the existence of common issues of fact. "The burden of showing that transfer is warranted is on the moving party." *Kaiser Indus. Corp. v. Wheeling-Pittsburgh Steel Corp.*, 328 F. Supp. 365, 368 (D. Del. 1971). Where the factual issues are disparate, consolidation is not appropriate. Although legal questions are common between these actions, the predominant factual questions are unique to each of the cases, and, therefore, transfer would not be appropriate.

### A. The Standard for Transfer Demands Common Questions of Fact.

The plain language of 28 U.S.C. § 1407 requires that "common questions of fact" must exist before cases can be transferred:

> When civil actions involving one or more *common questions of fact* are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such

> transfers shall be made by the judicial panel on multidistrict litigation
> authorized by this section upon its determination that transfers for such
> proceedings will be for the convenience of parties and witnesses and will
> promote the just and efficient conduct of such actions.

28 U.S.C.A. § 1407(a) (West Supp. 2000) (emphasis added).  Furthermore, when

common factual issues exist but are outweighed by any unique factual questions, transfer

remains inappropriate.

For example, in *In re Environmental Protection Agency Pesticide Listing*

*Confidentiality Litigation*, 434 F. Supp. 1235 (J.P.M.L. 1977), the principle issue

common to the actions sought to be transferred was whether EPA properly interpreted the

disclosure provisions of the Federal Insecticide, Fungicide, and Rodenticide Act.

Although the movants there admitted that the primary issue was one of law, they

nonetheless argued that this common question could best be disposed of by unified

proceedings before a single forum.  *Id.* at 1236.  This Panel was not persuaded:

> [T]he predominant, and perhaps only, common aspect in these actions is a
> legal question of statutory interpretation.  Any factual issues are primarily,
> if not entirely, unique questions pertaining to the specific data sought to be
> exempt from disclosure in each action.  Thus, since these actions share
> few, if any, questions of fact, transfer under Section 1407 is inappropriate.

*Id.*

The situation currently before this Panel is very analogous.  The predominant

issue common to these two cases is a legal one – whether EPA properly interpreted the

statutory and regulatory guidelines of the CAA.  The following legal questions are

integral to making that legal determination:  Is "routine" determined within the industry

or within the unit at the plant?  What is the meaning of the "increase in hours of

operation" exemption in the statute?  How are emissions increases measured?  What is

the correct legal test for causation and what showing is necessary to prove causation?

On the other hand, the predominant factual issues are not common among these cases. For example, several important factual issues are whether the various projects undertaken at the various units are non-routine changes and whether they caused a "significant net emissions increase" in regulated air pollutants. These inquiries are highly individualized determinations driven by the specific facts of each project. Because the common issues are legal, not factual, transfer of these cases is inappropriate. *See also In re Airline "Age of Employee" Employment Practices Litigation*, 483 F. Supp. 814, 817 (J.P.M.L. 1980) (holding transfer inappropriate where individual factual questions predominated and any existing common issues would "be mainly legal questions concerning the applicability of ADEA to airline flight deck crew members.")

### B.      Common Questions of Fact Do Not Predominate in These Actions.

Contrary to its assertions in its MDL Brief, the Government knows, and has conceded in its Motion to Coordinate Discovery (discussed *supra* at 5), that "**the operative facts** alleged in the Complaints (and accordingly, the facts as to which the United States [] seek[s] discovery) are **particular to the plants and to the defendant electric generating companies in each case**." Exh. D to Govt's MDL Brief, Brief at 10-11 (emphases added). The Government also admitted as much in its brief in support of its Motion for Leave to Amend Its Complaint (a copy of which is attached as Exh. A to the Government's MDL Brief ) ("Govt's Brief for Leave to Amend"), by stating that "the specific facts about the work done at each plant . . . varies from plant to plant." Govt's Brief for Leave to Amend at 15. Thus, the Government has concluded, "general consolidation" under Section 1407 is not appropriate. Exh. D to Govt's MDL Brief, Brief at 16 n.13.

Even without the Government's concessions, the "common issues of fact" it identifies do not withstand close analysis. These issues are not relevant, are not the principle factual inquiries, or are not "common" to these actions.

The first "factual" issue identified by the Government is whether the alleged plant modifications and decisions not to apply for permits were part of a coordinated effort by the Southern Company operating affiliates. Aside from the fact that the Government has not previously made this allegation in any of the operative pleadings in this matter, the allegation is completely irrelevant to whether any of the projects violated the CAA or whether they increased air pollutant emissions.

Another allegedly common factual issue identified by the Government is whether the types of projects performed at the plants were "routine maintenance" under common industry practice. What the government ignores, however, is that different projects were performed at various Georgia Power, Savannah Electric, and Alabama Power plants, and thus, discovery into these projects, as well as discovery into whether each of these particular projects is common within the coal-fired electric generating industry, is a unique inquiry for each project.

Furthermore, the allegations regarding Plant Scherer in no way involve common issues of fact, because they relate to when Georgia Power "commenced construction" of Plant Scherer Units 3 and 4. They are not part of any "coordinated life extension program." Nor are they routine maintenance projects. Moreover, the Government has alleged NSPS violations only at Plant Scherer, and thus, Georgia Power's discovery into the Government's conduct regarding NSPS issues will be unique.

The other factual questions identified by the Government as common to this litigation are, in fact, not common. First, whether any of the named defendants in these actions relied upon EPA's conduct and representations is necessarily an individualized determination based on what information was received, when it was received, and whether it was, in fact, relied upon.[5] The same is true for inquiries into whether and for how long the defendants knew of EPA's revised interpretation of the relevant regulations.

Even more inaccurate is the Government's statement that determining whether unit repairs and maintenance activities resulted in increased emissions will be a "common" question. Emissions increases by definition are determined on a project-by-project basis and will depend on data collected for each unit. There is no set of common discovery that can provide this information.

The only issue identified by the Government that is vaguely a common factual question is whether EPA has issued interpretations of the pertinent CAA regulations at variance with its current interpretation, and even this issue is a mixed question of law and fact. This single issue, however, does not include the NSPS violations the Government has asserted only against Georgia Power's Plant Scherer. Furthermore, this single "common" issue is far outweighed by the complex, individual factual questions that must be addressed on a plant-by-plant and project-by-project basis. As will be discussed *infra*, adequate alternatives exist to alleviate any overlapping discovery on this issue.

As this Panel has ruled, where the factual issues are primarily unique questions pertaining to individual circumstances, transfer is not appropriate. *See In re American*

---

[5] Furthermore, Georgia Power does not necessarily agree with the Government's assertion that reliance is an element of the fair notice inquiry.

*Home Products Corp. "Released Value" Claims Litigation*, 448 F. Supp. 276, 278

(J.P.M.L. 1978) (holding transfer inappropriate where "[t]he factual issues presented

[were] primarily, if not entirely, unique questions pertaining to the numerous shipments

involved in each action.")

## II.    TRANSFERRING THESE ACTIONS WOULD NOT SERVE THE CONVENIENCE OF PARTIES AND WITNESSES.

The existence of common questions of fact between actions is "but one condition

precedent to transfer under Section 1407." *In re Drowning Incident at Quality Inn*

*Northeast, Washington, D.C., on May 3, 1974*, 405 F. Supp. 1304, 1306 (J.P.M.L. 1976).

"Before a transfer will be ordered, the Panel must be satisfied that all statutory criteria

have been met." *Id.*  When a minimal number of actions are presented for transfer, the

moving party bears a heavier burden of showing transfer is appropriate.  Furthermore,

where, as here, suitable alternatives to transfer exist, consolidation under Section 1407 is

inappropriate.

### A.    The Moving Party Bears a Heavy Burden of Showing That Transfer of Actions is Appropriate.

As discussed *supra*, the Government chose to include only two, cherry-picked

cases, out of at least seven possibilities, in its MDL Motion.  This Panel has repeatedly

held:

> [I]n order to demonstrate that the just and efficient conduct of the
> litigation would be promoted by transfer where only a minimal number of
> actions are involved, the moving party bears a strong burden to show that
> the common questions of fact are so complex and the accompanying
> discovery so time-consuming as to overcome the inconvenience to the
> party whose action is being transferred and its witnesses.

*In re Interstate Medicaid Patients at Good Samaritan Nursing Center*, 415 F. Supp. 389,

391 (J.P.M.L. 1976).  *See also In re Garrison Diversion Unit Litigation*, 458 F. Supp.

223, 225 (J.P.M.L. 1978) (applying "heavy" burden of proof in transfer action where movant sought to consolidate only two actions); *In re 21ˢᵗ Century Productions, Inc. "Thrilsphere" Contract Litigation*, 448 F. Supp. 271, 272-73 (J.P.M.L. 1978) (noting same).

In this litigation, the Government has made no attempt to show that any of its asserted common questions of fact are unduly complex or that the accompanying discovery is exhaustively time-consuming. Rather, to prop up its claims of complexity, the Government asserts that it is "considering" filing and seeking transfer of two additional actions and that discovery served on the Government in the other CAA cases (which were expressly not included in its motion to transfer) has been overwhelming despite being nearly identical. Neither argument is persuasive.

The "consideration" of additional lawsuits by the Government should not affect the decision of this Panel. The fact that the Government may still be contemplating suits against other utilities does not make these two *pending* case more complex and thus should not be considered when determining whether to transfer these two actions.

Additionally, where is the supposed burden in responding to potentially duplicative discovery requests? The Government's own brief reveals the flaws in this argument. As the Government admits in its MDL Brief, the United States has made the **same** document production in all of the Northern Cases. *See* Government's MDL Brief at 10. Thus, if the Government is correct that the discovery requests in these cases will be similar to that in the other cases, the Government has already expended the time and effort involved in gathering documents, and it needs only to reproduce its prior productions. If the Government is wrong and the discovery requests in these two cases

are different from the other cases, such as discovery into NSPS interpretation issues, its argument that duplicative efforts will be required is seriously undermined.  Either way, the Government has not met its burden of establishing that transfer is warranted in this litigation.

**B.      Transfer Should Be Denied When Suitable Alternatives Exist to Minimize Duplicative Discovery.**

Even if the potential for some duplicative discovery exists, an MDL transfer is not appropriate where suitable alternatives exist to minimize the duplication.  *See, e.g., In re Eli Lilly and Co. (Cephalexin Monohydrate) Patent Litigation*, 446 F. Supp. 242, 244 (J.P.M.L. 1978) (denying transfer and observing that suitable alternatives to Section 1407 transfer are available to minimize the possibility of duplicative discovery).  Suitable alternatives include:  1) filing deposition notices in all actions, thereby making the deposition applicable in each action, *id.*; 2) seeking agreement on a stipulation that any discovery relevant to both actions may be used in each action, *see In re 21st Century Productions*, 448 F. Supp. at 273; and 3) suggesting the concerned district courts may consult and cooperate, if appropriate, to minimize the possibility of conflicting pretrial rulings.  *See In re Garrison Diversion Unit*, 458 F. Supp. at 225.  Moreover, as plaintiff in both these actions (and in any "tag-along" actions), the Government stands in the unique position of being able to seek orders "to make discovery taken in either action applicable to the other." *In re Drowning Incident*, 405 F. Supp. at 1306.  More importantly, the Government has recognized the wisdom of using these alternatives in these CAA cases as evidenced by its Motions to Coordinate Discovery filed in the other CAA cases.

The availability of these alternatives, coupled with the fact that there would be a minimal amount of common factual discovery in these cases, strongly advocates the denial of the Government's request to transfer these actions to MDL. *See In re Chiropractic Antitrust Litigation*, 483 F. Supp. 811, 813 (J.P.M.L. 1980) (denying transfer where common questions of fact existed and observing that "suitable alternatives to Section 1407 transfer are available in order to minimize the possibility of duplicative discovery.")

## III.    TRANSFERRING THESE CASES WOULD NOT PROMOTE THE JUST AND EFFICIENT CONDUCT OF THESE ACTIONS.

The Government asserts that consolidating these cases would promote the just and efficient conduct of these actions. The availability of the alternatives discussed above, however, refutes the possibility that duplicative discovery would result if transfer is denied. Furthermore, the pending Eleventh Circuit petitions in the TVA case make transferring these actions even more inappropriate. *See In re American Home Products*, 448 F. Supp. at 278 (stating that "another factor weighing against transfer under Section 1407 is the likelihood that a ruling on [a] question of law [by a Circuit Court of Appeals] . . . may have a substantial effect on the resolution of [the] actions.")

The Eleventh Circuit's decision in the TVA case will most likely influence the course of the Georgia and Alabama Cases because: (1) many of the claims and defenses before the Eleventh Circuit are the same as those presented in the Georgia and Alabama cases; (2) a decision in the TVA case likely will control interpretation of critical statutory and regulatory terms in these cases; and (3) discovery, motion practice, and the ultimate resolution of these actions will be significantly influenced by, and perhaps obviated by, the Eleventh Circuit's decision. Staying a case when a higher court is considering an

0729514.07

important issue of law bearing on the action is the most efficient course of action, not transferring it for consolidated discovery. *See, e.g., Leyva v. Certified Grocers of California, Ltd.*, 593 F.2d 857, 864 (9th Cir. 1979) (stating that "[a] trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it pending resolution of independent proceedings which bear upon the case"); *Stadler v. McCullough*, 882 F. Supp. 1524, 1527-28 (E.D. Pa. 1995) (finding "it more sensible to await the Third Circuit's decision and proceed accordingly, rather than charging forward, possibly to trial, knowing that we may be compelled to return to this point and begin anew.")

Discovery in these cases will be extraordinarily extensive and expensive and will consume an inordinate amount of the Defendants' time and resources, especially in light of the Government's claims of decades old violations. As Georgia Power argued in its Motion to Stay, waiting until the Eleventh Circuit rules and better defines the legal issues could potentially reduce or avoid entirely the burden of responding unnecessarily to premature discovery requests. *See Stadler*, 882 F. Supp. at 1527 (holding that "[i]f the action were to progress, the Third Circuit's ruling might cause the parties to retrace a number of their steps, and could render meaningless much of the work completed in the interim"); *Leyva*, 593 F.2d at 864 (holding that "[i]t would waste judicial resources and be burdensome upon the parties if the district court in a case such as this were mandated to permit discovery, and upon completion of pretrial proceedings, to take evidence and determine the merits of the case at the same time as the arbitrator is going through a substantially parallel process.") Thus, transferring these cases before the Eleventh Circuit

rules would likely result in a significant waste of the parties' and the judiciary's resources.

## **CONCLUSION**

For all of the reasons stated above, transferring and consolidating these cases for pretrial proceedings would not serve the just and efficient conduct of these actions. The Government's request to transfer these actions to MDL should therefore be denied.

This 30th day of May, 2001.

**TROUTMAN SANDERS LLP**

Daniel S. Reinhardt (by ... with express permission)
Daniel S. Reinhardt
Georgia Bar No. 600350

Attorneys for
Georgia Power Company

Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2216
(404) 885-3000

ORIGINAL

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT**
**LITIGATION**

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

MAY 31 2001

|  |  |  |
|---|---|---|
| In re | **Coal-Fired Electric Utilities** | ) |
|  | **Clean Air Litigation** | ) |

FILED
CLERK'S OFFICE

**MDL No. 1416**

## <u>REASONS WHY ORAL ARGUMENT SHOULD BE HEARD</u>

Pursuant to J.P.M.L. Rule 16.1(b), Defendant Georgia Power Company states that it

agrees with the Government that oral argument regarding the United States' Motion for an Order

Transferring Related Actions for Consolidated Pretrial Proceedings Pursuant to 28 U.S.C. § 1407

would be helpful in clarifying any issues addressed in the briefs and answering any questions the

Panel may have regarding procedural and/or substantive issues in these or related actions brought

by the Government under provisions of the Clean Air Act.

Respectfully submitted, this 30th day of May, 2001.

TROUTMAN SANDERS LLP

Daniel S. Reinhardt *(by JPM with express permission)*
Daniel S. Reinhardt
Georgia Bar No. 600350

Attorneys for
Georgia Power Company

Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia  30308-2216
(404) 885-3000

0731732.01

ORIGINAL

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

MAY 31  2001

| In re | Coal-Fired Electric Utilities | ) |
| | Clean Air Litigation | ) |
| | | ) |

MDL No. 1416

FILED
CLERK'S OFFICE

### PROOF OF SERVICE

I HEREBY CERTIFY that, pursuant to J.P.M.L. Rule 5.2(a), I have this day served a

true and correct copy of *Georgia Power's Response to the Government's Motion for Transfer*

via U.S. Mail, postage prepaid, on all counsel of record listed on the attached Panel Attorney

Service List.

This 30th day of May, 2001.

Daniel S. Reinhardt  *(by JMH with express permission)*
Daniel S. Reinhardt
Georgia Bar No. 600350

0733740.01

IAL PANEL ON MULTIDISTRICT LITIGATION - PANEL ATTORNEY SERVICE LIST

T: 1,416 - In re Coal-Fired Electric Utilities Clean Air Act Litigation
S: Pending

FEREE INFORMATION
st:
ge:

TORNEY - FIRM                          REPRESENTED PARTY(s)

---

eman, Michael D.                       => Alabama Power Co.*#
ch & Bingham LLP
. Box 306
0 Sixth Avenue North
mingham, AL  35203


ason, Jeffrey M.                       => Alabama Environmental Council*; Campaign For A Prosperous Georgia*; Physicians
thern Environmental Law Center            For Social Responsibility*; United States Public Interest Group*
 West Main Street
te 14
rlottesville, VA  22902


abe, Catherine R.                      => United States of America*
ironment & Natural Resources Division
. Box 7611
ironmental Enforcement Section
shington, DC  20044


inhardt, Daniel S.                     => Georgia Power Co.*
outman Sanders, L.L.P.
nk of America Plaza, Suite 5200
0 Peachtree Street, N.E.
lanta, GA  30308


ack, Ann M.                            => Savannah Electric & Power Co.*
uhan, Williams & Levy
7 Bull Street
avannah, GA  31401

---

NOTE: Please refer to the title page for complete report scope and key.
*    Signifies that an appearance was made on behalf of the party by the representing attorney.
#    Specified party was dismissed in some, but not all, of the actions in which it was named as a party.
NOTE: All dismissed parties (and counsel representing only dismissed parties) were suppressed.

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

MAY 31 2001

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| In re   **Coal-Fired Electric Utilities** | ) | |
| **Clean Air Litigation** | ) | **MDL No. 1416** |
| | ) | |

# EXHIBITS TO GEORGIA POWER COMPANY'S BRIEF IN OPPOSITION TO UNITED STATES MOTION FOR AN ORDER TRANSFERRING RELATED ACTIONS FOR CONSOLIDATED PRETRIAL PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407

## Exhibits

1.   May 16, 2000 Order in No. 1:99-CV-2859-JEC (N.D. Ga.)

2.   United States' Reply Memorandum In Support Of its Motion For Leave To Amend Its Complaint, filed April 6, 2001 in No. 1:99-CV-2859-JEC (N.D. Ga.)

3.   Georgia Power Company's Motion To Stay Discovery, filed April 13, 2001 in No. 1:99-CV-2859-JEC (N.D. Ga.)

4.   April 25, 2001 Order in No. 1:99-CV-2859-JEC (N.D. Ga.)

5.   Response Of Plaintiff United States To Defendant's Motion To Stay Discovery, filed April 27, 2001 in No. 1:99-CV-2859-JEC (N.D. Ga.)

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

        Plaintiff(s),

v.

ALABAMA POWER COMPANY, et al.,

        Defendant(s).

CIVIL ACTION NO.

1:99-CV-2859A-JEC

## ORDER

The Court has received a courtesy copy and hereby **GRANTS** the Consent Motion For Reconsideration [55].   The Court expects however, that discovery will proceed informally between the plaintiff and defendant Georgia Power on matters that would not require duplicative discovery or depositions, in the event that the Court denies the motions to dismiss by other defendants.

SO ORDERED, this __16__ day of May, 2000.

_____
JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

**2**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>       v.<br><br>ALABAMA POWER COMPANY,<br>GEORGIA POWER COMPANY,<br>SOUTHERN COMPANY SERVICES, INC.,<br>    subsidiaries of the<br>    Southern Company,<br><br>       Defendants. | <u>FILED UNDER SEAL</u><br><br>Civil Action No.<br><br>1:99-cv-2859-JEC<br><br><br>UNITED STATES' REPLY<br>MEMORANDUM IN SUPPORT<br>OF ITS MOTION FOR<br>LEAVE TO AMEND ITS<br>COMPLAINT |

<u>INTRODUCTION</u>

Defendants Alabama Power Company ("Alabama Power"), Georgia Power Company ("Georgia Power"), and Southern Company Services, Inc. ("SCS") have opposed the United States' Motion for Leave to Amend its Complaint, in sum, arguing that the claims against the six original and proposed defendants should be tried in four separate jurisdictions. Considerations of judicial economy and the Federal Rules of Civil Procedures, however, require that a single Court consider and rule on whether these Southern Company affiliates can continue to avoid regulation and air pollution controls under the Clean Air Act ("CAA") through their efforts to extend the lives of certain coal-fired electric power generating plants. The defendants raise several "red herrings" by arguing that amendment would cause the case to become unduly complex, that confusion would result from consideration of the State Implementation Plans ("SIPs"), and that the Court lacks

jurisdiction over the proposed defendants.

Defendants have not identified grounds sufficient, under the Federal Rules of Civil Procedure, to justify denial of the United States Motion to Amend.   The claims in the proposed Amended Complaint are properly joined.   They all raise common questions regarding whether the defendants' projects to extend the lives of their coal-fired electric generating plants violated the requirements of the Clean Air Act, and the resultant impact of those violations on intrastate and interstate air pollution.   The claims raise the same legal issues, arise from a single series of similar fact patterns, and share many common facts.   Furthermore, for any Court to fashion relief in this case, it will need to consider both the structure and the effects of the relief granted on the entire Southern Company electric generating system.   To accept defendants' arguments and divide this case among four jurisdictions would waste scarce judicial resources and deny the United States an opportunity to obtain effective relief for serious, ongoing violations of the Clean Air Act.

## THE DEFENDANTS

On November 3, 1999 the United States filed suit against Alabama Power, Georgia Power, and SCS (collectively "the Original Defendants") seeking penalties and injunctive relief for violations of the Clean Air Act ("CAA" or "the Act"), 42 U.S.C. §§ 7401, et seq., and related regulations.[1]   On March 1, 2000, the United

---

[1]Also on November 3, the United States Environmental Protection Agency ("EPA") served the Original and Proposed Defendants with a Notice of Violation ("NOV") which identified

- 2 -

States filed a Motion for Leave to Amend the Complaint, attaching a proposed amended compliant that alleges violations of the CAA and the applicable CAA State Implementation Plans ("SIPs") by both the Original Defendants and three additional subsidiaries of the Southern Company: Gulf Power Company ("Gulf Power"), Mississippi Power Company ("Mississippi Power"), and Savannah Power and Electric Company ("Savannah Power") (collectively the "Proposed Defendants").

With the Southern Company as its corporate head, the five utilities, Alabama Power, Georgia Power, Gulf Power, Mississippi Power, and Savannah Power, operate as five arms to produce and transmit electricity throughout the Southeast.[2]   SCS provides

---

the same claims identified in the proposed amended complaint. That day, counsel for the United States wrote to the Vice President and Associate General Counsel of the Southern Company and advised that the United States would be amending its Complaint to add the claims identified in the NOV.   Exhibit 1. Further, the Original Defendants sought and reached and agreement with the United States that they could have until the end of the year to file a responsive pleading to the Complaint and the United States could freely amend prior to that time.   Hence, the fact that the United States has sought to amend its Complaint should come as no prophetic flash of light to the defendants. Alabama Power's Opposition, at p.2.

[2] Defendant Alabama Power has challenged the authenticity and admissibility of the evidence submitted by the United States in support of its Opposition to Defendant's Motion to Dismiss. Defendant will likely file similar objections to the evidence presented here.   It is significant, however, that Defendant does not deny the truth of the statements made in all but two of the documents submitted by the United States in its Opposition and here, but rests simply on evidentiary objections.   The United States has submitted declarations supporting the authenticity and reliability of that evidence.   Save for two documents submitted in support of the United States' Opposition to the Motion to Dismiss, all of the documents were authored by the Defendants or their agents and all of the statements within those documents have been presented by the Defendants either to the public or

engineering and technical support to all five affiliates and, for example, develops plans for the system as a whole to meet existing and future demands for generating capacity.  For example, in 1998 it conducted an "integrated expansion planning study" making recommendations for "an optimum resource additional schedule for the system and individual operating companies."  <u>Southern Company Services 1998 Integrated Resource Plan System Resource Mix Study</u>, at 4 [Exhibit I to the Government's Response to Alabama Power's Motion to Dismiss - filed under seal[3]].  This study aims to determine what resource additions will be necessary to supply the projected load for individual companies and the system.  <u>Id</u>.  The need to maintain a minimum reserve capacity <u>for the system as a whole</u> is the guiding principle used to determine what resource additions will be needed.  <u>Id.</u>

It is clear that these companies operate as an integrated system throughout the Southeast and that rulings concerning one company in this matter will have significant impacts upon all the operating affiliates, regardless of their geographic location.

---

federal and state regulatory agencies as the truth.  Declaration of Jon Mueller, Exhibit 6.  Hence, they are records of regularly conducted activity or public records and are admissible as evidence against the Defendants.  Fed.R.Evid. 803(6), (8).  Given the opportunity to undertake discovery, the United States intends to utilize written requests and depositions of the appropriate corporate officials and representatives of  the Defendants to determine the accuracy of each of these statements and to provide the results to the Court.

[3]Because of their length, exhibits previously attached to the Response of the United States to Alabama Power's Motion to Dismiss will not be reproduced as exhibits to this brief.

ARGUMENT

I.   Leave to Amend Should Be Freely Given

Rule 15(a) of the Federal Rules of Civil Procedures provides that leave to amend "shall be freely given when justice so requires," id., and any denial must be justified, for example, because of undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice, or futility.  Foman v. Davis, 371 U.S. 178, 182 (1962); see also, e.g., McKinley v. Kaplan, 177 F.3d 1253, 1258 (11th Cir. 1999).  None of the Foman examples justify denial of the United States' motion.

II.  Amendment of the Complaint Would Not be Futile Because The Claims Arise from a Common Series of Occurrences, Share Common Legal Issues, Common Fact Patterns, and Many Common Facts

Defendants argue that amendment of the Complaint would be futile because joinder of the claims is improper.  In doing so, they seek to create a jurisdictional quagmire out of the requirements of Federal Rule of Civil Procedure 20.  They rely on employment discrimination cases which bear little resemblance to the facts of this case, and attempt to establish new law regarding the legal status of the SIPs, building on a 1945 price fixing case, Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945).

Federal Rule of Civil Procedure 20 aims to promote efficient administration of justice and to reduce duplication by consolidating related claims in a single action.  It provides:

> All persons . . . may be joined in one action as defendants if there is asserted against them, jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants

- 5 -

will arise in the action.

Id.  This Rule is to be construed liberally to promote trial convenience and to expedite final resolution of disputes to prevent multiple lawsuits.  See, e.g., League to Save Lake Tahoe v. Tahoe Regional Planning Agency, 558 F.2d 914, 917 (9th Cir. 1977).  As the Supreme Court has explained, under the Federal Rules of Civil Procedure, "the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 724 (1966) (emphasis added).  Separation of the claims asserted in the proposed amended complaint would be inefficient, would require duplicative presentation of evidence and testimony of witnesses, and would ultimately be contrary to both the letter and spirit of Rule 20.

A.   The Claims Arise from a Common, Coordinated Series of Decisions to Extend the Lives of Coal-Fired Electric Generating Facilities Across the Southern Company Electric System

"[W]hether a particular factual situation constitutes a single transaction or occurrence for purposes of Rule 20" is to be determined on a case-by-case basis.  Grayson v. K-Mart Corp., 849 F. Supp. 785, 787 (N.D. Ga. 1994) (quoting Mosley v. General Motors Corp., 497 F.2d 1330, 1333 (8th Cir. 1974)).  Although no hard and fast rules exist, id, Rule 20 generally permits "all reasonably related claims for relief by or against different parties to be tried in a single proceeding."  Mosley, 497 F.2d at 1333. "Absolute identity of all events is unnecessary."  Id.

- 6 -

Defendants' argument that the claims in the United States'
Amended Complaint constitute discrete occurrences is incorrect.
While separate corporate entities, the operations and management of
the original and proposed defendants are inextricably bound.   As
explained in greater detail in the United States' Opposition to the
Motion to Dismiss filed by Alabama Power, the Original and Proposed
Defendants, collectively the Southern Company Operating Companies
and SCS, are managed and operated as a single entity.   For example,
Alabama Power holds itself out as "one of five utilities in the
United States <u>operated</u> by Southern Company, the nation's largest
producer of electricity."   It further represents to the public
that:

> <u>Southern Company's size gives its subsidiaries strength.</u>
> <u>Alabama Power and its sister utilities enjoy significant</u>
> <u>savings and efficiencies by banding together to negotiate</u>
> <u>contracts, buy materials and supplies, standardize functions</u>
> <u>and share resources and best practices.   Together, these</u>
> <u>companies serve more than 3.7 million customers</u> in the
> Southeast.   Alabama Power also benefits from the financial
> strength and reputation of the Southern Company. ... Some
> 26,000 miles of transmission lines - enough to circle the
> earth - interconnect Southern Company's 278 coal, oil, gas,
> nuclear and hydro generating units.

Alabama Power 1997 Annual Report, Exhibit 5 (emphasis added).

While each operating subsidiary will claim it is different
than the others, the differences are in name only.   The companies
act together as an integrated unit controlled by the Southern
Company and an Operating Committee created under the Intercompany
Interchange Contract ("IIC").   Pursuant to the terms of the IIC,
the operating companies are interconnected and operated as an
integrated power supply system.   IIC Section 1.3.   The Operating

Companies are tasked to generate electricity at minimum cost,
supply their local territories, exchange energy between themselves,
and pool excess energy for use throughout the Southern Company
system.  IIC Sections 3.2, 3.3, 7.1, and 8.1.  To accomplish this
task, the Operating Companies have appointed SCS as their agent to
coordinate the electric operations of the Operating Companies.  IIC
Sections 1.15, 4.3, and 4.4.  Because resources are "pooled" in
this manner, the reliability of each affiliate's power generating
system depends, not so much on its own generating capacity, as on
the reserves available to the Southern system as a whole.  As
Georgia Power explains:

> As a member of the Southern electric system, Georgia
> Power shares reserves with the other operating companies.
> Therefore, the reserves available to meet Georgia Power's
> needs are best measured as the Southern electric system
> reserves which are the best indication of system
> reliability.

Georgia Power Company 1995 Integrated Resources Plan, Jan. 1995, at
4-4.

Decisions regarding increases and decreases in any one
affiliates generating capacity thus must be made on a coordinated
basis as they affect the reliability of the other affiliates'
systems and their attendant needs regarding new generating
capacity.  This basic fact is further illustrated by the
affiliates' practice of reporting to their respective public
utility commission the generation and outages that are expected for
other operating affiliates.  For example, Georgia Power reports
monthly to the Georgia Public Service Commission concerning
scheduled outages and generation availability among other things.

<u>See</u> Exhibit 3.  Such reports contain information concerning Alabama Power units as well as Georgia Power units.   <u>Id.</u>

In carrying out its responsibilities within this system, SCS SCS controls energy supplied to the system, IIC Section 3.4. coordinates power system operations, establishes provisions to be included in interconnection agreements between the Operating Companies and utilities outside the Southern system, and reviews and recommends plans to expand electricity generation by the Operating Companies.  <u>Id.</u> at Section 4.2.

The United States has alleged that each of the defendants, all of whom are part of this coordinated system, have modified the units identified in the Proposed Amended Complaint and that modification has resulted in increased emissions of NOx, among others, in excess of 40 tons per year.  Proposed Amended Complaint ¶¶ 1, 2.  The United States further alleges that Defendants made such "modifications" without obtaining the appropriate permits which is a violation of federal and state law.  <u>Id.</u>  The United States will submit that these modifications were made as part of an overall "life extension" program coordinated by SCS and the operating affiliates.

The defendants arguments that these actions should be considered discrete occurrences are based on two cases involving joinder of employment discrimination claims which raise issues irrelevant to this analysis.  <u>Grayson v. K-Mart Corp.</u>, 849 F. Supp. 785 (N.D. Ga. 1994); <u>Smith v. North American Rockwell Corp.</u>, 50 F.R.D. 515 (N.D. Okla 1970).  Both cases bear little factual

resemblance to the case now before the Court and present "somewhat close" questions of law. Grayson, 849 F. Supp. at 788; see also Mosley, 497 F.2d at 1334 (finding a decision which relied upon the reasoning of Smith to constitute an abuse of discretion).

In Grayson, the Court was asked to determine whether several unrelated plaintiffs could join their ADEA claims against K-Mart -- their common employer. To support their argument that the claims all arose from a single series of occurrences, the plaintiffs offered limited evidence of motive to discriminate, and anecdotal and statistical evidence of age bias. Grayson, 849 F. Supp. at 788-89. The adverse employment actions, however, had been taken at different locations, by different managers, and presumably witnessed by different employees. Id. Similarly in Smith, unrelated plaintiffs sought to join employment discrimination claims against a single employer. The plaintiffs were employed in different capacities, in different departments, had been denied different opportunities, and the relevant management decisions were made by different people, in different unions, under different work environments. Smith, 50 F.R.D. at 522. In both cases joinder was found to be improper. Id. at 523; Grayson, 849 F. Supp. at 791.

The opinion in Grayson emphasizes two particular problems with joinder of discrimination claims. First, to permit joinder based solely on allegations of company-wide bias would eliminate virtually all limits on joinder. Id. at 789. Second, if the cases were joined the result would be to present several consecutive mini-trials to a single jury. Id. at 791. The Smith Court

similarly emphasized the importance of practical considerations, finding it to be "of the highest importance that the practical impact of the joinder issue on the adjudication of each plaintiff's claim be clear."   Smith, 50 F.R.D. at 523.   Key practical considerations to be considered in this analysis include:  the individuals who will be deposed and serve as witnesses in each case; the evidence to be presented in each case; and, the order of proof.  Id.  As shown below, in the case now before this Court, these practical considerations weigh in favor of joinder.

B.   The Claims Share Numerous Common Questions of Law and Fact

Defendants argue that there are no common facts relative to the claims against them.  Such a statement is incorrect.  The case before the Court is a federal case about interstate air pollution resulting from violations of both the Clean Air Act and the State Implementing Plans (SIPs) that implement the Act.  A single plaintiff, the United States, is bringing claims against six inextricably related defendants for a series of concerted actions, overseen by a common entity (SCS) taken in violation of the requirements of the Clean Air Act.  More specifically, the United States alleges that the defendants failed to comply with the Prevention of Significant Deterioration ("PSD"), New Source Review ("NSR") and New Source Performance Standards ("NSPS") provisions of the Act when they made "major modifications" to various plants within the Southern electric system that increased their emissions of regulated pollutants.

Defendants argue that each of these alleged modifications is

- 11 -

unique, and because the affected plants are located in different states, four different federal district courts should determine the validity of the United States' claims and the Defendants' defenses. This approach is misguided as the facts of each claim are not that unique. For example, the United States has alleged that Defendants Alabama Power, Georgia Power, Gulf Power, Mississippi Power, and SCS have each replaced an economizer on one or more of their units.[4] Proposed Amended Complaint ¶¶ 115, 133, 161, 195, 205. The following facts are common to each of these replacements: each of the operating companies, with assistance from SCS, determined that these economizers were to be replaced; the economizers were replaced during a particular period of time with new equipment which cost a particular amount; the economizers were designed pursuant to specifications developed by SCS; and once installed were tested either by SCS or under its supervision to ensure that they operated in conformance with those specifications. The United States will submit that these replacements were undertaken as a means to extend the useful lives of the units and, under applicable case law including and the CAA, were "modifications." Defendants will argue, among other things, that these replacements were part of "routine maintenance and repair" and thus, exempt from PSD regulation. The facts critical to these determinations will not significantly vary from plant to plant, defendant to defendant, or

---

[4] Economizers are extremely large tubular heat transfer surfaces that are used to recover additional energy from flue gases by using these gases to preheat boiler feedwater before it enters the main boiler components.

- 12 -

state to state.

Many of the same individuals would also need to be deposed and/or present live testimony to provide factual support for each claim. Several factors establish that this overlap will be significant: the similarities in the projects, the fact that a single affiliate (SCS) provides the technical and engineering support for all Southern affiliates, see Southern Company 1998, 10-k at, I-2, the need for expert testimony on technical issues, and the involvement of the same EPA engineers in investigations of the violations. Individuals whose testimony would have to be duplicated if the case were divided include, for example, utility boiler experts, engineers and environmental compliance staff from SCS, industry witnesses, and EPA engineers.

The claims also share numerous common legal issues including, for example, the legal definition of "major modification" and "routine repair and maintenance." Defendants raise another "red herring" by arguing that the claims related to violations of the State Implementation Plans ("SIPs") cannot, by definition, share common issues of law because they require the application of the laws of different states. This argument misinterprets the relationship between state and federal agencies in enforcing the requirements of the Clean Air Act and attempts to create new law regarding the status of the SIPs.

All of the United States' claims in the proposed amended complaint have been brought to enforce the requirements of the Clean Air Act, 42 U.S.C. § 7401, et seq.. The claims allege

- 13 -

specific violations of both the Act itself and the SIPs enacted to implement the Act. The Clean Air Act has been described as a "bold experiment in cooperative federalism," Bethlehem Steel Corp. v. Gorsuch, 742 F.2d 1028, 1036 (7th Cir. 1984), because it requires the federal government to promulgate National Ambient Air Quality Standards ("NAAQSs") necessary to protect health and welfare, 42 U.S.C. § 7409, and then requires states either to implement the NAAQSs by enacting a SIP, or have the federal government enact a Federal Implementation Plant (FIP). 42 U.S.C. § 7410. Each SIP is a vehicle for implementation of the requirements of the Clean Air Act, not for the implementation or enforcement of the many additional air quality control requirements that arise from state air pollution control laws (e.g. regulations regarding odor and open burning). See. e.g., Florida Power & Light Co. v. Castle, 650 F.2d 579 (5th Cir. 1981) (holding that EPA cannot require a state to incorporate additional state law provisions, not required by the CAA, into its SIP). If a state opts to enact a SIP instead of having the federal government enact a FIP, its regulations will contain a discrete section of regulations that are required by the Clean Air Act, submitted to EPA for approval, and upon approval termed a SIP. This SIP is discrete portion of the state's broader air regulations regarding emissions of pollutants into the air. EPA in this case is not seeking to enforce, and legally cannot enforce, an individual state's air pollution regulations that go beyond the scope of the consistent core of these regulations that are required by the Clean Air Act and termed the SIP.

- 14 -

Detailed provisions specifying what must be included in the SIP are contained in Section 110 of the Act, 42 U.S.C. § 7410, and in regulations codified at 40 C.F.R. Parts 51 and 52. Each SIP must be submitted to EPA for approval. If EPA determines it meets the requirements of the Act, the SIP becomes federally enforceable.[5]

The federally approved and enforceable SIPs of Mississippi, Georgia, Alabama, and Florida incorporate the requirements of the PSD, NSR, and NSPS programs of the Clean Air Act. Mississippi, for example, has incorporated and adopted by reference all of the relevant subsections of 40 C.F.R. § 52.21. Mississippi Dept. of Environmental Quality Regulation APC-S-5(2). The Georgia SIP provides that no person shall construct or operate a facility in such a matter as to fail to comply with "any . . . requirement established for the Prevention of Significant Deterioration pursuant to Part C, Title I, of the Federal Act." Georgia Dept. of Natural Resources Air Quality Control Rule 391-3-1-.02(1), Alabama restates critical PSD provisions verbatim in its SIP, see, e.g., Alabama Dept. of Envt'l Mgt. Code Chapter ("ADEM") Rule 335-3-14.04(2)(b)(1) (definition of "major modification"), and ADEM Rule 355-3-14-.04(2)(a)(1) (definition of "major stationary source"). The Florida SIP recognizes, for example, that a "modification" for purposes of the Florida SIP "includes any change which would be defined as a modification under ... 40 C.F.R. § 52.01." FAC 62-

---

[5] If the SIP is disapproved and the state fails to rectify the problem(s), a Federal Implementation Plan (FIP) may be enacted. 42 U.S.C. § 7410(c).

210.100 (183).

Because the relevant core of air regulations applied as the SIP do not differ based on the geographic location of the plant, it is clear that the claims share common legal issues. "[T]he central purpose of Rule 20 is to promote trial convenience and expedite the resolution of disputes, thereby eliminating unnecessary lawsuits." A.M. Alexander v. Fulton County, 2000 WL 331384, at *9 (11th Cir. 2000). Thus, the Court need not address the issue of whether of SIP is federal law or state law to decide that the common legal issues raised in the claims would be more conveniently and expeditiously decided in a single lawsuit.

Moreover, the weight of judicial precedent on the issue, supports the conclusion that SIPs, because they have received federal approval, are federal law. See Navistar Int'l Transp. Corp. v. EPA, 858 F.2d 282, 284 (6th Cir. 1988) ("Emission limitations pursuant to a SIP are enforceable as federal law"); United States v. Ford Motor Co., 814 F.2d 1099, 1103 (6th Cir. 1987) (holding that a state court consent order invalidating an EPA approved SIP does not preclude federal enforcement of the SIP because "state courts . . . lack the authority to invalidate EPA-approved SIPs"); Union Elec. Co. v. EPA, 515 F.2d 206 (8th Cir. 1975) (aff'd 427 U.S. 246 (1976)) (upon EPA approval, the requirements of a SIP "have the force and effect of federal law"); United States v. General Dynamics Corp., 755 F. Supp. 720 (N.D. Texas 1991) (holding that a state pollution control board's interpretation of a SIP does not control when it is inconsistent

- 16 -

with the Clean Air Act); American Lung Assoc. v. Kean, 670 F. Supp. 1285, 1288 (D.N.J. 1987) ("Once a SIP is approved by the EPA, the state is bound as a matter of federal law to follow its provisions"); United States v. Congoleum Corp., 635 F. Supp. 174 (E.D. Penn. 1986) ("the SIP, after it is adopted by EPA, is federal law" and therefore abstention is not appropriate); see also Steve Novick & Bill Westerfield, Whose SIP is it Anyway? State-Federal Conflict in Clean Air Act Enforcement, 18 Wm. & Mary J. Envtl. L. 245, 247 (1994).

Under circumstances very different from those presented here, courts in a few jurisdictions have suggested that SIPs are state law. The holdings of these cases, however, do not ultimately rely on that conclusion, and these minority decisions are not binding on this Court. United States v. General Motors Corp., 702 F. Supp. 133 (N.D. Texas 1988), for example, questioned EPA's authority to review certain proposed emission control technologies, when it had already approved a SIP explicitly giving the State Administrator discretion to approve or disapprove specific control technologies. EPA sought to review the proposed control technology but had not alleged that emissions at the facility in question exceeded the applicable emission limits. Id. at 137. The Court held that, since EPA had given the State Administrator discretion over the issue, the EPA did not have the authority to demand an opportunity to review each new control. Id. at 138. This holding rests on the authority explicitly granted to the state within the SIP, not on the dicta about the status of the SIP. In United States v.

- 17 -

Riverside Labs., Inc., 678 F. Supp. 1352 (N.D. Ill. 1988), the court determined that it was appropriate to stay a federal enforcement action pending the outcome of action seeking a declaratory judgment regarding interpretation of a SIP in state court. Several aspects of the opinion, however, are problematic: it overstates the holding of the Seventh Circuit case on which it relies and a relevant, contrary district court ruling. Novick & Westerfield, supra, at 253. Furthermore, this minority position conflicts with the cases cited above.

Additionally, challenges to the regulations like those at issue here are made against the federal, not the state, government. Alabama Power knows this fact best. For example, when EPA passed certain PSD regulations in the late 1970's including the definition of "major modification", Alabama Power sued EPA, not the state of Alabama. Alabama Power Co. v. Costle, 636 F.2d 323 (D.C. Cir. 1979).[6]

---

[6] In ruling that EPA could not limit PSD review to modifications that exceeded a 100 or 250 ton threshold, see 42 U.S.C. § 7479(a), id. at 399-400, the court explained how this federal regulation would affect the issues raised in this case:

Implementation of the statute's definition of "modification" will undoubtedly prove inconvenient and costly to affected industries; but the clear language of the statute unavoidably imposes these costs except for de minimis increases. The statutory scheme intends to "grandfather" existing industries; but the provisions concerning modifications indicate that this is not to constitute a perpetual immunity from all standards under the PSD program. If these plants increase pollution, they will generally need a permit. Exceptions to this rule will occur when the increases are de minimis, and when the increases are offset by contemporaneous decreases of pollutants, as we discuss below. These two exceptions, we believe, will allow for improvement of plants, technological changes, and replacement of depreciated capital stock, without imposing a

Finally, it is worth noting that many common affirmative defenses might be raised by all of the defendants.  Of the twenty affirmative defenses raised by Georgia Power, few are unique to the claims against it.  To the extent that other defendants decide to raise similar defenses, such as fair notice, waiver, estoppel, laches, and unclean hands, <u>see</u> Answer of Georgia Power, at 32-34, it would be reasonable and desirable to have these issues resolved in a single court.

Inconsistent decisions in multiple courts on the Clean Air Act issues raised in this case would create uncertainties for the state agencies charged with implementing the PSD programs, and cause chaos by creating disparities between legal standards applied to the regulated entities within a single holding company.  Such a result is neither desirable nor necessary.

III. <u>Amendment of the Complaint would not Prejudice Defendants</u>

Defendants argue that the United States' Motion for Leave to Amend its Complaint should be denied because it would unduly prejudice their interests.  However, the only source of potential prejudice they can identify is an increase in the complexity of the case, which is insufficient to establish "undue" prejudice.  The addition of allegations of violations at five new plants increases the number of defendants and claims for relief, but because the similarities of the claims are so great, amendment of the Complaint will not substantially change the complexity of the case.

---

completely disabling administrative and regulatory burden.

In order for a Motion for Leave to Amend to be denied on the basis of prejudice, the prejudice must be "undue". Foman v. Davis, 371 U.S. 178, 182 (1962); see also Loggerhead Turtle v. County Council of Volusia County, 148 F.3d 1231, 1257 (11th Cir. 1998) (cert. denied 119 S. Ct. 1488 (199)) (rejecting court's reliance on prejudice to deny motion for leave to dismiss when the only purported prejudice was some additional expense and purported delay). Concerns of such "undue prejudice" arise, for example, when a motion for leave to amend is filed after the close of discovery and all dispositive motions have been filed. See, e.g., Campbell v. Emory Clinic, 166 F.3d 1157, 1162 (11th Cir. 1999); Technical Resource Servs. Inc. v. Dornier Med. Sys., Inc., 134 F.3d 1458, 1163 (11th Cir. 1998). Prejudice in such circumstances may be extreme because one party has structured their case, conducted discovery, and argued substantive motions under a theory of the case which the other party now seeks to change. To allow amendment in such cases could, for example, greatly increase litigating costs, demand reopening of discovery, and require that new motions to be filed.

No such "undue" prejudice is present in this case where no discovery has been taken, substantive motions other than those addressing jurisdiction and venue issues have not been filed, and a preliminary planning report identifying the potential for amendment has been filed. Defendants' only argument is that amendment would make the matter more complex. Any concerns that the complexity of the case could bias the result are not present

here where the Court, not a jury, is the fact-finder.  Thus, the is
not faced with any concerns similar to those noted in Grayson v. K-
Mart Corp., 849 F. Supp. 785, 790 (N.D. Ga. 1994) (noting the
Court's concern that joinder of several individual plaintiffs'
unrelated employment discrimination claims against a single
defendant might prejudice the defendant because "one or two
plaintiffs' unique circumstances could bias the jury against the
defendant generally.")

Defendants' only argument regarding prejudice thus is that the
addition of new plants and defendants to the case will make it
unwieldy.  Although amendment of the Complaint would increase the
number of parties and add allegations of CAA violations at five
additional plants, the similarities between the claims are so great
that much of the required discovery and testimony will overlap.
The same basic questions such as the interpretation of the "routine
repair and maintenance" exception will have to be decided by the
Court regardless of whether there is one underlying alleged
violation or twenty-two. Disputes are unlikely to arise over basic
issues such as the timing and nature of a certain economizer
replacement.  Instead, the factual disputes are likely to pertain
to factual issues common to all Southern operating companies, such
as, whether the plant modifications were part of a coordinated
Southern Company "life extension" project, and whether the
affiliates decided jointly that they were not going to apply for
PSD permits for life extension projects.  As discussed above,
resolving the claims against each of the affiliates will require

- 21 -

the testimony of the same witnesses: boiler and industry experts, engineering and environmental compliance staff from SCS, corporate officers of SCS and the affiliates, and EPA engineers. The total number of defense witnesses would be increased by the amendment; however, the burden of conducting the additional discovery associated with that increase would fall on the United States, not the defendants.[7] Thus, amendment of the Complaint will neither make the case unwieldy nor result in any "undue prejudice" to the defendants.

In contrast, a denial of the United States' Motion for Leave to Amend would greatly prejudice the United States and make it difficult, if not impossible, for the United States to obtain the relief it seeks. As discussed in the Reply to Alabama Power, at 3-5, Georgia Power, Alabama Power, Gulf Power, Mississippi Power, and Savannah Power are all part of the "Southern Company electric system." This system aims to reduce costs by ensuring that as additional generating capacity is needed, it is added by the next lowest cost generating facility, regardless of which affiliate owns that facility. Id. Should the Court deny the United States' Motion to Amend, the United States could potentially obtain inconsistent rulings on whether conducting a particular type of modification without adding pollution control technology

---

[7]Although the addition of new parties may add to the total number of defense witnesses the United States will depose, it is difficult to see how this might change (except possibly to decrease) the number of individuals in each individual defendant corporation likely to be deposed, or the total number of government witnesses likely to be deposed by each defendant.

- 22 -

constitutes a violation of the Clean Air Act. For example, if the Georgia Court holds that economizer replacement constitutes a "major modification" but the Alabama or Mississippi or Florida Court determines it is not, the Southern system, via its coordinating agent SCS, will simply encourage the companies which are not required to install emissions controls to step up their generation. For this reason, the practical impact of a Georgia decision that additional emissions controls were required could be nullified by a contrary decision in an Alabama, Florida, or Mississippi court. In order for any judicial order issued in this case to be effective, therefore, it must be applicable to all Southern affiliates.

The issue of potential prejudice therefore is an issue that is primarily applicable to the United States. Defendants have not shown that amendment of the Complaint would have any "undue" prejudice on them, and thus the motion to amend cannot be denied on this basis.

IV. <u>Questions of Jurisdiction over Mississippi Power and Gulf Power are not Before this Court</u>

Defendants also argue that amendment of the complaint would be futile because it would be improper for the Court to assert jurisdiction over two Proposed Defendants -- Mississippi Power and Gulf Power. The United States has previously responded to the joinder arguments in its Reply to Alabama Power. The issue of whether this Court has jurisdiction over Mississippi Power and Gulf Power is not before this Court, and in any event the evidence submitted by the United States to establish this Court's authority

- 23 -

to exercise jurisdiction over Alabama Power suggests that jurisdiction over the proposed defendants would also be proper.

Questions of personal jurisdiction over a corporation cannot be decided without an analysis of that corporation's contacts with the forum state. See, e.g., In re Chase & Sanborn Corp., 835 F.2d 1341 (11th Cir. 1988) (rev'd on other grounds sub nom Grandfinanciera, S.A. v. Nordberg, 492 U.S. 33 (1989)) (recognizing that the minimum contacts prong of the due process analysis is a fact intensive inquiry which must not be mechanical). In this instance, however, defendants appear to suggest that their operations are so similar that the Court's analysis of whether the exercise of personal jurisdiction is proper over Alabama Power will shed light on whether jurisdiction is proper over Gulf Power and Mississippi Power.

The United States has already submitted evidence to this Court sufficient to establish that it may exercise jurisdiction over Alabama Power consistent with due process. Certain documents the United States submitted to along with that brief also serve to establish that jurisdiction over the proposed defendants would be proper. For example, the Southern Company 10-k (Exhibit A to United States' Response to Alabama Power's Motion to Dismiss for Lack of Personal Jurisdiction and Venue) acknowledges that Gulf Power was admitted to do business in Georgia on November 20, 1984. This establishes that Gulf Power has purposefully availed itself of the benefits and protections of Georgia Law such that it could have reasonably anticipated being haled into Court in the state of

Georgia.  See, e.g., Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473-74 (1985).

However, the United States has not yet had an opportunity to conduct discovery regarding the contacts of any Southern affiliates with the State of Georgia.[8]  It is for this reason that the United States has requested in its Response to Alabama Power's Motion to Dismiss that it be given an opportunity to conduct discovery into this issue should the Court find it has not provided sufficient evidence of those contacts.

The United States suggests, therefore, that it would be reasonable and appropriate for the Court to grant the Motion for Leave to Amend prior to considering the jurisdictional issues raised in Alabama Power's Motion to Dismiss.  If Gulf Power and Mississippi Power intend to raise jurisdictional arguments, as defendants' brief suggests they might, they will have an opportunity to do so and discovery and briefing of all jurisdictional issues may proceed in an orderly fashion.

CONCLUSION

For the aforementioned reasons, the United States respectfully requests that the Court grant its Motion for Leave to Amend the Complaint before considering the Motions to Dismiss filed by Alabama Power and Southern Company Services, Inc.

------------------------------

[8]Although the United States Environmental Protection Agency has received documents from the defendants through administrative information requests, these documents relate to plant construction and modification plans and emissions, not the affiliates' contacts with a particular state.

Respectfully submitted,

LOIS J. SCHIFFER
Assistant Attorney General
Environment and Natural
  Resources Division
U.S. Department of Justice

JON A. MUELLER
Senior Attorney
SONJA L. PETERSEN
Trial Attorney
Environmental Enforcement
  Section
Environment and Natural
  Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
(202) 514-0056

RICHARD H. DEANE, JR.
United States Attorney
for the Northern District of
Georgia

By: _____
DANIEL A. CALDWELL
Assistant United States Attorney
Georgia Bar No. 102510
1800 United States Courthouse
75 Spring Street, S.W.
Atlanta, Georgia  30335
(404) 581-6224

**3**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

APR 1 3 2001

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

UNITED STATES OF AMERICA,       )
                                )
        Plaintiff,              )
                                )        CIVIL ACTION FILE
v.                              )
                                )        NO. 1:99-CV-2859
ALABAMA POWER COMPANY,          )
GEORGIA POWER COMPANY,          )        Judge Julie E. Carnes
SOUTHERN COMPANY SERVICES,      )
INC., subsidiaries of the       )
Southern Company,               )
                                )
        Defendants.             )

GEORGIA POWER COMPANY'S
MOTION TO STAY DISCOVERY

COMES NOW DEFENDANT GEORGIA POWER COMPANY ("Georgia Power")
and respectfully moves this Court for an Order staying discovery[1]
pending a decision from the United States Court of Appeals for
the Eleventh Circuit in *Tennessee Valley Authority, et al. v.
United States Environmental Protection Agency, et al.*, an appeal
which involves virtually the exact same legal issues raised by
the Complaint and the Answer filed in this case.  Staying
discovery in this case until such time as the Eleventh Circuit
rules will promote judicial efficiency and economy and cause no

_____

[1]  Alternatively, the Court could place the case on
administrative leave pending resolution of appellate issues.

prejudice to anyone.  In support of its motion, Georgia Power shows the Court as follows:

1.  On November 3, 1999, the United States Government filed this complaint against Georgia Power as part of a nationwide enforcement initiative by EPA, in which the Government filed seven separate, but virtually identical, actions against electric utilities in federal district courts across the country.  In all of these complaints, the Government alleges that certain maintenance, repair, and replacement projects undertaken by the utility companies at their plants over the last twenty-five years violated the CAA .  The Government now asserts these activities constituted "modifications" under the CAA, supposedly caused emissions increases, and thus violated the CAA.

2.  On the same day these complaints were filed, EPA issued an Administrative Compliance Order ("ACO") to the Tennessee Valley Authority ("TVA") finding that maintenance projects performed by TVA at fourteen units at nine of its power plants between 1983 and 1996 violated the same CAA provisions referenced in the complaints. The ACO required TVA to take immediate steps towards retrofitting costly pollution controls at its power plants.  Despite protracted discussions with TVA over the next six months, the Government refused to withdraw the ACO as TVA requested.

3.    On May 4, 2000, three petitions for review of the ACO
were filed in the Eleventh Circuit by TVA, Alabama Power Company
along with Duke Energy Corporation, and the Tennessee Valley
Public Power Association.  *Tennessee Valley Authority, et al. v.
United States Environmental Protection Agency, et al.*,
consolidated under lead docket No. 00-12310-E. Georgia Power
moved to intervene in the petitions, and the Eleventh Circuit
granted it intervention in the petition filed by TVA.   Four more
petitions for review were filed in November 2000 appealing an
order entered by an Environmental Appeals Board which upheld all
aspects of the ACO that EPA had chosen to defend.   All seven
petitions have been consolidated under lead docket No. 00-12310-
E, and briefing is completed.   The petitioners anticipate that
the Eleventh Circuit will set a date for oral argument soon.

4.    Both before and after the petitions were filed in the
Eleventh Circuit, EPA insisted on TVA immediately complying with
the ACO and repeatedly refused to withdraw it.   After seeking and
obtaining from EPA no relief from this unsubstantiated and
onerous order, TVA filed a motion asking the Eleventh Circuit to
stay the ACO and to relieve it of any compliance obligations it
might have thereunder.   Finding a substantial likelihood that TVA
would prevail on the merits, the Eleventh Circuit stayed the ACO
pending its final decision.

5.   Among other things, TVA, Georgia Power, and the other
petitioners maintain in their Eleventh Circuit petitions and
briefs that the actions EPA complains of – power plant
maintenance, repair, and replacement projects performed by TVA
over the past twenty years – do not constitute "modifications"
that require new source permitting under the CAA.  *See* 42 U.S.C.
§ 7475(a)(1).  Instead, these activities constitute the sort of
"routine maintenance, repair and replacements" that EPA has
expressly excluded by regulation from the CAA's permitting
requirements and/or they did not result in an emissions increase
as required by the CAA.  EPA's Order to TVA and the Government's
Complaint against Georgia Power directly contradict CAA
regulations, EPA's past pronouncements, and decades of utility
industry practice.

6.   On January 12, 2001, the Government refiled its
complaint against Alabama Power in the United States District
Court for the Northern District of Alabama.  *United States of
America v. Alabama Power Company*, Civil Action File No. 01-B-
0152-S.  In its complaint, the Government reasserted the same
allegations which it had attempted to bring against Alabama Power
in this case.  On March 20, 2001, Alabama Power answered the
complaint and moved for a stay of discovery pending a ruling by
the Eleventh Circuit on these same petitions.

- 4 -

7.    The case before this Court will be significantly influenced by the Eleventh Circuit's decision in *Tennessee Valley Authority v. USEPA* because:   (a) the claims and defenses before the Eleventh Circuit are strikingly similar, and in some instances identical, to those presented here; (b) a decision in *Tennessee Valley Authority v. USEPA* likely will guide this Court's interpretation of the critical statutory and regulatory terms at issue; and (c) discovery, motion practice, and the ultimate resolution of this case will be significantly influenced by, and perhaps controlled by, the Eleventh Circuit's decision.

8.    Discovery in this case will be extraordinarily extensive and expensive and will consume an inordinate amount of the parties' time and resources, as well as this Court's attention.   Staying discovery until the Eleventh Circuit rules will avoid potentially unnecessary discovery and prevent wasting the parties' and the Court's resources.

9.    The Government will suffer no prejudice as a result of a stay.

10.   Georgia Power has consulted with attorneys representing the Government regarding this motion to stay discovery.   The Government has withheld its consent to the motion.

WHEREFORE, for all of these reasons set forth above and in Georgia Power's Memorandum in support filed herewith, defendant Georgia Power Company respectfully requests the Court enter an

Order staying discovery in this action and granting such other

relief to which Georgia Power Company may be entitled.

This 13th day of April, 2001.

Respectfully submitted,

TROUTMAN SANDERS LLP

DANIEL S. REINHARDT
Georgia Bar No. 600350
MARGARET C. CAMPBELL
Georgia Bar. No. 126340
MARSHALL B. DUKES
Georgia Bar No. 232510

5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
Telephone: (404) 885-3000
Telecopy:  (404) 885-3995

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,           )
                                    )
     Plaintiff,                     )
                                    )          CIVIL ACTION FILE
v.                                  )
                                    )          NO. 1:99-CV-2859
ALABAMA POWER COMPANY,              )
GEORGIA POWER COMPANY,              )          Judge Julie E. Carnes
SOUTHERN COMPANY SERVICES,          )
INC., subsidiaries of the           )
Southern Company                    )
                                    )
     Defendants.                    )

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing *Georgia Power Company's Motion To Stay Discovery* was served upon each of the following:

### Via U.S. Mail:

Jeffrey M. Gleason, Esq.            S. Wesley Woolf, Esq.
Southern Environmental Law Ctr.     Southern Environmental Law Ctr.
201 W. Main St. - Suite 14          127 Peachtree St. - Suite 605
Charlottesville, VA  22902          Atlanta, GA  30303-1800

### Via Telecopy and U.S. Mail:

Jon A. Mueller, Esq.                Daniel Caldwell, Esq. - AUSA
Sonja L. Petersen, Esq.             U.S. Attorney's Office
Environmental Enforcement Sect.     Northern District of Georgia
Environmental & Natural             1800 U.S. Courthouse
Resources Division                  75 Spring Street, S.W.
U.S. Department of Justice          Atlanta, GA  30335
P. O. Box 7611
Washington, D.C. 20004-7611

This ___ day of April, 2001.

_Marshall B. Dukes_
MARSHALL B. DUKES

- 7 -

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

APR 1 3 2001

LUTHER D. THOMAS, Clerk
By:
_____ Deputy Clerk

UNITED STATES OF AMERICA,          )
                                   )
        Plaintiff,                 )
                                   )          CIVIL ACTION FILE
v.                                 )
                                   )          NO. 1:99-CV-2859
ALABAMA POWER COMPANY,             )
GEORGIA POWER COMPANY,             )  ·       Judge Julie E. Carnes
SOUTHERN COMPANY SERVICES,         )
INC., subsidiaries of the          )
Southern Company,                  )
                                   )
        Defendants.                )


### GEORGIA POWER COMPANY'S MEMORANDUM OF LAW
### IN SUPPORT OF ITS MOTION TO STAY DISCOVERY

COMES NOW DEFENDANT GEORGIA POWER COMPANY ("Georgia
Power") and respectfully submits this memorandum of law in
support of its motion to stay discovery pending a decision from
the United States Court of Appeals for the Eleventh Circuit in
*Tennessee Valley Authority, et al. v. United States Environmental
Protection Agency, et al.*

### BACKGROUND

#### A.   *EPA's Enforcement Initiative*

The United States Government began this action against
Georgia Power on November 3, 1999, as part of a nationwide
enforcement initiative by the Environmental Protection Agency.
Simultaneously with filing this action, the Government filed six

other, virtually identical cases against electric utilities across the country.[1]  In addition, the Government also issued an Administrative Compliance Order ("ACO") to Tennessee Valley Authority ("TVA") in which it alleged that TVA had committed similar violations of the Clean Air Act ("CAA") at fourteen units at nine of its plants. (A copy of the ACO and all six amendments thereto are attached as Exhibit 1.)

In all of these enforcement proceedings, including the present case, the Government alleges that certain maintenance, repair, and replacement projects undertaken by these utility companies at their plants over the last twenty-five years

---

[1] *See United States v. American Electric Power, et al.*, 99CV1182 (S.D. Ohio); *United States v. Cinergy, et al.*, 99CV1693 (S.D. Ind.); *United States v. Illinois Power Company, et al.*, 99CV833 (S.D. Ill.); *United States v. Ohio Edison Company, et al.*, 99CV1181 (S.D. Ohio); *United States v. Southern Indiana Gas and Electric Company, et al.*, 99CV1692 (S.D. Ind.); *United States v. Tampa Electric Company*, 99-2524 Civ-T-23F (M.D. Fla.).  EPA also issued Notices of Violation to Duke Energy Corporation ("Duke") and five other electric utilities: Dayton Power & Light, Virginia Electric Power Company, Mississippi Power Company, Savannah Electric & Power Company, and Gulf Power Company, and subsequently sued Duke. Finally, EPA has issued demands for information under the CAA to numerous additional electric utility companies:  Alabama Electric Cooperative, Allegheny Energy, Arizona Electric Co-Op, Arizona Public Service Company, Baltimore Gas & Electric Company, Carolina Power & Light Company, Consumers Energy, Conectiv, Detroit Edison, East Kentucky Electric Cooperative, Florida Power Corporation, Gainesville Electric, Jacksonville Electric Authority, LG&E Energy Corporation, Minnkota Electric Cooperative, Nevada Power, NIPSCo, Owensboro Municipal Utilities,  Orlando Utilities, Public Service Electric & Gas Company, Salt River Project, Santee Cooper, Seminole Electric and South Carolina Electric & Gas Company.

violated the CAA because they constituted "modifications" which
supposedly caused emissions increases.  For example, in its
Complaint against Georgia Power, the Government alleges that the
replacement of an economizer at Plant Bowen in 1992 constituted a
"modification."[2]  Amended Complaint at ¶ 161.  In all of the
district court cases, the Government is seeking large monetary
penalties of up to $27,5000 per day per violation and injunctive
relief requiring the utility companies to install extremely
expensive pollution control equipment. *See, e.g.,* Amended
Complaint at Prayer for Relief.   Similarly, the ACO required TVA
to take immediate steps towards retrofitting costly pollution
controls at its power plants. ACO at 18.

On December 28, 1999, Georgia Power answered the
Government's Complaint.  In its answer, Georgia Power asserted
twenty-one defenses, including that the Government's claims were
barred by the statute of limitations (Second Defense) and by the
Government's failure to provide fair notice as guaranteed by the
due process and equal protection clauses of the United States
Constitution (Eighth Defense); that the Government's prosecution
and enforcement of these claims were arbitrary and capricious

---

[2] A "modification" is "any physical change in, or change in
the method of operation of, a stationary source with increases
the amount of any air pollutant emitted by such source or which
results in the emission of any air pollutant not previously
emitted."  42 U.S.C. § 7411(a)(4).

(Nineteenth Defense); and that the Government was impermissibly attempting to create new law through enforcement rather than following required legislative procedures.   (Introduction, Sixteenth, Eighteenth, and Twenty-first Defenses).

Continuing its enforcement initiative, the Government refiled its complaint against Alabama Power in the United States District Court for the Northern District of Alabama on January 12, 2001, after this Court dismissed Alabama Power from this case for lack of personal jurisdiction.  *United States of America v. Alabama Power Company*, Civil Action File No. 01-B-0152-S.  In its latest complaint, the Government reasserted the same allegations which it had attempted to bring against Alabama Power in this case, including the replacement of economizers at Plants Barry and Gorgas.  On March 20, 2001, Alabama Power answered the complaint, asserted many of the same defenses that Georgia Power asserted in this action, and moved for a stay of discovery pending a ruling by the Eleventh Circuit regarding these same petitions.

## B.   *Eleventh Circuit Proceedings*

On May 4, 2000, three petitions for review of the ACO were filed by TVA, Alabama Power Company along with Duke Energy Corporation, and the Tennessee Valley Public Power Association in the Eleventh Circuit.  *Tennessee Valley Authority, et al. v. United States Environmental Protection Agency, et al.,*

consolidated under lead docket No. 00-12310-E. Georgia Power moved to intervene in the petitions, and the Eleventh Circuit granted it intervention in the original petition filed by TVA. Four more petitions for review were filed in November 2000 appealing an order entered by an Environmental Appeals Board which upheld all aspects of the ACO that EPA had chosen to defend.  All seven petitions have been consolidated under lead docket No. 00-12310-E.[3]

The legal issues raised by the seven petitions duplicate many of the legal issues raised by the Complaint and Answer in this case.  Among other arguments, TVA, Georgia Power, and the other petitioners maintain in their Eleventh Circuit petitions and briefs that the actions complained of in the ACO – power plant maintenance, repair, and replacement projects performed by TVA over the past twenty years – do not constitute "modifications" that require new source permitting under the CAA. See 42 U.S.C. § 7475(a)(1).  Instead, these activities constitute the sort of "routine maintenance, repair and replacements" that EPA has expressly excluded by regulation from the CAA's

_____

[3] Both before and after the petitions were filed in the Eleventh Circuit, EPA insisted on TVA immediately complying with the ACO and refused to withdraw it despite repeated requests from TVA.  After obtaining no relief from EPA, TVA filed a motion asking the Eleventh Circuit to stay the ACO and to relieve it of any compliance obligations it might have thereunder.  Finding a substantial likelihood that TVA would prevail on the merits, the Eleventh Circuit stayed the ACO pending its final decision.

permitting requirements.[4]  The petitioners argue that EPA's ACO to TVA (like the Government's Complaint against Georgia Power) directly contradicts these CAA regulations, EPA's past pronouncements, and decades of utility industry practice and thus are arbitrary, capricious, and contrary to law.

By way of further example, TVA also argues that TVA cannot be held liable for any violations under the CAA because TVA did not have fair notice of EPA's revised interpretation of "routine." (A copy of the Statement of Issues and Table of Contents from TVA's opening brief is attached as Exhibit 2.)[5] Other legal issues before the Eleventh Circuit include whether EPA's findings that the TVA projects were "modifications" under the CAA constitute reasoned decision-making when the record did not establish that the projects "resulted in" a "significant net emissions increase;" how one determines a project "results in" an emissions increase; and what is the proper method for accounting for an emissions increase, including what the appropriate starting and stopping points in time are for measuring an

_____

[4] Since 1974, EPA's own regulations have encouraged the electric power industry to make "physical [and] operational changes that increase efficiency or reliability or lower operating costs." EPA, "Requirements for Preparation, Adoption and Submittal of Implementation Plans," 57 *Fed. Reg.* 32327 (July 21, 1992).

[5] Georgia Power will provide the Court with a copy of this brief, or any of the others which it mentions, if the Court would like to see them.

emissions increase and whether actual, potential, or projected
emissions levels should be used to determine *post hoc* emissions
increases.   (A copy of the Statement of Issues and Table of
Contents from Georgia Power's brief and Duke Energy's brief are
attached as Exhibits 3 & 4.)   Alabama Power discussed whether
EPA changed its interpretation of the term "modification;"
whether EPA failed to provide "fair notice" of this new
interpretation; and whether EPA failed to follow rule-making
procedures before changing its regulatory requirements concerning
when maintenance, repair or replacement projects triggered CAA
permitting requirements. (Copies of the Statement of Issues and
Table of Contents from Alabama Power's briefs are attached as
Exhibit 5.)

These issues, and more, were thoroughly briefed in the
Eleventh Circuit.  In fact, over 1,000 pages of briefing were
submitted to that Court, including EPA's briefs, which had a
combined length of 350 pages, and two amici briefs.  Briefing is
now complete, and Georgia Power anticipates that the Eleventh
Circuit will set a date for oral argument in the near future.

## ARGUMENT AND CITATION TO AUTHORITY

**I.  DISCOVERY SHOULD BE STAYED BECAUSE OF THE IDENTITY OF LEGAL
ISSUES BETWEEN THIS CASE AND THE ELEVENTH CIRCUIT APPEALS.**

District courts have broad discretion in matters concerning
the control of their dockets and calendars and the unquestionable

authority to enter stays. *Landis v. North American Co.*, 299 U.S. 248, 254 (1936). "The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Id.* In ruling on a motion to stay, "[c]ourts must consider the time and effort of counsel and the litigants with a view toward a policy of avoiding piecemeal litigation." *Stadler v. Grossberg*, 882 F. Supp. 1524, 1527 (E.D. Pa. 1995) (citing *Landis*).

Courts have found it particularly appropriate to exercise their discretion to stay a case when a higher court is considering an important issue of law bearing on the action. *See, e.g., Leyva v. Certified Grocers of California, Ltd.*, 593 F.2d 857, 864 (9th Cir. 1979) (stating that "[a] trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it pending resolution of independent proceedings which bear upon the case"); *Marshel v. AFW Fabric Corp.*, 552 F.2d 471, 472 (2d Cir. 1977) (*per curiam*) (instructing district court to stay further proceedings pending Supreme Court's decision in a related case which was likely to determine the question of liability for damages); *Goldstein v. Time Warner New York City Cable Group*, 3 F. Supp. 2d 423, 439 (S.D.N.Y. 1998) (staying district court action pending D.C. Circuit decision on the

grounds that "resolution of that appeal should guide this Court in ruling on one of the key issues in this litigation"); *Stadler v. McCullough*, 882 F. Supp. 1524, 1527-28 (E.D. Pa. 1995) (finding "it more sensible to await the Third Circuit's decision and proceed accordingly, rather than charging forward, possibly to trial, knowing that we may be compelled to return to this point and begin anew"); *In re Literary Works in Electronic Databases Copyright Litigation*, 2001 WL 204212, at * 2 (S.D.N.Y. March 1, 2001) (agreeing that "[a] court may properly exercise this power [to stay] when a higher court is close to settling an important issue of law bearing on the action"); *Marbury v. Colonial Mortgage Co.*, 2001 WL 135719, No. 98-D-355-N, at *9 (M.D. Ala. Jan. 12, 2001) (holding "that the just and appropriate course of action" was to stay the case pending resolution of appeals in the Eleventh Circuit because those "decisions should provide guidance as to the legal test to apply . . . and as to the appropriate treatment of class motions"); *KK Motors, Inc. v. Brunswick Corp.,* 1999 WL 246808, No. 98-2307 (JRT/RLE), at *2 (D. Minn. Feb. 23, 1999) (granting stay of merits discovery in class action lawsuit pending ruling by Eighth Circuit that would very likely "narrow the issues in the pending case and assist in the determination of questions of law involved"). "This rule [permitting a trial court to stay a case pending resolution of independent proceedings which bear upon the case] . . . does not

require that the issues in such proceedings are necessarily
controlling of the action before the court." *Leyva*, 593 F.2d at
863-64 (citing *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342
U.S. 180 (1952); *Landis*, 299 U.S. at 254-44).

This case is just such a case in which staying discovery
pending a ruling by a higher court is "the just and appropriate
course of action." A decision either way on any of the issues by
the Eleventh Circuit in *Tennessee Valley Authority v. USEPA* will
in all likelihood greatly influence the course and outcome of
this case. As shown above, the claims and defenses before the
Eleventh Circuit are strikingly similar, and in some instances
identical, to those presented here. For example, one of the main
arguments pressed before the Eleventh Circuit is that EPA is
seeking to retroactively enforce against TVA a new interpretation
of the "modification" rule and the "routine maintenance, repair
and replacement" exclusion without providing the "fair notice"
required by law. For the last twenty-five years, Georgia Power
and all other electric utilities in the United States, including
TVA, have routinely performed this kind of repair, replacement,
and maintenance projects needed to keep their units operating
without obtaining new CAA permits.[6] A finding by the Eleventh

---

[6] It generally takes at least 12 to 24 months to obtain a
new source permit. Such permits require the retrofit
construction of the latest pollution control technology
available, which requires additional time and resources.

Circuit that EPA's action are an attempt to retroactively apply a new regulatory regime without "fair notice" and thus violative of the Administrative Procedure Act would dispose of EPA's claims against Georgia Power and end this case.  Other overlapping issues include, but are not limited to, whether the EPA's changed interpretation is arbitrary, capricious, and contrary to law; what is the proper manner in which to measure an emissions increase; and what evidence is necessary to prove the "modification" *resulted in* an emissions increase.  Thus, the Eleventh Circuit's formulation of the law to be applied to this case will in all likelihood set the agenda for discovery, motion practice, and the trial itself.  "Such a potentiality properly cautions restraint,"  *KK Motors, Inc.*, 1999 WL 246808 at *2, and supports staying discovery in the case until the Eleventh Circuit rules.

## II.  DISCOVERY SHOULD BE STAYED TO PREVENT WASTING THE PARTIES' AND THE COURT'S VALUABLE AND LIMITED RESOURCES.

Other factors that courts have considered when deciding whether to grant a stay include:  1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; 2) the private interests of and burden on defendants; 3) the interests of the courts; 4) the interests of persons not parties to the litigation; and 5) the public interest.  *See, e.g., KK*

*Motors, Inc.*, 1999 WL 246808, at *1-2; *In re: Literary Works*, 2001 WL 204212, at *2.   Each of these factors also counsels in favor of granting a stay in this proceeding.

### A.   Plaintiffs Here Are Parties to the Eleventh Circuit Proceedings and Will Suffer No Prejudice by a Stay.

Plaintiffs here have no great interest in having this case proceed while the Eleventh Circuit is considering controlling legal issues, and they will suffer no prejudice by the stay.   The Government is a party to the Eleventh Circuit appeal proceedings, and it thoroughly briefed its positions on these overlapping merits issues.   Thus, this case is not one in which this court would be "caus[ing] one litigant in a case to 'stand aside while a litigant in another settles the rule of law that defines the rights of both.'"   *In re: Literary Works*, 2001 WL 204212, at *2. Rather, the Government is a party to both proceedings and has had a full and fair opportunity to represent its interests.

Furthermore, plaintiffs will benefit as much as Georgia Power will by preventing wasteful merits discovery and additional duplicative merits briefing.   Any ruling by the Eleventh Circuit on these merits issues will affect which, if any, of the issues are the proper subjects of discovery and which, if any, the parties will need to brief in this Court.   Thus, it would be "more sensible to await the [Eleventh] Circuit's decision and proceed accordingly, rather than charging forward, possibly to

trial, knowing that we may be compelled to return to this point and begin anew." *Stadler*, 882 F. Supp. at 1527-28; *see also Florida Farmworkers Council, Inc. v. Marshall*, 710 F.2d 721, 726 (11th Cir. 1983) (acknowledging stay of D.C. district court case entered by D.C. Circuit by quoting, "Because action by the Eleventh Circuit may be dispositive of both the claims [in this case], we hereby instruct the District Court to stay further action . . . pending decision by the Eleventh Circuit").

**B.  The Burden on Georgia Power of Proceeding Under These Circumstances is Extreme and Unjustified.**

Discovery in this case will be extraordinarily extensive and expensive and will consume an inordinate amount of Georgia Power's time and resources, especially in light of the Government's claims of decades old violations.  Georgia Power and its attorneys already have spent hundreds of hours interviewing employees and traveling to plants and document storage facilities, simply trying to locate and collect documents potentially responsive to the Government's First Set of Document Requests.[7]   Needless to say, this process has been

---

[7] The Government's First Set asks for documents regarding only Plants Bowen and Scherer, the two plants named in the Complaint.  The Government, however, also has served upon Georgia Power a Second Set of Request for Production of Documents which contains over eighty separate requests and which requests documents regarding "modifications" (as the Government has defined that term) at ALL of Georgia Power coal-fired plants for the last twenty-four years.  It is inconceivable how expensive and time-consuming responding to those requests will be if

-13-

extraordinarily disruptive on Georgia Power's ability to conduct

it operations.  Staying discovery until the Eleventh Circuit

rules and better defines the issues could potentially reduce or

avoid entirely the burden of responding unnecessarily to massive

discovery requests and the accompanying disruption on Georgia

Power's business.  *See Stadler*, 882 F. Supp. at 1527 (holding

that "[i]f the action were to progress, the Third Circuit's

ruling might cause the parties to retrace a number of their

---

Georgia Power is required to do so.  Georgia Power has already
notified the Government that it objects to these requests and
intends to fight having to respond to them if the Government
refuses to make them more reasonable.  (A copy of Georgia Power's
February 27, 2001 Letter to the Government is attached hereto as
Exhibit 6.)

Similarly, in another one of the cases filed by the
Government in November 1999, American Electric Power has spent
in excess of $1.25 million collecting, organizing, reviewing and
producing its own documents.  *See United States v. American
Electric Power*, et al., 99CV1182 (S.D. Ohio) Memorandum of the
AEP Companies at 10 (filed February 9, 2001) (AEP has "expended
between one and a quarter and one and a half million dollars for
services external to [AEP], in addition to incurring huge
internal costs; the AEP Companies have had at least twenty people
solely engaged in the tasks required to respond to Plaintiffs'
document requests . . . the AEP Companies have reviewed tens of
millions of pages of documents; and the AEP Companies have
furnished in excess of twenty-five hundred boxes of documents to
Plaintiffs . . . .").

In addition, other discovery battles regarding the
Government's refusal to produce documents from certain EPA
regions and documents regarding industries other than the coal-
fired electric utility industry, as well as the Government's
privilege logs and assertions of the deliberative process
privilege, have occurred in these other cases.  Georgia Power
expects that similar disputes will arise in this case.

steps, and could render meaningless much of the work completed in the interim").

### C. Staying This Case Will Conserve Valuable Judicial Resources.

Judicial efficiency counsels in favor of staying discovery with regard to all issues.  The parties here have not briefed any of these issues for this Court, and yet extensive briefing on many of the issues has been submitted to the Eleventh Circuit. *See Goldstein*, 3 F. Supp. 2d at 438 (staying case pending resolution of "substantial questions of first impression" which had already been briefed before the D.C. Circuit).  Furthermore, piecemeal resolution of this litigation would not be an efficient use of the Court's and the parties' resources and should be avoided.  *Stadler*, 882 F. Supp. at 1527 (citing *Landis*, 299 U.S. at 254);  *Goldstein*, 3 F. Supp. 2d at 439.

Additionally, awaiting the Eleventh Circuit's decision will likely reduce or eliminate many of the discovery disputes which are likely to occur in this case and which would consume a significant amount of this Court's time and attention.  Georgia Power anticipates that the Eleventh Circuit will narrow and better define the issues in this case which in turn will determine proper subjects for discovery.  *See Leyva*, 593 F.2d at 864 (holding that "[i]t would waste judicial resources and be burdensome upon the parties if the district court in a case such

as this were mandated to permit discovery, and upon completion of
pretrial proceedings, to take evidence and determine the merits
of the case at the same time as the arbitrator is going through a
substantially parallel process").

**D.   Staying This Case is in the Public's Best Interest.**

As shown above, litigating these issues has already consumed
a great deal of the Government's time and resources.   The
Government has spent significant time and money arguing the legal
issues before the Eleventh Circuit - from both sides.[8]   Requiring
the parties to proceed in this case while the Eleventh Circuit is
considering these issues would be a further and unnecessary drain
on taxpayers.   Furthermore, the violations the Government has
alleged occurred at least nine years ago and as many as twenty-
three.   Staying this case pending a decision by the Eleventh
Circuit will not result in any significant harm, especially in
light of the fact that Georgia Power's coal-fired plants emit far
fewer pollutants per unit of energy produced now than they did
twenty years ago.   Additionally, amici briefs have been filed in
the Eleventh Circuit by the American Chemistry Council, the
American Forest and Paper Association, the Clean Air
Implementation Project, and the Southern Alliance for a Clean

---

[8] As this Court is aware, TVA is a governmental entity.

Energy, an environmental advocacy group; thus, third parties have been represented in those proceedings.

## CONCLUSION

For all of these reasons, Georgia Power respectfully requests that this Court stay all discovery in this action pending a decision by the Eleventh Circuit Court of Appeals in *Tennessee Valley Authority, et al. v. United States Environmental Protection Agency, et al.*, and grant such other relief to which Georgia Power Company may be entitled.

This _____ day of April, 2001.

Respectfully submitted,

TROUTMAN SANDERS LLP

DANIEL S. REINHARDT
Georgia Bar No. 600350
MARGARET C. CAMPBELL
Georgia Bar. No. 126340
MARSHALL B. DUKES
Georgia Bar No. 232510

5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
Telephone: (404) 885-3000
Telecopy: (404) 885-3995

4

Copies served
By Courtroom Deputy

# UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF GEORGIA
#### 2167 UNITED STATES COURTHOUSE
#### 75 SPRING STREET, S.W.
#### ATLANTA, GEORGIA 30303

CHAMBERS OF
**JULIE E. CARNES**
JUDGE

April 25, 2001

TO ALL COUNSEL

    RE:  USA v. GEORGIA POWER COMPANY
           1:99-CV-2859-JEC

Dear Counsel:

The Court received April 24, 2001, and **DECLINES** to approve the proposed Order to correspond with the schedule established in the Northern District of Alabama. Although the Alabama action is newly filed, this action was filed November 3, 1999 and is approaching the two year mark. Under the Civil Justice Reform Act, the Court is expected to dispose of all litigation within three years of its filing. The Court wishes to either administratively terminate the action, with the plaintiff's right to reopen following a disposition by the Eleventh Circuit of the current appeal, or proceed forward to final disposition as promptly as possible. The Court strongly suggests the former.

The parties should comply with the March 27, 2001 Order [64] and plaintiff shall respond to the pending Motion To Stay Discovery immediately.

Sincerely,

Kay Bates
Court Deputy
404/215-1514

cc:  ALL COUNSEL

5

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

APR 2 7 2001

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

GEORGIA POWER COMPANY,

      Defendant.

Civil Action No.
1:99-CV-2859-JEC

Judge Julie E. Carnes

## RESPONSE OF PLAINTIFF UNITED STATES
## TO DEFENDANT'S MOTION TO STAY DISCOVERY

Plaintiff, the United States of America ("United States")
hereby submits this response to the motion of Defendant Georgia
Power Company ("Georgia Power") to stay discovery pending a
decision from the United States Court of Appeals for the Eleventh
Circuit in *Alabama Power Company, et al. v. United States
Environmental Protection Agency, et al.*, a case involving an
appeal of administrative actions taken by the United States
Environmental Protection Agency ("EPA") with respect to the
Tennessee Valley Authority (hereinafter, "the *TVA* case" or
"*TVA*").

As set forth below, the United States disagrees that the
requested stay is warranted based on a weighing of the public
interest in avoiding a potentially lengthy delay of this
important litigation, and the substantial uncertainty either that
the Eleventh Circuit's ruling in *TVA* will be issued soon, or that
it will address the merits of the substantive legal issues

present in this case.

However, the United States agrees that a modest stay is appropriate pending action by the Judicial Panel on Multidistrict Litigation ("MDL Panel"), to which the United States will shortly move to consolidate pretrial proceedings in this and related cases.  The United States is confident that such a stay will not prejudice the ability of the parties and the Court to reach a disposition of the case within three years of its filing, consistently with the Civil Justice Reform Act and the concerns expressed by the Court in its April 25, 2001 letter to counsel. Indeed, the United States believes that a decision by the MDL Panel to grant the requested consolidation will enhance the prospects for orderly and prompt disposition of both this and the similar actions that would be subject to coordinated pretrial proceedings.

In addition, the United States is agreeable to the preference expressed by the Court in its April 25, 2001 letter to counsel as to the mechanism for a stay, so long as it is tied to a ruling by *either* the Eleventh Circuit in the *TVA* case or by the MDL panel, *whichever is sooner*.

## BACKGROUND

The Instant Action.[1]  The United States filed this action on

---

[1]     The background of this action is substantially recounted in this Court's March 27, 2001 Order ruling on Plaintiff's motion for leave to file an amended complaint and on the motions of several citizens groups for leave to intervene as plaintiffs.

2

November 3, 1999 against Alabama Power Company ("Alabama Power"),
Georgia Power, and Southern Company Services Inc. ("SCS"), all
subsidiaries of the Southern Company, alleging that all three
defendants violated the Clean Air Act.  On March 31, 2000, the
United States moved to amend the complaint, seeking to add
further counts against the original defendants, and to add
similar claims against three additional Southern Company
subsidiaries -- Gulf Power Company ("Gulf Power"), Mississippi
Power Company ("Mississippi Power"), and Savannah Electric and
Power Company ("Savannah Power").

Based on the pendency of the United States' motion to amend,
as well as the pendency of motions that had been filed by SCS (to
dismiss), by Alabama Power (to dismiss or transfer), and by
several citizens' groups (to intervene as plaintiffs), on May 16,
2000, the Court accepted the proposal by the United States and
Georgia Power to stay formal discovery pending the Court's ruling
on these motions.  On August 1, 2000, the Court granted the
motions to dismiss as to Alabama Power (for lack of personal
jurisdiction) and as to SCS (for failure to state a claim).  On
March 27, 2001, the Court partially granted the United States'
motion for leave to amend the complaint (instructing the United
States to file a new amended complaint in which it could amend
its claims against Georgia Power and bring new claims against
Savannah Power), denied the motion as to Gulf Power and
Mississippi Power (based on the same jurisdictional reasoning the
Court articulated in its ruling of August 1, 2000 as to Alabama

3

Power).[2]  On April 13, 2001, Georgia Power filed the instant
motion to stay discovery.

The Northern District of Alabama Case.  On January 12, 2001,
the United States re-filed in the United States District Court
for the Northern District of Alabama its claims against Alabama
Power.  On March 20, 2001, Alabama Power filed its answer and
counterclaims, and moved that court to stay discovery pending a
ruling by the Eleventh Circuit in TVA (a motion substantially
similar to the instant motion filed by Georgia Power in this
Court on April 13, 2001).  On April 11, 2001, the Northern
District of Alabama established a briefing schedule and a date
for oral argument (June 7, 2001) for Alabama Power's stay motion.

The TVA Case.  The TVA case arises out of administrative
actions taken by EPA with respect to its sister federal agency,
the Tennessee Valley Authority (TVA).  In May 2000, TVA and
several private entities, including several private power
companies, filed a total of six petitions for review in the
Eleventh Circuit challenging a Clean Air Act administrative
compliance order EPA issued to TVA as well as EPA's decision to
grant TVA's request that EPA reconsider that order.  Georgia
Power was subsequently allowed to intervene in those petitions.
In November 2000, four additional petitions for review were filed

---

[2]        The Court's March 27, 2001 Order also granted, with
restrictions, motions for leave to intervene as plaintiffs filed
on or about March 14, 2000 by Physicians for Social
Responsibility, Campaign for a Prosperous Georgia, U.S. Public
Interest Research Group, and Alabama Environmental Council.

in the Eleventh Circuit (again by TVA and several private
entities, including Georgia Power) challenging the decision of
EPA's Environmental Appeals Board upon reconsideration of the
administrative compliance order.  All ten petitions were later
consolidated by the Eleventh Circuit under lead docket No. 00-
12310-E.  Briefing on these petitions was completed on March 5,
2000.  No date has yet been set for oral argument.


<u>ARGUMENT</u>

I.   THE STAY REQUESTED BY GEORGIA POWER POSES TOO GREAT A
     RISK THAT THE PUBLIC INTEREST WILL BE COMPROMISED
     WITHOUT SUFFICIENT CERTAINTY THAT THE STAY WILL PRODUCE
     <u>THE BENEFITS THAT GEORGIA POWER PREDICTS</u>

     Plaintiff recognizes that the decision whether to stay
proceedings rests within the sound discretion of the district
court.  The authority to stay proceedings inheres in the court's
responsibility to control its docket in the interests of judicial
economy, efficiency, and fairness.  *Landis v. North American Co.*,
299 U.S. 248, 254 (1936).  However, a review of precedents -
including those cited by Georgia Power in support of its stay
motion - demonstrates that a court should avoid staying
proceedings where the potential gain in economy and efficiency is
too insubstantial, or too speculative, in relation to the costs
imposed on other parties or the public.  In short, we believe the
cases in which stays were justified to await a ruling in a
parallel case are distinguishable for three reasons:  First,
those cases did not involve a substantial public interest that

5

might be affected by the delay in the litigation.  Second, those

cases involved stays of moderate, usually known, duration.

Third, those cases involved a parallel proceeding in which there

was little question that a ruling would occur that would

substantially affect the litigation in which the stay was sought.

A.   In Determining the Appropriateness of a
     Requested Stay, Courts Generally Apply a
     Balancing Test That Weighs the Public
     Interest -- Which Here Weighs Against a
     Lengthy Stay -- in Addition to Other Factors

As Georgia Power recognizes (Georgia Power Brief at 11-12),

courts generally consider a number of factors in deciding whether

to grant a stay, including the interests, burdens, and potential

prejudice to the private litigants, the interests of the courts,

and the public interest.  *See*, *e.g.*, *Home Ins. Co. v. Coastal

Lumber* Co., 575 F. Supp. 1081 (N.D. Ga. 1983); *In re: Literary

Works*, 2001 WL 204212, at *2 (S.D.N.Y. March 1, 2001).  A stay

should be based on a balancing of interests in which the movant

bears the burden of showing a clear case of hardship or inequity

of going forward, and the absence of harm to others.  *Dunn v. Air

Line Pilots Ass'n*, 836 F. Supp. 1574, 1584 (S.D. Fla. 1993).

Some courts characterize a stay as extraordinary relief, to be

granted upon a showing by the movant of "something close to

necessity."  *See*, *e.g.*, *Coastal (Bermuda) Ltd. v. E.W. Saybolt &

Co., Inc.*, 761 F.2d 198, 203 n.6 (5th Cir. 1985).

Many of the cases in which courts have granted stay

requests, including cases cited by Georgia Power, involved

6

private financial disputes between parties.  Such cases did not
involve a party suing to abate alleged violations of law that, if
abated, would reduce alleged harm to public health and
significant natural resources.  Here, by contrast, the United
States, on behalf of EPA, acting in its sovereign capacity to
enforce laws and regulations designed to protect public health
and the environment, is seeking relief in which there is a direct
and substantial public interest.  That interest should be
considered in the balancing a court appropriately performs in
considering a requested stay.

Georgia Power addresses the public interest in its brief,
contending that the public would not suffer "any significant
harm" were this case to be stayed until the 11th Circuit rules in
*TVA*.  Georgia Power Brief at 16.  Yet in support of this
remarkable assertion, Georgia Power states that its coal-fired
plants emit "far fewer pollutants per unit of energy produced
than they did twenty years ago," without recognizing the relevant
point:  Plaintiff's claim that Georgia Power has emitted and
continues to emit far more pollutants -- hundreds of tons per
year -- than the Clean Air Act allows.[3]

---

[3]    Indeed, at numerous points in its brief, Georgia Power
argues the merits of this case or otherwise characterizes the
ultimate issues of law and fact to be determined in this action.
While the United States disagrees strongly with the fairness and
accuracy of many of those arguments and characterizations, we
recognize that they are not relevant to the disposition of the
instant motion, and we therefore do not address them herein.

B.   Courts Should Be Reluctant to Stay
     Proceedings Without Reasonable Certainty That
     a Decision in a Parallel Case Will Soon Be
     Issued and Will Address the Relevant
     Substantive Legal Issues

The United States recognizes that, in some instances, the
presence in one proceeding of a legal issue that is to be
determined in a parallel proceeding (particularly an appellate
court) has been found to warrant the grant of a stay pending a
ruling in the parallel forum.  *See* Georgia Power Brief at 8-10.
Yet an examination of these decisions reveals another important
factual distinction from the case at bar:  these cases generally
involved a greater certainty as to the brief duration of the
requested stay to await decision in a parallel proceeding, and
assurance that the decision, when made in the parallel forum,
would be likely to affect the disposition of the case in which
the stay was sought.

For example, In *Leyva v. Certified Grocers of Cal., Ltd.*,
593 F.2d 857, 864 (9th Cir. 1979), the court of appeals remanded
to the district court to determine whether to stay pending
decision in a parallel arbitration, cautioning that "a stay
should not be granted unless it appears *likely* the other
proceedings will be concluded *within a reasonable time* in
relation to the urgency of the claims presented to the court."
593 F.2d at 864 (*emphasis added*).  In *Marshel v. AFW Fabric
Corp.*, 552 F.2d 471, 472 (2d Cir. 1977) (*per curiam*), the court
of appeals remanded to the district court with instructions to

8

await a decision by the United States Supreme Court -- in a case in which oral argument had already been heard -- that would "in all likelihood" determine the liability issue in the district court case.  552 F.2d at 472.

Similarly, in *Goldstein v. Time Warner New York City Cable Group*, 3 F. Supp. 2d 423, 439 (S.D.N.Y. 1998), oral argument in the parallel appellate case had already been held six weeks prior to the district court's grant of a stay, and the district court found that resolution of the appellate case "should guide this Court in ruling on one of the key issues in this litigation." 3 F. Supp. 2d at 438-39.  In *In re: Literary Works*, *supra*, the court agreed to stay "within the bounds of moderation" pending a ruling by the Supreme Court in a case in which oral argument by the Supreme Court had already been scheduled to be held that same month, and all parties anticipated a decision before the end of the Supreme Court's term just three months hence.  Moreover, the district court concluded that while the Supreme Court decision "may not settle every question of fact and law before this Court ... in all likelihood it will settle many and simplify them all." (*internal quotation marks and citations omitted*).  2001 WL 204212 at *3.  And in *Marbury v. Colonial Mortgage Co.*, 2001 WL 135719, at *9 (M.D. Ala. Jan 12, 2001), the court stayed an action pending a ruling by the Eleventh Circuit where oral argument had already been scheduled to occur in less than two weeks, and where the court found that the Eleventh Circuit's decisions "should

provide guidance as to the legal test to apply" in the case
before it.  *Id.*[4]

In contrast to the authorities cited by Georgia Power, here
there is a substantial possibility that:  1) the Eleventh Circuit
will not soon rule on the *TVA* petitions for review; 2) the
Eleventh Circuit will dismiss the pending petitions for review
for lack of subject matter jurisdiction; or 3) if the Eleventh
Circuit reaches the merits of the petitioners' claims, it will
decide the case without reaching any (let alone most) of the
substantive legal issues at stake in the instant case.

Georgia Power correctly notes that the *TVA* petitions for
review have now been fully briefed to the Eleventh Circuit, and
Georgia Power "anticipates that the Eleventh Circuit will set a
date for oral argument in the near future."  Georgia Power Brief
at 7.  However, at this juncture, with no date having yet been
set for oral argument, and considering the heavy workload of the
Eleventh Circuit, there is simply no way to estimate when the
Eleventh Circuit will hear oral argument, let alone render a

---

[4]    While it is unclear on the face of the opinion how far
the parallel proceedings had advanced in the appellate court in
*KK Motors, Inc. v. Brunswick Corp.*, 1999 WL 246808, at *2 (D.
Minn. Feb. 23, 1999), in that case the district court granted a
stay, based on its conclusion that the appellate court's ultimate
ruling "will very likely narrow the issues in the pending case[ ]
and assist in the determination of questions of law involved."
*Id.* (*internal quotation marks and citations omitted*).  *But cf.*
*Stabler v. McCullough*, 882 F. Supp. 1524, 1527-28 (E.D. Pa. 1995)
(in private class action regarding employee profit sharing plan,
court granted Fed. R. Civ. P. 54(b) motion as to one party
(Killian) and stayed remainder of action pending resolution of
Killian's appeal to court of appeals).

decision in these complex petitions for review.  Thus, Georgia

Power cannot reasonably speculate whether the requested stay will

be moderate or lengthy in duration.

Georgia Power also asserts that a decision by the Eleventh

Circuit in TVA "will in all likelihood greatly influence the

course and outcome of this case."  Georgia Power Brief at 10.

Elsewhere, Georgia Power predicts that the Eleventh Circuit's

decision "will likely reduce or eliminate many of the discovery

disputes which are likely to occur in this case and which would

consume a significant amount of this Court's time and attention."

Georgia Power Brief at 15.  What Georgia Power overlooks in these

confident gazes into its crystal ball, however, is the very

substantial possibility that the Eleventh Circuit will not rule

*at all* on the Clean Air Act issues that are present in the

instant action.

The United States has argued to the Eleventh Circuit that

all of the TVA petitions for review should be dismissed *inter*

*alia* because: the federal courts have no jurisdiction to resolve

a dispute between federal agencies (in this case, between EPA and

its sister federal agency, TVA); TVA has not availed itself of

the mandatory inter-agency dispute resolution processes mandated

by Executive Orders and, therefore, the case is not ripe for

judicial review; TVA does not possess independent litigating

authority; and because the private petitioners (including Georgia

Power and Alabama Power) all lack standing to challenge EPA's

11

actions directed to TVA.  The United States has also argued, with
respect to the petitions for review challenging the
administrative compliance order issued to TVA by EPA, that the
administrative compliance order is not final agency action
subject to judicial review and that Congress has barred pre-
enforcement review of such administrative compliance orders
issued under the Clean Air Act.

Although the United States believes its jurisdictional
arguments are correct, even if the Eleventh Circuit reaches the
merits of the petitions for review, there are numerous ways that
it could decide those cases without addressing the central legal
questions at issue in this case as Georgia Power claims.  For
instance, the petitioners in the *TVA* case have challenged several
procedural aspects of the actions that EPA has taken with respect
to TVA as well as the sufficiency of the factual information
underlying EPA's emissions analysis.  While the United States
believes EPA's actions will be sustained with respect to both
issues, the Eleventh Circuit could nevertheless decide to remand
EPA's actions with respect to TVA - thus disposing of the case -
without even addressing the substantive legal issues.

Without hazarding a prediction as to how or when the
Eleventh Circuit will rule, the United States believes this Court
should properly conclude that the existence of significant
uncertainty as to the timing of such a ruling, and the existence
of so many bases on which the Eleventh Circuit may decline to
address the substantive Clean Air Act issues present in this

12

case, distinguishes the instant stay request from the several
cases in which a stay was granted based on a clear likelihood of
a prompt ruling on one or more central legal issues.

## II.   A MODEST STAY OF DISCOVERY PENDING ACTION BY THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION IS WARRANTED

This action is one of eight cases pending in U.S. District
Courts that have been filed by the United States, on behalf of
EPA, alleging violations of the Clean Air Act at 34 coal-fired
power plants located in the mid-western and south-eastern parts
of the United States.  The United States seeks, among other
things, to require these plants to install pollution controls and
otherwise to comply with the Clean Air Act.[5]

In all these actions, the United States, as well as several
States and citizen groups who are co-plaintiffs in three of the

---

[5]     Besides the instant action, the cases are:  *United
States v. Alabama Power Co.* (N.D. Ala., Civil Action No. CV-01-B-
0152-S (the re-filing of the United States' case against Alabama
Power  initially brought in the instant action); *United States v.
Illinois Power Co., et al.,* (S.D. Ill., Civil Action No.
99-833-MJR); *United States v. Southern Indiana Gas & Electric Co.*
("*SIGECO*"))(S.D. Ind., Civil Action No. IP99-1692 C-M/S); *United
States and State of New York, et al. v. American Electric Power
Service Corp., et al.* ("*AEP*") (S.D. Ohio, Civil Action No.
C2-99-1182), consolidated with *Ohio Citizen Action, et al. v.
American Electric Power Service Corp., et al.* (S.D. Ohio, Civil
Action No. C2-99-1250); *United States and State of New York, et
al. v. Ohio Edison Co., et al.* (S.D. Ohio, Civil Action No.
C2-99-1181); *United States v. Cinergy Corp., et al.* (S.D. Ind.,
Civil Action No. IP99-1693 C-M/S); and *United States v. Duke
Energy Corp.* (M.D.N.C., Civil Action No. 1:00 CV 1262).

cases (*U.S. and State of New York et al. v. AEP et al, U.S. and State of New York et al. v. Ohio Edison et al.* and *United States v. Georgia Power*), allege that the defendant electric-power generating companies have failed to obtain permits and install pollution controls that were required by the Clean Air Act when these plants underwent major modifications.  As a result, plaintiffs allege, the power plants operated by these companies have emitted and continue to emit excessive amounts of the pollutants sulfur dioxide, nitrogen oxides and particulates into the air, resulting in serious adverse consequences to human health and the environment over a wide, multi-state area downwind of the plants.  The United States, as well as the States and citizen groups, seek to require these plants to install pollution controls and otherwise to comply with the Clean Air Act.

Defendants have raised the same or similar defenses in all the cases, notably the common defense of alleged "lack of fair notice" of EPA`s interpretation of applicable Clean Air Act regulations.  To support these defenses, the defendants in the cases that have proceeded to discovery ("the Active Cases") have sought a virtually identical and extremely broad production of documents from the United States, consisting of all documents in any way referring to the Clean Air Act provisions and regulations that are applicable to these cases.

Our experience to date in the Active Cases has demonstrated to us that the coordination of document and deposition discovery

14

against the United States is urgently needed to prevent
duplication of discovery, unnecessary burdens on the courts and
the parties, inconvenience to witnesses, and delay in the
completion of discovery and resolution of the cases before the
Courts.  The absence of such coordination has thus far resulted
in multiple discovery disputes involving the same or similar
issues that have been dealt with in varying fashion by the
courts, as well as the prospect of multiple depositions of the
same individuals on the same issues.

The United States has initiated discussions with counsel for
defendants in the cases that have not yet proceeded to discovery,
such as the instant case, *United States v. Alabama Power*, and
*United States v. Duke Energy Corp.* about how we can learn from -
and avoid in these cases - the waste and inefficiency that the
lack of coordination has caused in the Active Cases.  The United
States has concluded that, at least as to the instant case,
*Alabama Power*, and any other case that might be filed against
other companies within the Southern Company family, it would be
appropriate to seek consolidation by the MDL Panel in an effort
to seek the most orderly, efficient, and expeditious resolution
of these related cases.

The United States plans to move promptly -- no later than
May 10, 2001 -- to the MDL Panel to consolidate pretrial
proceedings in the instant case and in one or more related
lawsuits, including *United States v. Alabama Power*.  The motion

15

will be made pursuant to 28 U.S.C. § 1407(a), which provides that
when "civil actions involving one or more common questions of
fact are pending in different districts, such actions may be
transferred to any district for coordinated or consolidated
pretrial proceedings."  Our research indicates that the MDL Panel
bases its transfer decisions upon the convenience of the parties
and witnesses and, most particularly, upon whether transfer will
promote justice and judicial economy (e.g., by eliminating
duplicative discovery, preventing inconsistent pretrial rulings,
and conserving the resources of the parties, their counsel, and
the judiciary).

We believe that we can expect a decision by the MDL Panel
within three to four months, if not sooner.  We understand that
twenty days after the MDL Clerk's office determines that the
motion has been properly filed, counsel are required to file a
notice of appearance.  The opposing parties may file an
opposition.  The MDL Panel then schedules a hearing and decides
whether to transfer the cases, and if so, to what district.   The
parties may suggest a particular transferee district which the
MDL Panel may honor, or the MDL Panel may select a court of its
own choosing which potentially could be a court in which none of
the actions are currently pending.  The MDL Panel meets bi-
monthly to hold hearings on requested transfers.

A modest stay of proceedings in this action pending decision
by the MDL Panel thus may potentially produce significant
benefits to the parties and to judicial economy.  *See Pepsi-Cola*

16

*Bottling Co. of Olean v. Cargill*, 1995 WL 783610, at *4-5

(D. Minn. 1995) (recommending deferral of action on class

certification motion until the MDL Panel decided a pending Motion

to consolidate several related causes of action in other

jurisdictions); *see also*, *Rivers v. Walt Disney Co.*, 980 F. Supp.

1358, 1362 (C.D. Cal.1997) (staying ostensible class action "in

its entirety" pending outcome of motion to consolidate before MDL

Panel); *KK Motors, Inc. v. Brunswick Corp.*, *supra*, 1999 WL

246808, at *4 (distinguishing case at bar from those in which

stay was warranted pending ruling by MDL panel).

Such a stay also would be of sufficiently brief duration

that it prejudice neither the public interest nor the other

parties.  In this case (as in *United States v. Alabama Power*),

defendants are already seeking a stay, albeit a potentially

longer stay until the Eleventh Circuit rules in *TVA*.  If it

develops that the Eleventh Circuit rules promptly and on the

merits in *TVA*, a stay until the MDL Panel rules may provide

defendants with substantially the same relief they seek through

their stay motions.  But if the Eleventh Circuit decision is not

forthcoming in the near term, or if the Eleventh Circuit does not

address the merits, a stay only until the MDL Panel rules will

avoid the prejudice to plaintiffs and the public interest that a

potentially longer stay pending the disposition of the *TVA* case

17

might entail.[6]

The United States is cognizant of the timing concerns and this Court's strong preference as to the mechanism to which it suggests the parties' consent in order to effectuate a stay, as expressed in its April 25, 2001 letter to counsel. The United States is confident that, even if the MDL Panel were to deny consolidation and transfer, the grant of a stay pending a ruling by the MDL panel will not prejudice the ability of the parties and the Court to reach a disposition of this case within three years of its filing (i.e., by November 2002), consistently with the Civil Justice Reform Act.[7] At the same time, we believe it is well worth seeking such consolidation and transfer by the MDL Panel to enhance the possibility of orderly and prompt disposition of both this and the similar actions that would be

---

[6]     Consolidation and transfer by the MDL Panel may also avoid the potential anomaly of this Court and the Northern District of Alabama reaching inconsistent decisions as to whether a stay to await the ruling of the Eleventh Circuit in *TVA* is appropriate.

[7]     In this regard, we note that a stay may be granted that would allow limited discovery to go forward without any undue burden on the parties or the Court. At this Court's urging, the United States and Georgia Power discussed just such a way for progress to occur while the previous discovery stay in this action was in effect, and the parties agreed that mutual responses to discovery requests should be provided within two weeks after the Court ruled on the then-pending motions (now resolved by the Court's March 27, 2001 ruling). However, Georgia Power moved to stay all discovery after the Court issued its March 27 ruling. The United States stands ready to produce its documents if Georgia Power will do the same, even if the Court otherwise deems it appropriate to stay proceedings. Such limited discovery would lessen the chances that a stay will compromise the timing for ultimate disposition of this action.

subject to coordinated pretrial proceedings.

Accordingly, the United States is agreeable to the mechanism suggested by the Court in its April 25, 2001 letter to counsel, with the caveat that our consent is for the period until a ruling *either* by the Eleventh Circuit in *TVA* (the Court's suggestion) or decision by the MDL Panel on the United States' motion for consolidation of pretrial proceedings, *whichever is sooner*.

<u>CONCLUSION</u>

For the foregoing reasons, the United States opposes Georgia Power's motion to stay discovery until the Eleventh Circuit rules, but agrees that a stay of modest duration, pending ruling by the MDL Panel on the motion the United States will promptly make to consolidate pretrial proceedings in this and related actions, is warranted.

Respectfully Submitted,

JOHN C. CRUDEN
Acting Assistant Attorney General
Environment and Natural Resources
 Division


_Jon A. Mueller (by s.c.)_
JON A. MUELLER
Senior Attorney
SONJA L. PETERSEN
DAVID ROSSKAM
Trial Attorneys
Environmental Enforcement Section
Environment and Natural Resources
 Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 514-3974

19

RICHARD H. DEANE, JR.
United States Attorney
Northern District of Georgia


DANIEL A. CALDWELL
Assistant U.S. Attorney
Georgia Bar No. 102510
1800 U. S. Courthouse
75 Spring Street, S.W.
Atlanta, Georgia 30303
(404) 581-6224

CERTIFICATE OF SERVICE

I hereby certify that on this date the foregoing Response of Plaintiff United States to Defendant's Motion to Stay Discovery was served by mailing a true copy thereof by first class mail, with adequate postage affixed thereto, and by facsimile transmission, addressed to:

Daniel S. Reinhardt
Margaret C. Campbell
Marshall B. Dukes
Troutman Sanders LLP
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2216

and by mailing true copies thereof by first class mail, with adequate postage affixed thereto, addressed to:

Jeffrey M. Gleason
Southern Environmental Law Center
201 West Main Street
Suite 14
Charlottesville, Virginia 22902

S. Wesley Woolf
Southern Environmental Law Center
127 Peachtree Street
Suite 605
Atlanta, Georgia 30303-1800


This 27th day of April, 2001

_____
DANIEL A. CALDWELL
ASSISTANT U.S. ATTORNEY